**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

IMPRIMISRX, LLC,

Plaintiff,

v.

OSRX, INC.; OCULAR SCIENCE, INC.,

Defendants.

Case No. 21-cv-01305-BAS-DDL

**ORDER:**
**(1) DENYING DEFENDANTS'**
**MOTION TO EXCLUDE EXPERT**
**TESTIMONY (ECF No. 166);**

**AND**

**(2) DENYING PLAINTIFF'S**
**MOTION TO EXCLUDE EXPERT**
**TESTIMONY (ECF No. 174)**

Before the Court are two *Daubert* motions by the parties to exclude expert testimony. (ECF Nos. 166, 174.)  Defendants OSRX, Inc. and Ocular Science, Inc. filed a *Daubert* motion to exclude Plaintiff's four proposed experts Mark Keegan, Sarah Butler, Dr. Kenneth Schell, and Dr. Robert Wunderlich. (ECF No. 166.)  Plaintiff ImprimisRx, LLC filed a *Daubert* motion to exclude the testimony of Defendants' expert Dr. Alyson Wooten. (ECF Nos. 174.)  For the following reasons, the Court **DENIES** the parties' motions.

- 1 -

21cv1305

## BACKGROUND

On July 20, 2021, Plaintiff commenced this action and filed a Complaint alleging false advertising, trademark infringement, false designation of origin, common law unfair competition, copyright infringement, and violation of California's Unfair Competition Law.  (ECF No. 1.)  The parties are compounding pharmacies that focus on medications used in optometry and ophthalmology.  (ECF No. 145.)  At the center of this dispute, Plaintiff claims Defendants are in violation of the Lanham Act, 15 U.S.C. § 1125(a), by falsely advertising they are in compliance with Section 503A of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 353a, and by infringing on Plaintiff's trademarks.  (ECF No. 145.)

In support of its claims, Plaintiff has designated two survey experts, a pharmacology operations expert, and a damages expert to testify at trial.  Defendants move to exclude their testimony.  (ECF No. 166-1.)  Plaintiff designated Mark Keegan as a survey expert to opine on the extent to which Plaintiff's trademarks have obtained secondary meaning among optometrists and ophthalmologists.  (ECF No. 166-2 at 11.)  Defendants move to exclude Keegan's testimony arguing Keegan's analysis is unreliable for failing to use a control group for his survey and not considering whether the marks at issue were generic.  (ECF No. 166-1.)

Second, Plaintiff designated Sarah Butler as a survey expert to opine on the extent to which advertising claims about Section 503A regulatory compliance is important to prescribers in their purchasing decisions.  (ECF No. 166-2 at 205–06.)  Defendants move to exclude Butler's testimony contending the control group she used was inadequate for the survey and the results are sufficiently illogical such that her analysis is unreliable.  (ECF No. 166-1.)  Defendants further argue her survey failed to use Defendants' actual advertising statements rendering it unreliable and irrelevant to the trier of fact.  (*Id.*)

Third, Plaintiff designated Dr. Kenneth Schell as an expert on pharmacology and pharmacy operations.  Schell is offered to opine on what regulations apply to Section 503A compounding pharmacies and whether Defendants comply with those regulations.

(ECF No. 166-2 at 440–41.)  Defendants move to exclude Schell's testimony arguing he is not qualified to provide opinion on regulatory compliance, his analysis is unreliable because he failed to review necessary materials, and his opinion improperly weighs in on the ultimate legal issues reserved for the trier of fact.  (ECF No. 166-1.)

Finally, Plaintiff designated Dr. Robert Wunderlich as a damages expert to opine on Plaintiff's alleged lost profits and Defendants' alleged unjustly earned profits.  (ECF No. 165 at 5.)  Defendants move to exclude Wunderlich's testimony by advancing his model is unreliable because it uses an arbitrary start date and does not properly model competition in the compounding pharmacies market.  (ECF No. 166-1.)  Defendants also argue his testimony would not be useful to the trier of fact.  (*Id.*)

To rebut Plaintiff's regulatory compliance expert testimony, Defendants designated Dr. Alyson Wooten as a regulatory compliance expert to provide opinions on the opinions offered by Schell and Defendants' compliance with Section 503A.  (ECF No. 173-1 at 37.)  Plaintiff moves to exclude her testimony arguing she is not qualified to sample Defendants' prescription data, her sampling methodology is unreliable, and her opinions would not be relevant or useful to the trier of fact.  (ECF No. 173.)

## ANALYSIS

### I.    Legal Standard

Federal Rule of Evidence 702 establishes several requirements for the admissibility of expert opinion evidence: (1) the witness must be sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge must "assist the trier of fact" either "to understand the evidence" or "to determine a fact in issue"; (3) the testimony must be "based on sufficient facts and data"; (4) the testimony must be "the product of reliable principles and methods"; and (5) the expert must reliably apply the principles and methods to the facts of the case.  Fed. R. Evid. 702.

Under *Daubert* and its progeny, the trial court is tasked with assuring that expert testimony "both rests on a reliable foundation and is relevant to the task at hand."

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) ("Daubert I").  "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.  And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation omitted).  Shaky but admissible evidence is to be attacked by cross-examination, contrary evidence, and careful instruction on the burden of proof, not exclusion.  *Daubert I*, 509 U.S. at 596.  The judge is "to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).  In its role as gatekeeper, the trial court "is not tasked with deciding whether the expert is right or wrong, just whether his [or her] testimony has substance such that it would be helpful to a jury."  Id. at 969–70.

The tests for admissibility in general, and reliability in particular, are flexible.  *Primiano*, 598 F.3d at 564.  The Supreme Court has provided several factors to determine reliability: (1) whether a theory or technique is testable; (2) whether it has been published in peer-reviewed literature; (3) the error rate of the theory or technique; and (4) whether it has been generally accepted in the relevant scientific community.  *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1064 (9th Cir. 2002) (summarizing *Daubert I*, 509 U.S. at 592–94), *overruled on other grounds by Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 460 (9th Cir. 2014).  These factors are meant to be "helpful, not definitive." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999).  The court "has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Primiano*, 598 F.3d at 564 (citations omitted).  "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his [or her] methodology." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("Daubert II").  Once the threshold established by Rule 702 is met, the expert may testify and the fact finder decides how much weight to give that testimony. *Primiano*,

598 F.3d at 565.

After admissibility is established to the court's satisfaction, attacks aimed at the weight of the evidence are the province of the fact finder, not the judge. *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014). The court should not make credibility determinations that are reserved for the jury. *Id.*

## II. Defendants' Motion to Exclude Plaintiff's Proposed Experts

### A. The Proposed Survey Expert – Keegan

Plaintiff designated Keegan as a survey expert and asked to opine on the extent to which Plaintiff's trademarks have acquired secondary meaning for ophthalmologists and optometrists. (ECF No. 166-2 at 11.) In support of his opinion, Keegan conducted a survey of ophthalmologists and optometrists to assess whether respondents believed Plaintiff's products and Defendants' products came from the same source. (*Id.*) Defendants move to exclude Keegan's testimony arguing his failure to use a control group and failure to evaluate whether the marks are generic rendered his methodology unreliable under *Daubert*. (ECF No. 166-1.) Finding Keegan has sufficient qualifications to provide an expert opinion on survey evidence, the Court considers Defendants' arguments for excluding his testimony.

#### 1. Control Group

Defendants contend because Keegan did not use a control group, his expert report does not measure the secondary meaning for the marks at issue. (ECF No. 166-1 at 14–17.) Defendants argue conducting a survey without a control group makes it sufficiently unreliable for exclusion under Rule 702 because such a survey fails to control for noise or potential error rate. (*Id.* at 14–15.) Defendants further advance that if Keegan had used a control group, the survey would have shown the marks lack secondary meaning. (*Id.* at 16–17.)

The Ninth Circuit has, in general, a capacious standard for admitting survey evidence. Survey evidence should be admitted "as long as [it is] conducted according to accepted principles and [is] relevant." *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th

Cir. 1997).  The Ninth Circuit has previously held that "technical inadequacies" in survey evidence "including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988). *See also Wendt*, 125 F.3d at 814.  In assessing a survey, courts must answer whether the survey is "relevant and conducted according to accepted principles" where any "follow-on issues" of survey design, reliability, and takeaways go to the weight of the survey rather than its admissibility. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001).  *See also Wendt*, 125 F.3d at 814; *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 (9th Cir. 1997).

The Ninth Circuit does not provide strong guidelines to assess whether a flaw in a survey means it was not conducted according to accepted principles or whether the flaw goes to the survey's design or methodology.  On the one hand, use of a control group is generally a standard practice when conducting a survey to test a causal proposition.  *See* Shari Seidman Diamond, *Reference Guide on Survey Research*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 359, 397 (2011).  On the other hand, the Court is mindful of its role as a gatekeeper of unscientific evidence and not as an appraiser of the success of an expert's methodology.   "A survey need not be perfectly conducted for testimony concerning its results to be admissible.  So long as the expert's testimony and the underlying survey have probative value after all the survey's deficiencies are taken into account, testimony concerning the results of the survey that meets the basic requirements of usefulness and reliability is admissible into evidence, and the trier of fact may accord it the weight it deems proper." 4 Jack B. Weinstein and Margaret A. Berger, *Weinstein's Federal Evidence* § 702.06 (2d ed. 1997).

Ninth Circuit case law suggests failing to use a control group goes to a survey's methodology, and therefore its weight as evidence, rather than the survey's admissibility. *See Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1172 (9th Cir. 2007) (characterizing a "failure to utilize a control group" as a "methodology" subject to impeachment); *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1135 (C.D. Cal. 1998), *aff'd*, 296 F.3d

- 6 -

894 (9th Cir. 2002) (finding a lack of a control group goes to weight and not admissibility). Other courts have similarly found the lack of a control group is a technical inadequacy that goes to the weight, not the admissibility, of the expert's testimony. *See Cohen v. Trump*, No. 3:13-CV-2519-GPC-WVG, 2016 WL 4543481, at *4 (S.D. Cal. Aug. 29, 2016); *Geiger v. Creative Impact Inc.*, No. CV-18-01443-PHX-JAT, 2020 WL 3268675, at *3 (D. Ariz. June 17, 2020); *Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*, No. CV 13-2747-DMG AGRX, 2014 WL 5797541, at *9 (C.D. Cal. Oct. 7, 2014).

In prior cases where courts found survey evidence so flawed as to be inadmissible, the survey's methodology suffered from other flaws that also cast doubt on its reliability. *See In re NJOY, Inc. v. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1079 (C.D. Cal. 2015) (finding lack of a control group alone does not render a survey inadmissible and summarizing cases excluding expert testimony where other survey flaws were present); *Reinsdorf v. Skechers*, 922 F. Supp. 2d 866, 878 (C.D. Cal. 2013) (excluding a survey where that survey used an inappropriate survey population and used close-ended questions without an "I don't know option" in addition to lacking a control group); *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 459–66 (finding a survey inadmissible where it lacked a control group, used leading or suggestive questions, lacked a recognized methodology, did not cover the proper population, and did not replicate market conditions).

The Court does not find that the Keegan survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible.  Keegan surveys an appropriate population (ophthalmologists and optometrists as confirmed via a series of employment questions), uses a standard question format, provides a "don't know/have no opinion answer," excludes respondents who answer questions too quickly, randomizes the questions, and surveys an appropriate population size.  (ECF No. 166-2 at 14–19.)  All of these survey features are in line with standard survey practices.  *See generally* Shari Seidman Diamond, *Reference Guide on Survey Research*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 359 (2011).  Ultimately, the Court is persuaded the lack of a control

group goes to the persuasiveness of the survey's evidence and is not fatal to the survey's reliability.

### 2.      Whether the Marks Are Generic

Defendants further argue because Keegan failed to address whether the marks are generic his survey was improperly designed and his testimony should be excluded. (ECF No. 166-1 at 17–18.) Keegan offers "no opinion" as to whether the marks at issue are generic. (*Id.* at 17.)

Criticism of the scope and extent of an expert's opinion does not undercut the reliability of that opinion's methodology. There is not extensive case law to this point; however, some courts have found analyses that fail to obtain "certainty" or rule out all alternative theories are nevertheless admissible under *Daubert* because reliability does not require that an expert be able to exclude all alternative theories. *See, e.g.*, *McClellan v. I-Flow Corp.*, 710 F. Supp. 2d 1092, 1101 (D. Or. 2010); *Ambrosini v. Labarraque*, 101 F.3d 129, 135 (D.C. Cir. 1996) ("The dispositive question is whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue,' not whether the testimony satisfies the plaintiff's burden on the ultimate issue at trial.") (quoting *Daubert I*, 509 U.S. at 581). Here, Defendants argue Keegan failed to consider all other hypotheses or review other explanations, for example that the marks are generic, for the phenomena observed in his data. While Defendants can argue Keegan should have done more, it does not mean that what Keegan did was unreliable or irrelevant.

Further, Defendants' assertion that the marks obtained generic status per Keegan's data are a criticism of his interpretation of the results. The *Daubert* inquiry does not require a court to exclude an expert's opinion merely because the expert's interpretation of the evidence is disputed. *See, e.g.*, *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 ("'The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.'") (quoting *Alaksa Rent–A–Car*, 738 F.3d at 969); *Daubert II*, 43 F.3d at 1318 ("[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his

methodology."). Interpreting survey evidence for the genericism or secondary meaning of marks requires some subjectivity and experts often will disagree about the correct conclusion. The job of the trial court is not to decide whether one interpretation is correct; rather, the trial court is meant to ensure the expert's methods are not so unscientific that his testimony would not help or would mislead the jury.

Defendants' critiques go to the persuasiveness of Keegan's testimony and not its reliability under *Daubert I* and Rule 702. Accordingly, Defendants' motion to exclude Keegan's testimony is denied.

### B.   The Proposed Compliance Expert – Butler

Butler was designated by Plaintiff as a survey expert to opine on the extent to which a company's advertising claim that it operates in full compliance with Section 503A is important to prescribers in selecting a compounding pharmacy. (ECF No. 166-2 at 4.) In support of her opinion, Butler conducted a survey of ophthalmologists and optometrists who prescribe compounded medications. The survey asked open-ended and close-ended questions about the factors that influence their selection of a compounding pharmacy. (*Id.* at 5.) Defendants move to exclude her testimony arguing her analysis is unreliable because her survey control group was inadequate, her survey did not assess the particular advertising claims at issue in the dispute, and her results are illogical. (ECF No. 166-1 at 18–22.) Finding Butler sufficiently qualified to render her opinion in reviewing her qualifications, the Court considers Defendants' arguments for exclusion.

### 1.   Control Group

Defendants assert Butler did not include an adequate control group in her closed-response survey which makes the survey's results unreliable (ECF No. 166-1 at 20–21.) In her closed-response survey, Butler included a question asking whether it would be "important to [respondents] when selecting a compounding pharmacy" that the "Pharmacy is in compliance with local zoning requirements." (ECF No. 166-2 at 213–14.) Respondents that selected this question were removed from Butler's final estimates. (*Id.*

at 218.)  Defendants argue this question is an improper control for survey noise, which is unexplained variability within a data sample.

The question of whether a selected control adequately accounts for survey noise goes to the weight of the survey evidence rather than its admissibility.  As discussed above, failing to use a proper control group alone does not render survey evidence inadmissible. *See Perfumebay.com Inc.*, 506 F.3d at 1172; *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d at 1135.  The design of the control group is ultimately a criticism of the survey's methodology which goes to the weight of the survey evidence.  *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1037 (9th Cir. 2009) (noting that the design of how questions are asked and screening of a control group go to the survey's weight).

Butler's survey uses an otherwise standard methodology.  She surveys an appropriate population (ophthalmologists and optometrists who prescribe compounded medications), asks open-ended and close-ended questions, uses quality checks to ensure survey responses are reliable, pre-tests respondents for understanding, and provides "none of the above" and "don't know/unsure" responses for the close-ended survey.  (ECF No. 166-2 at 209–15.)  To the extent Defendants are correct that Butler used an insufficient control group, the trier of fact can weigh that issue when assessing the persuasiveness of Butler's survey evidence.

### 2.    Assessment of Advertising Claims

Defendants argue Butler did not evaluate Plaintiff's advertising claims and therefore her opinion would not be relevant to the trier of fact.  (ECF No. 166-1 at 19.)  Butler conducted a survey asking optometrists and ophthalmologists what factors would be important in selecting a compounding pharmacy.  Defendants claim the survey is not relevant because Butler asked respondents hypothetically what would be important to them rather than whether the "small-font claim" on Defendants' actual webpage would be important to them in their purchasing decisions.  (*Id.* at 20.)

Defendants' argument presents both reliability and relevance concerns. The Court first addresses reliability. As noted, under Ninth Circuit precedent, challenges to a survey's methodology "including the format of the questions or the manner in which it was taken" go to the weight of the evidence and not its admissibility. *Keith*, 858 F.2d at 480. Defendants' criticisms of the format of Butler's survey questions, by using hypothetical features rather than the statements at issue, go to the survey's weight.

As to relevance, Defendants argue Butler's survey only addresses the importance of Section 503A compliance to prescribers and not the impact of the particular advertising claims at issue to prescribers. Because Defendants' particular claims were not surveyed, Defendants contend the survey is irrelevant to the questions posed in the litigation. (ECF No. 166-1 at 19–20.) Plaintiff rebuts that Butler's survey is relevant as it goes to the materiality of the alleged false claims. (ECF No. 192 at 14.)

Expert testimony is relevant if it is "sufficiently tied to the facts of the case" such "that it will aid the jury in resolving a factual dispute." *See Daubert I*, 508 U.S. at 591 (citation omitted). This standard is lenient. The Ninth Circuit has found expert testimony is relevant if it "logically advances a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315. *See also Primiano*, 598 F.3d at 565 ("Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry."). Defendants' argument parses the issue rather narrowly here. The importance to a consumer of hypothetical advertising claims is connected to the importance of similar and specific advertising claims. A trier of fact could find Butler's analysis about the importance of general claims about regulatory compliance useful even if the particular claims at issue are not tested. *See Apple, Inc v. Samsung Electronics Co., Ltd.*, No. 11-CV-01846-LHK, 2012 WL 2571332, at *10 (N.D. Cal. June 30, 2012) (finding a consumer survey on the importance of patented features that did not match the list of patent features at issue was still relevant). Accordingly, Butler's testimony is relevant.

### 3.     Conflicting Results

Defendants contend Butler's opinion is "fundamentally flawed" because its results are logically in tension. (ECF No. 166-1 at 21.)  In Butler's expert report, 54.1 percent of survey respondents selected "Pharmacy operates in full compliance with Section 503A regarding compounded drugs" under the FDCA as an important factor in selecting a compounding pharmacy. (ECF No. 166-2 at 219.)  In a separate question, 57.4 percent of survey respondents answered they were not aware of Section 503A prior to taking the survey. (*Id.* at 224.)  Defendants argue if most respondents were previously unaware of Section 503A, a majority of respondents could not then also claim it was an important factor in their choice of a compounding pharmacy. (ECF No. 166-1 at 21.)  Defendants claim Butler's survey is therefore fundamentally flawed and should be excluded. (*Id.* at 22.)

The Ninth Circuit has consistently held criticisms over the results of a survey go to its persuasive weight rather than its admissibility. *See Clicks Billiards*, 251 F.3d at 1263 (holding "critique of conclusions, and the like go to the weight of the survey rather than its admissibility"); *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1199 (9th Cir. 2014) ("[I]ssues regarding the correctness of his opinion, as opposed to its relevancy and reliability, are a matter of weight, not admissibility.").  However, where a survey's results are so illogical as to cast doubt over its reliability, the inquiry can move from weight to admissibility. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting "conclusions and methodology are not entirely distinct from one another" such that a court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered").  That has not happened here.

First, the Court finds the survey's results are logically possible.  Prescribers can maintain a preference that compounding pharmacies follow all applicable rules and regulations without having an awareness of all the applicable rules and regulations.  Second, Butler's choice of a control question attempts to isolate Section 503A's importance relative to other, hypothetical regulations.  As discussed, whether the survey did so effectively goes to the weight of the survey evidence not its reliability.  Third, even if the

response is irrational where a respondent believes Section 503A compliance was an important factor in selecting a compounding pharmacy but is unaware of Section 503A, the assumed percentage of irrational responses is not so significantly pervasive as to morph the issue from weight to admissibility.  *See, e.g.*, *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, No. ML152668PSGJEMX, 2023 WL 1813530, at *5 (C.D. Cal. Feb. 7, 2023).

Accordingly, the Court denies Defendants' motion to exclude the testimony of Butler.

### C.    The Proposed Pharmacy and Regulations Expert – Schell

Plaintiff designated Schell as an expert on pharmacology and pharmacy operations. Schell is offered to opine on what compound medications are, what the differences are between Section 503A and Section 503B facilities, what restrictions govern Section 503A pharmacies, whether Defendants operate in compliance with Section 503A regulations, and why compliance with Section 503A regulations is important.  (ECF No. 166-2 at 440–41.) Defendants offer a litany of arguments in support of their motion to exclude Schell's testimony.  The Court reviews each in turn.

First, Defendants argue "Dr. Schell's expertise on pharmaceutical matters simply do [sic] not qualify him to offer expert opinion on the law."  (ECF No. 166-1 at 24.)  Rule 702 requires an expert be "qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  This standard contemplates a "broad conception of expert qualifications" where experience can be the basis for reliable expert testimony.  *See Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (quoting *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994)).  The Court disagrees with Defendants' assessment of Schell's qualifications.  Schell is clinical faculty at the University of California San Diego School of Pharmacy and Pharmaceutical Studies where he teaches classes in pharmacy law and ethics.  (ECF No. 166-2 at 454.)  Schell serves on the Sharp Healthcare Institutional Review Board.  (*Id.*)  Schell works as a consultant for pharmacy operations, sterile manufacturing, and regulatory compliance issues.  (*Id.*)  While

Schell may not be a licensed attorney, his practical and academic experience with compounding regulations qualifies him to offer his opinions about compliance with Section 503A regulations.

Second, Defendants assert Schell's opinion should be excluded because it merely recites evidence from emails and prior sworn testimony that could be readily understood by the trier of fact. (ECF No. 166-1 at 24.) Courts have previously excluded testimony where experts merely describe facts and "lay matters" that could be understood without an expert's help. *See Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468 (S.D.N.Y. 2005); *In re Novatel Wireless Sec. Litig.*, No. 08CV1689 AJB RBB, 2011 WL 5827198, at *4 (S.D. Cal. Nov. 17, 2011); *Johns v. Bayer Corp.*, No. 09-CV-1935, 2013 WL 1498965, at *28 (S.D. Cal. Apr. 10, 2013) (excluding expert testimony that merely recited a narrative of regulatory events).

In reviewing the Schell Report, the Court disagrees with the contention that Schell merely offers a recitation of the facts. Schell describes pharmaceutical compounding generally, Sections 503A and 503B regulations, and the importance of the at-issue regulations to the pharmacy industry. (ECF No. 166-2 at 444–47.) While he quotes from materials uncovered in discovery, Schell interprets those documents in line with his expertise in pharmacy operations. For example, Schell interprets a series of Defendants' emails for whether Defendants were filling bulk orders in contravention of Section 503A. (*Id.* at 448.) Schell also interprets Defendants' suggestions related to order volume according to his familiarity with industry norms and practices. (*Id.*) A lay trier of fact would not have sufficient familiarity with these regulations to come to the interpretive conclusions Schell does.

Third, Defendants argue Schell's opinions are unreliable because he did not review OSRX prescription records to verify whether the emails he reviewed reflected Defendants' actual practices. (ECF No. 166-1 at 25.) The Court is not persuaded that Schell's failure to consult OSRX's prescription records renders his methodology unreliable. "Expert opinion testimony is . . . reliable if the knowledge underlying it has a reliable basis in the

knowledge and experience of the relevant discipline." *U.S. v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006) (citations omitted). "An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022). As noted, Schell has extensive academic and consulting experience with Sections 503A and 503B. Schell employs this expertise and experience in reviewing Defendants internal documents. This is a reliable methodology.

While Defendants may argue Schell should have reviewed more materials in coming to his conclusion, that argument goes to the weight of his analysis rather than the reliability of the methodology he employed. The test under *Daubert* is the soundness of the expert's methodology, not the correctness of his conclusions. *See Daubert II*, 43 F.3d at 1318. Defendants can challenge the strength of Schell's conclusions on cross-examination. *See Elosu*, 26 F.4th at 1024.

Fourth, Defendants argue Schell improperly opines on the subjective beliefs of others by stating that "[i]n my experience, prescribers care a great deal about compounding pharmacies' compliance with the law and FDA regulations." (ECF No. 166-1 at 26.) Defendants contend Schell's opinion on whether compliance is "important" should be excluded for commenting on the intent or subjective beliefs of others. (*Id.*)

In reviewing Schell's report, he does not speculate on the opinions and beliefs of others. Schell explains he is speaking to his experience when describing what prescribers care about. Schell has sufficient experience in the pharmaceutical industry to discuss his experience with prescribers and whether compliance appeared important to them without conducting a survey. Schell does not offer hypothetical reactions of industry participants to Defendants' purported conduct and does not speculate on the industry's reaction. *Cf. Aya Healthcare Services, Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1320 (S.D. Cal. 2020). To the extent Defendants disagree with his opinion, they can cross-examine Schell.

Finally, Defendants argue Schell's testimony is inadmissible because he expresses an opinion on legal conclusions.  (ECF No. 166-1 at 24.)  Whether Defendants comply with Section 503A is central to Plaintiff's claim that Defendants' advertisements touting compliance were false and actionable under the Lanham Act.  While "expert testimony concerning an ultimate issue is not per se improper," an expert witness "cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law."  *Mukhtar*, 299 at 1066 n.10.  In practice, the "rule is easy to state but difficult to apply and the outcome depends upon how the expert expresses his opinion."  *Fidelity Nat'l Fin., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburg*, No. 09-CV-140-GPC-KSC, 2014 WL 1286392, at *8 (S.D. Cal. Mar. 28, 2014).  The Ninth Circuit has previously allowed expert testimony about compliance with industry standards and regulations, where that testimony does not reach the ultimate issue of law, even if that testimony was couched in legal terms.  *See Hangarter*, 373 F.3d at 1016–17 (holding an expert's testimony was properly admitted where that testimony referred to the law but never stated Defendants actually broke the law).

The Court denies Defendants' *Daubert* motion to the extent it seeks to exclude Schell's entire testimony.  Schell's expert report describes pharmaceutical compounding, Sections 503A and 503B regulations and their requirements, and why compliance with Sections 503A and 503B are important to the compounding pharmacy industry.  The heading of Section D and introductory sentence of paragraph 31 of Schell's report convey strong statements of how to apply the law to the facts (for example, "OSRX routinely violates the rules . . . of 503A pharmacies").  He will not be permitted to opine on whether Defendants routinely violate the law.  The body of his report, however, provides information that would be helpful to the jury on how to understand Sections 503A and 503B regulations and apply those industry norms, regulations, and practices to the facts at hand.  His opinion necessarily refers to those regulations in line with the Ninth Circuit's allowance of experts to reference regulations in support of their opinions.  *See Hangarter*,

373 F.3d at 1016.   The Court will revisit the issue if Schell's proffered testimony impermissibly encroaches on legal conclusions.

Therefore, the Court denies Defendants' motion to exclude Schell's testimony.

### D.   The Proposed Damages Expert – Wunderlich

Wunderlich was designated by Plaintiff as an economic damages expert to opine on what lost profits Plaintiff suffered as a result of Defendants' alleged misconduct and what unjust gains Defendants obtained as a result of their purported malfeasance.  (ECF No. 165 at 5.)   In support of this opinion, Wunderlich researched the compounding pharmacy market, reviewed Defendants' and Plaintiff's financial statements, and estimated lost revenues and unjustly earned profits using these materials and the supposed percentage of prescribers that believe Section 503A compliance is an important factor in selecting a compounding pharmacy as provided by Butler.   (*Id.*)   Defendants move to exclude Wunderlich's testimony arguing his opinion is unreliable because his damages model picks an arbitrary start date, makes illogical assumptions about the compounding pharmacy market, and would not be helpful to the trier of fact.  (ECF No. 166-1.)   The Court, in reviewing his background, finds Wunderlich qualified to offer his opinion on economic damages.   The Court then reviews Defendants' arguments for excluding his testimony.

#### 1.   Model Start Date

Defendants argue Wunderlich's model is unreliable because he picks the start date as the date ImprimisRx terminated its other lawsuit with Allergan. (ECF No. 166-1 at 28.) According to Defendants, this date is arbitrary because Wunderlich did not do any work to understand whether ImprimisRx complied with the Allergan ruling.  (*Id.*)

Wunderlich's selection of a model start date and assessment of whether Allergan is still a competitor go to the weight of his testimony rather than its admissibility.  Criticisms over the start date or an input for a model, rather than a criticism of the model itself, are factual disputes that do not go against the reliability of the expert.  *See Bally v. State Farm Life Ins. Co.*, 335 F.R.D. 288, 299 (N.D. Cal. 2020) (finding criticism over using unpooled versus pooled policy rates as a model input do not undermine the model's reliability); *In*

*re NJOY*, 120 F. Supp. 3d at 1070–71 (explaining that it is not the trial court's role under *Daubert* to assess the correctness of the facts underlying one expert's testimony). Defendants have leave to convince the trier of fact that the relevant period of alleged infringement started later; however, disputes over the underlying facts of the case do not render Wunderlich's model unreliable. *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.,* No. C 03 1431 SBA, 2006 WL 1390416, *7 (N.D. Cal. May 18, 2006) (explaining that selecting an earlier model start date grounded in the facts of the case than Defendants would have selected does not make it per se unreliable).

### 2.    Defining the Relevant Market

Defendants contend Wunderlich's damages model is unreliable because he does not identify any other compounding pharmacy competitors and assumes any sales not captured by Defendants, were it not for Defendants' alleged misconduct, would necessarily flow to Plaintiff. (ECF No. 166-1 at 28–29.) Defendants argue this assumption prevents the damages model from isolating the impact of the statements or use of the marks. (*Id.* at 29.)

The Ninth Circuit has affirmed with respect to lost profits analyses "the reasonableness of the assumptions underlying the experts' lost profit analysis" and critiques thereof are "a matter for the jury's consideration in weighing that evidence." *Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001) (quoting *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, 47 Cal. App. 4th 464, 489 (Cal. Ct. App. 1996)). Accordingly, lost profit calculations are "necessarily an estimate" that cannot obtain "mathematical precision." *Humetrix*, 268 F.3d at 919. Nevertheless, the Court has a gatekeeping responsibility in evaluating whether to admit expert testimony that purports to calculate lost profits. *See Mukhtar*, 299 F.3d at 1063–64. Expert testimony that features "too great an analytical gap between the data and the opinion proffered" should not be admitted. *Joiner*, 522 U.S. at 146. The Court thus reviews whether the assumptions underpinning Wunderlich's analysis are so illogical as to render it unreliable.

Defendants' criticism of Wunderlich's analysis centers on whether it is reasonable to assume that Defendants and Plaintiff operate in a two-party market. According to

Wunderlich, if Defendants did not make the alleged misstatements, customers would necessarily purchase their compounding solutions from Plaintiff.  For this to be true, the analysis assumes: (1) prescribers make prescribing decisions based on compliance with Section 503A; (2) there are no other competitors within the compounding pharmacy market; and (3) demand would not be affected by the removal of Defendants from the compounding pharmacy market.

With respect to the assumption that prescribers make decisions based on compliance with Section 503A, this question goes to the center of this case.  Disagreements over the factual basis of Wunderlich's report and testimony do not render his opinions so flawed that they would not assist the jury in determining damages.  *See Airhawk Int'l, LLC v. Ontel Prods. Corp.*, No. 18CV73-MMA (AGS), 2020 WL 10321726 (S.D. Cal. Jan. 2, 2020); *Marketquest Grp., Inc. v. BIC Corp.*, No. 11-cv-618-BAS (JLB), 2018 WL 1756117, at *3 (S.D. Cal. Apr. 12, 2018).  And even if this critique did go to reliability, Wunderlich nevertheless provides alternative damages calculations in the event the trier of fact did not agree with Wunderlich's assumptions about the confusion rate between products.

In reviewing competition, other courts have grappled with similar lost profit analyses under the Lanham Act.  In one trade dress infringement case, the court found a 1:1 lost profits model using defendant's sales data was inadmissible under *Daubert*.  *See Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, 923 F. Supp. 2d 1245, 1256 (S.D. Cal. 2013) ("Brighton I").  In that case, the trial court found the assumption unreasonable that consumers who bought a $20 knockoff bag would have paid $200 for an authentic bag if not for the alleged infringement.  *Id.* at 1254.  Accordingly, the trial court found the expert's damages model unreliable for failing to appreciate the lack of real competition between plaintiff and defendant.  *Id.* at 1256.  Other courts have similarly found assuming a 1:1 lost profits relationship is unreasonable given the particularities of the market at issue. *See L&L White Metal Casting Corp. v. Cornell Metal Specialties Corp.*, 353 F. Supp. 1170, 1176 (E.D.N.Y. 1972) (rejecting testimony that Plaintiff "would have made every one of the sales" as too speculative where Plaintiff's products were one third more expensive than

Defendant's products); *Peter Pan Fabrics, Inc. v. Jobela Fabrics, Inc.*, 329 F.2d 194, 195–96 (2d Cir. 1964) (finding the maker of expensive fabric "cannot reasonably expect to sell the same number of yards as the infringer who caters to the bargain basement market").

Unlike those examples, there is appreciable competition here to support a 1:1 lost profits model.  As Wunderlich notes as a basis for his assumption, Plaintiff and Defendants are the main national compounding pharmacies with participation by some smaller firms. (ECF No. 165 at 13 n.17.)  Their products are generally substitutes.  Their prices are not so disparate as to cast doubt that they compete with one another.  Indeed, they regularly compete for the same customers and accounts.  (*Id.* at 13 n.18.)  To the extent Defendants disagree this is largely a two-player market, that criticism goes to Wunderlich's testimony's weight, not its admissibility.  *See Brighton Collectibles, Inc. v. Coldwater Creek Inc.*, No. 08-CV-2307-H POR, 2010 WL 3718859, at *10–11 (S.D. Cal. Sept. 20, 2010) ("Brighton II").

Wunderlich's model assumes demand would not change with the exclusion of Defendants from the market.  This assumption is logical: the number of patients receiving ophthalmological treatment, and therefore the demand for compounding formulae, is unlikely to change based on the number of compounding pharmacies available to prescribers.  There may be differences in price which could affect demand at the margins, but it is not unreasonable for Wunderlich to assume a rather inelastic demand schedule. There may also have been a shift toward local compounding pharmacies or away from compounding at all, but, as discussed above with respect to competition, it is not unreasonable for Wunderlich to assume this would not happen.

Accordingly, the Court denies Defendants' motion to exclude Wunderlich's testimony.

## III.   Plaintiff's Motion to Exclude Defendants' Proposed Expert

Defendants retained Dr. Alyson Wooten to "to opine on issues regarding compliance with Section 503A, including to evaluate and provide [her] opinions regarding the analysis and conclusions in the Schell Report."  (ECF No. 172-1 at 37–38.)  Wooten concluded,

contrary to the Schell report, "OSRX routinely dispenses its compounded drugs pursuant to valid patient-specific prescriptions, as required under section 503A of the [FDCA]." (*Id.*)  In the motion before the Court, Plaintiff moves to exclude Wooten's expert testimony arguing her background is insufficient to sample data, her methodology is unreliable, and her report fails to review necessary materials to form an accurate opinion.  (ECF No. 172.)

### A.  Qualifications

Plaintiff's first argues Wooten is not qualified to provide a statistical analysis.  (ECF No. 174, at 11.)  In making this argument, Plaintiff contends Wooten's curriculum vitae and academic background "is devoid of qualifications regarding statistical or probabilistic analysis" or "college- or graduate-level statistics coursework."  (*Id.*)  Plaintiff argues because Wooten's background does not discuss sampling methodologies or statistical methods, Wooten's "lack of relevant knowledge is sufficient for exclusion."  (*Id.*)  The Court is not persuaded.

Under Ninth Circuit precedent, an expert may be qualified to offer a particular opinion either as a result of practical training or academic experience.  *Thomas*, 42 F.3d at 1269 ("[T]he advisory committee notes emphasize that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert."); *Rogers v. Raymark Indus. Inc.*, 922 F.2d 1426, 1429 (9th Cir. 1991) ("A witness can qualify as an expert through practical experience in a particular field, not just through academic training.").  "The threshold for qualification is low for purposes of admissibility; minimal foundation of knowledge, skill, and experience suffices."  *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*, No. C 10–00544 JW, 2011 WL 5417090, at *4 (N.D. Cal. Oct. 27, 2011).

The fact that Wooten is not a statistician does not necessarily provide grounds for exclusion.  "Statistical expertise is not confined to those with degrees in statistics. Because statistical reasoning underlies many kinds of empirical research, scholars in a variety of fields . . . are exposed to statistical ideas, with an emphasis on the methods most important to the discipline."  David H. Kaye & David A. Freedman, *Reference Guide on Statistics*,

1   *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 212, 215 (2011).  Wooten has completed

2   a Doctor of Pharmacy and a Master of Business Administration.  (ECF No. 172-1 at 51.)

3   Wooten has served as Managing Director of the Health Analytics Practice at Berkeley

4   Research Group for three years and previously served as an adjunct professor at the

5   Philadelphia College of Osteopathic Medicine, School of Pharmacy.  (*Id.*)  Accordingly,

6   Wooten has the requisite exposure and experience to select a simple subset of prescriptions

7   to review and is qualified to opine on the subject matter as an expert witness under Rule

8   702.  Plaintiff's arguments about Wooten's lack of academic coursework in statistics go to

9   the weight of her testimony and the persuasiveness of her sampling rather than their

10  admissibility.  *See In re Silicone Gel Breast Implants Prod. Liab. Litig.*, 318 F. Supp. 2d

11  879, 889 (C.D. Cal. 2004) ("A lack of specialization affects the weight of the expert's

12  testimony, not its admissibility.").

13      **B.      Extrapolation**

14          Plaintiff's second argument is that Wooten's testimony should be excluded because

15  her sample set of prescriptions written in California in 2021 to 2022 is not generalizable to

16  prescriptions across the United States.  (ECF No. 172 at 12–13.)  Plaintiff contends because

17  Wooten does not include prescriptions written between 2019 and 2020 and because

18  Wooten does not include prescriptions written in other states, her opinion is unreliable and

19  should be excluded.  (*Id.*)

20          Plaintiff's criticism goes to the scope and extrapolation of Wooten's sample rather

21  than the methodology of her review.  Sampling is a standard practice when reviewing large

22  amounts of data.  *See In re NJOY*, 120 F. Supp. 3d at 1080; *see also In re Countrywide Fin.*

23  *Corp. Mortg.-Backed Sec. Lit.*, 948 F. Supp. 2d 1021, 1033 (C.D. Cal. 2013) (discussing

24  appropriate sample size for representative review of large loan data set and determining

25  100 items was sufficient).  Plaintiff may take issue with Wooten's sample selection and

26  extrapolation, but these concerns go to the persuasiveness of her review rather than its

27  reliability.  *See Alaska Rent-A-Car*, 738 F.3d at 968–70 (finding criticism of extrapolating

28  Juneau's car rental rates to the entire state goes to impeachment not admissibility);

*Southland Sod Farms*, 108 F.3d at 1143 (holding Defendants' objection that an expert's survey was only conducted in Southern California goes to weight and not admissibility).

Further, Wooten offers a reasonable explanation for her sampling choices. Wooten offers three reasons for only reviewing prescriptions for patients in California: (1) the litigation was brought in California; (2) Schell alleges that Defendants' practices violate both Section 503A and California state law; and (3) of the ten emails reviewed by Schell, three relate to clinics in California. (ECF No. 173-1 at 43.) Wooten explains she used data from 2021 and 2022 because the transition between computer systems left an incomplete record for the data from 2019, which would require manual data entry for thousands of entries. *Id.*

These choices do not make her underlying methodology unreliable. *See Alaska Rent-A-Car*, 738 F.3d at 970. The California prescription data was available to both parties and data transfer issues made the 2021 and 2022 data the best available. *See Moonbug Entertainment Ltd. v. BabyBus (Fujian) Network Tech. Co., Ltd.*, No. 21-CV-06536-EMC, 2023 WL 4108838, at *17 (N.D. Cal. June 21, 2023) (using the best data available at the time was "reasonable" and did not render a report insufficiently reliable for admission). Wooten's analysis implicitly assumes prescriptions in California would be sufficiently similar to prescriptions written in other states. Plaintiff has not presented a reason to believe California prescriptions would not be thus representative. And even if there were such a difference, there is no reason to believe California prescriptions are so thoroughly unrepresentative as to render Wooten's opinion about California prescriptions to be "junk science" and inadmissible. Instead, Plaintiff's critiques go to the persuasiveness of Wooten's testimony to the trier of fact. *See In re Nat'l Football League*, 2023 WL 1813530, at *9 ("Defendants' arguments against [Plaintiff's experts]—that this-or-that figure and assumption should not have been used—go to weight.").

## C.    Methodology and Usefulness to the Trier of Fact

Plaintiff finally argues Wooten lacks a sufficient factual basis for her opinion because she was unfamiliar with the appropriate dosages of the medications on which she

opines and did not review the communications underlying the prescriptions. (ECF No. 172 at 15–16.) Plaintiff further asserts Wooten's opinion would not be helpful to the trier of fact because Wooten's opinion could be found by reviewing the dispensing log spreadsheet without further analysis. (*Id.* at 17.)

First, the purpose of Wooten's proposed testimony is more limited than Plaintiff argues. Wooten is offered to rebut Schell's proposed testimony that OSRX engages in bulk compounding in violation of Section 503A because it routinely provides non-patient specific products in the form of "office stock." (ECF No. 173-1 at 41.) Wooten's analysis reviews OSRX's prescription data to determine whether there were valid, patient-specific prescriptions for each entry in OSRX's prescription data such the products provided could not be office stock as Schell opines. It is not necessary to Wooten's narrow investigation on this point to understand what dosing regimen is proper for each patient. Rather, observing a patient-specific prescription is available for each dispensed product is sufficient to rebut Schell's proposed testimony that OSRX provides "office stock" or bulk compounds. Further, Wooten provides citations to her general experience and the sources she relied upon in evaluating whether a given prescription "appeared reasonable for patient-specific use." (*Id.* at 46.)

Relatedly, in her expert report, Wooten opines "OSRX's dispensing practices are compliant with 503A pharmacy requirements." (*Id.* at 48). While Wooten may testify about her review of OSRX's prescription data and whether Defendants appear to prescribe products in bulk, Wooten will not be permitted to opine on whether Defendants violate the law as this is an ultimate issue that belongs to the trier of fact.

Second, the factual dispute between the parties as to what quantity of product constitutes non-patient specific prescriptions does not undercut the reliability of Wooten's testimony. *See In re NJOY*, 120 F. Supp. 3d at 1070–71. The parties can debate whether three of four bottles of product constitutes bulk compounding in violation of Section 503A; the Court need not weigh in at this stage. The resolution of what amount is reasonable will affect the weight of Wooten's testimony to the trier of fact who can review the prescription

log data and Wooten's analysis. This ongoing factual dispute, however, does not make her underlying rebuttal methodology and review unreliable.

Finally, Wooten's proposed testimony would aid the trier of fact, contrary to Defendants' assertion, for two reasons. First, it provides a methodological rebuttal to the proposed testimony of Schell. Second, Wooten uses her expertise in assessing whether a valid prescription is present for the prescriptions she sampled, which a lay trier of fact would struggle to do. Her analysis consisted of reviewing the prescription for patient-specific data, drug information, directions of use, and prescriber signature in addition to the language of the order form. (ECF No. 173-1 at 45.) This review relies on her experience and expertise as a pharmacist beyond what is expected of a lay trier of fact.

Accordingly, Plaintiff's motion to exclude Wooten's testimony is denied.

## CONCLUSION

Based on the foregoing, the Court **DENIES** the parties' motions to exclude their proffered experts' testimonies. The Court finds the experts at issue are duly qualified to render expert opinions and their methodologies sufficiently reliable for admission. To the extent their testimonies go to ultimate questions of law reserved for the trier of fact, the Court will not permit this testimony if it is elicited at trial.

**IT IS SO ORDERED.**

DATED: November 8, 2023

Hon. Cynthia Bashant
United States District Judge

21cv1305