UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

```
IMPRIMISRX, LLC,                    )  Case No. 21-cv-1305-BAS
                                    )
                      Plaintiff,    )  August 12, 2024
      vs.                           )
                                    )  Motions In Limine Hearing
OSRX, INC., et al.,                 )
                                    )
                      Defendant.    )
_____   )
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CYNTHIA A. BASHANT
UNITED STATES DISTRICT JUDGE

PAGES 1 - 24

APPEARANCES:

```
FOR PLAINTIFF:          ELLIS, GEORGE, CIPOLLONE,  ET AL.
                        2121 Avenue of the Stars, 30th Floor
                        Los Angeles, California  90067
                        By: KEITH J. WESLEY, Esq.
                            GEORGE LAIOLO, Esq.

FOR DEFENDANT:          WILSON, SONSINI, GOODRICH & ROSATI
                        650 Page Mill Road
                        Palo Alto, California  94304
                        By: DYLAN J. LIDDIARD, Esq.
                            DALE R. BISH, Esq.
```

REPORTED BY:

ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
U.S. OFFICIAL COURT REPORTER
U.S. District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California  92101

Reported stenographically; transcribed with CAT software.

1      _**MONDAY, AUGUST 12, 2024, 3:15 P.M.**_

2                          **\*\*\***

3          **THE CLERK:**  Calling Matter No. 14, 21-cv-1305,

4   ImprimisRx, LLC vs. OSRX, Inc., et al., on calendar for motion

5   *in limine* hearing.

6          **THE COURT:**  Don't you want to do criminal after

7   listening to all that?

8          **MR. LIDDIARD:**  I'll pass.

9          **MR. WESLEY:**  We thought our case was important.

10         **THE COURT:**  You think you've got problems with your

11  clients.

12         Can you state your appearances for the record, please.

13         **MR. WESLEY:**  For the plaintiff, Keith Wesley and George

14  Laiolo.

15         **MR. LAIOLO:**  Good afternoon, Your Honor.

16         **THE COURT:**  Good afternoon.

17         **MR. LIDDIARD:**  For Defendant, Dylan Liddiard and Dale

18  Bish.

19         **THE COURT:**  Okay.  Good afternoon.  As you have

20  learned, I am in trial.  Just for future reference, when we get

21  to your trial, COVID is up and running.  We are losing jurors

22  every day in our trial.  So I really hope that I'll be able to

23  finish this trial in the timeframe that I've got allotted for

24  it, and that I don't have to retry it, but we've already lost

25  two jurors already.  So we're holding our fingers tight.

1      Let's go, and I'd like to rule on the motions

2  *in limine*.  At least it will give you some idea of what the

3  confines of the trial is going to be, and then we can talk about

4  a trial date.

5      So there's a motion to exclude the expert opinions of

6  Dr. Wunderlich.  First of all, I do find the motion was timely

7  filed.  I find the motion did not become relevant until after I

8  had ruled on summary judgment, so there was no way it could have

9  been filed sooner.  So I think it was timely filed.

10      I do have a problem, however, with Dr. Wunderlich's

11  lost profit model.  Because he calculates the lost profits

12  stemming from false advertising along with the trademark

13  infringement, and because there's no longer a false advertising

14  claim, I think the damages fail to align with Plaintiff's theory

15  of the case, or at least with what's left of Plaintiff's theory

16  of the case, and includes irrelevant damages given the dismissed

17  claims.

18      And furthermore, Plaintiff is responsible for showing

19  causation, and it doesn't sound like this damages model shows

20  that the purported damages were caused by the trademark

21  infringement.  So I can tell you I am inclined to grant the

22  motion to exclude his opinions based on the lost profits model.

23      With respect to the unjustly earned profits model, he

24  does separate out the damages for false advertising, and claims

25  that a hundred percent of Defendant's sales were made because of

1    the infringed marks.  I'm not sure Plaintiff is going to be able

2    to support Dr. Wunderlich's assumption that a hundred percent of

3    the sales were made because of the infringing mark.  That seems

4    like kind of a leap.

5              But I will allow Dr. Wunderlich to testify on this

6    model only, since it is Defendant's burden to show the

7    infringement did not relate to their profits.  And I'll allow

8    Defendant to attack this assumption on cross-exam or any other

9    way Defendant chooses to show that alleged infringement did not

10   relate to a hundred percent of their profits.

11             So my thought would be to deny the motion to exclude

12   his opinions based on unjustly earned profits model.  Does

13   anyone want to be heard any more on those -- that motion?

14             **MR. WESLEY:**  Yes, your Honor.

15             **THE COURT:**  Okay.  You can sit if you want or you can

16   use the podium, whatever is easier.

17             **MR. WESLEY:**  Okay.  Options.  Thank you, Your Honor.

18             So in terms of the actual damages or our lost profits,

19   first off, I believe that there will be evidence of causation.

20   That evidence will not come in through Dr. Wunderlich, but it

21   will come in through lay witnesses.

22             And so the other side did not move for summary judgment

23   on the issue of causation.  They could have done so.  And it's

24   black-letter law that motions *in limine* should not be

25   substitutes for summary judgment.

1          **THE COURT:**  I understand.  But right now, his

2    calculations combine the dismissed claims as well as the not

3    dismissed claims.

4          **MR. WESLEY:**  I understand Your Honor's point.  However,

5    Dr. Wunderlich testified in deposition that his opinion would be

6    the same if this case had only been a trademark infringement

7    case.  In other words, for actual damages in a trademark

8    infringement case, the infringement need not be the only cause

9    of the lost sale.  It need only have a causal connection to the

10   lost sale.

11         In other words, we could have lost a sale for multiple

12   reasons:  Could have been price; could have been false

13   advertising; could have been trademark; or it could have been

14   them all.  And so what Dr. Wunderlich is saying is that if both

15   false advertising and trademark infringement contributed to the

16   lost sale, then his opinion is still relevant.

17         Let me also say one more general thing and one more

18   specific thing.  The general thing is that the Supreme Court in

19   the Ninth Circuit has said that there's a distinction between

20   the quantum of evidence, the type of evidence needed to show the

21   act of harm versus the quantity of harm in this case.

22         We all know that we're never going to be able to

23   pinpoint in a trademark infringement case the exact dollar

24   figure of actual damages.  We know that.  It's impossible.

25         But what the courts have said in this context is that

1    if there is proof of the fact of harm, if there's proof that

2    there is some harm, then what do is we put all evidence tending

3    to allow the jury to be able to quantify a reasonable amount of

4    actual damages.  And that's exactly what Dr. Wunderlich will do.

5         Once we present evidence of the proof of the fact of

6    harm, he will come in and say, I looked at Imprimis's historical

7    sales records.  I looked at their costs.  And if, jury, you

8    determine that they lost a single sale due to this trademark

9    infringement, then I can tell you with clear certainty that the

10   amount they would have lost on that sale was -- I'm making this

11   up -- $50.

12        And that is a helpful piece of evidence for the jury.

13   It tethers the jury to the actual historical records that are --

14   that are at issue in this case.  And so -- and had they moved

15   for summary judgment on causation, we could have presented all

16   these cases.  We could have presented *Story Parchment.*  We could

17   have presented DSPT in the Ninth Circuit.

18        We could have presented -- I'm blanking on some of the

19   other ones, but there's a whole litany of cases that say that in

20   this context, we need to put as much evidence as possible to

21   enable the jury to make an estimate.

22        I argued this issue 12 years ago, Your Honor, with

23   Dr. Wunderlich.  It was in the court -- no, actually, it was

24   across the street.  It was in front of Judge Huff.  And she said

25   we're not going to exclude Dr. Wunderlich for this very reason.

1   And we submitted that citation in our opposition, and I think it

2   was the right call.  There was no runaway jury.  There was a

3   jury that listened to the evidence and came up with a reasonable

4   approximation of the damages that made our client whole in a

5   case of deliberate infringement.

6        So for that reason, I think, at minimum, the Court

7   should defer ruling on what Dr. Wunderlich is going to say until

8   it hears our lay witnesses.  I agree with the Court in terms of

9   unjust enrichment, that due to the very specific burden-shifting

10   standards under the statute and under the Supreme Court case

11   law, that his opinions on revenue and profits there are

12   relevant.

13        So if the Court doesn't have any further questions, I

14   would simply ask that the Court defer ruling on both, the actual

15   damage side as well as the wrongful profits side, until we're

16   actually in the context of trial.

17        **THE COURT:**  Okay.  Let me hear from Defendant.

18        **MR. BISH:**  Good afternoon, Your Honor.  Dale Bish.

19   I'll be brief.

20        If Dr. Wunderlich's methodology took into account the

21   causation that counsel is now promising to someday share with

22   us, that would be one thing.  But that's not the methodology he

23   used.  Instead, he just assumed liability under both false

24   advertising and trademark, and has no way to disaggregate them

25   under his generic model.

1            So while it might be true that some lay witness might

2       testify to something, that is not the model or the evidence that

3       Dr. Wunderlich used to arrive at his calculations.  And his

4       counsel has repeatedly said in their papers, and now today,

5       Dr. Wunderlich is not doing any analysis as to causation.

6            So the jury will have no way to disaggregate the two,

7       and we'll be left having to present him with a cross-examination

8       of the unfair competition claims that have been dismissed.  It's

9       just not fair to put us in that position.

10           With respect to the disgorgement of profits analysis,

11      we don't disagree with Your Honor's ruling.  However, is there a

12      disagreement as to whether or not that's an equitable or legal

13      remedy.  Our position is that it's an equitable remedy for the

14      Court because it's not tethered to actual damages.

15           So with that nuance, I'll sit down.

16           **THE COURT:**  Okay.  I will grant in part and exclude --

17      and deny in part the expert opinions of Dr. Wunderlich.  Because

18      Dr. Wunderlich made his decision based on both the false

19      advertising and the trademark infringement claims, I agree with

20      the Defense that then cross-examining him on was this based on

21      false advertising claims that were dismissed sort of negates the

22      dismissed causes of action.

23           And I think at this point, given the fact that he

24      doesn't -- there's no way to separate the two and he does not

25      separate the two, and because there's no longer any false

1  advertising claim, he should not be allowed to go forward with

2  that.

3      I will, however, deny the motion with respect to the

4  earned profits, unjustly earned profits.  You may be right.  It

5  may be an equitable remedy.  I haven't looked at that, because

6  it's unjust to -- I think it probably is an equitable remedy,

7  but I will defer ruling on that.

8      With respect to Defendant's motion to exclude evidence

9  related to -- and just for the record, for Stephanie's benefit,

10  that was 294, granted in part, denied in part.

11      Motion to exclude evidence related to the dismissed or

12  abandoned claims, 295.  I agree with the concept that unless it

13  has something to do with trademark infringement and what is

14  required to prove trademark infringement, it's not admissible.

15  So I would say anything to do with compounding regulation,

16  compliance or noncompliance with 503(a), clinical trials and

17  research, selecting and prescribing compounding medications,

18  unfair competition based on anything besides trademark

19  infringement, I would grant the motion.

20      With respect to specifics, it seems to me, although all

21  of these witnesses are listed on the might-call list, so it may

22  end up becoming moot, but it seems to me that Kenneth Schnell is

23  testifying about compounding regulation.  Kelsey Deschamps,

24  Cassidy Zirko, and Jennifer Baker are testifying about OSRX's

25  noncompliance with 503(a).  Charles Hicks, Chaim Thornton,

1    Damian Goldberg, Francis Ma, Matthew Gee, Francine Vaccari are

2    all testifying about unfair competition, clinical trials and

3    research, selecting and prescribing compounding medications.

4         So unless they have something to say specifically about

5    trademark infringement, I would be inclined to exclude them.  As

6    I say, since they are only on the might-call list, my thought

7    would be if the decision is made that you do need to call them

8    as a witness, I would require a proffer as to what they have to

9    say about trademark infringement before they're allowed to

10   testify.

11        I would allow Greg Anderson to testify solely about

12   Defendant's infringement and what the effect was on Plaintiff's

13   sales.  So that's sort of my tentative with respect to the

14   witnesses.

15        With respect to the exhibits -- and this is, again,

16   sort of generic.  But to the extent Plaintiff is introducing an

17   exhibit because they're claiming it shows Defendant is using

18   Plaintiff's trademarks, I will allow it in.  And it seems to me

19   that 21, 22, 26, 32, 38, 43, 44, 46, 96, and 162, Plaintiff

20   makes an argument that they're -- shows that they're being

21   used -- that's being used on the issue of trademarks.

22        And to the extent they claim the exhibit goes to

23   marketing channels, I think that goes to *Sleekcraft* factors, so

24   it's admissible, specifically 46, 93, 119.  I may have messed up

25   a number because I have 46 twice, but I was trying to do the

1   best I could, given all the numbers.  119, 132, 152, and 222,

2   Plaintiff alleges those have to do with marketing channels.

3         But to the extent Plaintiff just wants to admit an

4   exhibit without any trademark infringement just to show

5   Defendant is capable of refraining from using Plaintiff's

6   trademarks, I'll exclude those under 403.  They only have

7   marginal relevance and they have the danger of confusing the

8   jury and wasting time.  So specifically, I would say 13, 14, 31,

9   41, 55, 56, and 161 all seem to fall into that bucket.

10        Similarly, the fact that the Defendant communicates

11  with a customer of Plaintiffs or that a customer was unclear on

12  whether they were talking to OSRX or Imprimis, or that Defendant

13  is copying Plaintiff's business model I think has very little to

14  no relevance on the issue of using the trademark infringement.

15  So, again, under 403, I would exclude 90, 92, 194, and 197.

16        Are there any questions or concerns about that ruling?

17        **MR. WESLEY:**  Yes, Your Honor.

18        **THE COURT:**  Okay.

19        **MR. WESLEY:**  I understand the Court's ruling on the

20  witnesses.  I don't anticipate calling those witnesses, although

21  I think a couple testified to trademark-related issues when the

22  Defendants sought their deposition.  We opposed and the

23  depositions were ordered.  But I think it's probably going to

24  work itself out.  I understand the Court's position.

25        There are a few, however -- and before I get to the

1    specific exhibits, I think this is a dangerous motion *in limine*.

2    It's completely scattershot.

3        **THE COURT:** No.  What it is, is saying that you're not

4    allowed to put in the stuff that got dismissed, and don't try

5    and backdoor it.  So I'm trying to make sure that that -- you

6    understand what my rulings -- that's why I gave you buckets.

7    I'm not as concerned about the numbers as I am about my general

8    outlines of what I will allow in and what I won't.

9        **MR. WESLEY:** I totally agree.  This isn't about 503(a)

10   or 503(b).  That's not the case we're trying here, Your Honor.

11   And I'd simply ask the Court to allow us to make our opening

12   statement and show the Court in realtime what our case is

13   actually going to be before excluding *in limine* these exhibits.

14       For example, Exhibit 55 and 56 I think were on the

15   Court's tentative exclusion list.  Exhibit 55 and 56 --

16   Exhibit 55 is our order form for our drugs with the trademarks

17   at issue in this case.  Exhibit 56 is their order form.  We have

18   emails saying, Hey -- from them, internal emails saying, Why

19   don't we just copy Imprimis' order form?  That will be easy.

20       That's classic evidence of deliberate knowing

21   infringement.  That's relevant to the *Sleekcraft* factors.  It's

22   relevant to secondary meaning.

23       **THE COURT:** As long as you follow my general rule,

24   which is if you're bringing it in just to show that Defendant is

25   capable of refraining from using the trademarks.  So I don't

1    want to have you put up something, an exhibit, that says, Look,

2    they didn't use the trademark in this particular exhibit, so

3    they know how to not use the trademarks.  That seems to me,

4    under 403, not admissible.

5        If, however, the exhibit says, Here's our trademark and

6    here's an example of them using our trademark, I think that

7    comes in.  So if 55 or 56 has their trademark on it and -- or

8    has a trademark that you believe is a copy of their trademark, I

9    think it comes in.  To the extent it doesn't, then it doesn't

10   come in.

11       **MR. WESLEY:**  I don't agree with that distinction,

12   Your Honor.  Let me tell you why.

13       If Nike is suing somebody for infringing its swoosh

14   design, and it has evidence this high (*indicating*) of the

15   defendant copying other intellectual property, copying its ad,

16   copying its -- copying a different trademark, that goes to the

17   Defendant's state of mind.  That goes to intent, which is --

18   that's the heart of these cases.  It's secondary meaning.  It's

19   likely to confusion.

20       Relatedly, Exhibit 92, a doctor attempting to purchase

21   products from OSRX believing it was Imprimis, that's classic

22   actual confusion evidence.  The email had our trademark.  The

23   doctor emails OSRX and says, Hey, I've been talking to -- I've

24   been waiting to order from Imprimis for a while.  You can't get

25   any clearer actual confusion evidence than that.  And that is

1    one of the *Sleekcraft* factors.  It also has been considered in

2    secondary meaning.

3        **THE COURT:**  If it's tied directly to the trademark

4    infringement or the trademark use, I will allow it in.  So if

5    the confusion is, We sent a trademark to this person, we sent

6    the exact same trademark, and that person responded thinking

7    we're Imprimis, then I will allow it in.  If it is just, I was

8    unclear, I get confused between the two, they tried to copy --

9    you know, generically, they've tried to copy our business model,

10   I think under 403, that's getting too far afield.

11       So I feel like I've given you guidance on what I would

12   allow and what I wouldn't allow.  I will look at these

13   particular exhibits if you're trying to get them in, but I think

14   I'm giving you fair warning as to what I'll allow and what I

15   won't allow.

16       **MR. WESLEY:**  And that's all I want, Your Honor, because

17   what I don't want to do is to mention something in opening

18   statement or with a witness, and then the other side to jump up

19   and start screaming and say, you know, this was a motion

20   *in limine*.  I just -- I just need guidance as to where to draw

21   those lines.

22       **THE COURT:**  And the guidance is, if it's using

23   trademark infringement and you can tie that directly to someone

24   was confused by the use of the trademark, I will allow it in.

25       If it's not tied directly to the use of the trademark

1  and is just generic confusion, or I wasn't clear who I was

2  talking to, or Defendant wants to copy our business model, or

3  they've done other things besides use the trademark, I think

4  under 403, that's going too far.  So that's sort of my generic

5  ruling on the motion.

6          **MR. WESLEY:**  Okay.  Thank you.

7          **THE COURT:**  So I'll grant in part and deny in part 295.

8          Motion to exclude evidence of the *Allergan*

9  lawsuit, 293.  First of all, I don't think Plaintiff's

10  regulatory or safety issues, if there are any, go to the

11  doctrine of unclean hands.  I think the Defendant has to show

12  that the alleged violations go to the subject matter of the

13  Plaintiff's claims.  It has to be related to the Plaintiff's

14  claims.  So any of their regulatory or safety issues don't

15  relate to whether Defendant used a trademark to deceive

16  customers.

17          And similarly, the *Allergan* lawsuit centers on

18  Plaintiff's false advertising, not trademark infringement.  So I

19  don't think it's relevant on the doctrine of unclean hands.

20          I understand there may be some relevance on mental

21  state, on -- you know, the mental state that was used.  But I'm

22  not sure the probative value outweighs the serious prejudice of

23  admitting some of this evidence.  Certainly, for example,

24  evidence that Plaintiff's unsafe product caused a customer to

25  die seems to me overly prejudicial.  So I guess I want to know

1    what exactly Defendant wants to introduce in this regard, and I

2    can tell you under 403, I'm going to limit it pretty severely.

3         **MR. LIDDIARD:**  Thank you, Your Honor.  Perhaps it makes

4    sense to defer ruling on these motions *in limine* until the

5    Plaintiff has put on its case.

6         If they're going to put on their case and say, We're a

7    stellar, outstanding company, we've built -- we have goodwill,

8    we have a great reputation in the industry, we sell reputable

9    quality products, and they put on evidence to that effect, then

10   I believe at that time, they've opened the door, and we can put

11   on their evidence of regulatory violations and everything that

12   they've done.

13        Perhaps maybe the fact that they killed a patient with

14   one of their formulas goes too far, and maybe that will stay

15   out, but there's plenty of other regulatory violations repeated

16   that show that they are not the outstanding company that they're

17   going to claim they are in the trial.

18        **THE COURT:**  Okay.  I'll tell you what I'll do.  296

19   and 297, I'll grant the motion to exclude without prejudice.

20        **MR. LIDDIARD:**  Thank you.

21        **THE COURT:**  And that means -- I mean, all of my rulings

22   frankly are without prejudice, and I will tell you when we start

23   trial, that that's my ruling as well.  That any time I rule at

24   the break, I'll give you a chance -- I don't want you to argue

25   in front of the jury, but at every break, I'll say Number 1, do

1    you want to make a record for appeal?  And Number 2, did I get

2    it wrong?  Feel free to raise outside the presence of the jury

3    why you think the ruling that I made often on the fly was wrong.

4         So at this time, I will grant motion 296 and 297

5    without prejudice.  You can reraise it, but don't mention it in

6    opening and don't raise it until I've cleared it, depending upon

7    whether the door has been opened.

8         **MR. LIDDIARD:**  Thank you.

9         **THE COURT:**  Okay.  I think the only other thing, there

10   was a motion to seal, which I will grant, which I think is 299.

11        So trial dates.  I still would really like to try this

12   on the 17th of September.  I don't know -- I know that there was

13   some conflict last time we talked.  Is that possible?

14        **MR. LIDDIARD:**  Your Honor, both Mr. Bish and I have a

15   trial scheduled in Miami for September 16th.  And we had a case

16   management conference last week, and the judge said she's ready

17   to try that case.

18        Similar to I think what's going on in this courtroom,

19   we were there in April.  We were Number 2 on the calendar.  One

20   of the cases didn't settle, so we got kicked.  There may be one

21   case in front of us for the trial in September.  But we will be

22   back in Miami, and it looks like that case will hopefully go to

23   trial this time around.

24        **THE COURT:**  How long is that trial going to last?

25        **MR. LIDDIARD:**  It's set to go for two to three weeks.

1          **THE COURT:**  Well, the next date I have available is

2    November 12th.

3          **MR. LIDDIARD:**  And that would work for -- both sides

4    met and conferred, Your Honor, and I believe November 12th

5    works.

6          **THE COURT:**  All right.  My dance card is getting very

7    full.  It will have to be done in a week, but I think I set time

8    limits on the parties --

9          **MR. LIDDIARD:**  Twenty hours total.

10          **THE COURT:**  Yeah.  So I think that that will get us

11    through in a week.

12          All right.  November 12th.  Let's -- do we need to do

13    any further status or can we just confirm November 12th?

14          **MR. LIDDIARD:**  The 12th works for us.  We've conferred

15    with our client and our expert.

16          **MR. WESLEY:**  November 12th is fine with the Plaintiff.

17    Thank you, Your Honor.

18          **THE COURT:**  Okay.  Let's set it for trial

19    November 12th.

20          Just so you know, on the Monday before, in the

21    afternoon, the courtroom is open and available -- no?  It's a

22    holiday.  Oh.  Well, any Monday between now and November 12th,

23    other than November 11th, which is a holiday, our courtroom is

24    open for you to play with the technology.  And I strongly

25    encourage you to do that.  It actually works pretty well.  We've

1  got not only the old ELMO, but we also -- you can hook up your

2  computer.  Unfortunately, I think I've got this right, that the

3  Mac doesn't work as well.

4          **THE CLERK:**  They have to bring in an adaptor.

5          **THE COURT:**  You have to bring in an adaptor.  Anyway,

6  you want to make sure you've got that figured out if you're

7  planning on using the tech -- your computer.

8          I do not want binders of exhibits.  That's kind of a

9  running joke, because my very first trial, I did not think to

10  say that, and we had the whole side of the room with binders

11  that never -- none of which I ever opened.  So I am perfectly

12  capable of plugging in a thumb drive.  So, you know, you can

13  give me a thumb drive if you want to for exhibits.

14          As far as jury selection, generally, I question all

15  jurors.  I don't remember how many we call up for a civil trial.

16          **THE CLERK:**  Twenty-two, I think.

17          **THE COURT:**  Okay.  I will question them all.  I'll give

18  you very brief follow-up time.  I can tell you that your

19  follow-up questions count against your time.  So if you have

20  questions you want me to ask when I'm asking the questions, it

21  doesn't count against your time.  When you're asking the

22  questions, it does.

23          So you may want me to do the questioning.  And I'll try

24  and do as much as I can, based on what I know of the case.  But

25  if there's anything unusual that may come up during the course

1    of the case, it would be good to front it for the *voir dire*.

2            And then even if I have someone who says, I can't be

3    fair, I hate drug companies, or whatever they say, I won't take

4    them off for cause right then, because then I find the next

5    three people all hate drug companies as well.  So I act like

6    what they're saying is not going to take them off.

7            And then at the break, we will take challenges for

8    cause.  We do a blind strike system, so you'll have a sheet of

9    paper, and you do your three challenges, and the other side will

10   do their three challenges, and whoever the first eight that are

11   not challenged will sit on the jury.

12           We'll have all eight -- we'll see how we're doing with

13   COVID at that point in time, but we'll have all eight

14   deliberate, and we can go down to six if it's really -- I think

15   we'll be fine with two alternates, I think.  So that would be my

16   plan at this point.

17           Any other questions?

18           **MR. LIDDIARD:**  Not from Defendants.

19           **MR. LAIOLO:**  Your Honor, briefly.

20           **THE COURT:**  Yes.

21           **MR. LAIOLO:**  As to coming in on Mondays before the --

22   what time?

23           **THE COURT:**  Afternoon.  I have a criminal calendar in

24   the morning.

25       **(The Court and Clerk conferred sotto voce.)**

1        **THE COURT:**  Email Stephanie.  She said she'll work with

2    you and she'll let you know what the calendar looks like that

3    day.  Some Mondays, my morning calendar is a little bit less and

4    you can come in at 11:00, or you can schedule with her during

5    lunch or in the afternoon.

6        **MR. LAIOLO:**  And also, does the Court have any

7    preferences on deadlines for filing objections to jury

8    instructions?

9        **THE COURT:**  What I would like is I don't need standard

10   jury instructions.  I will use the Ninth Circuit standard

11   instructions.  And as trial goes on, I make little notes to

12   myself about what we need to include.

13        What I would like is the substantive instructions just

14   about these particular -- this particular cause of action.  And

15   I think probably -- why don't you make it two weeks before the

16   trial date, if you could submit to me -- perhaps it's

17   unrealistic -- a joint suggestion as far as the proposed

18   substantive instructions outlining what the differences are

19   between the two so that I can then just make a ruling on those.

20        **MR. LAIOLO:**  The parties have already submitted the

21   joint proposed jury instructions with the changes.

22        **THE COURT:**  Okay.  Great.  Then I'm fine.  That's fine.

23   As long as you've submitted the joint to me, if there's anything

24   else you want me to know.  You said something about objection,

25   but you're objecting to the joint instructions.

1          **MR. LAIOLO:**  If there's differences between the

2      parties, different instructions, and there are some, we were

3      wondering if the Court has any inclination of when there might

4      be a ruling on which instruction would be used.

5          **THE COURT:**  And those are in the joint instructions?  I

6      haven't looked at them.

7          **MR. LAIOLO:**  Yes.  So some joint instructions, they'll

8      have a Defense version and they'll have a Plaintiff's version.

9          **THE COURT:**  Okay.  If you would like that before

10     opening statement, I can certainly let you know.  Do you want to

11     have a hearing?  It's easier for me if I do it orally than in

12     writing.  So I'll -- why don't we just do a hearing the week

13     before and I can tell you what my ruling on jury instructions

14     are.

15         **MR. LAIOLO:**  Okay.  Perfect.

16         **THE COURT:**  And have you submitted a verdict form?

17         **MR. LAIOLO:**  Yeah.  Once again, kind of like jury

18     instructions, the parties submitted competing verdict forms.

19         **THE COURT:**  Okay.  Let's take a look at it, because

20     often, I reject both sides in civil cases.  So let's take a look

21     at it.

22         *(The Court and Clerk conferred sotto voce.)*

23         **THE COURT:**  She suggested we do it November 4th in the

24     afternoon.  And if you're the last one of the day, then you can

25     stay and play around with the equipment if you want to do that.

1      **MR. LIDDIARD:**  That would be perfect.

2      **THE CLERK:**  So how about November 4th at 3:00 o'clock?

3      **THE COURT:**  Okay.  And that will be to rule on jury

4   instructions and the verdict form.  Anything else you need me to

5   rule on at that time?

6      **MR. LAIOLO:**  Not that I can think of, Your Honor.

7      **MR. LIDDIARD:**  No, I don't believe so.

8      **MR. WESLEY:**  We submitted a deposition -- objections to

9   deposition testimony that the other side designated.

10      **THE COURT:**  Okay.  I'll take a look at that.

11      **MR. LIDDIARD:**  We can take another look at that before

12   the 4th, given the rulings on the --

13      **THE COURT:**  That would be lovely.

14      **MR. LIDDIARD:**  Okay.

15      **THE COURT:**  Anything that I don't have to rule on, let

16   me know.  Otherwise, I'll be prepared to rule on that.

17      **MR. LIDDIARD:**  All right.  Thank you.

18      **MR. WESLEY:**  Your Honor, how does it work in terms of

19   the exhibits that go back with the jurors in light of the fact

20   that you're asking for a thumb drive?  Would we have for the

21   clerk a hard copy set?

22      **THE COURT:**  You can have either one.  They can take

23   hard copies back.  We also have the ability for them to play a

24   computer system back there.

25      **THE CLERK:**  Double-check it.

1    **THE COURT:**  Yeah.  Really double-check it.  The last

2    one we did, all the exhibits that I excluded were still on the

3    thumb drive, and they went back into the jury room, and then the

4    jury said, We're looking at exhibits that we don't remember

5    seeing during the trial.  So make sure your thumb drive has

6    everything off of it that doesn't belong there.

7         **MR. WESLEY:**  Sounds good.  Thank you.

8         **MR. LIDDIARD:**  Thank you.

9         **THE COURT:**  All right.  We'll see you then on

10   November 4th.  And I'm sorry I couldn't go forward with trial.

11   I really would have liked to have done this.

12        **MR. WESLEY:**  Thank you, Your Honor.

13        **MR. LIDDIARD:**  Thank you.

14        **THE COURT:**  Much more than what I'm doing right now.

15        *(Proceedings adjourned at 3:48 p.m.)*

16                          ★★★

17                   *REPORTER'S CERTIFICATE*

18        I, Anne Roldan, certify that I am a duly qualified
     and acting Official Court Reporter for the United States
19   District Court, that the foregoing is a true and accurate
     transcript of the proceedings as taken by me in the
20   above-entitled matter on August 12, 2024; and that the format
     used complies with the rules and requirements of the United
21   States Judicial Conference.

22   Date:  August 23, 2024

23   _____

24   *Anne Roldan, RMR, CRR, CSR 13095*

25