DYLAN J. LIDDIARD (BAR NO. 203055)
DALE R. BISH (BAR NO. 235390)
THOMAS J. MARTIN (BAR NO. 150039)
CHARLES A. TALPAS (BAR NO. 308505)
MIKAELA BURKHARDT (BAR NO. 328112)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 493-9300
Email: dliddiard@wsgr.com

*Attorneys for Defendants OSRX, Inc. and Ocular Science, Inc.*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMPRIMISRX, LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>OSRX, INC. ; OCULAR SCIENCE, INC.,<br><br>        Defendants. | Case No. 3:21-CV-01305-BAS-DDL<br><br>**DEFENDANTS' OMNIBUS MEMORANDUM OF POINTS & AUTHORITIES RE POST-TRIAL MOTIONS AND ISSUES**<br><br>Special Briefing Schedule Ordered<br><br>Judge:  Hon. Cynthia A. Bashant<br>Hearing Date: January 17, 2025<br>Time: 10:00 A.M.<br>Courtroom:  12B |
| OSRX, INC., OCULAR SCIENCE, INC.,<br><br>        Counterclaimants,<br><br>    vs.<br><br>IMPRIMISRX, LLC,<br><br>        Counterdefendant. | *Filed Concurrently With Defendants' Notice of Motion and Motion Re Post-Trial Motions and Issues and Declaration of Joseph Cohen* |

# TABLE OF CONTENTS

**Page**

THERE IS INSUFFICIENT EVIDENCE THAT THE MARKS ARE VALID............. 1

I.      THE MARKS ARE GENERIC.............................................................. 1

    A.      Uncontroverted Evidence of Genericness...................................... 2

        1.      Plaintiff's Testimony Regarding the Significance of Its Marks ........ 3

        2.      Context and Use of the Terms in the Relevant Industry................... 3

        3.      Plaintiff's Own Marketing Materials................................................. 6

        4.      Survey Evidence Confirms Genericness............................................. 7

    B.      Plaintiff Offered No Evidence to Rebut Genericness ................................. 8

        1.      Plaintiff's Abbreviated and Composite Terms Arguments Fail ........ 8

        2.      Plaintiff's Availability of Alternatives Arguments Fail ................... 9

        3.      Plaintiff's Acquired Distinctiveness Arguments Fail...................... 10

        4.      Plaintiff's Arguments Regarding PTO Status Fail .......................... 11

II.     SECONDARY MEANING EVIDENCE WAS INSUFFICIENT...................... 11

THE EVIDENCE OF "FAIR USE" COULD NOT BE REJECTED ........................... 13

THERE IS INSUFFICIENT EVIDENCE TO SUPPORT DAMAGES ....................... 14

PLAINTIFF LACKS STANDING ................................................................. 15

EQUITABLE ISSUES AND DEFENSES ....................................................... 16

I.      LACHES AND AQUIESCENCE ......................................................... 16

    A.      Factual Background.................................................................... 17

    B.      Argument..................................................................................... 19

        1.      Plaintiff's Claims Should Be Barred by Laches.............................. 19

        2.      Plaintiff's Claims Should Be Barred by Acquiescence ................... 21

II.     UNCLEAN HANDS .......................................................................... 21

    A.      Plaintiff's Inequitable Conduct in Interactions with the PTO ................. 22

    B.      Plaintiff's Inequitable Conduct in Its First Trademark Case .................... 22

    C.      Plaintiff's Inequitable Conduct in this Trademark Case ............................ 23

MISTRIAL BASED ON LACK OF JUROR AGREEMENT ....................................... 24

## TABLE OF AUTHORITIES

**Page**

### CASES

*3M Co. v. Intertape Polymer Group, Inc.*,
   423 F. Supp. 2d 958 (D. Minn. 2006) .................................................. 20

*Amusement Art, LLC v. Life is Beautiful, LLC*,
   2016 WL 6998566 (C.D. Cal. Nov. 29, 2016),
   *aff'd*, 768 F. App'x 683 (9th Cir. 2019) ............................................. 23

*Attridge v. Cencorp Div. of Dover Tech. Int'l, Inc.*,
   836 F.2d 113 (2d. Cir. 1987) ........................................................ 24, 25

*Birtcher Electro Med. Sys., Inc. v. Beacon Labs., Inc.*,
   738 F. Supp. 417 (D. Colo. 1990) ...................................................... 5

*Blood v. Titan Sports, Inc.*,
   1997 U.S. Dist. LEXIS 24485 (W.D.N.C. May 13, 1997)......................... 21

*Cairns v. Franklin Mint Co.*,
   292 F.3d 1139 (9th Cir. 2002) ......................................................... 13

*Cave Man Kitchens Inc. v. Caveman Foods LLC*,
   2020 WL 6874238 (W.D. Wash. Nov. 23, 2020)................................... 16

*CG Roxanne LLC v. Fiji Water Co.*,
   569 F. Supp. 2d 1019 (N.D. Cal. 2008).................................... 12, 13, 14

*Classic Foods Int'l Corp. v. Kettle Foods, Inc.*,
   468 F. Supp. 2d 1181 (C.D. Cal. 2007).................................. 2, 5, 10, 12

*Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*,
   125 F.3d 28 (2d Cir. 1997) ............................................................ 6, 14

*Danjaq LLC v. Sony Corp.*,
   263 F.3d 942 (9th Cir. 2001) ........................................................... 20

*Denver Urban Homesteading, LLC v. Devaes Inst.*,
   2015 WL 12552043 (C.D. Cal. Nov. 5, 2015) ..................................... 11

*Eastridge Dev. Co. v Halpert Assoc.'s, Inc.*,
   853 F.2d 772 (10th Cir. 1988) ..................................................... 24, 25

*Engineered Arresting Sys. Corp. v. Atech, Inc.*,
   356 F. Supp. 3d 1323 (N.D. Ala. 2018) ................................................ 9

*Fantasia Distrib., Inc. v. Myle Vape, Inc.*,
   2024 WL 3966035 (E.D.N.Y. Aug. 28, 2024) ........................................ 2

*Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*,
   198 F. 3d 1143 (9th Cir. 1999) ...................................................... 1, 2

*Fitbug Ltd. v. Fitbit, Inc.*,
  78 F. Supp. 3d 1180 (N.D. Cal. 2015) ................................................. 20

*FluorDX, LLC v. Quidel Corp.*,
  2019 WL 4599842 (S.D. Cal. Sept. 23, 2019) ................................. 16

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,
  826 F.2d 837 (9th Cir. 1987) .............................................................. 21

*Gaia Techs., Inc. v. Reconversion Techs., Inc.*,
  93 F.3d 774 (Fed. Cir. 1996) .............................................................. 16

*Grupo Gigante S.A. de C.V. v Dallo & Co.*,
  391 F.3d 1088 (9th Cir. 2004) ............................................................ 20

*Halicki Films, LLC v. Sanderson Sales & Mktg.*,
  547 F.3d 1213 (9th Cir. 2008) ............................................................ 16

*Hickory Farms, Inc. v. Snackmasters, Inc.*,
  500 F. Supp. 2d 789 (N.D. Ill. 2007) .............................................. 9, 10

*Hyson USA, Inc. v. Hyson 2U, Ltd.*,
  821 F.3d 935 (7th Cir. 2016) .............................................................. 21

*In re Pennington Seed, Inc.*,
  466 F.3d 1053 (Fed. Cir. 2006) ............................................................ 8

*Internet Specialties West, Inc. v. Milon-DiGirogio Enters., Inc.*,
  559 F.3d 985 (9th Cir. 2009) .............................................................. 20

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
  304 F.3d 829 (9th Cir. 2002) .............................................................. 19

*Ketab Corp. v. Mesriani Law Grp.*,
  2016 WL 2902333 (C.D. Cal. May 18, 2016),
  *aff'd*, 734 F. App'x 401 (9th Cir. 2018) .......................................... 12

*L'Oreal USA, Inc. v. Trend Beauty Corp.*,
  2013 WL 4400532 (S.D.N.Y. Aug. 15, 2013) ................................... 16

*Lindy Pen Co. v. Bic Pen Corp.*,
  982 F.2d 1400 (9th Cir. 1993), *abrogated on other grounds by*
  *SunEarth, Inc. v. Sun Earth Solar Power Co.*,
  839 F.3d 1179 (9th Cir. 2016) ............................................................ 14

*Liquid Controls Corp. v. Liquid Controls. Corp.*,
  802 F.2d 934 (7th Cir. 1986) ................................................................ 9

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................ 16

*McCullough v. Consol. Rail Corp.*,
  937 F.2d 1167 (6th Cir. 1991) ...................................................... 24, 25

*Miller v. Glenn Miller Prods, Inc.*,
  454 F.3d 975 (9th Cir. 2006) .............................................................. 20

*Nartron Corp. v. STMicroelectronics, Inc.*,
　305 F.3d 397 (6th Cir. 2002) ......................................................................... 4

*Nat'l Conf. of Bar Examiners v. Multistate Legal Studies, Inc.*,
　692 F.2d 478 (7th Cir. 1982) ......................................................................... 9

*Network Computers, Inc. v. Network Computer, Inc.*,
　1997 WL 601433 (N.D. Cal. Sept. 18, 1997) ............................................. 10

*Neutron Depot, L.L.C. v. Bankrate, Inc.*,
　798 F. App'x 803 (5th Cir. 2020) ................................................................ 16

*Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*,
　496 F.3d 1231 (11th Cir. 2007) ................................................................... 15

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
　324 U.S. 806 (1945) ..................................................................................... 21

*Retail Servs., Inc. v. Freebies Publ'g*,
　247 F. Supp. 2d 822 (E.D. Va. 2003),
　*aff'd*, 364 F.3d 535 (4th Cir. 2004) ............................................................. 2

*Rudolph Int'l, Inc. v. Realys, Inc.*,
　482 F.3d 1195 (9th Cir. 2007) .................................................................. 1, 4

*Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*,
　402 F.3d 1198 (Fed. Cir. 2005) ................................................................... 16

*Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*,
　621 F.3d 981 (9th Cir. 2010) ....................................................................... 21

*Shire City Herbals, Inc. v. Blue*,
　410 F. Supp. 3d 270 (D. Mass. 2019) .......................................................... 10

*Snyder's Lance, Inc. v. Frito-Lay N. Am., Inc.*,
　542 F. Supp. 3d 371 (W.D.N.C. 2021) ..................................................... 9, 12

*Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*,
　908 F.3d 313 (8th Cir. 2018) ....................................................................... 12

*Surgicenters of Am., Inc. v. Medical Dental Surgeries, Co.*,
　601 F.2d 1011 (9th Cir. 1979) ....................................................................... 3

*Teevee Toons, Inc. v. MP3.com, Inc.*,
　148 F. Supp. 2d 276 (S.D.N.Y. 2001) ..................................................... 24, 25

*Threshold Enters. Ltd. v. Pressed Juicery, Inc.*,
　445 F. Supp. 3d 139 (N.D. Cal. 2020) ................................................... *passim*

*United States PTO v. Booking.com B.V.*,
　591 U.S. 549 (2020) ................................................................................... 1, 9

*United States v. Stauffer*,
　922 F.2d 508 (9th Cir. 1990) ................................................................... 24, 25

*Welding Servs., Inc. v. Forman*,
     509 F.3d 1351 (11th Cir. 2007) .................................................................. 7, 9

*WSM, Inc. v. Hilton*,
     724 F.2d 1320 (8th Cir. 1984) ...................................................................... 10

*Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*,
     419 F.3d 925 (9th Cir. 2005) ..................................................................... 1, 10

*Youngevity Int'l v. Smith*,
     2018 WL 6305763 (S.D. Cal. Nov. 30, 2018) ................................................ 15

## STATUTES

15 U.S.C. § 1115 ............................................................................................. 13, 19

15 U.S.C. § 1117 .................................................................................................. 20

Cal. Code Civ. P. § 339 ....................................................................................... 20

## MISCELLANEOUS

1 McCarthy § 11:43 .............................................................................................. 11

2 McCarthy § 11:45 .............................................................................................. 13

2 McCarthy § 19:36 .............................................................................................. 13

2 McCarthy § 30:72 .............................................................................................. 13

2 McCarthy § 30:79 .............................................................................................. 13

## THERE IS INSUFFICIENT EVIDENCE THAT THE MARKS ARE VALID

The Court should invalidate the nine marks that still remain at issue pursuant to Defendants' claims for declaratory relief and, in the alternative, find that Plaintiff has failed to demonstrate the marks are valid and enforceable as a matter of law.[1]

## I.   THE MARKS ARE GENERIC

"A generic name—the name of a class of products or services—is ineligible for federal trademark registration." *United States PTO v. Booking.com B.V.*, 591 U.S. 549, 551 (2020). Where "an allegedly valid trademark has not been registered with the PTO, the plaintiff bears the burden of persuasion that the mark is not generic." *Rudolph Int'l, Inc. v. Realys, Inc.*, 482 F.3d 1195, 1198 (9th Cir. 2007); *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F. 3d 1143, 1146 (9th Cir. 1999).

"A court determines whether a mark is generic by (i) identifying the category of goods or services to which the mark is meant to apply and (ii) analyzing whether the relevant consuming public's primary perception of the mark is as a source of a product or as a type, category, or kind of product." *Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 148 (N.D. Cal. 2020) (citing *Filipino Yellow Pages*, 198 F.3d at 1147). Courts in the Ninth Circuit refer to this as the "who-are-you/what-are-you" test. *Id.* (citing *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 929 (9th Cir. 2005)). "If the relevant public primarily understands a mark as describing 'who' a particular good or service is, or where it comes from, then the mark is valid." *Id.* If instead "the relevant consuming public primarily understands the mark as describing 'what' the particular good or service is, then the mark is or has become generic." *Id.* In other words, "courts must ask whether 'the primary significance of the term in the minds of the consuming public is the product [and not] the producer.'" *Id.* (citation omitted).

---

[1] Although the Court expressly reserved Defendants' Rule 50 and other motions for post-judgment briefing, Tr. 750:3-25, aspects of those motions are intertwined with the factual evidence related to Defendants' claims for declaratory relief and are included here for context and to avoid redundancy in subsequent briefing. Defendants reserve the right to move comprehensively on the remaining issues following entry of judgment, if necessary.

Here, there is no factual dispute regarding the first step of the analysis, i.e., identifying the "goods" to which "the mark is meant to apply."

- PRED-MOXI is meant to apply to a compounded prescription eye medication combining prednisolone and moxifloxacin;

- DEX-MOXI is meant to apply to a compounded prescription eye medication combining dexamethasone and moxifloxacin;

- PRED-BROM is meant to apply to a compounded prescription eye medication combining prednisolone and bromfenac;

- PRED-GATI-BROM is meant to apply to a compounded prescription eye medication combining prednisolone, gatifloxacin and bromfenac;

- PRED-MOXI-BROM is meant to apply to a compounded prescription eye medication combining prednisolone, moxifloxacin and bromfenac;

- TIM-LAT is meant to apply to a compounded prescription eye medication combining timolol and latanoprost;

- TIM-BRIM-DOR is meant to apply to a compounded prescription eye medication combining timolol, brimonidine and dorzolamide; and

- TIM-BRIM-DOR-LAT is meant to apply to a compounded prescription eye medication combining timolol, brimonidine, dorzolamide and latanoprost.

As to the second step of the analysis, the uncontroverted evidence supports only one conclusion: the primary significance of each mark is a combination of the medications abbreviated in the mark. Because the marks answer the question "what are you?" they are generic. *See Filipino Yellow Pages*, 198 F.3d at 1147.

**A.    Uncontroverted Evidence of Genericness**

Genericness can be shown through various sources. *See Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F. Supp. 2d 1181, 1189-93 (C.D. Cal. 2007). A "non-exhaustive list of competent sources" includes "consumer surveys, testimony of consumers or trade professionals, dictionary definitions, uncontested usage of the mark by competitors to describe their products, generic usage in newspaper and magazine articles, and generic usage by the proponent of the trademark." *Fantasia Distrib., Inc. v. Myle Vape, Inc.*, 2024 WL 3966035, at *6 (E.D.N.Y. Aug. 28, 2024). Judgment as a matter of law is appropriate where, as here, these evidentiary sources are "so one-sided that there can be no doubt" the asserted marks are generic. *Retail Servs., Inc. v. Freebies Publ'g*, 247 F. Supp. 2d 822,

825 (E.D. Va. 2003), *aff'd*, 364 F.3d 535 (4th Cir. 2004) ("Although genericness is a question of fact, resolution of this question on summary judgment is nevertheless appropriate where 'the evidence is so one-sided that there can be no doubt'").

### 1. Plaintiff's Testimony Regarding the Significance of Its Marks

Throughout trial, Plaintiff's witnesses repeatedly confirmed their marks are used to identify the compounded medications themselves, rather than as a source-identifier. For example, when asked whether he was aware that Ocular was selling PRED-MOXI at the time Imprimis filed applications with the PTO, Mr. Baum testified:

> When you say PRED-MOXI, ***when I hear that, I think of the formulation***. And so they were making that formulation, for sure. How they were marketing it, I don't know.

*See* Tr. 173:4-6 (emphasis added). Other ImprimisRx witnesses, like Cindi White (VP of Sales & Marketing) and Andrew Boll (CFO), confirmed that the abbreviations in their marks were meant to signify the underlying generic name for the medication and—just as importantly—that they were not meant to signify anything else. *See, e.g.*, DX3000 at 244:7-13, 248:6-249:18; DX3005 at 79:11-79:23, 88:7-9, 100:5-8, 134:3-6.[2]

Tellingly, none of Plaintiff's witnesses testified that the asserted marks could signify anything other than the combination of medications for that particular formulation (*i.e.*, the "good" itself). In cases where the mark holder is unable to offer any potential significance aside from the product or service itself, courts find genericness as a matter of law. For example, in an oft-cited passage in *Surgicenters of Am., Inc. v. Medical Dental Surgeries, Co.*, the Ninth Circuit reasoned: "There is nothing in the record to indicate that any potential consumer considered the term 'Surgicenter' to mean anything other than a surgical center," so the "district court properly found that the consuming public connected the term 'Surgicenter' with the service rather than the server." 601 F.2d 1011, 1017 (9th Cir. 1979). Plaintiff's own testimony therefore confirms the marks are generic.

### 2. Context and Use of the Terms in the Relevant Industry

---

[2] For the Court's convenience, attached hereto as Addendum A is a compendium of excerpted images from exhibits admitted during trial.

Common usage in the industry likewise demonstrates the marks are generic. Both parties offered evidence regarding the conventional "multiple bottle" regimens for post-operative and glaucoma care, which gave rise to the demand for these compounded formulations in the first place. Tr. 287:5-288:9, 300:8-305:19; DX076.032-033, 086-088. The individual medications, which the parties combine into compounded formulations, are commonly prescribed for post-operative care (*i.e.*, prednisolone, dexamethasone, moxifloxacin, gatifloxacin and bromfenac) and glaucoma (*i.e.*, timolol, brimonidine, dorzolamide and latanoprost). Tr. 288:10-291:4; DX076.042, 087-088, 105, 110-111. These medications have "been around forever" and have been prescribed in combination—albeit in separate bottles—for just as long. *Id.* There are many branded and generic versions of these medications. Tr. 287:24-290:20; DX076.042, 087-088, 105, 110-111. Naturally, the branded versions use the same generic names at issue here to identify "what" their product is, whereas the name brand serves to identify "who" the source of the product is, *e.g.*, Vigamox (moxifloxacin); Zymaxid (gatifloxacin); Prolensa (bromfenac); Pred Forte (prednisolone); Alphagan (brimonidine); Xalatan (latanoprost); Combigan (brimonidine and timolol). DX076.042, 087, 105, 110-111.

Against that backdrop, it is implausible that eye doctors would understand the common names for these medications—whether abbreviated or not—signify a source, as opposed to describing medications that have been available for decades. *See Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 406-07 (6th Cir. 2002) (considering historical use of "smart power" as generic term within the semiconductor industry); *Realy's*, 482 F.3d at 1198 (historical context of "disinfectable" in relevant industry); *Threshold*, 445 F. Supp. 3d at 148 ("if the relevant consuming public primarily understands the mark as describing 'what' the particular good or service is, then the mark is or has become generic").[3] Indeed, this is precisely what Mr. Keegan's survey

---

[3] In fact, it is the eye doctors' familiarity with these medications that led both parties to use the abbreviations in the first place. As Ms. White testified, ImprimisRx "depends" on eye doctors recognizing the underlying generic medications within the asserted marks, since compounding pharmacies like ImprimisRx are not allowed to tell eye doctors how

(continued...)

demonstrated, i.e., that the vast majority of eye doctors associate the abbreviations with "what" the medications are not "who" makes them. Tr. 373:14-22 (only one third associate tested marks with any particular company); 376:16-18 (279 respondents), 502:18-504:10 (only 49 out of 279, or 17%, associate the tested marks with Plaintiff).

The evidence also shows the terms are used generically in scientific journals, which is highly probative of genericness. *See Birtcher Electro Med. Sys., Inc. v. Beacon Labs., Inc.*, 738 F. Supp. 417, 421 (D. Colo. 1990) ("articles from scientific journals that used the terms generically, as individual words and complete phrases" supports the "claim that the terms are not suggestive or descriptive, but generic"). For example, ImprimisRx's training materials reference scientific journal articles that demonstrate the individual medications, as well as the specific combinations at issue here, are used in the industry as generic names for those medications. *See* DX076.065-70, 095-101. For example, the article "Comparative analysis of intravitreal triamcinolone acetonide-moxifloxacin versus standard perioperative eyedrops in cataract surgery" (DX076.065-070), includes the following excerpts:

- Recently, the introduction of triamcinolone acetonide-moxifloxacin (Tri-Moxi), which contains 15 mg/mL of triamcinolone acetonide and 1mg/mL of moxifloxacin, has made 'dropless' surgery a new option.

- There are also other types of injectable compound drugs such as dexamethasone-moxifloxacin (Dex-Moxi) and dexamethasone-moxifloxacin-ketorolac (Dex-Moxi-Ketor).

- Dexamethasone-moxifloxacin (Dex-Moxi) or dexamethasone-moxifloxacin-ketorolac (Dex-Moxi-Ketor) can be used as alternatives to Tri-Moxi.

*See* DX076.065-070; *see also* DX076.095-101.

The evidence also shows that the same terminology is used generically to identify competitor's medications. *See, e.g.*, *Classic Foods*, 468 F. Supp. 2d at 1190 ("usage of the term by competitors" is "strong evidence"). For example, another compounding pharmacy, APS Pharmacy, lists its "smartdrops" formulations using the same exact

their formulations can be used. Tr. 290:21-291:14, 293:2-9. ImprimisRx uses easily recognizable abbreviations for the underlying medications *because* "physicians know what they can be used for." *See, e.g.*, DX076.063, 093, 116.

1   abbreviations and the full names of the medications in their combinations drops. *See*

2   DX008.005. Plaintiff also referenced other compounding pharmacies that use the

3   abbreviations but in a different order. *See, e.g.*, Tr. 343:22-345:10. Consistent with

4   industry terminology, Plaintiff's training materials include many examples of competitors

5   using the same medication names and/or abbreviations, generically, to describe their drug

6   products. *See, e.g.*, DX076.042, 047-048. Plaintiff even uses the same abbreviations to

7   refer to Defendants' formulations. *See* PX230 ¶ 18; DX076.044. Common usage in the

8   industry therefore supports finding that the marks at issue are generic.

9   ### 3.  Plaintiff's Own Marketing Materials

10      With respect to its own products, Plaintiff's brochures and catalogs categorize its

11  medications into portfolios of "umbrella" brands. *See* Tr. 283:20-23; DX076.051.

12  "Simple Drops" is the umbrella brand for its glaucoma drops, including TIM-LAT,

13  TIM-BRIM-DOR and TIM-BRIM-DOR-LAT. *See* Tr. 117:7-21, 283:20-23; DX032.

14  And "LessDrops" is the umbrella-brand for its topical eye drops, like PRED-MOXI,

15  PRED-BROM, PRED-GATI-BROM and PRED-MOXI-BROM (*e.g.*, Tr. 283:20-284:7,

16  284:14-19; PX226.011) and "DropLess" is the brand for injectables like DEX-MOXI

17  (*e.g.*, Tr. 115:14-17; 282:23-283:9; PX226.005).[4] Plaintiff's actual "brands" are "Simple

18  Drops" and "Less Drops," and the abbreviations are the medications that it can combine

19  into one bottle for eye doctors.[5] In other words, the abbreviations at issue here do not

20

21  [4] Where the nondescript abbreviations always appear next to stylized brands like "Simple

22  Drops," "LessDrops," "DropLess," and the ImprimisRx logo, the abbreviations do not
    serve as trademarks in the first place. *See Cosmetically Sealed Indus., Inc. v. Chesebrough-*

23  *Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997) (analyzing fair use and noting that
    "non-trademark use" was "evidenced by the fact that the source of the defendants' product

24  is clearly identified by the prominent display of the defendants' own trademarks").

    [5] *See, e.g.*, DX032.001-003 (describing "Simple Drops" formulations as "multiple

25  medications into one drop bottle" and "multiple medications into one combination drop");
    PX226.039 (describing "LessDrops" formulations as "unique steroid, antibiotic, and

26  nonsteroidal combination formulations"); PX226.005 (describing "DropLess"
    formulations as "combination injectable formulations" and "intraocular or periocular

27  injections of combinations of anti-inflammatory drugs and antibiotics"); PX228.037
    ("DropLess" order form labeling the listed "Compounded Formulation[s]" as "Injectable

28  Medications"); DX076.160 ("Simple Drops" order form labeling the listed "Compounded
    Formulation[s]" as "Topical Medications").

function as trademarks at all. They merely answer the question "What [medication] are you" and they are, therefore, generic. *See Threshold*, 445 F. Supp. 3d at 148.

There is no evidence suggesting the abbreviations signify anything but the underlying medications. On the contrary, the evidence shows the marks (*i.e.*, abbreviations like "TIM-LAT") are always adjacent to the full generic name of the medications (*e.g.*, "Timolol/Latanoprost") or a picture of the bottle that includes the full generic name. *See, e.g.*, DX032; PX226; PX227 (*passim*). With the full names printed next to the marks and on the bottles, the abbreviations can signify only one thing to eye doctors: the medications. When an "abbreviation is used in association with the generic words, rather than being used in a way that would give rise to a meaning distinct from those words," that is evidence the mark is generic. *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1360 (11th Cir. 2007).

Finally, in its marketing materials, Plaintiff instructs eye doctors to use the full generic names of the medication instead of, or interchangeably with, its purported trademarks. *See, e.g.*, PX227.025 ("Prednisolone Acetate-Gatifloxacin-Bromfenac" or "Prednisolone-Gatifloxacin-Bromfenac"); DX076.092 ("PRED-GATI-BROM" as an example of "COMPOUNDED EYE DROP" with "Antibiotic, Non-Steroidal Anti-Inflammatory, Steroid Anti-Inflammatory"); DX076.174 ("prednisolone 1% - gatifloxacin 0.5%"). In fact, two ImprimisRx emails expressly confirm that the abbreviations are the merely the "Short Name" of the full generic name, or "Long Name," of the medications it compounds. *See* PX2071.002; PX2072.005. All of this is to say that Plaintiff uses the "marks" to generically describe the ingredients in its formulations, and nothing more.

### 4. Survey Evidence Confirms Genericness

Finally, the survey evidence at trial confirms that the marks are generic. Here, Mr. Groehn's survey results overwhelmingly demonstrated genericness beyond the 50% threshold, Tr. 505:17-506:15, and Plaintiff did not conduct its own genericness survey to rebut Mr. Groehn's. On the contrary, Plaintiff's survey expert, Mark Keegan, agreed Mr.

1  Groehn's *Teflon* survey was administered correctly and admitted his own secondary

2  meaning survey showed indications of genericness. *See* Tr. 408:3-22.

3  ### B.    Plaintiff Offered No Evidence to Rebut Genericness

4  Plaintiff offered no competent evidence to overcome a finding of genericness. Most

5  saliently, Plaintiff did not offer any direct evidence from eye doctors regarding how they

6  view the primary significance of Plaintiff's marks.

7  Instead, Plaintiff's substantive theories against genericness fit into four categories:

8  (i) that the abbreviation and/or combination of the generic names for the medications at

9  issue somehow makes the marks not generic; (ii) that the availability of potential

10 alternative marks somehow renders the marks not generic; (iii) that its marks are somehow

11 not generic because it was purportedly the first to market particular formulations, invested

12 in their branding, and developed some level of secondary meaning; and/or (iv) that its

13 registration status with the PTO somehow means the marks are not generic. As explained

14 below, Courts routinely reject these arguments as irrelevant or legally insufficient.

15 ### 1.    Plaintiff's Abbreviated and Composite Terms Arguments Fail

16 It is undisputed that prednisolone, dexamethasone, gatifloxacin, moxifloxacin,

17 bromfenac, timolol, brimonidine, dorzolamide and latanoprost are the generic names of

18 commonly-used medications. *See* DX076.042, 087-088, 105, 110-111. It is likewise

19 undisputed that the generic name of a medication cannot be monopolized via trademark:

20 > This situation may be contrasted with pharmaceutical products where a
21 > generic name is designated for a new pharmaceutical product and its
   > manufacturer associates it with a brand name. For example, ibuprofen is the
22 > generic term designated for a particular nonsteroidal anti-inflammatory drug
   > and ADVIL is a brand name indicating a source of the drug. Trademark
   > protection does not inure to the generic name there and it does not do so here.
23

24 *In re Pennington Seed, Inc.*, 466 F.3d 1053, 1058 (Fed. Cir. 2006).

25 Plaintiff instead suggests that its marks are not generic because it combines

26 multiple terms and abbreviates them. There is ample case law dealing with "composite"

27 marks that combine two generic terms and/or are abbreviations for generic terms.

28 When analyzing a combination of multiple generic elements (known as a

"composite mark"), courts ask whether the combination results in some meaning that is more than "the sum of their parts." *Hickory Farms, Inc. v. Snackmasters, Inc.*, 500 F. Supp. 2d 789, 795 (N.D. Ill. 2007) ("Other composite terms are nothing more than the sum of their parts, such as 'multistate bar examination' and 'light beer'") (noting courts are not precluded "from examining the meanings of the component parts in determining the meaning of the mark as a whole") (quoting *Liquid Controls Corp. v. Liquid Controls. Corp.*, 802 F.2d 934, 938 (7th Cir. 1986); *Threshold*, 445 F. Supp. 3d at 150 (same).

It is likewise established that abbreviations and acronyms for generic terms are themselves generic unless the abbreviation "has a meaning distinct from the underlying words." *See Engineered Arresting Sys. Corp. v. Atech, Inc.*, 356 F. Supp. 3d 1323, 1342 (N.D. Ala. 2018) (holding "BAK-12" not distinct from "break arresting kit-12") (quoting *Welding Servs.*, 509 F.3d at 1359); *see also Nat'l Conf. of Bar Examiners v. Multistate Legal Studies, Inc.*, 692 F.2d 478 (7th Cir. 1982) (holding "MBE" generic).

With those two frameworks in place, the analysis is straight forward. First, nobody suggested another possible significance for the terms, whether alone or in isolation, and the evidence confirms that there is none. *Supra* pp. 2-3. Accordingly, each combination of the generic medication names is nothing more than the sum of its parts, and are therefore generic.[6] Second, there is no evidence that the abbreviations have significance to eye doctors aside from the medications themselves. *Supra* pp. 3-6. Accordingly, there is no basis to infer that the abbreviations give rise to any meaning that is distinct from the underlying generic medication names.[7] Thus, Plaintiff's abbreviations and composite terms arguments do not refute genericness.

### 2. Plaintiff's Availability of Alternatives Arguments Fail

---

[6] "Further, for an asserted trademark such as PRETZEL CRISPS that is a 'compound of generic elements' ('pretzel' and 'crisps'), the mark 'is generic if the combination yields no additional meaning to consumers capable of distinguishing the goods or services.'" *Snyder's Lance, Inc. v. Frito-Lay N. Am., Inc.*, 542 F. Supp. 3d 371, 382 (W.D.N.C. 2021) (quoting *Booking.com*, 591 U.S. at 558-59).

[7] *Welding Servs.*, 509 F.3d at 1360 (finding an abbreviation generic when used to describe defendant's goods and when "used in association with the generic words" rather than "in a way that would give rise to a meaning distinct from those words").

1   At trial, Plaintiff emphatically pointed to "evidence" that Defendants could have
2   used different abbreviations and/or arranged them in different orders. *See, e.g.*, Tr.
3   252:17-254:11. It is a well-settled principle of trademark law, however, that the
4   availability of alternatives cannot render a generic term protectable. "[In] analyzing
5   whether a term is generic, the existence and widespread use of alternative terms is
6   immaterial." *Threshold*, 445 F. Supp. 3d at 154; *Shire City Herbals, Inc. v. Blue*, 410 F.
7   Supp. 3d 270, 296 (D. Mass. 2019) (same).

8   ### 3.   Plaintiff's Acquired Distinctiveness Arguments Fail

9   Plaintiff offered testimony regarding its investment into the "brands" for those
10  newly introduced formulations, Tr. 121:10-15, 128-130, arguing that the marks did not
11  exist previously but had attained "secondary meaning" through Plaintiff's investment.

12  Courts routinely reject that argument. "A generic mark 'cannot become a trademark
13  under any circumstances.'" *Network Computers, Inc. v. Network Computer, Inc.*, 1997
14  WL 601433, at *5 (N.D. Cal. Sept. 18, 1997) (quoting *Surgicenters*, 601 F.2d at 1014).
15  "Generic marks receive no trademark protection, even with a showing of secondary
16  meaning, because they merely identify what a product is." *Classic Foods*, 468 F. Supp.
17  2d at 1188 (citing *Yellow Cab*, 419 F.3d at 927).[8] For example, in *Hickory Farms*, the
18  court rejected plaintiff's argument that its investment into the "Beef Stick" brand should
19  inform whether the term beef stick is generic.

20  > Hickory Farms argues that its substantial investment in its BEEF STICK and
21  > turkey stick marketing campaign should factor into the Court's analysis of
    > whether the terms are generic. This emphasis, however, is misplaced. The
22  > Seventh Circuit has held that "a generic term … may not be exclusively
    > appropriated as a trademark, regardless of the length of time it may have
    > been used by a single distributor at the consumer level and despite whatever
23  > promotional effort he may have expended to exploit it."

24  500 F. Supp. 2d at 795 (citations omitted). For the same reasons, Plaintiff's arguments
25  regarding the acquired distinctiveness of its marks cannot defeat a finding of genericness.

26  _____

27  [8] "[N]o matter how much money and effort [plaintiff] has poured into promoting its
    product and what success it has achieved in securing public identification, [plaintiff]
28  cannot deprive others of the right to call a product or service by its generic title." *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1327 (8th Cir. 1984).

### 4.    Plaintiff's Arguments Regarding PTO Status Fail

Finally, Plaintiff pointed to the status of its marks on the PTO's principal register and supplemental register as presumptive evidence that the marks are not generic. For any marks not registered on the principal register, including marks on the supplemental register, the mark holder bears the burden of proof to establish that the marks are not generic, and there are no evidentiary presumptions regarding the validity of those marks. *See* 2 McCarthy § 19:36; *Denver Urban Homesteading, LLC v. Devaes Inst.*, 2015 WL 12552043, at *5 (C.D. Cal. Nov. 5, 2015) (finding it "irrelevant and erroneous" to cite the supplemental register as evidence that a mark is not generic).

With respect to marks on the primary register, Plaintiff is correct that there is a presumption of validity, but it is rebuttable. *See Threshold*, 455 F. Supp. 3d at 155. Here, Defendants easily rebutted that presumption with overwhelming evidence of genericness. *Supra* pp. 2-7. Especially so, when Plaintiff did not make any effort to show that its marks are, in fact, distinctive. The burden then shifts back to Plaintiff to show that its marks are not generic. In sum, the PTO listings cannot save Plaintiff from genericness.

## II.    SECONDARY MEANING EVIDENCE WAS INSUFFICIENT

As an alternative ground for finding that the marks are not valid and protectable, the evidence is also insufficient to find acquired distinctiveness.

Plaintiff is not entitled to a presumption of secondary meaning for any of the marks. For the seven marks that were refused registration on the Principal Register, Plaintiff must show secondary meaning. *See* 2 McCarthy § 19:36. While two of the marks are on the Principal Register (PRED-MOXI and DEX-MOXI), the PTO's registration of those marks was not conditioned on any showing of acquired distinctiveness. Therefore, Plaintiff was entitled only to a *rebuttable* presumption of "inherent distinctiveness" as to those two marks, not a presumption of secondary meaning. *See* 1 McCarthy § 11:43. That presumption necessarily burst because of the overwhelming contrary evidence (*supra* pp. 2-7) and, more fundamentally, because Plaintiff tacitly conceded that its marks are ***not*** inherently distinctive. *See* Tr. 724:11-13 ("They're descriptive"). Thus, Plaintiff had to

1  show secondary meaning for all marks.

2  There was insufficient evidence to find that any of the marks acquired secondary

3  meaning. The only direct evidence that Plaintiff offered regarding secondary meaning

4  was the survey conducted by Mr. Keegan. Putting aside the shortcomings of his survey

5  design and methodology, he tested only two of the marks (PRED-GATI-BROM and

6  PRED-MOXI-BROM), and there is no survey evidence regarding the other seven. As to

7  those seven marks, there is zero basis to support a finding of secondary meaning.

8  "Evidence indicating that one of the marks had acquired secondary meaning does not

9  necessarily show that any other mark had acquired it as well." *Sturgis Motorcycle Rally,*

10  *Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 334 (8th Cir. 2018) (affirming

11  judgement to set aside jury verdict under Rule 50 for lack of evidence on mark validity).

12  Even for the two marks he tested, Mr. Keegan admitted that he could ***not*** conclude

13  that they had acquired a "sufficient" level of secondary meaning. Tr. 388:24-389:2. As

14  Mr. Keegan conceded, the survey results fell short of the threshold that he uses as a "rule-

15  of-thumb" for sufficient secondary meaning, Tr. 402:7-403:25, even without

16  implementing a control. Thus, even facially, Mr. Keegan's survey is not a sufficient basis

17  to find secondary meaning. The actual levels of secondary meaning shown in his survey

18  are within the range where courts have found a lack of secondary meaning, including at

19  summary judgment. *See Snyder's Lance*, 542 F. Supp. 3d at 402-03 (38.7%); *Classic*

20  *Foods*, 468 F. Supp. 2d at 1193 (34.8%).

21  Otherwise, Plaintiff only offered two other circumstantial arguments going to

22  acquired distinctiveness: (i) self-serving testimony by Plaintiff's witnesses about how eye

23  doctor's view Plaintiff's marks and (ii) testimony regarding purported investment into its

24  asserted marks. As courts have recognized, however, neither of those arguments is

25  sufficient to establish secondary meaning. *See, e.g.*, *CG Roxanne LLC v. Fiji Water Co.*,

26  569 F. Supp. 2d 1019, 1031 (N.D. Cal. 2008) (collecting cases where self-serving

27  testimony by partial witnesses and evidence of investment in advertising were held to be

28  insufficient); *Ketab Corp. v. Mesriani Law Grp.*, 2016 WL 2902333, at *6 (C.D. Cal.

1  May 18, 2016) (holding same evidence insufficient to establish secondary meaning),

2  *aff'd*, 734 F. App'x 401 (9th Cir. 2018).

3                            *       *       *       *

4       Because the evidence is overwhelming that the composite abbreviations at issue

5  are generic and/or have not acquired a significant amount of secondary meaning, the

6  Court should invalidate the marks altogether or, in the alternative, find that Plaintiff has

7  not met its burden to establish validity as a matter of law.

8           **THE EVIDENCE OF "FAIR USE" COULD NOT BE REJECTED**

9       The Court should find Plaintiff failed to demonstrate infringement as matter of law

10  because Defendants' limited use of the marks in question indisputably constitutes fair use.

11  In the Ninth Circuit, "a junior user is always entitled to use a descriptive term in good

12  faith in its primary, descriptive sense other than as a trademark." *Cairns v. Franklin Mint

13  Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002) (citing 2 McCarthy § 11:45). The defendant

14  must prove that its use of the term is not as a trademark or service mark, that it uses the

15  term "fairly and in good faith" and that it only uses the term to describe its goods. *See,

16  e.g.*, *CG Roxanne*, 569 F. Supp. 2d at 1034 (citing 15 U.S.C. § 1115(b)).

17       Plaintiff does not dispute that Defendants abbreviations accurately describe

18  Defendants' compounded medications. *See, e.g.*, Tr. 286:23-287:4. There is no evidence

19  that Defendants use them *as a trademark* or that they ***could*** signify anything other than

20  the underlying medications. *Supra* pp. 2-6. Courts have dismissed similar trademark

21  infringement claims at the pleading stage on fair use grounds where, as here, it is clear

22  from Defendants' labelling that brands like "OSRX," "Ocular Science" and "OMNI"

23  communicate the source of the product, and not terms like "PRED-MOXI," "DEX-

24  MOXI," etc. *Threshold*, 445 F. Supp. 3d at 155-56 ("It is clear from the label that 'Pressed

25  Juicery' and not 'wellness shot' communicates the source of Pressed Juicery's product").

26       Plaintiff's sole evidence regarding Defendants' intent was an email where Eric

27  Garner acknowledged the existence of Plaintiff's trademark registrations. *See* PX202; Tr.

28  235:7-236:3. That, however, does not show that Defendants' use of the terms was a bad

1    faith attempt to "traffic on" Plaintiff's purported goodwill. *Threshold*, 445 F. Supp. 3d at

2    156. The "fair use" doctrine expressly contemplates that junior users cannot be foreclosed

3    from using a descriptive term that describes her own products, regardless of whether she

4    knows that the term is claimed by someone else on the supplemental register.

5          In any event, the overwhelming evidence regarding Defendants' accurate use of the

6    abbreviated terms cannot support a finding of bad faith. Defendants do not use the terms

7    in any stylized or promotional manner that might suggest they were meant to be used as

8    source identifiers. *See* Tr. 527:2-9; 532:23-533:15. And, whenever Defendants use the

9    terms, they are surrounded by Defendants' own logos and branding, making clear that

10   there is no intent to deceive regarding source. Such use plainly falls within the bounds of

11   fair use. *See, e.g.*, *CG Roxanne*, 569 F. Supp. 2d at 1034 (considering "the manner in

12   which" mark is used, including that "the mark is placed in small font on the back of the

13   bottle"); *Chesebrough-Pond's*, 125 F.3d at 30 (noting that fair use was "evidenced by the

14   fact that the source of the defendants' product is clearly identified by the prominent

15   display of the defendants' own trademarks").

16          **THERE IS INSUFFICIENT EVIDENCE TO SUPPORT DAMAGES**

17          Plaintiff failed to present evidence that would provide the jury with a legally

18   sufficient basis to support a finding of damages. To obtain actual damages for trademark

19   infringement, a plaintiff "must prove both the fact and the amount of damage." *See Lindy*

20   *Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993), *abrogated on other*

21   *grounds by SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016).

22   "Recovery of damages for trademark infringement is subject to the usual standards of

23   damages: plaintiff must prove both causation and amount." 2 McCarthy § 30:72. Plaintiff

24   must prove "a proper segregation of those sales deemed infringing from those that are

25   not," and this burden cannot be met "by mere speculation." *Id.* § 30:79.

26          In its case, Plaintiff offered evidence of Defendants' gross profits, as a purported

27   measure of Plaintiff's actual damages, but did not offer evidence of a single sale that

28   resulted from the alleged infringement. Plaintiff admitted, including through corporate

1    testimony it could not identify a single account that it lost as a result of the alleged

2    infringement. *See* DX3000 at 98:10-15, 102:1-7. Indeed, Plaintiff showed only a few stray

3    instances in which Defendants actually used the marks in question. Yet Plaintiff's expert

4    assumed (without any basis in evidence) that all of Defendants' sales were wrongful *even*

5    *if the customer was not exposed to the alleged infringement*. Tr. 39:21-24, 440:8-15.[9]

6        Without any evidence of causal connection, Plaintiff cannot recover actual

7    damages in the form of lost profits. *See Youngevity Int'l v. Smith*, 2018 WL 6305763, at

8    *4 (S.D. Cal. Nov. 30, 2018) (granting summary judgment to defendants on monetary

9    damages where evidence "merely shows that distributor sales went down without any

10   indication as to why"); *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496

11   F.3d 1231, 1251-52 (11th Cir. 2007) (affirming grant of Rule 50 motion in trademark

12   infringement case for lack of causal evidence to support monetary damages). Because

13   Plaintiff failed to offer any evidence that would bridge the gap between Defendants'

14   profits and Plaintiff's damages, its claim for damages should be dismissed.

15                        **PLAINTIFF LACKS STANDING**

16       ImprimisRx initially filed this lawsuit on July 20, 2021, bringing claims of

17   trademark infringement against Defendants. *See* ECF No. 1 ¶¶ 47-57. It is undisputed that

18   the marks were owned by a separate legal entity, Harrow IP, LLC ("Harrow IP"), a

19   subsidiary of Harrow Health, Inc. (formerly Imprimis Pharmaceuticals, Inc.), which are

20   not parties to this action.[10] ImprimisRx claims it has standing by virtue of a license

21   agreement with a purported "Effective Date" of November 29, 2019. *See* DX095.

22   _____

23   [9] Plaintiff's expert was (correctly) precluded from offering his lost profits opinion at trial
     because it included sales due to purported trademark infringement and false advertising

24   with no way to disaggregate the two. *See* ECF No. 318 at 8:16-9:2. Plaintiff then urged
     that it could present Defendants' profits to the jury under a disgorgement theory, arguing

25   (incorrectly) that disgorgement of profits constitutes actual damages. Plaintiff's expert
     never should have been allowed to present Defendants' profits to the jury in the first place,

26   as there is no connection between those and the allegedly infringing activity. By presenting
     Defendants' profits to the jury, Dr. Wunderlich presented the same profits numbers that

27   Court had excluded in its motion *in limine* order (ECF No. 316).
     [10] Imprimis Pharmaceuticals is the applicant and registrant for most of the marks at issue.

28   See PX172 (PRED-MOXI); PX173 (DEX-MOXI); PX165 (PRED-GATI-BROM; PX170
                                                              (continued...)

1    However, as Plaintiff's CEO conceded at trial, the license *agreement was not*

2  *signed until August 3, 2021*, Tr. 200:11-20, *i.e.*, after this lawsuit was filed. This testimony

3  was not refuted or corrected, making it an undisputed fact. It is likewise undisputed that

4  PRED-MOXI-BROM was not added to the license until August 22, 2022, more than a

5  year after Plaintiff filed its lawsuit. *See* Tr. 200:11-20, 202:5-14. This is fatal to Plaintiff's

6  claims.

7    As the Court knows, trademark standing is limited to the mark's owner or someone

8  with an ownership interest (*e.g.*, assignment or exclusive license). *See Halicki Films, LLC*

9  *v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1225 (9th Cir. 2008). But standing is

10  measured "at the commencement of suit," which in turn impacts the Court's jurisdiction.[11]

11  Because Plaintiff did not have standing to pursue its claims at the outset of the case, its

12  claims must be dismissed. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 570 n.5 (1992).

13  ## EQUITABLE ISSUES AND DEFENSES

14  ## I.    LACHES AND AQUIESCENCE

15    Plaintiff and Defendants both used common abbreviations for the ophthalmic

16  medications that they compounded at their respective pharmacies. Plaintiff and its

---

(TIM-BRIM-DOR); PX166 (TIM-BRIM-DOR-LAT), PX171 (TIM-LAT), PX168 (PRED-BROM). Imprimis Pharmaceuticals, Inc. changed its name to Harrow Health, Inc. ("Harrow Health"). Tr. 158:8-19. Harrow Health then transferred its IP to Harrow IP on November 1, 2019. *See* PX210; Tr. 135:6-16, 136:16-23. Thereafter, Harrow IP registered the other two marks at issue, MOXI-BROM and PRED-MOXI-BROM. PX167; PX169.

[11] *See Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202 n.3 (Fed. Cir. 2005) ("The initial standing of the original plaintiff is assessed at the time of the original complaint, even if the complaint is later amended."); *Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 779-80 (Fed. Cir. 1996) (holding a mid-litigation *nunc pro tunc* assignment of patent and trademark rights was ineffective to cure the jurisdictional defect created by plaintiff's lack of standing on the date of the commencement of the action); *Neutron Depot, L.L.C. v. Bankrate, Inc.*, 798 F. App'x 803, 806 n.4 (5th Cir. 2020) ("[i]f plaintiff is not the owner of the mark at the time suit was filed, that defect cannot be cured by a later assignment"); *Cave Man Kitchens Inc. v. Caveman Foods LLC*, 2020 WL 6874238, at *4 (W.D. Wash. Nov. 23, 2020) (relying on *Gaia* to hold that a *nunc pro tunc* assignment did not confer standing to sue because it "merely reflects that an alleged oral agreement was made" and not that the requisite written transfer was executed on that pre-filing date); *L'Oreal USA, Inc. v. Trend Beauty Corp.*, 2013 WL 4400532, at *12 (S.D.N.Y. Aug. 15, 2013) ("a declaration [asserting plaintiff was assigned the trademarks] executed after the commencement of this action cannot serve as the basis for standing"). *Cf. FluorDX, LLC v. Quidel Corp.*, 2019 WL 4599842, at *3 (S.D. Cal. Sept. 23, 2019) (evidence of title at time complaint filed required for plaintiff to have standing).

corporate affiliates were aware that Defendants were using the same abbreviations to describe their medications by December 2015. Yet they made an affirmative (and strategic) decision to "lay in wait" for six years before taking any action. Because this conduct is the epitome of laches and acquiescence, Plaintiff's claims should be dismissed.

### A.    Factual Background

On December 14, 2015, the PTO expressly referred Imprimis Pharmaceuticals to Ocular Science's website, and included screenshots, which showed that Ocular Science was using the exact same abbreviations (*e.g.*, PRED-MOXI, DEX-MOXI and PRED-KETOR) in connection with its identical products. *See* DX005.002. In April 2016, Imprimis Pharmaceuticals responded to the PTO. *See* DX011.008. Imprimis Pharmaceuticals confirmed it was "aware" of Ocular Science's use and represented it was "taking steps necessary to prevent the company from making, using, and selling Applicant's compounded formulations using Applicant's mark." *Id.*

Indeed, Imprimis Pharmaceuticals *had* filed a trademark lawsuit against Ocular Science in February 2016 but also made the conscious decision not to include these marks at the time. *See* PX230 ¶¶ 9, 21-31; Tr. 144:7-11. The Complaint itself acknowledged Ocular Science's use of the PRED-MOXI, DEX-MOXI and PRED-KETOR abbreviations, *inter alia*, but did not allege that use of those marks constituted trademark infringement. *See* PX230 ¶¶ 18, 21-31; Tr. 144:24-145:8.

The parties settled those claims in 2017, DX027, through a settlement agreement, a general release, a Section 1542 waiver, and modest payment. *Id.* ¶ 2. By the time of the settlement, the PRED-MOXI and DEX-MOXI marks were registered (PX172, PX173), and Imprimis Pharmaceuticals had filed trademark applications for PRED-GATI-BROM (DX049.227), TIM-LAT (PX171), TIM-BRIM-DOR (DX024), and TIM-BRIM-DOR-LAT (DX022). The parties agreed that Ocular Science could continue selling its formulations, without any restrictions on its use of the abbreviations. *See* DX027 ¶ 5. The parties agreed that *if the pending patents were issued*, Ocular Science would cease future sales and would make royalty payments for past sales. *Id.* In other words, Imprimis

Pharmaceuticals gambled that *if* the patents ultimately issued, it would receive a windfall from the past sales made by Ocular Science. As Mr. Baum testified, this was a calculated decision based on his assumption that the patents would issue.

> **Q.** And then it says, If the patent shall be issued, Ocular Science shall cease sales of all Imprimis Products. Do you see that?
>
> **A.** Yes.
>
> **Q.** And was that part of the reason why you did not sue based on these products?
>
> **A.** Right. We thought the patents would issue. They were being – you know, going through the process at the USPTO. And if they issued, ***then there wouldn't be any reason to be upset about the trademarks***.

Tr. 144:21-145:8, 147:3-21 (emphasis added). Mr. Baum further testified that the settlement agreement did not prevent Ocular Science from using the marks in question:

> **Q.** In your view, did that payment deter them from infringing your trademarks in the future?
>
> **A.** No.
>
> **Q.** Did you see them infringe additional marks after that?
>
> **A.** Yes.
>
> **Q.** Where did you see it?
>
> **A.** Trade shows, advertisements. We heard about it from our sales people....

Tr. 148:2-10.

Plaintiff was thus fully aware of Defendants' use of the marks. *See* PX216.009; Tr. 148:2-10. Plaintiff also closely monitored Defendants' marketing strategies and was aware when Defendants launched competing formulations. *See* Tr. 282:18-284:13. Yet Plaintiff did nothing. Contemporaneous internal documents further reveal Plaintiff's indifference toward the use of its purported trademarks, and that ImprimisRx purposefully never sent a cease-and-desist letter. *See* DX080; DX081; Tr. 196:12-18.[12]

Meanwhile, OSRX spent years trying to compete with ImprimisRx on price and

---

[12] ImprimisRx sales training materials used the same abbreviations at issue (*i.e.*, its own purported trademarks) to describe OSRX's identical formulations. *See* DX076.043-044. It did not inform its sales staff that OSRX "should not be using" those abbreviations to describe its own products. *See* Tr. 286:3-25.

1   customer service. *See* Tr. 526:23-528:16, 285:17-286:2; 327:11-20.1. Doing so required

2   massive investment, starting with OSRX's CEO depleting his family's life savings to get

3   the Company started. *See* Tr. 570:6-571:5. ImprimisRx sat back and did nothing (Tr.

4   571:11-17), as years went by with OSRX slowly increasing its sales, albeit usually at a

5   loss. PX 182 & Tr. 443:13-445:2, 566:11-567:6. Then, out of nowhere, ImprimisRx filed

6   this lawsuit claiming that every sale made during those years of silence was wrongful.

7   **B.   Argument**

8   The Lanham Act expressly contemplates that courts can and should exercise their

9   equitable powers, including laches and acquiescence, in trademark infringement cases.

10  *See* 15 U.S.C. § 1115(a)-(b).

11  **1.   Plaintiff's Claims Should Be Barred by Laches**

12  "'Laches is an equitable time limitation on a party's right to bring suit,' resting on

13  the maxim that 'one who seeks the help of a court of equity must not sleep on his rights.'"

14  *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002) (citations

15  omitted). Laches applies where a plaintiff unreasonably delays bringing trademark claims

16  and that delay causes prejudice to the alleged infringer. *Id.* at 835.

17  If laches mean anything at all, it must apply here. The owner of the mark not only

18  knew about Defendants' use of the abbreviations in 2015, it made an affirmative, strategic

19  decision to do nothing about the alleged infringement. At the same time, Plaintiff

20  misleadingly represented to the PTO that it was "taking steps" to stop the Defendants'

21  purportedly infringing conduct. Only once Defendants had acquired traction in the field,

22  and rejected Mr. Baum's overture of an acquisition, did Plaintiff act on the marks. Plaintiff

23  does not offer any justification or excuse for its delay because there is none.

24  Because the Lanham Act does not have its own statute of limitations, courts

25  consider the limitations period of the most closely analogous state law claims. *Jarrow*,

26  304 F.3d at 838. If any part of the allegedly infringing conduct occurs outside the

27  analogous limitations period, the delay is presumptively unreasonable. *Id.* at 836-37. Prior

28  Ninth Circuit cases have relied on California's four-year catch-all statute of limitations,

1    but they did not analyze the question in depth, since the parties agreed to the four-year

2    period. *See Internet Specialties West, Inc. v. Milon-DiGirogio Enters., Inc.*, 559 F.3d 985,

3    990 n.2 (9th Cir. 2009); *Miller v. Glenn Miller Prods, Inc.*, 454 F.3d 975, 997 n.11 (9th

4    Cir. 2006); *Fitbug Ltd. v. Fitbit, Inc.*, 78 F. Supp. 3d 1180, 1189 (N.D. Cal. 2015) (noting

5    no case actually analyzes the proper limitations period). The most analogous state law

6    claim, however, is common law trademark infringement, which has a two-year limitations

7    period. *See Fitbug*, 78 F. Supp. 3d at 1189-90 (finding "meritorious" argument that two-

8    year period applied without deciding the issue); Cal. Code Civ. P. § 339. Ultimately, it

9    does not matter whether it is two or four years because laches is an equitable doctrine that

10   clearly and unambiguously should preclude Plaintiff's strategic delay here.

11        Defendants were unquestionably prejudiced by Plaintiff's strategic delay. Prejudice

12   exists, as here, when an alleged infringer took actions or suffered consequences it would

13   not have if the plaintiff had timely brought suit. *See Danjaq LLC v. Sony Corp.*, 263 F.3d

14   942, 955 (9th Cir. 2001). A party can show prejudice by proving that it has continued to

15   build a valuable business around its trademark during the time that the plaintiff delayed

16   the exercise of its legal rights. *See Grupo Gigante S.A. de C.V. v Dallo & Co.*, 391 F.3d

17   1088, 1105 (9th Cir. 2004) (affirming summary judgment on laches in Lanham Act case).

18   Defendants made significant investments into their own brand and growing their own

19   business. Defendants also continued to sell their formulations, and use industry standard

20   abbreviations when it introduced new formulations, all of which served only to increase

21   the amount of damages that Plaintiff would try to recover in this lawsuit.

22        Had Plaintiff raised the issue, for example in a cease and desist letter, Defendants

23   could have brought the matter to the PTO's attention and otherwise avoided the prospect

24   of the massive windfall that Plaintiff now seeks. At a minimum, Plaintiff's ability to

25   recover damages should be limited as a consequence of its delay in asserting its claims.

26   *See* 15 U.S.C. § 1117 (damages recoverably "subject to the principles of equity"); *3M Co.

27   v. Intertape Polymer Group, Inc.*, 423 F. Supp. 2d 958, 966 (D. Minn. 2006) (noting that

28   even if claims are not barred by laches, damages may be limited by delay).

### 2. Plaintiff's Claims Should Be Barred by Acquiescence

Acquiescence and laches are "very similar" and "closely related concepts." *See Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 988-89 (9th Cir. 2010). Acquiescence "limits a party's right to bring suit following an *affirmative* act by word or deed by the party that conveys implied consent to another." *Id.*; *see also Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 940 (7th Cir. 2016) (prevents owner "from impliedly permitting another's use of his mark and then attempting to enjoin that use after the junior user has invested substantial resources to develop the mark's good will"). "The elements of a *prima facie* case for acquiescence are as follows: (1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *Seller Agency Council*, 621 F.3d at 989.

Here, Plaintiff's delay was unreasonable, and Defendants were prejudiced, for the same reasons described above (*i.e.*, the second and third elements). The first element is satisfied because Plaintiff was aware of the purported infringement when the settlement agreement was executed, but—rather than try to stop it—Plaintiff instead took a royalty interest in those "infringing" sales. In *Blood v. Titan Sports, Inc.*, a mark owner was held to have "encouraged [defendant] to believe that [plaintiff] acquiesced in the use of his mark" based on his royalty interest in the allegedly infringing sales, and the defendant's pursuit of those sales established a sufficient level of prejudice. *See* 1997 U.S. Dist. LEXIS 24485, at *21 (W.D.N.C. May 13, 1997).

## II. UNCLEAN HANDS

Unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief …." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). To prevail on unclean hands, "defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims." *Fuddruckers, Inc. v. Doc's*

*B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987). Here, Plaintiff's longstanding and multifaceted inequitable conduct related to the marks in question bar it from recovery.

### A.    Plaintiff's Inequitable Conduct in Interactions with the PTO

Plaintiff engaged in a deceptive campaign with the PTO. In response to a PTO inquiry about whether PRED-MOXI was a "term of art" or had any significance in the industry, Plaintiff said it is "a term of art for compounded formulations that include prednisone (or prednisolone) and moxifloxacin the relevant market trade or industry." DX002 (original application); DX003 (PTO inquiry); DX004 (response conceding terms of art in industry). The PTO rejected the trademark application because "the mark merely describes an ingredient of applicant's goods." DX005.002. After this initial denial, Plaintiff changed its position in later applications for the DEX-MOXI trademark, stating that "'DEX,' 'MOXI,' and 'DEXMOXI' do not have any significance" in the "trade or industry and are not 'terms of art' within Applicant's industry." DX015.002. Plaintiff engaged in this duplicitous about-face to get approval, even though it knew they were terms of art for the underlying medications.

That was not Plaintiff's only disingenuous exchange with the PTO. In April 2016, in response to the PTO's initial rejection of the application for PRED-MOXI, Imprimis told the PTO that Defendants' use of the mark was not evidence that PRED-MOXI "is a term of art for such compounded formulations, but rather, is evidence of unauthorized use of Applicant's mark," representing that it was taking action "to prevent" Defendants from using the mark. DX011.008. That was a lie. Plaintiff took no action to stop Defendants from using the alleged trademarks until it filed this action on July 20, 2021.

### B.    Plaintiff's Inequitable Conduct in Its First Trademark Case

In February 2016, Imprimis Pharmaceuticals filed its first trademark infringement complaint against Ocular Science. DX230. That complaint acknowledged that Ocular Science was marketing post-operative compounded formulations and specifically referred to "Pred-Moxi," "Pred-Ketor" and "Dex-Moxi" as "the Ocular Science Formulations." *Id*. at 6. Imprimis Pharmaceuticals never alleged that the use of these terms was

1    infringement, despite its April 2016 representations to the PTO (referenced above).

2    This first case was settled in April 2017. DX027. As part of that settlement,

3    Defendants paid $30,000 (*id* ¶ 4) and agreed to pay Imprimis a royalty of 20% of revenues

4    on "all products constituting formulations claimed in Imprimis' applications for patents

5    pending as of April 21, 2017 with the [PTO]." *Id*. ¶ 5. The parties released all claims "they

6    have had or which they now have" against each other, including unknown claims, waiving

7    claims under Section 1542 of the California Civil Code. *Id*. ¶ 2. In other words, Plaintiff

8    released all known and unknown claims and even anticipated Defendants' continued use

9    of, at least, Pred-Moxi, Pred-Ketor, and Dex-Moxi ("the Ocular Science formulations"

10   acknowledged in the underlying complaint) until, at minimum, Plaintiff's patents were

11   approved (and beyond if not approved). *Id*.  ¶ 5. The PTO never issued such patents (Tr.

12   147:22-23, 169:7-170:20); and Plaintiff never advised Defendants that the applications

13   had been denied, and further conceded at trial that Defendants "ha[d] every right to make

14   those formulations." Tr. 158:1-7. Nor did Plaintiff ask Defendants to stop using the

15   abbreviations, which were used for years with Plaintiff's knowledge and blessing; instead,

16   Plaintiff just belatedly filed this action in July 2021. Tr. 195:9-196:22.

17   ## C.    Plaintiff's Inequitable Conduct in this Trademark Case

18   In its complaint, filed July 20, 2021, Plaintiff averred that it was "the exclusive

19   licensee" of the trademarks. *See* ECF No. 1 ¶ 32. That was not true. As Plaintiff's CEO

20   admitted at trial, ImprimisRx did not become the exclusive licensee of nine marks until

21   August 3, 2021, Tr. 199:6-200:20, and, for PRED-MOXI-BROM, not until August 2022.

22   Tr. 201:25-204:16. In short, Plaintiff misrepresented to the Court (and Defendants) its

23   status as exclusive licensee of the sued-upon marks in order to fabricate standing.

24   Plaintiff has acted inequitably and with unclean hands with respect to the trademark

25   claims in this case. Plaintiff should be barred from any recovery.[13]

26

27   [13] *See, e.g.*, *Amusement Art, LLC v. Life is Beautiful, LLC*, 2016 WL 6998566, at *4-5
     (C.D. Cal. Nov. 29, 2016) (unclean hands doctrine was complete defense where plaintiff

28   knowingly made misrepresentations to the PTO to secure trademark registrations), *aff'd*,
     768 F. App'x 683 (9th Cir. 2019).

## MISTRIAL BASED ON LACK OF JUROR AGREEMENT

The jury returned a verdict on November 20, 2024 (ECF No. 342). Joseph Cohen, Juror No. 7, read about the verdict in a press release and contacted the court clerk to advise that the damages award referenced in the media report was not correct, which communication was relayed to all counsel on November 21, 2024. Defense counsel contacted Juror No. 7, who confirmed the accuracy of his message to the Court and further signed a declaration stating that the jurors had not agreed to a total damages figure of $34.9 million, or a punitive damages amount of $20.4 million. *See* Declaration of Joseph Cohen, filed concurrently herewith. Rather, Mr. Cohen stated that the jury agreed to award $20.4 million in total damages. *Id*.

This was and is a serious development. The Court should rescind its discharge order and interview each juror, with counsel, to ascertain exactly what the jury agreed to in damages and enter a corrected judgment accordingly. If, after interviews, it cannot be determined exactly what the jury intended to award, then a new trial should be ordered.

It is established that inquiring into the jurors' deliberative process is precluded by Fed. R. Evid. 606(b). However, there is a distinction "between inquiring into the jury's deliberative process" and "merely seeking to determine whether the verdict actually agreed to by the jury is the same as the verdict reported to the court, which the case law permits." *Teevee Toons, Inc. v. MP3.com, Inc.*, 148 F. Supp. 2d 276, 278 (S.D.N.Y. 2001).[14] *See also Attridge v. Cencorp Div. of Dover Tech. Int'l, Inc.*, 836 F.2d 113, 115-116 (2d. Cir. 1987) (approving order correcting jury award after learning that jury's reported award intended to net out the contributory negligence of plaintiff); *McCullough v. Consol. Rail Corp.*, 937 F.2d 1167 (6th Cir. 1991) (same); *Eastridge Dev. Co. v Halpert Assoc.'s, Inc.*, 853 F.2d 772 (10th Cir. 1988) (same).

---

[14] The Ninth Circuit put it this way: "The district court did not alter the jury's verdict itself; it simply corrected the verdict form to reflect the jury's true intent," and "no possible unfairness can be found in a judgment that reflects the jury's true intent." *United States v. Stauffer*, 922 F.2d 508, 514 (9th Cir. 1990) (upholding decision to correct jury error in verdict form).

*Teevee Toons* is on point, and the Court should follow its process. There, the jury reported a verdict in favor of plaintiffs in a copyright infringement action. After the media reported the verdict, jurors contacted the court and advised that the amount of damages was incorrect. *Teevee Toons*, 148 F. Supp. 2d at 277. The court, which stayed entry of judgment, conducted juror interviews (with counsel) and held hearings on the matter. *Id*. In so doing, the court observed that testimony from the jurors was appropriate to determine the accuracy of the verdict and, based on the interviews, found that the reported amount was clearly erroneous. *Id*. at 278. Because the court could not determine the exact amount the jury intended to award, a new trial was required. *Id*. at 278-79 ("even though all the jurors remembered that the magnitude of the verdict they unanimously agreed to was approximately $3 million, none independently remembered the exact number or the exact breakdown," so "the only reasonable alternative is to retry the case").[15]

As in *Teevee Toons*, here, the media reported the verdict and a juror voluntarily contacted the court to note that the reported amount of damages was incorrect (and judgment has not yet been entered). The Court should follow-up with the jury panel to determine exactly what amount was agreed and enter a corrected amount to "reflect the jury's true intent." *Stauffer*, 922 F.2d at 514. The inquiry with jurors need not invade the deliberative process and may be restricted to ascertaining if $20.4 million was the amount in punitive damages the jury intended to award; or if, as Juror No. 7 avers under oath, the total award was meant to be $20.4 million. If for some reason there is no way to determine the exact amount the jury intended to award here, then, as in *Teevee Toons*, a mistrial should be declared, and a new trial ordered.

---

[15] In both *Attridge* and *McCullough*, the court conducted jury interviews (with counsel) after the panel had rendered a verdict in order to effectuate the jury's intent, and the procedure was upheld. *See* 836 F.2d at 115-16; 937 F.2d at 1168-69, 1171-72. In *Eastridge*, the district court allowed party interviews with jurors as a basis for granting motion for a corrected verdict, which was upheld on appeal. *See* 853 F.2d at 783.

Dated:  December 6, 2024

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: */s/ Dylan J. Liddiard*

Dylan J. Liddiard

*Attorneys for Defendants*
*OSRX, Inc. and Ocular Science, Inc.*