ELLIS GEORGE LLP
Keith J. Wesley (State Bar No. 229276)
  kwesley@ellisgeorge.com
Christopher W. Arledge (State Bar No. 200767)
  carledge@ellisgeorge.com
George B. A. Laiolo (State Bar No. 329850)
  glaiolo@ellisgeorge.com
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for Plaintiff and Counter-
Defendant ImprimisRx, LLC

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMPRIMISRX, LLC, and HARROW IP, LLC, | Case No. 3:21-CV-01305-BAS-(DDL) |
| Plaintiffs, | **PLAINTIFF IMPRIMIS'S OPPOSITION TO DEFENDANTS' POST-TRIAL MOTIONS** |
| vs. | [Filed Concurrently with Declaration of Keith J. Wesley] |
| OSRX, INC.; OCULAR SCIENCE, INC., | Date:    January 17, 2025<br>Time:    10:00 AM<br>Crtrm.: 12B |
| Defendants. | Judge:  Cynthia Bashant |
| | Trial Date:    November 12, 2024<br>Action Filed:  July 20, 2021 |
| AND RELATED CROSS-ACTION | |

# **TABLE OF CONTENTS**

**Page**

I.    Introduction ..................................................................................1

II.   The Standards of Review ..............................................................1

III.  The Jury Found, and Based on the Evidence Could Have Found, that the Trademarks are Not Generic. ...............................................2

IV.   The Jury Found, and Based on the Evidence Could Have Found, that the Trademarks Had Acquired Distinctiveness—i.e., Secondary Meaning..................................................................................9

V.    The Jury Rejected Defendants' Fair Use Defense. .......................12

VI.   The Jury's Award of Damages is Supported by the Law and Evidence.........13

VII.  The Jury Found, and Based on the Evidence Could Have Found, that Imprimis Had Standing. ..............................................................17

VIII. Equitable Defenses Are Unavailable to Willful Infringers. ............19

IX.   The Law Does Not Support Defendants' Argument Regarding Juror Agreement. ..................................................................................22

1

# TABLE OF AUTHORITIES

2

**Page**

## CASES

3

4

*Adidas-America, Inc. v. Payless Shoesource, Inc.*,
    546 F. Supp. 2d 1029 (D. Or. 2008) ...................................................21

5

*Adray v. Adry-Mart, Inc.*,
    76 F.3d 984 (9th Cir. 1995) .......................................................9, 13

6

7

*Advertise.com, Inc. v. AOL Advert., Inc.*,
    616 F.3d 974 (9th Cir. 2010) ...........................................................2

8

9

*California Cooler, Inc. v. Loretto Winery, Ltd.*,
    774 F.2d 1451 (9th Cir. 1985) ...........................................................5

10

11

*DC Comics v. Towle*,
    802 F.3d 1012 (9th Cir. 2015) .........................................................19

12

13

*E.T. Browne Drug Co. v. Cococare Products, Inc.*,
    538 F.3d 185 (3d Cir. 2008) .............................................................6

14

15

*Evergreen Safety Council v. RSA Network, Inc.*,
    697 F.3d 1221 (9th Cir. 2012) .........................................................20

16

17

*F21 OpCo, LLC v. Airwair Int'l Ltd.*,
    2023 WL 2626368 (C.D. Cal. Feb. 17, 2023) ...................................13

18

19

*Filipino Yellow Pages, Inc. v. Asian J. Publications, Inc.*,
    198 F.3d 1143 (9th Cir. 1999) ...........................................................5

20

21

*Jason Scott Collection, Inc. v. Trendily Furniture, LLC*,
    68 F.4th 1203 (9th Cir. 2023) .........................................................14

22

23

*JL Beverage Co, LLC v. Jim Beam Brands Co.*,
    828 F.3d 1098 (9th Cir. 2016) .........................................................10

24

25

*Johnson v. Yellow Cab Transit Co.*,
    321 U.S. 383 (1944) ........................................................................20

26

27

*Jonson v. Paradise Valley Unif. Sch. Dist.*,
    251 F.3d 1222 (9th Cir. 2001) ...........................................................2

28

# TABLE OF AUTHORITIES
### (Continued)

**Page**

*JUUL Labs, Inc. v. Chou*,
   676 F. Supp. 3d 827 (C.D. Cal. 2023) ................................................................10

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014)..........................................................................................17

*Lontex Corp. v. Nike, Inc.*,
   107 F.4th 139 (3d. Cir. 2024)......................................................................10, 12

*Los Angeles Police Protective League v. Gates*,
   995 F.2d 1469 (9th Cir. 1993)..............................................................................2

*M.I.B. Group LLC v. Aguilar*,
   2024 WL 3857540 (C.D. Cal. July 16, 2024) .....................................................19

*Malovani v. Doe*,
   2012 WL 12886493 (C.D. Cal. May 14, 2012) ...................................................19

*Marketquest Grp., Inc. v. BIC Corp.*,
   316 F. Supp. 3d 1234 (S.D. Cal. 2018) ........................................................16, 21

*Marketquest Grp., Inc. v. BIC Corp.*,
   862 F.3d 927 (9th Cir. 2017)........................................................................1, 13

*Masters v. UHS of Delaware, Inc.*,
   631 F.3d 464 (8th Cir. 2011).............................................................................17

*Meyers v. Kang*,
   2024 WL 1829624 (C.D. Cal. Jan. 2, 2024) .......................................................19

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*,
   316 US. 203 (1942).....................................................................................15, 16

*Nat'l Licensing Ass'n, LLC v. Inland Joseph Fruit Co.*,
   361 F. Supp. 2d 1244 (E.D. Wash. 2004)......................................................17, 18

*Nintendo of Am., Inc. v. Dragon Pacific Int'l*,
   40 F.3d 1007 (9th Cir. 1994).......................................................................15, 16

*P&P Imports LLC v. Johnson Enterprises, LLC*,
   46 F.4th 953 (9th Cir. 2022)........................................................................9, 12

1
2

## TABLE OF AUTHORITIES
### (Continued)

**Page**

3
4
*Paige LLC v. Shop Paige LLC*,
   2024 WL 3594450 (C.D. Cal. July 10, 2024) ....................................11

5
6
*Patsy's Italian Restaurant, Inc. v. Bana*s,
   575 F. Supp. 2d 427 (E.D.N.Y. 2008) ....................................20

7
8
*Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp.,*
   *LLC*,
   7 F.4th 989 (11th Cir. 2021) ....................................2

9
10
*Pom Wonderful LLC v. Coca-Cola Co.*,
   166 F. Supp. 3d 1085 (C.D. Cal. 2016) ....................................20

11
12
*Reeves v. Sanderson Plumbing Products, Inc.*,
   530 U.S. 133 (2000) ....................................1

13
14
*San Diego Comic Convention v. Dan Farr Productions*,
   336 F. Supp. 3d 1172 (S.D. Cal. 2018) ....................................2, 5

15
16
*San Miguel Pure Foods Co., Inc. v. Ramar Int'l Corp.*,
   2012 WL 13227045 (C.D. Cal. Nov. 27, 2012) ....................................20

17
*Shuffle Master Inc. v. Awada*,
   2006 WL 2547091 (D. Nev. Aug. 31, 2006) ....................................11

18
19
*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
   251 F.3d 814 (9th Cir. 2001) ....................................16

20
21
*Snap v. Vidal*,
   __ F. Supp. 4th ___, 2024 WL 4488446 (C.D. Cal. Sept. 27, 2024) ....................................6, 9

22
23
*Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*,
   601 F.2d 1011 (9th Cir. 1979) ....................................4, 5

24
25
*Teevee Toons, Inc. v. MP3.com, Inc.*,
   148 F. Supp. 2d 276 (S.D.N.Y. 2001) ....................................23, 24

26
27
*Thomas & Betts Corp. v. Panduit Corp.*,
   138 F.3d 277 (7th Cir. 1998) ....................................11

28

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*TrafficSchool.com, Inc. v. Edriver Inc.*,
   653 F.3d 820 (9th Cir. 2011) ...................................................................22

*Traver v. Meshriy*,
   627 F.2d 934 (9th Cir. 1980) ...................................................................22

*United States Patent and Trademark Office v. Booking.com B.V.*,
   591 U.S. 549 (2020) (Sotomayor, J., concurring) ....................................9

*United States v. Gibbs*,
   570 F. Supp. 3d 1096 (N.D. Okla. 2021) ................................................23

*Venture Tape Corp. v. McGills Glass Warehouse*,
   540 F.3d 56 (1st Cir. 2008) .....................................................................14

*Waits v. Frito-Lay, Inc.*,
   978 F.2d 1093 (9th Cir. 1992) .................................................................18

*Wallace v. City of San Diego*,
   479 F.3d 616 (9th Cir. 2007) .................................................................1, 2

*Wecosign, Inc. v. IFG Holdings, Inc.*,
   845 F. Supp. 2d 1072 (C.D. Cal. 2012) ..................................................18

*WMS Gaming Inc. v. WPC Productions Ltd.*,
   542 F.3d 601 (7th Cir. 2008) ...................................................................16

*Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*,
   419 F.3d 925 (9th Cir. 2005) .....................................................................2

**STATUTES**

15 U.S.C. §1114 ................................................................................................17

15 U.S.C. §1114 (section 32) ...........................................................................17

15 U.S.C. §1117(a)(3) .......................................................................................15

15 U.S.C. §1125 (section 43(a)) ..................................................................17, 18

15 U.S.C. §1125(a) .......................................................................................17, 18

1

<u>**TABLE OF AUTHORITIES**</u>
(Continued)

2

<u>Page</u>

3

<u>**RULES**</u>

4

Fed. R. Civ. P. Rule 50 ...................................................................1, 12

5

Fed. R. Civ. P. Rule 59 ...................................................................1, 16

6

Fed. R. Evid. 606 ....................................................................22, 23, 24

7

8

<u>**OTHER AUTHORITIES**</u>

9

2 McCarthy on Trademarks and Unfair Competition, §12:13 (5th ed.) ....................6

10

McCarthy on Trademarks and Unfair Competiton, §30:59......................................13

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.     <u>Introduction</u>

Conspicuously absent from defendants' post-trial motion is any mention of the requisite standards of review.  Similarly lacking in defendants' motion is any effort to comply with those standards.  Rather than address evidence that a juror could find supports the verdict, defendants ignore it.  Rather than acknowledge and grapple with inferences that the jury could have made in plaintiff Imprimis's favor, defendants infer the opposite.  Rather than disregard testimony that the jury could have found lacked credibility, defendants rely on it.  And rather than recognize that this Court must rule on equitable issues in a manner that is consistent with the jury's findings—both express and implied—defendants invite the Court to rewrite the verdict form to switch all of the check marks from "yes" to "no".  Defendants' post-trial motion is thus of little use in guiding the Court's analysis.  For that reason, we start with (and emphasize throughout) the lens through which this Court must view all of the evidence at this stage of the case.

# II.    <u>The Standards of Review</u>

When reviewing a post-trial motion under Rule 50 of the Federal Rules of Civil Procedure, this Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).  This Court "should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* at 151.  Moreover, "summary judgment is generally disfavored in trademark cases, due to the intensely factual nature of trademark disputes." *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 935 (9th Cir. 2017).

When reviewing a post-trial motion under Rule 59 of the Federal Rules of Civil Procedure, this Court may grant the motion only if the verdict is "against the clear weight of the evidence." *Wallace v. City of San Diego*, 479 F.3d 616, 630 (9th Cir.

2007).  This Court may not grant the motion even if it "would have arrived at a different verdict."  *Id.*

Finally, "where a judge tries equitable claims and a jury tries legal claims, the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations."  *Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993); *see also Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, 7 F.4th 989, 1002 (11th Cir. 2021) (reversing trademark cancellation where "the record clearly demonstrates that the jury made findings on the distinctiveness and protectability of [plaintiff's] marks" and thus "the district court erred in disregarding these findings when it cancelled the marks").

## III.  The Jury Found, and Based on the Evidence Could Have Found, that the Trademarks are Not Generic.

"Whether a mark is generic is a question of fact."  *Advertise.com, Inc. v. AOL Advert., Inc.*, 616 F.3d 974, 977 (9th Cir. 2010).

Over a dozen different people—eight jurors and five independent, professional trademark examiners—have previously assessed the trademarks and unanimously concluded that they are not "generic."  Based on governing law—including law agreed to by the parties—and the evidentiary record, this Court cannot and should not conclude that all of those who came before it were unreasonable.  *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 929–30 (9th Cir. 2005) (reversing summary judgment in favor of defendant on issue of whether "Yellow Cab" was generic as a matter of law); *San Diego Comic Convention v. Dan Farr Productions*, 336 F. Supp. 3d 1172, 1182–83 (S.D. Cal. 2018) ("DFP again misses the mark. Here, DFP has the burden of persuading the Court that 'the record as a whole' demonstrates only one thing—that Comic-Con is generic [(citing *Jonson v. Paradise Valley Unif. Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001)]. . . . Unfortunately for DFP, the jury was free to disbelieve and disregard the testimony of Mr. Baker and the Court cannot at this stage make any credibility determinations.").

Imprimis does not argue that it has a trademark in the underlying chemicals that are combined in its compounded drugs.  It does not have a trademark interest in prednisolone, for example.  Imprimis also does not dispute that "prednisolone" is the name of a generic drug.  Imprimis does not claim trademark rights in the combination of the underlying drugs when they are fully spelled out—e.g., prednisolone-gatifloxacin-bromfenac.  The issue is whether the specific shortened versions of the underlying drug names selected by Imprimis, combined in the specific order chosen by Imprimis, is at least descriptive and therefore potentially protectable.

Let's start with the shortened versions selected by Imprimis in isolation.  After all, "apple" is undeniably generic for an apple cart because "apple" is the English word used to define a particular fleshy red, green, or yellow fruit, but a shortened version— e.g., "apl"—is not.  Similarly, "convention" is a generic term for a large meeting or conference on a particular subject, but the shortened version—e.g., "con"—is not.  And "prednisolone" is the English word used to define a particular chemical, but a shortened version—e.g., "pred"—is not.  Ex. 1 at 122:2–16.[1]  In other words, there's only one word in English to identify, respectively, the fruit we all know as an "apple", the event we call a "convention", and the chemical "prednisolone."  For that reason, they are "generic."  All purveyors of those products need the ability to use those terms.  But there are a lot of different ways the generic terms apple, convention, or prednisolone can be abbreviated; the abbreviations themselves thus are not "generic."

Defendants' problems however run far deeper because the marks they have used are not simply "Pred" or "Moxi" or the rest, in isolation.  Rather, the marks are unique combinations of those abbreviations.  Ex. 1 at 120:25–124:12.  Defendants' primary argument at trial was that those unique combinations were generic because they simply

---

[1] All exhibits are excerpts from the trial transcript or admitted trial exhibits (Wesley Decl. Ex. 11), copies of which are attached to the Wesley Declaration filed concurrently herewith.

described the ingredients of the underlying compound medications.  *See* Ex. 12 at 96:15–17. 98:9, 101:9, 103:2–25, 104:10, 105:25, 175:3, 183:20, 184:4, 185:8–16, 186:7, 188:22–23, 230:4, 234:2, 237:14, 246:2, 287:2, 289:2–17, 293:7, 294:10–22, 295:1-22, 296:13, 328:24, 332:15–17, 472:7–23, 473:5–23, 493:20, 496:15, 530:18, 533:12, 699:15, 703:1, 705:16, and 718:16.  That argument makes defendants' position untenable, because the governing law does not say the marks are just *capable* of being descriptive in such circumstances; rather, the governing law says the marks are at minimum descriptive *as a matter of law*.

The Model Ninth Circuit jury instruction—agreed to by both parties—proves the point.  Instruction No. 12 in this case, which is based on Model Ninth Circuit Instruction 15.10, says, "the word 'apple' is descriptive when used in the trademark 'CranApple' to designate a cranberry-apple juice. It directly describes ingredients of the juice." *See also Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1014 (9th Cir. 1979) ("A merely 'descriptive' term specifically describes a characteristic or ingredient of an article or service. It can, by acquiring a secondary meaning, i.e., becoming 'distinctive of the applicant's goods', become a valid trademark.").  This agreed-upon instruction—i.e., a recitation of the law that both parties agree upon—dooms defendants' argument.  It shows a generic term (apple) being combined with a shortened version of another generic term ("cran" for cranberry) to create a descriptive trademark—i.e., the exact result that defendants say cannot occur as a matter of law.  And the instruction goes on to teach that when a trademark describes the *ingredients* of the product, then that trademark *is* (not "could be" but "is") descriptive.  In sum, if CranApple is a descriptive trademark for a juice consisting of the ingredients cranberry and apple—as both parties agree—then Pred-Moxi-Brom is at least descriptive of a compounded formulation consisting of the ingredients prednisolone acetate, moxifloxicin, and bromfenac.

There is, then, no reason to analyze whether the combining of multiple generic terms can be descriptive where those terms do *not* describe the ingredients of a product.

1   But even if we look at the law in such cases, defendants are, again, wrong. Defendants

2   use law from the Seventh Circuit to suggest that the combination of generic names

3   cannot be protectable unless "the combination results in some meaning that is more

4   than 'the sum of their parts.'" Mot. at 8:28–9:7. But the Ninth Circuit disagrees.

5       The Ninth Circuit has specifically rejected "the proposition that 'a combination

6   of two generic words is also generic, unless the combination is a 'deviation from

7   natural usage' or an 'unusual unitary combination.'" *Filipino Yellow Pages, Inc. v.*

8   *Asian J. Publications, Inc.*, 198 F.3d 1143, 1148 (9th Cir. 1999) (rejecting a standard

9   very similar to the standard defendants distill from cases in the Seventh Circuit). The

10  validity of "'a composite term . . . is not judged by an examination of its parts. Rather,

11  the validity of a trademark is to be determined by *viewing the trademark as a whole. .*

12  *. .* Thus, the composite may become a distinguishing mark even though its components

13  individually cannot.'" *Id.* at 1149–50 (quoting *California Cooler, Inc. v. Loretto*

14  *Winery, Ltd.*, 774 F.2d 1451, 1455 (9th Cir. 1985).

15      On occasion, as in *Surgicenters*, the Ninth Circuit has found that the combination

16  of generic terms results in a mark that is generic. But those cases involved

17  overwhelming evidence that consumers saw the composite terms as generic. *Filipino*

18  *Yellow Pages*, 198 F.3d at 1148. None of the evidence present in *Surgicenters* or other

19  cases where genericism has been found as a matter of law is present here:  No

20  publications clearly using the trademarks in a generic sense. No overwhelming

21  evidence of others using the trademarks generically. No dictionaries or thesauruses

22  defining the trademarks in question.

23      In fact, the Ninth Circuit has found many combinations of generic terms to be

24  descriptive. *See* extended discussion in *Filipino Yellow Pages*, 198 F.3d at 1149–1150

25  (marks such as "Junior Chamber of Commerce," "Park 'N Fly," "California Cooler,"

26  "Self-Realization Fellowship," and "Committee for Idaho's High Desert"); *see also*

27  *San Diego Comic Convention*, 336 F. Supp. 3d at 1184 (denying JMOL challenging

28  jury finding that Comic-Con is not a "generic" mark for use with a comic book

convention).

Here, the evidence that the trademarked names served a purpose and had value over and above that of a generic term is overwhelming. Other companies sold drugs with similar ingredients without using the trademarked names. Ex. 4 at 346:6–25, 349:5–350:20, 366:19–22.[2] Defendants say this evidence is irrelevant, but they are wrong. 2 McCarthy on Trademarks and Unfair Competition, §12:13 (5th ed.) ("Nonuse by competitors of the contested designation as a generic name is evidence of non-genericness"), *citing E.T. Browne Drug Co. v. Cococare Products, Inc.*, 538 F.3d 185, 198 (3d Cir. 2008) (Nonuse by competitors of the term "cocoa butter formula" was evidence that the term was not generic, precluding summary judgment); *see also Snap v. Vidal*, __ F. Supp. 4th ___, 2024 WL 4488446, at *10 (C.D. Cal. Sept. 27, 2024) (lack of use by competitors supported non-genericism). That no third party uses the trademarks to describe their products is powerful evidence that the terms are not generic. After all, it would be difficult to advertise an apple cart without ever mentioning the word "apple." But it is apparently not all that hard to advertise combination eyedrops without using words such as pred-moxi-brom or tim-brim-lat-dor.

Moreover, by ignoring the marketplace, defendants are missing something obvious and important. If defendants believed using the specific names Imprimis had been using would get them sued and cost them lots of money—and they did, Ex. 2 at 235:13–236:16—then why did they continue, when other names would suffice?

Defendants' marketing executive, Eric Garner, testified that doctors are familiar with the shortened versions of the ingredient names used by Imprimis; that is, doctors know that "pred" means prednisolone, "gati" means gatifloxacin, and "brom" means

---

[2] Defendants' only evidence that another company used any of the trademarks predated the issuance of the relevant trademark and predated the existence of most of the marks. *See* Ex. 4 at 354:25–366:22 and Ex. DX-08.

1  bromfenac.  Ex. 2 at 545:10–546:13.  So it would not matter the order in which you

2  placed those terms; doctors would still know what the product was.  Mr. Garner agreed.

3  *Id.*  For the product names with three components (like Pred-Moxi-Brom), there were

4  six different combinations available.  Ex. 2 at 252:17–253:2.  For the product names

5  with four components (like Tim-Brim-Dor-Lat), there were 24 different combinations

6  available.  Ex. 2 at 254:6–23.  Yet OSRX always used the same combination that

7  Imprimis had created and been using.

8      The real reason defendants used the exact same trademarks as Imprimis was to

9  trade on Imprimis's goodwill in the marketplace.  As Mr. Garner testified:

10      I wanted to use the standard abbreviations, again, that are
        used in the industry, because you have more credibility with
11      doctors if you are using the correct abbreviations that they use
        versus some wonky kind of exaggerated version like Dr. Wright
12      was offering in his email.

13  Ex. 2 at 248:8–12. Imprimis had spent substantial time and money marketing its

14  products with the names in this particular order, Ex. 1 at 120:16–19, 153:20–154:10;

15  Ex. 2 at 267:1–275:7, and as a result, everybody in the industry knew the names in this

16  particular order.  Ex. 2 at 246:5–247:5.  The jury could have reasonably concluded that

17  defendants used the trademarks not because they are "generic" but because the marks

18  carried substantial goodwill in the marketplace due to Imprimis's efforts and that

19  defendants wanted to trade upon that goodwill.[3]

20      Defendants' remaining arguments fall flat.

21      1.    Imprimis's witnesses did not testify that the marks were "meant to signify

22  the underlying generic name for the medication" alone, Mot. at 3:11–14.  They testified

23

24  _____

[3] Defendants are incorrect that a trademark's secondary meaning is irrelevant to the
25  genericism inquiry.  Although a generic trademark cannot transform into a protectable
    mark based on secondary meaning alone, recognition of the mark as a brand name—
26  rather than a mere descriptor—is clearly relevant.  *See*, *e.g.*, McCarthy at 12:14
    ("[S]urveys that test for secondary meaning . . . may yield relevant results that point
27  towards or away from trademark significance").

28

that the trademarks were valuable brand assets around which they built their business. Ex. 1 at 120:9–19, 125:7–15; Ex. 3 at 272:20–273:1; Ex. 10 at 421:5–16 ("Customers, people associate those trademarks with our business").

2.      The evidence does not clearly show "generic use" in scientific journals. Rather, the evidence shows instances where the entire chemical formulation—i.e., the generic name—is "identified" and then the brand name is identified in parentheses next to it. *See* Mot. at 5:16–21. Far from showing genericism, this evidence supports non-genericism. If the shortened phrase were necessary to describe the formulations, then there would have been no need to use the longer phrase as well.

3.      The evidence did not show the marks used by third parties. The best defendants could produce is a stray order from a pharmacy named APS Pharmacy from 2016, which pre-dated the issuance of Imprimis's trademark registrations and the existence of the majority of the trademarks.

4.      Imprimis's use of other trademarks—e.g., "LessDrops" and "DropLess"—is irrelevant. That Ford owns a trademark in the term "F-Series" for a line of its trucks does not make the trademark for its "F-150" model any less valuable or protectable.

5.      The jury did not need to credit defendants' genericism survey. There were multiple reasons presented—both by Imprimis's expert and on cross of defendants' expert—for why the survey either overstated the findings of genericism or was not credible at all. Ex. 5 at 385:7–386:14; Ex. 9 at 508:7–20, 510:25–511:25, 513:8–18. Indeed, the lack of an instruction in the survey on the meaning of genericism is fatal. Governing law holds that the combination of generic terms can, in totality, be descriptive. There is every reason to believe that eye doctors taking the survey would not know that and might conclude that combinations of abbreviations of generic drug names must themselves be generic. Finally, the U.S. Supreme Court has cautioned against overreliance on surveys in evaluating genericism, with some Justices going so far as to say surveys like those submitted by defendants "may be an unreliable indicator

of genericness." *United States Patent and Trademark Office v. Booking.com B.V.*, 591 U.S. 549, 564 (2020) (Sotomayor, J., concurring).  For that reason, another judge just months ago overturned a finding of genericism by the USPTO, which was based on the exact same Teflon survey design utilized by defendants' expert.  *Snap*, 2024 WL 4488446, at *13–16.

In sum, the trademarks are at minimum descriptive, likely as a matter of law, but certainly as a conclusion a reasonable juror could reach when viewing the evidence and all inferences in Imprimis's favor.

**IV.    The Jury Found, and Based on the Evidence Could Have Found, that the Trademarks Had Acquired Distinctiveness—i.e., Secondary Meaning.**

"Because of the intensely factual nature of the secondary meaning inquiry, summary judgment is generally disfavored."  *P&P Imports LLC v. Johnson Enterprises, LLC*, 46 F.4th 953, 961 (9th Cir. 2022).  "Secondary meaning can be established in a variety of ways, including direct consumer testimony; survey evidence; exclusivity, manner, and length of use of mark; amount and manner of advertising; amount of sales and number of customers; established place in the mark; and proof of intentional copying by the defendant."  *Id.*  In addition, "actual confusion is an indicium of secondary meaning."  *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 987 (9th Cir. 1995).

Not every factor (or even a majority of factors), however, need be present.  The Ninth Circuit has held that a reasonable juror could find secondary meaning if there is evidence to support solely two factors—intentional copying and survey evidence.  *Id.* ("By submitting evidence of intentional copying and an admissible consumer survey, P&P created a triable issue of fact about secondary meaning.").

Like in *P&P Imports*, Imprimis submitted "evidence of intentional copying and an admissible consumer survey" and thus "created a triable issue of fact about secondary meaning."

As for intentional copying:

1.    Defendants knew about Imprimis's trademarks when adopting the same

marks.  Ex. 2 at 233:5–19; Ex. 4 at 337:8–338:7; Ex. 2071; *see also JL Beverage Co, LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1112 (9th Cir. 2016) (genuine issue of fact as to defendant's intent when jury could infer that defendant "adopted the [plaintiff's] logo with the knowledge that the mark already belonged to [plaintiff]"); *Lontex Corp. v. Nike, Inc.*, 107 F.4th 139, 152 (3d. Cir. 2024) ("[A] jury could . . . find willfulness from Nike's continued use after it learned of Lontex's trademark").  In fact, defendants' head of marketing knew that defendants were legally prohibited from using the marks, Ex. 2 at 235:7–18; Ex. 202 ("Also, PRED-GATI-BROM, PRED-BROM is trademarked by Imprimis.  We cannot use it in our ad copy"), but defendants used them anyway.  And defendants' co-founder, Dr. Damian Goldberg, learned information on the value of Imprimis's branding efforts while a paid Imprimis consultant, Ex. 1 at 140:1–14, 143:14–24, and then encouraged defendants to mimic Imprimis, Ex. 4 at 306:1–22, 308:19–309:8; Ex. 199.

2.    As explained above, defendants in no way needed to use the marks to "describe" the formulations, and the jury could reasonably conclude that defendants used the trademarks to capitalize on the secondary meaning Imprimis had created.

3.    Defendants had deliberately adopted another trademark (Droplet) that was confusingly similar to Imprimis's Dropless trademark.  Ex. 1 at 145:18–146:14; Ex. 27; *see JUUL Labs, Inc. v. Chou*, 676 F. Supp. 3d 827, 845 (C.D. Cal. 2023) ("Past lawsuits filed against a defendant can serve as evidence of willfulness").

4.    Defendants used at least some of the trademarks as paid google ad words—i.e., using the marks to drive customers searching for Imprimis's formulations to defendants instead.  Ex. 2 at 541:6–542:20.

5.    Defendants gave two different lies under oath as to the reasons why they adopted the trademarks.  Eric Garner and Anthony Sampietro said on multiple occasions that the order of the product names was required by legal regulations.  Ex. 2 at 230:6–10, 231:23–24; Ex. 4 at 347:9–20.  They conceded that they did not know the regulations but that Amy Frost, their compliance person, would provide that

1    information.  Ex. 2 at 230:6–7, 232:2–6.  She did not.  Ex. 7 at 473:10–13.  Defendants

2    never provided that information through a witness and never provided this Court with

3    the mysterious regulations because none exist.  Ex. 3 at 275:21–23.  Defendants then

4    testified  that  the  order  of  the  names  was  dictated  by  the  concentrations  of  the

5    ingredients therein, highest to lowest.  Ex. 2 at 238:24–239:3, 251:5–16; Ex. 4 at

6    347:9–23.  But they ultimately conceded that many of the product names did not follow

7    that rule.  Ex. 4 at 353:9–13; Ex. 7 at 473:14–19.

8        6.    Defendants continued to use the trademarks after Imprimis had provided

9    notice of its objection and in fact throughout the litigation and trial.  Ex. 1 at 108:14–

10   109:5, 148:11–19, 151:17–152:6; Ex. 2 at 237:1–18; Ex. 3 at 276:15–277:12; Ex. 200;

11   Ex. 1161; Ex. 2032; *Paige LLC v. Shop Paige LLC*, 2024 WL 3594450, at *4 (C.D.

12   Cal. July 10, 2024) ("Shop Paige's willful infringement is displayed by Shop Paige's

13   continuous use of the infringing mark to this day").  Moreover, the proposition that the

14   use of a plus sign in lieu of a dash would obviate any issue was so absurd that the jury

15   may have found it consistent with a willful infringer who will say anything to explain

16   away clear and obvious intent to infringe.

17        Any of the above could support a juror's determination of intentional copying.

18   The totality of the above leaves no doubt as to the reasonableness of the jury's findings

19   on intent.

20        On top of evidence of deliberate infringement, Imprimis's expert's survey

21   showed that more than one-third of respondents identified the trademarks in question

22   with a single source.  Ex. 5 at 373:12–22, 381:12–382:2, 383:2–8.  And defendants'

23   own expert conducted a survey that showed similar levels of consumer recognition of

24   the trademarks.  *Id.* at 384:3–385:14.  Results in this range have been deemed

25   "persuasive" in demonstrating secondary meaning and, at minimum, enough to create

26   a genuine issue for the jury.  *Shuffle Master Inc. v. Awada*, 2006 WL 2547091, at *3

27   (D. Nev. Aug. 31, 2006); *see also Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d

28   277, 295 (7th Cir. 1998) (holding that figures in the 30% range "did not establish

secondary meaning as a matter of law" but are "still probative of the issue of secondary meaning" that raised material questions of fact).

Finally, although *P&P Imports* holds that evidence of intentional copying and a survey are enough to create an issue of fact on secondary meaning, the record contains substantial evidence on additional relevant factors, including: (a) extensive and exclusive use of the mark in advertising and sales, Ex. 3 at 267:1–275:7; (b) success in growing sales through use of the marks, Ex. 1 at 138:23–139:17; (c) admissions from defendants that the marks were widely known in the industry, Ex. 2 at 246:5–247:5, and gave defendants credibility with doctors, *id.* at 248:6–19; (d) unsolicited articles linking the marks with Imprimis, Ex. 3 at 272:13–23; and (e) evidence that consumers thought there was an association between defendants and Imprimis due to defendants' use of the marks, Ex. 3 at 278:16–280:6, 280:12–23.

A reasonable jury could have found the trademarks had acquired secondary meaning.[4]

## V.     The Jury Rejected Defendants' Fair Use Defense.

The Court correctly instructed the jury on the law of fair use. Consistent with its findings that defendants willfully infringed the trademarks and engaged in unfair competition maliciously and/or fraudulently, the jury rejected defendants' fair use defense. Because "fair use" requires that a junior user use a mark "in good faith", and in light of the jury's findings, the defense has no application. *See Lontex*, 107 F.4th at 152 (affirming district court's denial of fair use defense where jury found willful trademark infringement and thus "a reasonable jury could reject Nike's fair use

---

[4] Defendants say the Court should disregard the presumption of distinctiveness for the two marks registered on the Principal Register. But the "contrary evidence" cited by defendants is irrelevant in a Rule 50 inquiry, and Imprimis did not "tacitly concede" that those two marks are not inherently distinctive. The quotation cited by defendants is a discussion in closing argument about the seven marks that were registered on the Supplemental Register, not the two on the Principal Register.

1  defense"); *Marketquest Grp.*, 862 F.3d at 937 (reversing fair use finding where jury
2  could have inferred bad faith of defendant).

3        In addition, and alternatively, a reasonable juror could have found that
4  defendants failed to sustain their burden of proving they were using the trademarks in
5  a "primary, descriptive sense" and "other than as a trademark." Defendants used the
6  marks as paid adwords to drive consumers searching for Imprimis to defendants
7  instead, and defendants described their formulations without use of the marks. *See*,
8  *e.g.*, Ex. 2013. The jury did not have to (and, based on the jury's findings undoubtedly
9  did not) believe defendants' explanation for why it used the marks.

10 **VI.    <u>The Jury's Award of Damages is Supported by the Law and Evidence</u>**.

11       There are two different issues on damages. The first is whether the jury could
12 treat defendants' profits as a proxy for Imprimis's damages. The law is clear that they
13 could. The second is whether the specific number picked by the jury was supported by
14 substantial evidence. It was.

15       "[R]ecovery of a defendant's profits may . . . be a proxy for the plaintiff's actual
16 damages." *F21 OpCo, LLC v. Airwair Int'l Ltd.*, 2023 WL 2626368, at *2 (C.D. Cal.
17 Feb. 17, 2023), *citing Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988 (9th Cir. 1995). As
18 the leading treatise on trademark law explains, "[b]ecause of the difficulties of proving
19 an actual diversion of sales, the courts often assumed or presumed that the infringer's
20 profits consisted entirely of profits on sales that would have been made by plaintiff but
21 for the infringing actions. In competitive relationships, the courts continue to use this
22 method of measuring plaintiff's losses." *McCarthy*, §30:59. That is so because
23 "between the victim and the wrongdoer, the burden should be and is placed on the
24 wrongdoer to prove, if it can, that some sales were not caused by the infringement, or
25 would not have gone to the plaintiff or that the infringer is more efficient and has lower
26 costs than the plaintiff." *Id.*

27       Defendants identified Imprimis as their only significant competitor in the
28 compounded ophthalmic drug space. Ex. 4 at 335:5–336:13, 338:1–7, 341:6–22; Ex.

163; Ex. 2071; Ex. 2072. There was extensive testimony and documentary evidence that Imprimis and defendants were promoting to the same exact customers, that customers were confused, and that Imprimis lost sales and customers to defendants. Ex. 3 at 275:8–14, 281:5–8, 285:1–12. As defendants' own head of marketing testified: "The last thing you want is to build a brand that people would conflate with any others." Ex. 2 at 528:9–16. Moreover, this is not a case where the defendant had an exponentially higher profit margin; in fact, *defendants' expert* found it reasonable to apply *Imprimis's* profit margin to defendants' revenues for the accused products when calculating defendants' relevant profit. Ex. 8 at 558:11–559:20, 561:12–562:5. In other words, this is the quintessential case where the law recognizes that an award of the defendant's profits can serve as a proxy for the plaintiff's actual damages.

Defendants complain that Imprimis did not identify a particular account that it lost because of the alleged infringement. But the difficulty in identifying particular lost accounts is precisely why courts endorse and accept an award of a defendant's profits as a proxy for plaintiff's actual damages. *Venture Tape Corp. v. McGills Glass Warehouse*, 540 F.3d 56, 63 (1st Cir. 2008) ("When a mark owner cannot prove actual damages attributable to the infringer's misconduct (e.g., specific instances of lost sales), its recovery of an equitable share of the infringer's profits serves, *inter alia*, as a 'rough measure' of the likely harm that the mark owner incurred because of the infringement, while also preventing the infringer's unjust enrichment and deterring further infringement"). And the Ninth Circuit has held that flexibility in the quantification of damages is particularly important in cases like this involving intentional trademark infringement. *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1222–23 (9th Cir. 2023) ("[I]t is essential that trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement" and thus in cases of intentional infringement, the Ninth Circuit will "accept crude measures of damages").

As to the specific amount awarded, defendants complain that Imprimis's expert

assumed that all of defendants' sales of the relevant products were wrongful. But that was a reasonable conclusion. Doctors knew the trademarks, which were critical to Imprimis's success. Ex. 1 at 120:16–19, 153:20–154:10. Defendants testified that when they were starting out, Imprimis was the only player in the compounded ophthalmologic space, Ex. 2 at 221:15–23, everyone in the marketplace recognized the Imprimis trademarks, *id.* at 246:5–247:5, and defendants had more credibility with doctors by using the marks, *id.* at 248:6–19. A reasonable juror could have found that everyone in the marketplace recognized the Imprimis trademarks because of Imprimis's marketing and sales efforts and innovative products—i.e., exactly what trademarks are intended to protect. The jury could have concluded that "but for" defendants' use of Imprimis's marks to gain initial interest in the marketplace, defendants never would have gotten the business off the ground. And because defendants themselves identify Imprimis as their only significant competitor, a reasonable juror could have concluded that if defendants had not succeeded, their sales would have gone to Imprimis.

If defendants believed that some of their sales were caused by factors other than willful trademark infringement, they should have done an apportionment analysis for the jury. When evaluating an award of the defendant's profits from the infringing goods, the burden on the trademark owner is solely to prove the defendant's revenue from the sale of those goods. The burden then shifts to the defendant to prove the defendant's costs and any amounts attributable solely to factors other than the infringement. 15 U.S.C. §1117(a)(3) ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed"); *see also Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 US. 203, 206–07 (1942) ("The burden is the infringer's to prove that his infringement had no cash value in sales made by him. If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark."); *Nintendo of Am., Inc. v. Dragon Pacific Int'l*, 40 F.3d 1007, 1012 (9th Cir.

1994) (same).  As this Court echoed when denying summary judgment on damages in

a trademark case:

> Defendants argue that there is no evidence they profited from the use of the marks since they never sold articles bearing the infringing mark.  Furthermore, Defendants claim they sold many items from multiple sources and it is impossible to determine if a buyer bought an item specifically from the 2011 catalogue or from some other source that had the infringing mark.  These are appropriate and valid arguments the Court experts Defendants to make to the jury.  At trial Defendants must bear the burden of showing which sales are not attributable to the infringing activity.  At this stage, however, Defendants have failed to establish the absence of a genuine issue of material fact.

*Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1300 (S.D. Cal. 2018).

Defendants provided zero expert testimony on the issue and provided no method of calculating the sales purportedly solely attributable to factors other than the infringement.  The jury was well within its discretion to award all of defendants' profits with no apportionment.  *Nintendo*, 40 F.3d at 1012 ("[W]here infringing and noninfringing elements of a work cannot be readily separated, all of a defendant's profits should be awarded to a plaintiff."); *see also WMS Gaming Inc. v. WPC Productions Ltd.*, 542 F.3d 601, 608–09 (7th Cir. 2008) (reversing district court's ruling on amount of defendant's wrongful gain in trademark case because the district court did not faithfully apply *Mishawaka Rubber*).

In fact, although not required based on the evidence and legal standard, the jury did apportion some of the profits.  The jury awarded $14.5 million, nearly half the profit figure offered by Imprimis's expert, Ex. 6 at 433:9–435:22 ($27.7 million), and less than the profit figure offered by defendants' expert as well.  In fact, considering defendants continued to infringe in 2023 and 2024 despite failing to produce sales records for those years, the total profits could have been significantly higher and thus the jury may have apportioned even more to non-trademark factors.

The jury did its job.  There is no reason to believe the jury's damages figure was "contrary to the clear weight of the evidence," which is the standard for granting a new trial under Rule 59.  *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d

1   814, 819 (9th Cir. 2001).  The damage award is well within the range supported by the

2   evidence and case law.  It should not be disturbed.[5]

3   **VII.    The Jury Found, and Based on the Evidence Could Have Found, that**

4           **Imprimis Had Standing**.

5           Defendants assert that Imprimis lacked standing to sue because the trademarks

6   were owned by Imprimis's sister company (Harrow IP LLC) at the time of the filing

7   of the lawsuit, Imprimis supposedly did not sign a license agreement until a couple

8   weeks after the filing of the initial complaint, and the Pred-Moxi-Brom trademark was

9   not added to the license agreement until a year later.

10          For two reasons, the Court need not even grapple with defendants' assertions

11  above.  First, the jury rejected defendants' arguments, finding that Imprimis had a valid

12  license to sue.  As explained above, the law does not authorize the Court to reject the

13  findings of the jury.

14          Second, defendants' points relate solely to 15 U.S.C. section 1114 (i.e., section

15  32) of the Lanham Act, which governs infringement of registered marks.  Defendants'

16  assertions are inapplicable to 15 U.S.C. section 1125(a) (i.e., section 43(a)), which

17  governs false designation of origin, and common law unfair competition.  *See*, *e.g.*,

18  *Nat'l Licensing Ass'n, LLC v. Inland Joseph Fruit Co.*, 361 F. Supp. 2d 1244, 1256

19  (E.D. Wash. 2004) ("Where a plaintiff might lack standing under § 32, a plaintiff may

20  yet have standing to bring an action under § 43(a)").

21          Section 1125(a) "authorizes suit by 'any person who believes that he or she is

22  likely to be damaged' by the false designation of origin.  *Lexmark Int'l, Inc. v. Static

23  Control Components, Inc.*, 572 U.S. 118, 129 (2014).  All that is required under section

24  _____

25  [5] "[Plaintiff's] expert estimated gross revenues at more than $300 million during the
    relevant period, and [defendant's] own expert testified that its net profits from the
26  treatment programs exceeded $6 million.  These numbers provide a reasonable basis
    from which the jury could determine that disgorging $2.4 million in profits was
27  necessary to prevent UHS from being unjustly enriched."  *Masters v. UHS of
    Delaware, Inc.*, 631 F.3d 464, 474 (8th Cir. 2011).
28

1125(a) is that the plaintiff have "a commercial interest in the allegedly misused mark
that is 'likely to be damaged.'" *Nat'l Licensing Ass'n,* 361 F. Supp. 2d at 1256, *quoting
Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1108 (9th Cir. 1992). Imprimis—i.e., the
entity that has been using the trademarks to sell the compounded medications in
question—does not just have a commercial interest in the trademarks; it has *the
greatest commercial interest* in the marks. Ex. 1 at 135:3–23, 203:14–204:5. Nor is
there anything in the common law of California that sets a higher bar for standing to
sue for common law unfair competition.

Imprimis undoubtedly has standing under section 1125(a) and the common law
of California. And because the tests for infringement of a registered mark under section
1114, false designation of origin under section 1125(a), and common law unfair
competition are the same, it matters not whether Imprimis had standing under one,
some, or all. *See*, *e.g.*, *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072,
1079 (C.D. Cal. 2012) (analyzing section 1114, section 1125, and common law unfair
competition claims together because the analysis under section 1114 and section 1125
is "oftentimes identical" and the common law claims are "substantially congruent"). 
Thus, the standing argument has no practical effect on the outcome because even if the
section 1114 claim were somehow defective, the jury's verdict, including the damages
award, is amply supported by the section 1125 claim and the common-law claim.

In addition, even if the Court were inclined to re-examine standing under section
1114, Imprimis has standing under that provision as well. The license agreement says
it is effective as of 2019. The lone witness asked about the date of signing was not a
signatory and testified he had no personal knowledge of the timing of the signing of
the agreement. Ex. 1 at 199:17–200:7. The "gotcha" evidence defendants seize upon
is a docusign time-stamp at DX095.020. But the docusign time-stamp does not
reference either of the signatories of the actual agreement—Andrew Boll of Harrow IP
or John Saharek of ImprimisRx. Instead, the docusign appears to relate to the filing of
the agreement into an internal "GLD database" on August 3, 2021. The only evidence

1  in the record from one of the actual signatories is Exhibit DX125A, where one of the

2  signatories declares that the agreement was actually entered into on July 6, 2021.

3  DX125A.006 ("The License Agreement was signed on July 6, 2021").  That document

4  is consistent with DX095.020, which identifies the "7.6.21" agreement.[6]

5          Finally, even if there had been convincing evidence that the license was signed

6  a couple weeks after the lawsuit, it would not matter.  Because the licensor and licensee

7  are controlled by the same individual, Ex. 12 at 135:3–23, 136:24–137:4, 197:19–

8  198:4, "it would be inequitable to allow [defendants] to avoid liability merely because

9  [Imprimis] waited to memorialize the transfer." *Malovani v. Doe*, 2012 WL 12886493,

10  at *4 (C.D. Cal. May 14, 2012); *see also Meyers v. Kang*, 2024 WL 1829624, at *3

11  (C.D. Cal. Jan. 2, 2024) ("[T]he court finds where a 'one-man shop' owns the mark,

12  the individual owner of the company can establish standing to sue so long as he submits

13  some evidence of the assignment of transfer of rights to the individual plaintiff, *even if*

14  *retroactive*.") (emphasis added); *M.I.B. Group LLC v. Aguilar*, 2024 WL 3857540, at

15  *7 (C.D. Cal. July 16, 2024) (same).  To hold otherwise would elevate form over

16  function, reward an adjudicated willful infringer, and invite years more of duplicative

17  litigation between Harrow IP and defendants.

18  **VIII.  <u>Equitable Defenses Are Unavailable to Willful Infringers</u>**.

19          Defendants raise the equitable defenses of laches, acquiescence, and unclean

20  hands.  None of those defenses, however, are available to defendants because they have

21  been adjudged to be willful infringers.  *DC Comics v. Towle*, 802 F.3d 1012, 1026 (9th

22  Cir. 2015) (the doctrine of laches "does not apply 'in cases of willful infringement'"),

23

24  ───────────────────

[6] That PRED-MOXI-BROM was added to the license in 2022 makes sense because

25  PRED-MOXI-BROM was not registered with the USPTO until October 2021—i.e.,

26  after the filing of the lawsuit.  Ex. 169.  Requiring a trademark owner to file a separate

27  lawsuit because an additional trademark is registered and/or infringed after the

original filing date would be bad policy with illogical and negative results, including

28  multiplicity of overlapping lawsuits between the same parties.

1    *quoting Evergreen Safety Council v. RSA Network, Inc.*, 697 F.3d 1221, 1228 (9th Cir.

2    2012); *see also San Miguel Pure Foods Co., Inc. v. Ramar Int'l Corp.*, 2012 WL

3    13227045, at *9 (C.D. Cal. Nov. 27, 2012) ("A party's willful infringement of a senior

4    user's trademark bars the consideration of laches and other equitable defenses.");

5    *Patsy's Italian Restaurant, Inc. v. Bana*s, 575 F. Supp. 2d 427, 457 (E.D.N.Y. 2008)

6    ("[I]t is impossible for the balance of equities to tip in the Syosset Defendants' favor

7    when they acted in bad faith and with an intent to infringe upon Plaintiffs' rights.

8    Therefore, the Syosset Defendants' equitable defenses are foreclosed by virtue of the

9    jury's findings"); *Pom Wonderful LLC v. Coca-Cola Co.*, 166 F. Supp. 3d 1085 (C.D.

10   Cal. 2016) ("courts must not automatically apply the doctrine of unclean hands and

11   'permit a defendant wrongdoer to retain the profits of his wrongdoing merely because

12   the plaintiff himself is possibly guilty of transgressing the law.'" *Johnson v. Yellow

13   Cab Transit Co.,* 321 U.S. 383, 387 (1944)").

14        Even if the Court could disregard the effect of the jury's findings of willfulness

15   and malice (which the Court cannot at this stage), the equitable defenses would still

16   fail.

17        As for laches, although two of the trademarks were in use prior to the first lawsuit

18   between the parties, most of the trademarks in question post-dated that lawsuit. Indeed,

19   several of the marks were not used until just a year or two prior to the filing of the

20   lawsuit. Ex. 1 at 127:2–132:6. Therefore, the "presumption" of unreasonable delay,

21   Mot. at 19:24–20:10, does not apply to the majority of the marks. Nor was the delay

22   unreasonable. Part of the time was spent attempting to convince defendants to stop

23   infringing during acquisition discussions that occurred in 2020. Ex. 1 at 151:3–16. As

24   for prejudice, defendants cite no evidence because there is none. Defendants say they

25   could have "brought the matter to the PTO's attention" but there is no evidence in the

26   record to support that proposition, and no case holds defendants' proposition to be

27   actionable prejudice supporting a laches defense. In fact, courts have refused to apply

28   laches where, as here, the defendant says it is not using the names as a trademark, but

instead for other reasons. *Adidas-America, Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1073 (D. Or. 2008).

Acquiescence fails for the same reasons as laches. *Marketquest Grp.*, 316 F. Supp. 3d at 1294 ("[T]o the extent acquiescence focuses on delay by the plaintiff, Defendants' failure on the laches defense dooms their acquiescence defense"). And acquiescence requires an affirmative act implying consent. There is no such affirmative act here. Defendants' asserted affirmative act was Imprimis agreeing in the 2017 settlement to take a "royalty interest" in the infringing sales. As an initial matter, as described above, that argument only applies to two of the marks because the rest were not even in existence. But even as to the two applicable marks, as Imprimis's founder testified, the whole point of the settlement was to get money for past use that could not be erased and then to stop the sales altogether upon issuance of a patent. Ex. 1 at 178:8–16 ("The lawsuit was designed to get them to stop making the formulations. And if they stopped making the formulations, they wouldn't be able to use the trademark."). This was not affirmative consent.

Defendants' unclean hands defense fails as well. There was no inequitable conduct before the PTO. There is no evidence that Imprimis said anything in its applications it did not believe; Imprimis was guided by counsel throughout the application process, and the majority of the marks were registered on the Supplemental Register anyway so any alleged misstatements caused no harm. That Imprimis had a different view as to the significance of DEX-MOXI versus PRED-MOXI does not indicate duplicity; the two marks are different and based on different formulations. That Imprimis told the USPTO that it was taking action to stop defendants from using the PRED-MOXI mark was true. As explained above, Imprimis believed its first lawsuit against defendants—including the settlement thereof—would get defendants to not only stop using the trademark PRED-MOXI but also to stop selling the formulation altogether.

Finally, the litigation conduct cited as problematic by defendants was nothing of the sort. The only evidence in the record supports Imprimis's good-faith actions in the earlier lawsuit. In this case, Imprimis represented that it was the exclusive licensee of the trademarks in question because it was and remains the exclusive licensee thereof, as explained above. *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 834 (9th Cir. 2011) (reversing application of unclean hands and noting the need for "clear, convincing evidence" of inequitable conduct).

The equitable defenses would fail on their merits, but they deserve scant attention due to the jury's finding of willful and malicious conduct—conduct that "equity" cannot reward.

## IX. The Law Does Not Support Defendants' Argument Regarding Juror Agreement.

Defendants submit a declaration from a juror who (sort of) tries to impeach the jury's verdict. For hundreds of years—all the way back to the English common law—the law has greatly restricted a juror's ability to do so. "Once a verdict has been delivered and accepted in open court, and the jury is polled and discharged, jurors may not claim that their assent was mistaken or unwilling. Attacks on jury unanimity . . . are also inappropriate after the jurors have assented to the verdict in a poll in open court." *Traver v. Meshriy*, 627 F.2d 934, 941 (9th Cir. 1980) (internal citations omitted).

Therefore, the rules of evidence allow a juror to testify against the jury's verdict only in very narrow circumstances. Because there are no allegations of improper outside influences or jury misconduct, the only exception even potentially applicable is Federal Rule of Evidence 606(b)(2)(C)'s exception for when "a mistake was made in entering the verdict on the verdict form." This narrow exception applies only where there is a *clerical error* in reducing the verdict to the verdict form. *See* Fed. R. Evid. 606 (2006 Advisory Committee Notes).

1    Defendants' case, *Teevee Toons, Inc. v. MP3.com, Inc.,* 148 F. Supp. 2d 276,
2    278 (S.D.N.Y. 2001), is just such a case. There, the jurors "[u]nanimously and
3    unequivocally . . . stated that their decision had been to award a total verdict in the
4    vicinity of $3 million and that the actual numbers entered on the verdict sheet were a
5    result of calculation errors that had occurred in the process of converting the total award
6    into awards for each individual infringement as required by the verdict sheet."

7        Here, there is no unanimous and unequivocal testimony about a clerical error.
8    There is only a single juror who says he is confused about the verdict number he saw
9    in the media and is not sure what happened. Juror Cohen states in paragraphs 2 and 3
10   of his declaration that he saw media articles showing that "ImprimisRx was awarded
11   $34.9 million" and that "reported damages figure was not a number that I personally
12   agreed to, and to the best of my knowledge is not the damages amount that any of the
13   other jurors agreed to." Of course not. The special verdict form did not have the jurors
14   total the various categories of compensatory and punitive damages; so nowhere would
15   they have written $34.9 million. It is possible that Mr. Cohen misunderstood the jury
16   instructions and did not realize how the various sums on the special verdict form would
17   be added together. But such confusion—even if real—is irrelevant under Rule 606.
18   *See*, *e.g.*, *United States v. Gibbs*, 570 F. Supp. 3d 1096, 1098–99 (N.D. Okla. 2021)
19   ([F]ederal courts have consistently held that 'testimony of jurors is incompetent to
20   impeach a verdict based on misinterpretation of the court's instructions.'").

21       Mr. Cohen goes on to say that "myself and the other jury members agreed to
22   award ImprimisRx $20.4 million in total damages. I did not agree to award
23   ImprimisRx $20.4 million in punitive damages." Yet, he *did* agree. The special verdict
24   form did not have a line for "total damages." It did have a line for "punitive damages,"
25   and this jury unanimously agreed to $20.4 million and, when polled, all agreed in open
26   court that they had agreed to that verdict. Again, there is no indication that there was
27   an error in transmitting the jury's agreed-upon verdict to paper.

28

Unlike in *Teevee Toons*, there is no unanimity and certainty amongst the jurors; indeed, even Juror Cohen himself is uncertain, which is clear from the material that defendants' counsel chose not to include in his declaration. Mr. Cohen's original email to this Court was very different in substance and tone; he was much more open to the possibility that he was merely confused, as the italicized text below makes clear:

> Today, out of curiosity, I looked for any news about the law suit I just sat on and found a press release from Harrow that mentioned the judgment awarded to them as $34.9 million. *Either* they have that wrong or our submitted paperwork was completed incorrectly *or the misunderstanding is on my part.* But yesterday while deliberating I, personally, never heard the figure of $34.9 million *and don't think that amount was ever mentioned.* As a jury *I believe* we decided on the TOTAL amount of $20.4 million. But it seems the $14.5 million was ADDED onto the $20.4 million rather than what we intended as the $14.5 million as part of the $20.4 million total judgment. *If the error is on my part then I apologize and you can disregard.* But I'm concerned enough to contact you.

Wesley Decl. Ex. 13. This is not the email of a juror who is sure there was a clerical error. This is the email of a juror who admitted that he may just be confused and points out only that he does not remember seeing $34.9 million on the verdict form— and for good reason, since that figure is arrived at only when the jury's totals are added together, something the jury was not asked to do.

These circumstances do not fit within Rule 606's narrow exception related to clerical error. Juror Cohen's declaration is therefore inadmissible, and this Court should reject defendants' argument that is based solely on that declaration.

Respectfully Submitted:

Dated: December 20, 2024

ELLIS GEORGE LLP
    Keith J. Wesley
    Christopher W. Arledge
    George B. A. Laiolo

By:     */s/Keith J. Wesley*
       Keith J. Wesley
Attorneys for Plaintiff and Counter-Defendant ImprimisRx, LLC

1

## PROOF OF SERVICE

2

**ImprimisRx, LLC v OSRX, Inc., et al.**
**USDC, SDCA, Case No. 3:21-cv-01305-BAS-DDLx**

3

4

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

5

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 2121 Avenue of the Stars, 30th Floor, Los Angeles, CA 90067.

6

7

On December 20, 2024, I served true copies of the following document(s) described as **PLAINTIFF IMPRIMIS'S OPPOSITION TO DEFENDANTS' POST-TRIAL MOTIONS** on the interested parties in this action as follows:

8

### SEE ATTACHED SERVICE LIST

9

10

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  On December 20, 2024, I caused a copy of the document(s) to be sent from e-mail address dtorosyan@ellisgeorge.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

11

12

13

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

14

Executed on December 20, 2024, at Los Angeles, California.

15

16

_____

17

Diane Torosyan

18

19

20

21

22

23

24

25

26

27

28

<u>**SERVICE LIST**</u>

*ImprimisRx, LLC v OSRX, Inc., et al.*
USDC, SDCA, Case No. 3:21-cv-01305-BAS-DDLx

| | |
|---|---|
| Dylan J. Liddiard, Esq.<br>Dale R. Bish, Esq.<br>Mikaela Burkhardt, Esq.<br>Thomas J. Martin, Esq.<br>Charles A. Talpas, Esq.<br>Allie M. Fellows, Esq.<br>WILSON SONSINI GOODRICH &<br>ROSATI, PC<br>650 Page Mill Road<br>Palo Alto, California  94304<br>Telephone: (650) 493-9300<br>Email:  dliddiard@wsgr.com<br>        dbish@wsgr.com<br>        mburkhardt@wsgr.com<br>        tmartin@wsgr.com<br>        ctalpas@wsgr.com<br>        pmarquez@wsgr.com<br>        afellows@wsgr.com | Attorneys for Defendants and Counter-Claimants OSRX, Inc., Ocular Science, Inc. |
| Carolynn Beck, Esq.<br>EISNER, LLP<br>152 West 57th Street<br>48th Floor<br>New York, New York 10019<br>Telephone: (646) 876-2614<br>Email:  cbeck@eisnerlaw.com | Attorneys for Defendants and Counter-Claimants OSRX, Inc., Ocular Science, Inc. |
| Zachary T. Elsea, Esq.<br>EISNER, LLP<br>433 N. Camden Drive, 4th Floor<br>Beverly Hills, California 90210<br>Telephone:  (310) 855-3200<br>Facsimile:  (310) 855-3201<br>Email:  zelsea@eisnerlaw.com | Attorneys for Defendants and Counter-Claimants OSRX, Inc., Ocular Science, Inc. |