DYLAN J. LIDDIARD (BAR NO. 203055)
DALE R. BISH (BAR NO. 235390)
THOMAS J. MARTIN (BAR NO. 150039)
CHARLES A. TALPAS (BAR NO. 308505)
MIKAELA BURKHARDT (BAR NO. 328112)
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
650 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 493-9300
Email: dliddiard@wsgr.com

*Attorneys for Defendants OSRX, Inc. and Ocular Science, Inc.*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMPRIMISRX, LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>OSRX, INC. ; OCULAR SCIENCE, INC.,<br><br>    Defendants. | Case No. 3:21-CV-01305-BAS-DDL<br><br>**REPLY IN SUPPORT OF DEFENDANTS' POST-TRIAL BRIEF**<br><br>Special Briefing Schedule Ordered<br><br>Judge: Hon. Cynthia A. Bashant<br>Hearing Date: January 17, 2025<br>Time: 10:00 A.M.<br>Courtroom: 12B |
| OSRX, INC., OCULAR SCIENCE, INC.,<br><br>    Counterclaimants,<br><br>    vs.<br><br>IMPRIMISRX, LLC,<br><br>    Counterdefendant. | |

**TABLE OF CONTENTS**

**Page**

I. THE MARKS SHOULD BE CANCELLED ...................................................... 1

    A. The Marks Are Generic .................................................................. 1

        1. Plaintiff's Does Not Address Uncontroverted Evidence of Genericness ............................................................................. 2

        2. Plaintiff's Legal Arguments Against Genericness Lack Merit ........ 3

    B. The Marks Lack Acquired Distinctiveness .................................................. 6

II. FAIR USE AND EQUITABLE DEFENSES ....................................................... 6

III. DAMAGES ............................................................................................ 9

IV. STANDING ........................................................................................... 10

V. JURY ISSUE ......................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adidas-Am., Inc. v. Payless Shoesource Inc.*,
    546 F. Supp. 2d 1029 (D. Or. 2008) .................................................................. 9

*DC Comics v. Towle*,
    802 F.3d 1012 (9th Cir. 2015) ........................................................................... 8

*Evergreen Safety Council v. RSA Network, Inc.*,
    697 F.3d 1221 (9th Cir. 2012) ........................................................................... 8

*Groupion, LLC v. Groupon, Inc.*,
    826 F. Supp. 2d 1156 (N.D. Cal. 2011) ............................................................. 7

*Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*,
    270 F.3d 298 (6th Cir. 2001) ............................................................................. 6

*Holland v. Florida*,
    560 U.S. 631 (2010) .......................................................................................... 8

*In re Nordic Naturals, Inc.*,
    755 F.3d 1340 .................................................................................................... 4

*P&P Imports LLC v. Johnson Enterprises, LLC*,
    46 F.4th 953 (9th Cir. 2022) ............................................................................. 6

*Pharmacia Corp. v. Alcon Labs., Inc.*,
    201 F. Supp. 2d 335 (D.N.J. 2002) ........................................................... 1, 4, 8

*Reiffin v. Microsoft Corp.*,
    281 F. Supp. 2d 1149 (N.D. Cal. 2003) ............................................................. 1

*Rsrv. Media, Inc. v. Efficient Frontiers, Inc.*,
    2017 WL 123420 (C.D. Cal. Jan. 11, 2017) ...................................................... 7

*Snyder's Lance, Inc. v. Frito-Lay N. Am., Inc.*,
    542 F. Supp. 3d 371 (W.D.N.C. 2021) .............................................................. 5

*SportFuel, Inc. v. PepsiCo, Inc.*,
    932 F.3d 589 (7th Cir. 2019) ............................................................................. 7

*Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*,
    908 F.3d 313 (8th Cir. 2018) ............................................................................. 8

*Sweich v. Astrue*,
    2009 WL 890678 (N.D.N.Y. Mar. 30, 2009) .................................................... 4

*Teevee Toons, Inc. v. MP3.com, Inc.*,
    148 F. Supp. 2d 276 (S.D.N.Y. 2001) ............................................................. 10

*Tisch Hotels, Inc. v. Americana Inn, Inc.*,
    350 F.2d 609 (7th Cir. 1965) ............................................................................. 8

*VHT, Inc. v. Zillow Grp., Inc.*,
    918 F.3d 723 (9th Cir. 2019) ............................................................................... 10

*Whittaker Corp. v. Execuair Corp.*,
    736 F.2d 1341 (9th Cir. 1984) ............................................................................... 9

**STATUTES**

15 U.S.C. § 1115(b)(4) ................................................................................................... 7

**RULES**

Fed. R. Civ. P. 50 ........................................................................................................... 1

Defendants established its equitable claims and defenses by a preponderance of the evidence, which is their burden here. *See Reiffin v. Microsoft Corp.*, 281 F. Supp. 2d 1149, 1154 (N.D. Cal. 2003). To the extent there is overlap between findings reached by the jury and findings that the Court should make as to these equitable claims and defenses, Defendants demonstrated why the Court should reach those findings under the standard(s) prescribed by Fed. R. Civ. P. 50 and/or 59. *See* Mot. at 1 n.1.

## I. THE MARKS SHOULD BE CANCELLED

### A. The Marks Are Generic

Plaintiff concedes the material facts which require a finding of genericness.

First, Plaintiff does not dispute that prednisolone, dexamethasone, gatifloxacin, moxifloxacin, bromfenac, timolol, brimonidine, dorzolamide and latanoprost are the generic names of those medications. *See* Opp. at 3, 8; *see also Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 340-42 (D.N.J. 2002) ("latanoprost" is the generic name for drug marketed under "Xalatan" brand name) ("Timolol is the generic name"). Plaintiff also concedes that the same terms are the generic designations for a compounded formulation combining those respective medications into one bottle, at least "when they are fully spelled out—e.g., prednisolone-gatifloxacin-bromfenac." Opp. at 3; *see also* Opp. at 8 ("the entire chemical formulation—i.e., the generic name"); *Pharmacia*, 201 F. Supp. 2d at 341-42 ("timolol-latanoprost" is generic name for drug marketed under "Xalacom" brand name).

Second, Plaintiff concedes that eye doctors "know" the abbreviations refer to the underlying generic names of those medications:

> [D]octors know that "pred" means prednisolone, "gati" means gatifloxacin, and "brom" means bromfenac. So it would not matter the order in which you placed those terms; ***doctors*** would still know ***what the product was***.

Opp. at 6-7 (internal citations omitted) (emphasis added). Plaintiff similarly admits that "[t]here is every reason to believe that eye doctors" would recognize the purported marks as "combinations of abbreviations of generic drug names" and conclude that those combinations "must themselves be generic." *Id.* at 8.

REPLY ISO DEFS' POST-TRIAL BRIEF             -1-            CASE NO.: 3:21-CV-01305-BAS (DDL)

In other words, Plaintiff admits that "pred-gati-brom" means the same thing to eye doctors as "prednisolone-gatifloxacin-bromfenac," which is the generic term for that particular formulation. Based on those undisputed facts, the Court should find that the purported marks are generic. *See* Mot. at 1, 8-9. It is black-letter law that a term is generic if it is "an abbreviation of a generic name which still conveys to the buyer the original generic name connotation of the name which is abbreviated." *See* 2 McCarthy § 12:37.

Plaintiff allots virtually no space to the facts, underscoring that genericness, here, turns on legal arguments. Specifically, Plaintiff recycles the same legal arguments that Defendants accurately predicted and dispelled in their opening brief. *See* Mot. at 8-11. Before turning to those, however, it is worth noting Plaintiff's failure to address the overwhelming record evidence of genericness. After all, it was Plaintiff's burden to establish that the marks are not generic. *Id.* at 1, 11.

### 1. Plaintiff's Does Not Address Uncontroverted Evidence of Genericness

Defendants highlighted Plaintiff's own use of the terms in a generic manner, including in internal materials, marketing materials, communications with the PTO, and lawsuits against Defendants. *See* Mot. at 3, 6-7. Plaintiff does not argue that any of these examples reflect non-generic use, let alone explain why. Instead, Plaintiff merely counters that its own witnesses subjectively believed the terms were "valuable brand assets around which they built their business." Opp. at 7-8. That, however, says nothing about whether doctors associate the terms with a source, rather than the medications. *See* Mot. at 1.

Defendants also highlighted evidence of generic use in the ophthalmic industry, including the historical context, usage by competitors, and usage in scientific publications. *See* Mot. at 4-6. Plaintiff does not discuss any concrete examples, except in two bizarre points that make no sense. *See* Opp. at 8 (lines 4-13).[1] Aside from examples of generic

---

[1] Plaintiff references examples in scientific literature where the full name of a formulation is followed by a parenthetical with the abbreviations at issue: e.g., "There are also other types of injectable compound drugs such as dexamethasone-moxifloxacin (Dex-Moxi) and dexamethasone-moxifloxacin-ketorolac (Dex-Moxi-Ketor)." *See* Mot. at 5. It clearly shows that the abbreviations are generic equivalents to the full medication names, and
(continued...)

use, Plaintiff also ignores that this evidence shows why it is implausible that eye doctors would associate these generic terms with a source, rather than the most commonly prescribed medications in the industry. *See* Mot. at 4-6.

Finally, Defendants demonstrated that the survey evidence offered by both parties confirms that the purported marks are generic, as the vast majority of eye doctors associate them with the full generic names of the medications. *See* Mot. at 4-5, 7-8. Ironically, in their criticism of Defendants' survey, Plaintiff does the best job of driving this point home:

> Governing law holds that the combination of generic terms can, in totality, be descriptive. There is every reason to believe that eye doctors taking the survey would not know that and might conclude that combinations of abbreviations of generic drug names must themselves be generic.

Opp. at 8. As confirmed by the survey evidence, of course eye doctors equate these obvious abbreviations with the full generic names of medications being abbreviated.

Regarding its own evidence, Plaintiff still offers no direct evidence from eye doctors suggesting that they primarily associate the purported marks with something other than the underlying medications. The only "evidence" Plaintiff cites, at all, are examples of alternative abbreviations. *See* Opp. at 6. As explained in the opening brief, and again below, alternatives generic terms are immaterial. Mot at 10.

**2.   Plaintiff's Legal Arguments Against Genericness Lack Merit**

Plaintiff mainly hangs its hat on the "abbreviated and composite terms" and "availability of alternatives" arguments (Opp. at 3-7), even though Defendants already explained why both fail (Mot at 8-10). Plaintiff does not dispute Defendants' cited authorities.[2] Instead, Plaintiff merely notes the more general rule that a composite of

---

courts routinely find that such evidence weighs strongly in favor of genericism. *Id*. Plaintiff's argument that it somehow shows non-generic use, because the "shortened phrase" is not necessary, makes no sense. *See* Opp. at 8. Plaintiff also notes that another compounding pharmacy used the same abbreviations before Plaintiff's marks were registered. *Id*. But prior use by third parties is evidence for, not against, genericness.

[2] Plaintiff misleadingly suggests that Defendants provided a legal standard that applies only in the Seventh Circuit and has been rejected in the Ninth Circuit. *See* Opp. at 5. Not so. The "deviation from natural usage" or an "unusual unitary combination" language, which Plaintiff cites as being rejected (Opp. at 5), is simply not in Defendants' brief.

generic elements is not *automatically* generic (Opp. at 5), even though no one said that they are. Otherwise, Plaintiff posits a host of made-up legal doctrines, without citation, all of which misstate the law.[3]

Plaintiff's focus on the "CranApple" analogy is misguided. Plaintiff admits that the purported marks (e.g., DEX-MOXI) are meant to apply to specific compounded medications (e.g., dexamethasone-moxifloxacin) and that the full medication names are the generic denomination for them. *See* Opp. at 3, 8. In the pharmaceutical context, a medication is not a mere "ingredient" or "characteristic" of the good. The medication *is* the "good" for trademark analysis purposes. *See* Mot. at 8; *Pharmacia*, 201 F. Supp. 2d at 340-42, 374, 379 (latanoprost is generic name for drug marketed under brand name Xalatan) (timolol-latanoprost is generic name for drug marketed under brand name Xalacom) ("Prescription drugs are a unique commodity") ("prescription drug packaging is required to display generic names") ("in the pharmaceutical field, professionals have been trained to distinguish generic and proprietary names within a class of drugs").[4] Thus,

---

[3] Opp. at 3 ("But there are a lot of different ways the generic terms apple, convention, or prednisolone can be abbreviated; the abbreviations themselves thus are not generic.");

Opp. at 4 ("a generic term (apple) being combined with a shortened version of another generic term ('cran' for cranberry)" creates "a descriptive trademark");

Opp. at 4 ("In sum, if CranApple is a descriptive trademark for a juice consisting of the ingredients cranberry and apple—as both parties agree—then Pred-Moxi-Brom is at least descriptive of a compounded formulation consisting of the ingredients prednisolone acetate, moxifloxicin [*sic*], and bromfenac.");

Opp. at 6 ("After all, it would be difficult to advertise an apple cart without ever mentioning the word 'apple.' But it is apparently not at all that hard to advertise combination eyedrops without using words such as pred-moxi-brom or tim-brim-lat-dor [*sic*].");

Opp. at 8 ("Far from showing genericism, this evidence supports non-genericism. If the shortened phrase were necessary to describe the formulations, then there would have been no need to use the longer phrase as well.").

[4] *See also Sweich v. Astrue*, 2009 WL 890678, *4 n.35 (N.D.N.Y. Mar. 30, 2009) ("Blephamide" is "[t]rademark for sulfacetamide sodium, treats eye infections, and prednisolone acetate, teats an allergy or inflammation"); *In re Nordic Naturals, Inc.*, 755 F.3d 1340, 1341-42 (Fed. Cir. 2014) ("docosahexaenoic acid" and its abbreviation "DHA" both equally generic terms). This case is not about fruits or juices.

juice analogies aside, a better analogy is that "CranApple" is generic for a bowl of cranberries and apples. *See* Opp. at 3, 6 ("apple" generic for "the fruit" or "apple cart").

Plaintiff also fixates on the number of alternative "combinations available" for the formulations at issue. *See* Opp. at 7. The argument is legally incorrect (Mot. at 10) and suffers from a common-sense flaw. These medications are available for all compounding pharmacies to use, and there are thousands across the nation. If each compounding pharmacy had to invent a new and slightly different abbreviation for the underlying generic names, it would increase searching costs and consumer confusion, unless doctors somehow could remember the different ways each pharmacy abbreviates generic names.

Fortunately, trademark law allows all competitors to use the same abbreviation for a generic term if the relevant consumer draws no distinction between the abbreviation and the generic term itself. *See* Mot. at 8-9. When a claimed mark is an abbreviation or a composite of generic elements, then the question is whether that abbreviation or composite yields some additional or alternative significance—aside from the underlying generic meaning—in the minds of the relevant consuming public. *See* Mot. at 8-9. Here, Plaintiff admits that the marks are composite abbreviations of generic terms, **and** Plaintiff admits that eye doctors understand them to signify the underlying generic names of its compounded medications. *See* Opp. at 3, 8. Plaintiff ignores that decisive point.

Plaintiff notes its investment into goodwill but ultimately acknowledges that it cannot transform a generic term into a non-generic term. *See* Opp. at 6-7 n.3. Plaintiff also briefly notes that some secondary meaning surveys can be relevant to genericness. *Id.* at 7 n.3. Indeed, Defendants made this point in their brief, insofar as secondary meaning survey results just like Plaintiff's have been held to demonstrate genericness, unintentionally. *See* Mot. at 4-5, 7-8; *Snyder's Lance, Inc. v. Frito-Lay N. Am., Inc.*, 542 F. Supp. 3d 371, 402-403 (that "less than half of the Mantis survey respondents [38.7%] associated the [term] with a single source" was "clear evidence" of genericness).

Finally, Plaintiff makes a passing reference to the PTO in its introduction, but Plaintiff does not argue that PTO status impacts the determination here. *See* Mot. at 11.

### B. The Marks Lack Acquired Distinctiveness

Plaintiff contends that a reasonable juror could find secondary meaning based on two factors, intentional copying and survey evidence (Opp. at 9), but Plaintiff has no survey evidence at all for seven of the purported marks (PRED-MOXI, DEX-MOXI, PRED-BROM, MOXI-BROM, TIM-LAT, TIM-BRIM-DOR and TIM-BRIM-DOR-LAT). *See* Mot. at 12; Tr. 395:19-23. Plaintiff does not argue that there is some other combination of evidence that is legally sufficient, absent any survey evidence, to support a finding of acquired distinctiveness as to those marks.

Moreover, Plaintiff's secondary meaning showing is a far cry from *P&P Imports LLC v. Johnson Enterprises, LLC*, 46 F.4th 953 (9th Cir. 2022), the case Plaintiff relies upon to argue that it created a "triable issue of fact about secondary meaning." Opp. at 9. In *P&P Imports*, a trade dress case, plaintiff's survey evidence showed that sixty-three percent of respondents believed the product was "from a single source/company," albeit an "anonymous" one, results which the expert opined "strongly" suggested secondary meaning. *See* 46 F.4th at 963. Here, by contrast, Plaintiff's expert admits that his thirty-five to thirty-seven percent survey results did ***not*** demonstrate a sufficient level of secondary meaning (Tr. 388:22-389:2), putting aside that a significant portion of those respondents did not attribute the marks to Plaintiff or an "anonymous" source but, rather, to Defendants, other companies, or generic sources (Tr. 404:25-405:6, 408:16-22, 409:18-412:4).[5] That does not suffice, and Plaintiff still cites no case holding otherwise.

## II. FAIR USE AND EQUITABLE DEFENSES

Plaintiff primarily argues that the asserted affirmative defenses of fair use, laches,

---

[5] An unknown, anonymous source still must be a "single" source, which ultimately turns out to be Plaintiff, not a hodgepodge of other companies, generic sources and Defendants. *See* 2 McCarthy § 15:42 ("Of course, to establish a secondary meaning, the survey introduced by a litigant must prove that buyers associate the designation with it, not with another company and certainly not associate it with the opponent in the case"); *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 315 n.7 (6th Cir. 2001) ("While the law allows secondary meaning to be established by demonstrating that the public is aware that the product comes from an anonymous source, there must be evidence indicating that it is a single, anonymous source").

acquiescence and unclean hands are "not available" based on the jury's finding of willfulness. *See* Opp. at 12-13, 19-20. Plaintiff is wrong for at least the following reasons.

As to fair use, Plaintiff merely points out that the jury's finding is inconsistent with one element of the fair use defense—that Defendants used the term "fairly and in good faith." *See* 15 U.S.C. § 1115(b)(4). Plaintiff ignores that, in the opening brief, Defendants cited irrefutable evidence and case law showing that a reasonable jury was required to find for Defendants on all elements of the fair use defense, including the "fairly and in good faith" element. *See* Mot. at 13-14. Plaintiff relied solely on evidence that Defendants were, at some point, aware of Plaintiff's marks in order to show willfulness or bad faith. *Id.* As case law makes clear, mere awareness is insufficient to show willful infringement or bad faith, particularly when the majority of Plaintiff's marks were unregistered—and Defendants' use preceded registration of the two that were. *Id.* at 17-18; *see also Rsrv. Media, Inc. v. Efficient Frontiers, Inc.*, 2017 WL 123420, at *9-10 (C.D. Cal. Jan. 11, 2017) (mere knowledge does not create triable issue of fact); *SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 600-601 (7th Cir. 2019) (same); *Groupion, LLC v. Groupon, Inc.*, 826 F. Supp. 2d 1156, 1165 (N.D. Cal. 2011) (awareness not sufficient, especially for unregistered marks).

As to the equitable defenses, Plaintiff's willfulness arguments fail for the same reason (i.e., insufficient evidence) as well as others.

First, after briefing by the parties, the Court agreed to allow the willful infringement jury question solely for the purpose of determining whether Plaintiff would be entitled to statutory damages for its two registered marks, and the Court reserved the right to treat it as an "advisory opinion." *See* Tr. 6:15-20. Thus, the Court is not bound by the jury's verdict in its weighing of the equities on laches, acquiescence and unclean hands.

Second, there is a mismatch between the willfulness standard that the Court instructed for the purposes of determining statutory damages, i.e., mere "knowledge" or "recklessness" as to infringement (*see* Instruction No. 23, ECF No. 344 at 42), versus the type of willfulness that may weigh against a Defendants' equitable defenses, i.e., an intent

to confuse and "exploit the advantage of an established mark" (*see, e.g.*, *DC Comics v. Towle*, 802 F.3d 1012, 1026 (9th Cir. 2015) (citation omitted)).

In any event, "the fact that a defendant was a willful infringer does not necessarily preclude the district court from granting the defendant equitable relief from an infringement claim." *Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 345 (8th Cir. 2018). "Equity demands flexibility and eschews mechanical rules," and in "an appropriate case, a district court might determine that the defendant's willful infringement" was "sufficiently minor compared to the plaintiff's delay and acquiescence that the balance of equities still favors the defendant." *Id.* (citing *Holland v. Florida*, 560 U.S. 631, 649-50 (2010); *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 615 (7th Cir. 1965)).

Plaintiff's criticisms of the equitable defenses also merit little consideration.

Plaintiff does not offer any reasonable excuse for its delay. At the outset, Plaintiff offered no evidence of informal efforts to resolve potential trademark claims prior to the filing of this lawsuit. Mr. Baum's self-serving and vague testimony that such efforts took place (at some unknown time) lack any evidentiary support. *See* Opp. at 20. On the other hand, no one disputes that Plaintiff would receive a windfall from Defendants' purportedly infringing sales—if Plaintiff's patents had issued—by virtue of the royalty interest in the settlement agreement. *See* Mot. at 17-18. Plaintiff cannot wait and see if infringing sales lead to royalty payments and, if not, sue for trademark infringement. *See Evergreen Safety Council v. RSA Network, Inc.*, 697 F.3d 1221, 1227 (9th Cir. 2012) ("delay is impermissible when its purpose or effect is to capitalize on the value of the alleged infringer's labor by determining whether the infringing conduct will be profitable"); *Pharmacia*, 201 F. Supp. 2d at 384-85 (unreasonable to delay trademark claims while negotiating a patent dispute).

Plaintiff also ignores that—by the time of the 2017 settlement agreement—it had registered two, and applied for five, of the marks, and it was on notice of Defendant's similar convention for abbreviating the underlying medications. *See* Mot. at 17.

Contrary to what Plaintiff suggests (Opp. at 19), Defendants did cite evidence of prejudice (Mot. at 18-19). Plaintiff just ignores it. Plaintiff also wrongly suggests that Defendants cannot claim reliance because Defendants contend the terms are generic, citing *Adidas-Am., Inc. v. Payless Shoesource Inc.* (Opp. at 20-21). *Adidas* is wildly inapposite insofar as it concerns knock-off Adidas shoes, where the infringing conduct was Payless's use of purely decorative stripes on certain shoe designs. *See* 546 F. Supp. 2d 1029, 1073-74 (D. Or. 2008). That is nothing like what Defendants did here.[6]

## III. DAMAGES

Plaintiff cites 2 McCarthy § 30:59, purportedly as support for its argument that a defendant's profits can be awarded by the jury as actual damages. *See* Opp. at 13. That same section of the treatise, however, makes it crystal clear that the remedy is equitable and reserved for the sound discretion of the Court. *See* 2 McCarthy § 30:59.

One key difference between actual damages (the legal remedy) and disgorgement of profits (the equitable remedy) is the proof required as to "causation and amount." *See* Mot. at 14-15; 2 McCarthy § 30:72. Plaintiff did not come close to showing causation and amount at trial, even though the Court warned Plaintiff it would be held to the actual damages standard of proof. *See* Mot. at 14-15. Now, Plaintiff does not even try to argue that it met the standard. Instead, Plaintiff merely attempts to show that it met the Lanham Act's lower bar for equitable disgorgement. *See* Opp. at 14-16. It is black-letter law that Plaintiff cannot satisfy its burden on actual damages that way. *See* Mot. at 14-15.

---

[6] Defendants invested so that the quality of its formulations would be associated with its actual branding, i.e., OSRX and OMNI, rather than the generic names of the drugs. That is, Defendants wanted OSRX and OMNI to be regarded as a quality source for drugs like "pred-moxi-brom," believing it to be just as generic as "prednisolone-moxifloxacin-bromfenac." They are prejudiced if they now cannot use those terms. Defendants also invested to increase awareness and acceptance of its compounded combination drops as an alternative to the conventional "multiple bottle" regimens offered by commercial pharmacies. *See* Mot. at 4, 17-19. Defendants believed they could use the generic terms without—years later—forfeiting the proceeds of those sales. *See Whittaker Corp. v. Execuair Corp.*, 736 F.2d 1341, 1347 (9th Cir. 1984) (prejudice where defendant "continued engaging in its existing practices, incurring additional potential liability by reason of [plaintiff's] failure to take prompt action").

## IV. STANDING

The marks at issue are owned by Harrow IP LLC, and Plaintiff did not become a licensee until *after* it filed the initial complaint. *See* Mot. at 15-16. Plaintiff cites no evidence showing that the license agreement was fully executed by both parties (i.e., Harrow IP LLC and Plaintiff) prior to the initial complaint—only that one signatory, Mr. Boll on behalf of Harrow IP LLC, claims to have signed the agreement on July 6, 2021. *See* DX125A (the interrogatory asks when Harrow IP signed the agreement). Tellingly, Mr. Boll did not testify about the execution date at trial. The only evidence of when Plaintiff signed the agreement is Mr. Baum's testimony that it was signed on August 3, 2021. *See* Mot. at 16. Plaintiff further concedes that it had no right to PRED-MOXI-BROM until 2022, in any event. *See* Opp. at 19 n.6.

Plaintiff's response, that it may have standing on its Section 43 claim, is unavailing. Like all claims, standing is determined as of the time the initial complaint was filed. In its complaint, as throughout this litigation and trial, Plaintiff relied on its licensee status as the sole basis for pursuing its trademark claims (under Sections 32 and 43). To the extent that Plaintiff may have some other hypothetical basis for standing under Section 43, it was not pleaded or litigated in this case, let alone established, and it is "too late" to raise it now.[7] *See VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 736-37 (9th Cir. 2019) (verdict "cannot be sustained on a theory that was never presented to the jury").

## V. JURY ISSUE

This case is exactly like *Teevee Toons, Inc. v. MP3.com, Inc.*, 148 F. Supp. 2d 276 (S.D.N.Y. 2001). Mr. Cohen's email to the Court, and his declaration, are not expressions of confusion (Opp. at 24). Mr. Cohen unequivocally stated under oath that he believes there was an error in reducing the verdict to the verdict form. There is no reason why the Court should not take Mr. Cohen at his word.

---

[7] Plaintiff had no basis to allege it was an exclusive licensee. Had Defendants known the truth, they would have filed a Rule 11 motion, and Plaintiff's frivolous allegation is a further example of bad faith litigation conduct supporting the unclean hands defense.

1  Dated: December 8, 2024

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: */s/ Dylan J. Liddiard*
      Dylan J. Liddiard

*Attorneys for Defendants
OSRX, Inc. and Ocular Science, Inc.*