1  DYLAN J. LIDDIARD (BAR NO. 203055)
   DALE R. BISH (BAR NO. 235390)
2  THOMAS J. MARTIN (BAR NO. 150039)
   CHARLES A. TALPAS (BAR NO. 308505)
3  MIKAELA BURKHARDT (BAR NO. 328112)
   WILSON SONSINI GOODRICH & ROSATI
4  Professional Corporation
   650 Page Mill Road
5  Palo Alto, CA 94304
   Telephone: (650) 493-9300
6  Email: dliddiard@wsgr.com

7  *Attorneys for Defendants OSRX, Inc. and
   Ocular Science, Inc.*

8

9              UNITED STATES DISTRICT COURT

10            SOUTHERN DISTRICT OF CALIFORNIA

11  IMPRIMISRX, LLC,                  ) Case No. 3:21-CV-01305-BAS-DDL
                                      )
12          Plaintiff,                ) **DEFENDANTS'**
                                      ) **MEMORANDUM OF POINTS**
13      v.                            ) **AND AUTHORITIES IN**
                                      ) **SUPPORT OF DEFENDANTS'**
14  OSRX, INC.; OCULAR SCIENCE,       ) **RENEWED MOTION FOR**
    INC.,                             ) **JUDGMENT AS A MATTER OF**
15                                    ) **LAW OR, IN THE**
          Defendants.                 ) **ALTERNATIVE, MOTION FOR**
16                                    ) **A NEW TRIAL**
                                      )
17                                    ) Hearing Date: April 25, 2025
                                      ) Courtroom: 12B
18                                    ) Judge:   Hon. Cynthia A. Bashant
                                      )
19  _____   ) **NO ORAL ARGUMENT UNLESS**
                                      ) **ORDERED BY THE COURT**
20                                    )
21                                    ) *Filed Concurrently With*
    OSRX, INC.; OCULAR SCIENCE,       ) *Defendants' Notice of Motion and*
22  INC.,                             ) *Motion*
                                      )
23          Counterclaimants,         )
                                      )
24      v.                            )
                                      )
25  IMPRIMISRX, LLC,                  )
                                      )
26          Counterdefendant.         )
                                      )
27  _____   )
28

---

MPA ISO DEFS' RENEWED MOT. FOR JMOL, OR                    CASE NO. 3:21-cv-1305-BAS-DDL
IN THE ALTERNATIVE, MOT. FOR NEW TRIAL

# TABLE OF CONTENTS

**Page**

I.    LEGAL STANDARD ....................................................................... 1

II.   VALIDITY ..................................................................................... 2

      A.    The Purported Marks Are Generic ............................................ 2

            1.    Plaintiff Is Unable to Address Uncontroverted Evidence of Genericness ..................................................... 4

                  a. Evidence of Generic Use in Ophthalmic Industry......4

                  b. Plaintiff's Own Use of the Purported Marks…………6

                  c. Survey Evidence……………………………………8

            2.    Plaintiff's Legal Arguments Against Genericness Lack Merit................................................................... 8

      B.    Alternatively, the Purported Marks are Merely Descriptive ... 11

III.  LIKELIHOOD OF CONFUSION............................................... 12

IV.   ACTUAL DAMAGES ................................................................. 18

      A.    There Is No Evidence of Lost Profits ...................................... 19

      B.    There Was No Defensible Basis to Calculate Lost Profits...... 22

V.    WILLFULNESS ........................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. Murakami*,
  54 Cal.3d 105 (1991) ....................................................................................25

*Am. Auto. Ass'n of N. Cal., Nev. & Utah v. Gen. Motors LLC*,
  367 F. Supp. 3d 1072 (N.D. Cal. 2019)..................................................15, 21, 22

*AMF Inc. v. Sleekcraft Boats*,
  599 F.3d 341 (9th Cir. 2003) .........................................................................14

*Arcona, Inc. v. Farmacy Beauty, LLC*,
  976 F.3d 1074 (9th Cir. 2020) .......................................................................13

*Aurora World, Inc. v. Ty Inc.*,
  719 F. Supp. 2d 1115 (C.D. Cal. 2009) ...........................................................15

*Avco Corp v. Turn & Bank Holdings, LLC*,
  659 F. Supp. 3d 483 (M.D. Pa. 2023), *aff'd* 2024 WL 3439771 (3d Cir.
  2024) ...............................................................................................................21

*Birchter Electro Med. Sys., Inc. v. Beacon Labs., Inc.*,
  738 F. Supp. 417 (D. Colo. 1990)......................................................................5

*Brookfield Commc'ns, Inc. v. W. Coast Ent'mt Corp.*,
  174 F.3d 1036 (9th Cir. 1999) .......................................................................16

*CG Roxane LLC v. Fiji Water Co. LLC*,
  569 F. Supp. 2d 1019 (N.D. Cal. 2008)............................................................13

*Classic Foods Int'l Corp. v. Kettle Foods, Inc.*,
  468 F. Supp. 2d 1181 (C.D. Cal. 2007) .............................................................4

*Cohn v. Petsmart, Inc.*,
  281 F.3d 837 (9th Cir. 2002) .........................................................................15

*Cosmetically Sealed Indus., Inc. v. Cheesebrough-Pond's USA Co.*,
  125 F.3d 28 (2d Cir. 1997) ..............................................................................7

*Designer Skin, LLC v. S&L Vitamins, Inc.*,
  560 F. Supp. 2d 811 (D. Ariz. 2008) .........................................................16, 18

*Denver Urban Homesteading, LLC v. Devaes Inst.*,
   2015 WL 12552043 (C.D. Cal. Nov. 5, 2015) ....................................................4

*Dfinity Found. v. Meta Platforms, Inc.*,
   2022 WL 16857036 (N.D. Cal. Nov. 10, 2022) ...........................................14, 15

*Dorr-Oliver, Inc. v. Flid-Quip, Inc.*,
   94 F.3d 376 (7th Cir. 1996) ........................................................................14, 17

*Engineered Arresting Sys. Corp. v. Atech, Inc.*,
   356 F. Supp. 3d 1323 (N.D. Ala. 2018)..............................................................9

*Fenner v. Dependable Trucking Co.*,
   716 F.2d 598 (9th Cir. 1983) .............................................................................2

*Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*,
   198 F.3d 1143 (9th Cir. 1999) ...........................................................................4

*Groeneveld Trans. Efficiency, Inc. v. Lubecore Int'l, Inc.*,
   730 F.3d 494 (6th Cir. 2013) ...........................................................................18

*Groupion, LLC v. Groupon, Inc.*,
   859 F. Supp. 2d 1067 (N.D. Cal. 2012)............................................................24

*Gruner + Jahr USA Pub. v. Meredith Corp.*,
   991 F.2d 1072 (2d Cir. 1993) ..........................................................................15

*Hansen Beverage Co. v. Vital Pharm., Inc.*,
   2010 WL 3069690 (S.D. Cal. Aug. 3, 2010).....................................................23

*Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*,
   270 F.3d 298 (6th Cir. 2001) ...........................................................................12

*Hickory Farms, Inc. v. Snackmasters, Inc.*,
   500 F. Supp. 2d 789 (N.D. Ill. 2007).................................................................9

*Ill. Tool Works, Inc. v. Rust-Oleum Corp.*,
   955 F.3d 512 (5th Cir. 2020) ...........................................................................20

*Intel Corp. v. Terabyte Int'l, Inc.*,
   6 F.3d 614 (9th Cir. 1993) ...............................................................................19

*JIPC Mgmt, Inc. v. Incredible Pizza Co.*,
   2009 WL 10671438 (C.D. Cal. June 24, 2009)..................................................21

*Josephs v. Pac. Bell*,
443 F.3d 1050 (9th Cir. 2006) ................................................................1

*Katzin Leather, Inc. v. Roadwire, LLC*,
2022 WL 17101245 (C.D. Cal. May 6, 2022) ....................................13

*Lindy Pen Co. v. Bic Pen Corp.*,
982 F.2d 1400 (9th Cir. 1993) ...............................................19, 23, 24

*M2 Software, Inc. v. Madacy Entm't*,
421 F.3d 1073 (9th Cir. 2005) ..............................................................13

*McClaran v. Plastic Indus., Inc.*,
97 F.3d 347 (9th Cir. 1996) ..................................................................23

*Molski v. M.J. Cable, Inc.*,
481 F.3d 724 (9th Cir. 2007) ..................................................................1

*Morgan v. Woessner*,
997 F.2d 1244 (9th Cir. 1993) ................................................................2

*Montgomery Ward & Co v. Duncan.*,
311 U.S. 243 (1940).................................................................................1

*Multi Time Machine, Inc. v. Amazon.com, Inc.*,
804 F.3d 930 (9th Cir. 2015) ................................................................18

*Murphy v. City of Long Beach*,
914 F.2d 183 (9th Cir. 1990) ..................................................................1

*Nartron Corp. v. STMicroelectronics, Inc.*,
305 F.3d 397 (6th Cir. 2002) ..................................................................5

*Nat'l Conf. of Bar Examiners v. Multistate Legal Studies, Inc.*,
692 F.2d 478 (7th Cir. 1982) ..................................................................9

*Nelson-Ricks Cheese Co. v. Lakeview Cheese Co.*,
331 F. Supp. 3d 1131 (D. Idaho 2018), *aff'd* 775 F. App'x 350 (9th Cir.
2019) ................................................................................................*passim*

*Network Automation, Inc. v. Advanced Sys. Concepts*,
368 F.3d 1137 (9th Cir. 2011) ..............................................................18

*In re Nordic Naturals, Inc.*,
755 F.3d 1340 (Fed. Cir. 2014) ............................................................11

*Nutri/System, Inc. v. Con-Stan Indus., Inc.*,
 809 F.2d 601 (9th Cir. 1987) .........................................................14

*P&P Imports LLC v. Johnson Enterprises, LLC*,
 46 F.4th 953 (9th Cir. 2022) ......................................................11, 12

*In re Pennington Seed, Inc.*,
 466 F.3d 1053 (Fed. Cir. 2006) ......................................................10

*Pharmacia Corp. v. Alcon Labs., Inc.*,
 201 F. Supp. 2d 335 (D.N.J. 2002).........................................2, 3, 6, 10

*Rudolph Int'l, Inc. v. Realy's, Inc.*,
 482 F.3d 1195 (9th Cir. 2007) .........................................................3, 5

*S. Union Co. v. Irvin*,
 563 F.3d 788 (9th Cir. 2009) ...............................................................2

*San Miguel Pure Foods Co. v. Ramar Int'l Corp.*,
 625 F. App'x 322 (9th Cir. 2015) ....................................................24

*Scat Enters., Inc. v. FCA USA LLC*,
 2017 WL 5896182 (C.D. Cal. June 8, 2017).....................................24

*Sen v. Amazon.com, Inc.*,
 2020 WL 4582678 (S.D. Cal. Aug. 10, 2020), *aff'd*, 2021 WL 6101385
 (9th Cir. 2021)..................................................................................18

*Sensient Techs. Corp. v. SensoryEffects Flavor Co.*,
 613 F.3d 754 (8th Cir. 2010) ...........................................................18

*Shire City Herbals, Inc. v. Blue*,
 410 F.Supp. 3d 270 (D. Mass. 2019)..................................................9

*Snyder v. Freight, Constr., Gen. Drivers, Warehousemen & Helpers, Local
 No. 287*,
 175 F.3d 680 (9th Cir. 1999) ..........................................................1,

*Snyder's Lance, Inc. v. Frito-Lay N. Am., Inc.*,
 542 F. Supp. 3d 371 ...........................................................................8

*Star Indus., Inc. v. Bacardi & Co.*,
 412 F.3d 373 (2d Cir. 2005) ............................................................14

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003)................................................................................2

*Surgicenters of Am., Inc. v. Medical Dental Surgeries, Co.*,
    601 F.2d 1011 (9th Cir. 1979) ..............................................................7

*Sweich v. Astrue*,
    2009 WL 890678 (N.D.N.Y. Mar. 30, 2009) ......................................10

*tagTrends, Inc. v. Nordstrom, Inc.*,
    2014 WL 12561604 (C.D. Cal. Sept. 30, 2014) ...........................20, 21

*Threshold Enters., Ltd. v. Pressed Juicery, Inc.*,
    445 F. Supp. 3d 139 (N.D. Cal. 2020).......................................4, 5, 7, 9

*United States PTO v Booking.com B.V.*,
    591 U.S. 549 (2020)................................................................................3

*Vail Assoc., Inc. v. Vend-Tel-Co.*,
    516 F.3d 853 (10th Cir. 2008) ..............................................................17

*Welding Servs., Inc. v. Forman*,
    509 F.3d 1351 (11th Cir. 2007) ..........................................................7, 9

*Zazu Designs v. L'Oreal, S.A.*,
    979 F.2d 499 (7th Cir. 1992) ..............................................................24

## Other Authorities

Fed. R. Civ. P. 50 ..........................................................................................1

Fed. R. Civ. P. 59 ..........................................................................................1

## Miscellaneous

2 McCarthy §12:37 .....................................................................................3, 9

2 McCarthy §15:42 .........................................................................................12

2 McCarthy §19:36 ...........................................................................................4

3 McCarthy §2312 ...........................................................................................21

4 McCarthy §25A:7 .........................................................................................18

4 McCarthy §30:74 .........................................................................................21

1    Defendants OSRX, Inc. ("OSRX") and Ocular Science, Inc. ("Ocular Science,"
2    together "Defendants") respectfully renew their motion for judgment as a matter of law,
3    pursuant to Fed. R. Civ. P. 50, on the grounds that the record does not support the jury's
4    verdict.  In the alternative, Defendants move for a new trial pursuant to Fed. R. Civ. P. 59,
5    on the grounds that the jury's verdict was against the clear weight of the evidence, or
6    alternatively, for an order of remittitur.

7    # I.    LEGAL STANDARD

8        Under Rule 50, the Court may set aside a jury verdict as a matter of law if a
9    reasonable jury would not have had a legally sufficient evidentiary basis to support the
10   verdict.  *See* Fed. R. Civ. P. 50(a), (b).  The Court should grant judgment as a matter of
11   law if the evidence in the record, viewed "in the light most favorable" to the nonmoving
12   party, "permits only one reasonable conclusion, and that conclusion is contrary to the
13   jury's verdict." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006).

14       Recognized grounds for a new trial under Rule 59 "include, but are not limited to,
15   claims 'that the verdict is against the weight of the evidence, that the damages are
16   excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski v.*
17   *M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v.*
18   *Duncan*, 311 U.S. 243, 251 (1940)); *Murphy v. City of Long Beach*, 914 F.2d 183, 187
19   (9th Cir. 1990) ("erroneous jury instructions, as well as the failure to give adequate
20   instructions, are also bases for a new trial").  Unlike a Rule 50 motion, a district court
21   reviewing a motion for a new trial has "the duty" to "weigh the evidence" as the Court
22   "saw it, and to set aside the verdict of the jury, even though supported by substantial
23   evidence," if the Court believes "the verdict is contrary to the clear weight of the evidence"
24   or to prevent a miscarriage of justice.  *Murphy*, 914 F.2d at 187 (citations omitted).

25       A new trial may also be granted if "the damages are excessive." *Molski*, 481 F.3d
26   at 729.  Even where a new trial is not necessary, remittitur may be appropriate if the Court
27   deems a jury verdict grossly excessive or clearly not supported by evidence.  *Snyder v.*
28   *Freight, Constr., Gen. Drivers, Warehousemen & Helpers, Local No. 287*, 175 F.3d 680,

689 (9th Cir. 1999). If the Court determines that the award is grossly excessive, it must give the prevailing party "the option of either submitting to a new trial or accepting a reduced amount of damage which the court considers justified." *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983).

The Court also "should determine whether a punitive damage award exceeds the amount necessary to accomplish the goals of punishment and deterrence in deciding whether it is grossly excessive." *Morgan v. Woessner*, 997 F.2d 1244, 1258 (9th Cir. 1993). The Due Process Clause "prohibits the imposition of grossly excessive or arbitrary punishments on tortfeasors." *S. Union Co. v. Irvin*, 563 F.3d 788, 791 (9th Cir. 2009) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003)). There are three guideposts on whether punitive damages are grossly excessive:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Id.* The first guidepost is the most important. *Id.*

## II.  VALIDITY

The parties thoroughly briefed the validity issue in the prior post-trial motion (ECF Nos. 350 at 1-13, 351 at 2-12, 352 at 1-6), which Defendants incorporate by reference. The Court declined to decide the issue at the hearing on January 17, 2025. It remains clear, however, that the marks are generic or, alternatively, merely descriptive.

### A.    The Purported Marks Are Generic

Plaintiff concedes the material facts which require a finding of genericness.

First, Plaintiff does not dispute that prednisolone, dexamethasone, gatifloxacin, moxifloxacin, bromfenac, timolol, brimonidine, dorzolamide and latanoprost are the generic names of those medications. *See* ECF No. 351 at 3, 8; *see also Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 340-42 (D.N.J. 2002) ("latanoprost" is the generic name for drug marketed under "Xalatan" brand name) ("Timolol is the generic name"). Plaintiff also concedes that the same terms are the generic designations for a

compounded formulation combining the respective medications into one bottle, at least "when they are fully spelled out—e.g., prednisolone-gatifloxacin-bromfenac." ECF No. 351 at 3; *see also id.* at 8 ("the entire chemical formulation—i.e., the generic name"); *Pharmacia*, 201 F. Supp. 2d at 341-42 ("timolol-latanoprost" is generic name for drug marketed under "Xalacom" brand name).

Second, Plaintiff admits that eye doctors "know" the abbreviations refer to the underlying generic names of those medications: "***doctors know*** that 'pred' means prednisolone, 'gati' means gatifloxacin, and 'brom' means bromfenac. So it would not matter the order in which you placed those terms; doctors would still know ***what the product was***." ECF No. 351 at 6-7 (emphasis added). Plaintiff similarly admits that "[t]here is every reason to believe that eye doctors" would recognize the purported marks as "combinations of abbreviations of generic drug names" and conclude that those combinations "must themselves be generic." *Id.* at 8.

Thus, Plaintiff admits that "pred-gati-brom" means the same thing to eye doctors as "prednisolone-gatifloxacin-bromfenac," which is the generic term for that formulation (likewise for the others). Those undisputed facts compel a finding of genericness. Marks are not immune from genericness just because they are composite abbreviations. It is black-letter law that a term is generic if it is "an abbreviation of a generic name which still conveys to the buyer the original generic name connotation of the name which is abbreviated." *See* 2 McCarthy on Trademarks & Unfair Competition § 12:37 (5th ed.).

Defendants cited overwhelming evidence of genericness (ECF No. 350 at 2-8), which Plaintiff did not and cannot rebut, underscoring that issue turns on legal arguments. Before revisiting those arguments, however, it is worth highlighting Plaintiff's utter failure to set forth any actual evidence in response to Defendants' evidence of genericness. After all, it was Plaintiff's burden to establish that the marks are ***not*** generic under the familiar "who-are-you/what-are-you" test. *See* ECF No. 350 at 1, 11 (citing *United States PTO v. Booking.com B.V.*, 591 U.S. 549, 551 (2020); *Rudolph Int'l, Inc. v. Realy's, Inc.*, 482 F.3d 1195, 1198 (9th Cir. 2007); *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*,

198 F.3d 1143, 1146 (9th Cir. 1999); *Threshold Enters., Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 148 (N.D. Cal. 2020); *Denver Urban Homesteading, LLC v. Devaes Inst.*, 2015 WL 12552043, at *5 (C.D. Cal. Nov. 5, 2015); 2 McCarthy § 19:36).

1. **Plaintiff Is Unable to Address Uncontroverted Evidence of Genericness**

   a. **Evidence of Generic Use in Ophthalmic Industry**

There is ample evidence of generic use in the ophthalmic industry, including the market context, scientific publications, and use by competitors (ECF No. 350 at 4-6).

Both parties testified about the conventional "multiple bottle" regimens for post-operative care and glaucoma, which gave rise to the demand for "combination" drop formulations from compounding pharmacies in the first place. *See* Tr. 287:5-288:9, 300:8-305:19; DX076.032-033, 086-088. The individual medications that the parties combine in their formulations are some of the most common prescription drugs for post-operative care (prednisolone, dexamethasone, moxifloxacin, gatifloxacin and bromfenac) and glaucoma (timolol, brimonidine, dorzolamide and latanoprost). *See* Tr. 288:10-291:4; DX076.042, 087-088, 105, 110-111. The medications have "been around forever," and they have been prescribed together—albeit in separate bottles—for just as long. *Id.*

There are many branded and generic versions of these medications. Tr. 287:24-290:20; DX076.042, 087-088, 105, 110-111. Naturally, the branded versions use the same generic names to identify "what" the medication is, while separate brand names identify the source: e.g., Vigamox (moxifloxacin); Zymaxid (gatifloxacin); Prolensa (bromfenac); Pred Forte (prednisolone); Alphagan (brimonidine); Xalatan (latanoprost); Combigan (brimonidine and timolol). *See* DX076.042, 087, 105, 110-111. The same terminology is used generically by a range of competitors, including large pharmaceuticals and generic drug manufacturers, other compounding pharmacies, and Defendants. *See* DX008.005; Tr. 343:22-345:10; DX076.044, 047-048; PX230 ¶ 18. Such use by competitors is indicative of genericness. *See Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F. Supp. 2d 1181, 1190 (C.D. Cal. 2007) ("usage of the term by competitors" is "strong evidence").

1   Articles in scientific journals also show that these individual medications, and

2   combinations of the abbreviations, are the generic names for those medications.  *See*

3   DX076.065, 095-101; DX049.090, 096.  One article, titled "Comparative analysis of

4   intravitreal triamcinolone acetonide-moxifloxacin versus standard perioperative eyedrops

5   in cataract surgery" (DX076.065-070), reports:

> Recently, the introduction of triamcinolone acetonide-moxifloxacin
> (Tri-Moxi), which contains 15mg/mL of triamcinolone acetonide and
> 1mg/mL of moxifloxacin, has made "dropless" surgery a new option. . . .
> There are also other ***types*** of injectable compound drugs such as
> dexamethasone-moxifloxacin (Dex-Moxi) and dexamethasone-moxifloxacin-
> ketorolac (Dex-Moxi-Ketor).

10  *See* DX076.066 (emphasis added).[1]  Evidence of generic use in scientific journals is a

11  powerful indication of genericness.  *See Birchter Electro Med. Sys., Inc. v. Beacon Labs.,*

12  *Inc.*, 738 F. Supp. 417, 421 (D. Colo. 1990) ("articles from scientific journals that used

13  the terms generically, as individual words and complete phrases" supports the "claim that

14  the terms are not suggestive or descriptive, but generic").

15  Given this industry context, it is implausible that eye doctors would understand the

16  common names for these ubiquitous medications—whether abbreviated or not—to signify

17  a source, as opposed to the medication itself.[2]  Here, the industry context is persuasive

18  evidence of genericness.  *See Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397,

19  406-07 (6th Cir. 2002) (historical use of "smart power" as generic term in semiconductor

20  industry); *Realy's*, 482 F.3d at 1198 (historical context of "disinfectable" in relevant

21  industry); *Threshold*, 445 F. Supp. 3d at 148 ("if the relevant consuming public primarily

22  understands the mark as describing 'what' the particular good or service is, then the mark

---

[1]  *See also* DX049.090 ("To evaluate the corneal penetration of moxifloxacin (moxi) and gatifloxacin (gati) following topical ocular administration of VIGAMOX or XYMAR by measuring the concentrations of moxi and gati in corneal tissue and aqueous humor (AH) of patients undergoing penetrating keratoplasty (PK)").

[2]  Eye doctor familiarity with the medications is why Plaintiff uses the abbreviations. As Ms. White testified, Plaintiff "depends" on eye doctors recognizing the underlying medications within the asserted mark, since compounding pharmacies are not allowed to tell eye doctors how the formulations can be used. Tr. 290:21-291:14, 293:2-9.  That is, Plaintiff uses easily recognizable abbreviations for the medications ***because*** "physicians know what they can be used for," based off the name.  *See* DX076.063, 093, 116.

1    is or has become generic").

2        Plaintiff did not discuss any of these examples, except in two bizarre points that

3    make no sense. *See* ECF No. 351 at 8 (lines 4-13).[3] Nor did Plaintiff cite any evidence

4    supporting the implausible notion that it managed to train doctors to associate well-known

5    generic drug names—the antithesis of a trademark—with a single source. *See Pharmacia*,

6    201 F. Supp. 2d at 340-42, 374, 379 ("in the pharmaceutical field, professionals have been

7    trained to distinguish generic and proprietary names within a class of drugs").

8            **b.      Plaintiff's Own Use of the Purported Marks**

9        As Defendants showed (ECF No. 350 at 3, 6-7), Plaintiff's witnesses confirmed that

10   the purported marks were meant to signify the underlying generic names of the drugs. *See*

11   DX3000 at 244:7-13, 248:6-249:18; DX3005 at 79:11-23, 88:7-9, 100:5-8, 134:3-6; Tr.

12   173:4-6. Defendants also highlighted evidence which reflects Plaintiff's generic use of

13   the abbreviations, including in marketing materials, internal materials, communications

14   with the PTO, and lawsuits against Defendants (ECF No. 350 at 6-7).

15       In its marketing materials, Plaintiff categorizes its drugs into portfolio brands:

16   "Simple Drops" is the portfolio for glaucoma drops, including TIM-LAT, TIM-BRIM-

17   DOR and TIM-BRIM-DOR-LAT; "LessDrops" is the portfolio for topical post-operative

18   drops, including PRED-MOXI, PRED-BROM, PRED-GATI-BROM and PRED-MOXI-

19   BROM; and "DropLess" is the portfolio for post-operative injectables, like DEX-MOXI.

20   *See* Tr. 115:14-17, 117:7-21, 282:23-284:20; DX076.051; DX032; PX226.005-011.

21       These portfolio brands, and ImprimisRx's housemark, are Plaintiff's source

22   identifiers. On the other hand, the nondescript abbreviations, which always appear next

23   to those actual source identifiers, clearly do not function as trademarks in any of Plaintiff's

24

25       [3] Plaintiff argues that the reference to "dexamethasone-moxifloxacin (Dex-Moxi)" is
26   not generic because the "shortened phrase" is not necessary. *See* ECF No. 351 at 8. That
     argument makes no sense, as the example clearly shows the abbreviation used as an
27   equivalent to the generic term. Plaintiff also notes that another compounding pharmacy
     used the abbreviations before Plaintiff's mark was registered (*id.*), even though prior use
28   by third parties is evidence for, not against, genericness.

marketing materials. Rather, they are just the first syllable of the generic medications that Plaintiff can compound.[4] They merely answer the question "what [medication] are you," which makes them "generic." *Threshold*, 445 F. Supp. 3d at 148.[5]

These materials show that the abbreviations cannot signify anything except the underlying medications. Each abbreviation (e.g., TIM-LAT) always appears next to the full generic name of the medication (e.g., "Timolol/ Latanoprost") and often alongside a picture of the bottles, which must always include the full generic name of the medication. *See, e.g.,* DX032; PX226; PX227 (*passim*). When an "abbreviation is used in association with the generic words, rather than being used in a way that would give rise to a meaning distinct form those words," that is evidence that the mark is generic. *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1360 (11th Cir. 2007).

Other examples also show that Plaintiff uses the full generic names and abbreviations interchangeably. *See* PX2071.002; PX2072.005; PX227.025; DX076.092, DX076.174. More importantly, however, there are no examples that suggest these terms were ever used to signify something other than the medications. As the Ninth Circuit said in *Surgicenters of Am., Inc. v. Medical Dental Surgeries, Co.*, there "is nothing in the record to indicate that any potential consumer considered the term 'Surgicenter' to mean anything other than a surgical center." 601 F.2d 1011, 1017 (9th Cir. 1979).

Plaintiff did not argue that any of these examples reflect non-generic use, let alone explain why. *See* ECF No. 351. Instead, Plaintiff merely countered that its own witnesses

---

[4] DX032.001-003 (describing Simple Drops formulations as "multiple medications into one drop bottle" and "multiple medications into one combination drop"); PX226.039 (describing LessDrops as "unique steroid, antibiotic, and nonsteroidal combination formulations"); PX226.005 (describing DropLess formulations as "combination injectable formulations" and "intraocular or periocular injections of combinations of anti-inflammatory drugs and antibiotics"); PX228.037 (DropLess order form listing "Compounded Formulation[s]" as "Injectable Medications"); DX076.160 (Simple Drops order form listing "Compounded Formulation[s]" as "Topical Medications").

[5] *See Cosmetically Sealed Indus., Inc. v. Cheesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997) (non-trademark use where "source of the defendants' product is clearly identified by the prominent display of the defendants' own trademarks").

subjectively believed the terms were "valuable brand assets around which they built their business." ECF No. 351 at 7-8. That, however, says nothing about the operative question: i.e., whether eye doctors associate the terms with a source, rather than the medications.

### c.    Survey Evidence

Finally, Defendants showed that the survey evidence by both parties confirms that the purported marks are generic, as the vast majority of eye doctors associate them with the full generic names of the medications. *See* ECF No. 350 at 4-5, 7-8. Defendants' expert, Andreas Groehn, showed genericness beyond the 50% threshold (Tr. 505:17-506:15). Ironically, in its criticism of Defendants' survey, Plaintiff does the best job of articulating why the purported marks are generic:

> Governing law holds that the combination of generic terms can, in totality, be descriptive. There is every reason to believe that *eye doctors taking the survey* would not know that and might *conclude that combinations of abbreviations of generic drug names must themselves be generic*.

ECF No. 351 at 8 (emphasis added). Plaintiff did not conduct a genericness survey, but its expert, Mark Keegan, conducted a secondary meaning survey, which showed that the vast majority of eye doctors understand the abbreviations to signify the type of medication, not a source. *See* Tr. 373:14-22; 376:16-18; 389:24-390:8; 502:18-504:10. Mr. Keegan admitted his survey showed evidence of genericness (Tr. 408:16-18), and secondary meaning surveys like his have been held to show genericness, unintentionally. *See Snyder's Lance, Inc. v. Frito-Lay N. Am., Inc.*, 542 F. Supp. 3d 371, 402-03 ("less than half of the Mantis survey respondents [38.7%] associated [them] with a single source," which was "clear evidence" of genericness).

### 2.    Plaintiff's Legal Arguments Against Genericness Lack Merit

Plaintiff offered no competent evidence to overcome a finding of genericness. Most saliently, Plaintiff has no direct evidence from eye doctors showing that they primarily associate the abbreviations with anything but the underlying medications. Aside from Plaintiff's vague testimony about its purported investment into its brands, which is immaterial (*infra* n.6), Plaintiff primarily relies on two legal arguments: that the purported

1    marks are not generic because (i) they are combinations of abbreviations for generic terms,

2    and (ii) there were alternative abbreviations that Defendants could have used. *See* ECF

3    No. 351 at 3-7. Both arguments fail under well-settled caselaw.

4        Defendants dispelled both arguments in prior briefing. ECF No. 350 at 8-10; ECF

5    No. 351 at 3-7.[6] It is well-settled that abbreviations and/or composites of generic elements

6    are also generic if, viewed as a whole by the relevant consumer, they have the same

7    significance as the underlying generic elements. ECF No. 350 at 8-9.[7] In some situations,

8    abbreviations and/or composite terms might be more than the "sum of their parts," by

9    taking on "some meaning" beyond the generic elements. *Hickory Farms*, 500 F. Supp. 2d

10   at 795; *Threshold*, 445 F. Supp. 3d at 150 (same). Not here, where "doctors ***know*** that

11   'pred' means prednisolone." ECF No. 351 at 6-7. It is also well-settled that generic terms

12   are still generic even if there are other generic terms for the same good. ECF No. 350 at

13   9-10 (citing *Threshold*, 445 F. Supp. 3d at 154; *Shire City Herbals, Inc. v. Blue*, 410 F.

14   Supp. 3d 270, 296 (D. Mass. 2019)).

15       Plaintiff did not and cannot dispute Defendants' cited authorities.[8] Instead, Plaintiff

16

17       [6] Defendants anticipated Plaintiff would rely on two other arguments: (i) Plaintiff's
18   purported evidence of acquired distinctiveness and (ii) the PTO status of its marks. ECF
     No. 350 at 8, 10-11. Plaintiff tacitly conceded those points. ECF No. 352 at 5. In any
19   event, there is no evidence of acquired distinctiveness, and Plaintiff acknowledges that a
     generic term cannot become non-generic due to secondary meaning (ECF No. 352 at 5).
20   Regarding the PTO status of its marks, it is beyond dispute that the supplemental register
     does not confer any evidentiary value on validity, and here the two marks on the principal
     register were ***not*** granted based upon a showing of acquired distinction, so they have no
21   presumptions of secondary meaning. ECF No. 350 at 1-11. The PTO status of its marks
     was not contested in the prior briefing (ECF No. 351).

22       [7] *See Hickory Farms, Inc. v. Snackmasters, Inc.*, 500 F. Supp. 2d 789, 795 (N.D. Ill.
23   2007) ("Other composite terms are nothing more than the sum of their parts, such as
     'multistate bar examination' and 'light beer.'") (citation omitted); *Threshold*, 445 F. Supp.
24   3d at 150 (same); *Engineered Arresting Sys. Corp. v. Atech, Inc.*, 356 F. Supp. 3d 1323,
     1342 (N.D. Ala. 2018) ("BAK-12" not distinct from "barrier arresting kit-12") (quoting
25   *Welding Servs.*, 509 F.3d at 1359)); *Nat'l Conf. of Bar Examiners v. Multistate Legal
     Studies, Inc.*, 692 F.2d 478 (7th Cir. 1982) ("MBE" is generic); 2 McCarthy § 12:37.

26       [8] Plaintiff misleadingly suggested that Defendants provided a legal standard that
27   applies only in the Seventh Circuit and has been rejected in the Ninth Circuit. ECF No.
     351 at 5. Not so. The "deviation from natural usage" or an "unusual unitary combination"
28   language, which Plaintiff cited as being rejected, is not in Defendants' brief. Plaintiff also
     merely noted the more general rule that a composite of generic elements is not
     *automatically* generic (*id.*), even though no one said they are.

simply made up its own legal doctrines without citation, which misstate the actual law:

- "But there are a lot of different ways the generic terms apple, convention, or prednisolone can be abbreviated; the abbreviations themselves thus are not generic." ECF No. 351 at 3.

- "[A] generic term (apple) being combined with a shortened version of another generic term ('cran' for cranberry')" creates a "descriptive trademark. … [I]f CranApple is a descriptive trademark for a juice consisting of the ingredients cranberry and apple—as both parties agree—then Pred-Moxi-Brom is at least descriptive of a compounded formulation consisting of the ingredients prednisolone acetate, moxifloxacin [*sic*], and bromfenac." *Id.* at 4.

- "After all, it would be difficult to advertise an apple cart without ever mentioning the word 'apple.' But it is apparently not at all that hard to advertise combination eyedrops without using words such as pred-moxi-brom or tim-brim-lat-dor [*sic.*]." *Id.* at 6

- "Far from showing genericism, this evidence supports non-genericism. If the shortened phrase were necessary to describe the formulations, then there would have been no need to use the longer phrase as well." *Id.* at 8.

Plaintiff's focus on the "CranApple" analogy is misguided. Plaintiff admits the marks (e.g., Dex-Moxi) are meant to apply to specific compounded medications (e.g., dexamethasone-moxifloxacin) and that the full medication names are the generic denominations for them. *See* ECF No. 351 at 3, 8. For pharmaceuticals, a medication is not a mere "ingredient" or "characteristic" of the good. The medication **is** the good for trademark purposes. *See Pharmacia*, 201 F. Supp. 2d at 340-42, 374, 379 (latanoprost is generic name for drug marketed under brand name Xalatan) (timolol-latanoprost is generic name for drug marketed under brand name Xalacom) ("[p]rescription drugs are a unique commodity") ("prescription drug packaging is required to display generic names") ("in pharmaceutical field, professionals have been trained to distinguish generic and proprietary names within a class of drugs").[9] Therefore, juice analogies aside, a better

---

[9] *See also In re Pennington Seed, Inc.*, 466 F.3d 1053, 1058 (Fed. Cir. 2006) ("This situation may be contrasted with pharmaceutical products where a generic name is designated for a new pharmaceutical product and its manufacturer associates it with a brand name. For example, ibuprofen is the generic term designated for a particular nonsteroidal anti-inflammatory drug and ADVIL is a brand name indicating a source of the drug. Trademark protection does not inure to the generic name there and it does not do so here."); *Sweich v. Astrue*, 2009 WL 890678, at *4 n.35 (N.D.N.Y. Mar. 30, 2009) ("Blephamide" is "[t]rademark for sulfacetamide sodium, treats eye infections, and
(continued…)

analogy is that "CranApple" is generic for a bowl of cranberries and apples. *See* ECF No. 351 at 3, 6 ("apple" generic for "the fruit" or "apple cart").

Plaintiff's fixation on the number of alternatives for the abbreviations at issue (ECF No. 351 at 107) is legally incorrect. *Supra* 9. Moreover, as a practical matter, these drugs are available for all compounding pharmacies to use, and there are thousands across the nation. If each one had to invent a new and slightly different abbreviation for the underlying generic names, it would increase searching costs and consumer confusion, unless doctors somehow could remember how each pharmacy abbreviates generic names.

The undisputed bottom line is that the marks are composite abbreviations of generic terms, ***and*** eye doctors understand the abbreviations to signify the generic names of the underlying medications. Plaintiff admits all of this but ignores the decisive implication.

### B.    Alternatively, the Purported Marks are Merely Descriptive

Plaintiff contends that a reasonable juror could find secondary meaning based on two factors, intentional copying and survey evidence. *See* ECF No. 351 at 9. Plaintiff has no survey evidence for seven of the marks (PRED-MOXI, DEX-MOXI, PRED-BROM, MOXI-BROM, TIM-LAT, TIM-BRIM-DOR and TIM-BRIM-DOR-LAT). *See* ECF No. 350 at 12; Tr. 395:19-23. Plaintiff does not argue that there is some other combination of evidence that is legally sufficient, absent any survey evidence, to support a finding of acquired distinctiveness as to those marks.

As to the two surveyed marks, PRED-MOXI-BROM and PRED-GATI-BROM, Plaintiff's evidence is a far cry from *P&P Imports LLC v. Johnson Enterprises, LLC*, 46 F.4th 953 (9th Cir. 2022), the case Plaintiff relies upon to argue that it created a "triable issue of fact about secondary meaning." ECF No. 351 at 9. In *P&P Imports*, a trade dress case, plaintiff's survey evidence showed that 63% of respondents believed the product was "from a single source/company," albeit an "anonymous" one, results which the expert

---

prednisolone acetate, treats an allergy or inflammation"); *In re Nordic Naturals, Inc.*, 755 F.3d 1340, 1341-42 (Fed. Cir. 2014) ("docosahexaenoic acid" and its abbreviation "DHA" both equally generic terms). This case is not about fruits or juices.

opined "strongly" suggested secondary meaning.  *See* 46 F.4th at 963.  Here, by contrast, Plaintiff's expert admits that his 35% to 37% survey results did ***not*** show a sufficient level of secondary meaning (Tr. 388:22-389:2, 403:16-20), and even most of those did not attribute the marks to Plaintiff or a single "anonymous" source but, rather, to Defendants, other companies, or generic sources (Tr. 376:16-18, 404:25-405:6, 408:16-22, 409:18-412:4, 503:8-504:10).[10]  Plaintiff cites no case holding a similar showing to be sufficient.

## III.  LIKELIHOOD OF CONFUSION

Unlike most trademark cases, here, the purported marks (obvious abbreviations of the generic names of medications, like Pred-Moxi) do not appear on the applicable goods. Instead, the product bottles and packaging must display the full generic names of the medications (e.g., Prednisolone-Moxifloxacin).  *See, e.g.,* DX032, PX227, PX2013.  Both parties also include their respective housemark logos on the bottles.  *Id*.

Plaintiff instead relies on Defendants' exceedingly rare uses of the purported marks in external communications.  Plaintiff mustered only seven examples of Defendants using the actual abbreviations (DX081, PX200, PX220, PX1161, PX2020, PX2032, PX2103):

- One marketing email sent from an "info@osrxpharmaceuticals.com" email account (DX081);

- Two one-off email conversations between an OSRX sales rep and a customer (PX2020, PX2103);

- Two screen shots of a "Prescriber Account" registration webpage, where doctors can register a new account, which they must do before they submit prescriptions through the OSRX website (PX200, PX220);

- One screenshot of an OSRX's "Resources" webpage, where "Patient Info Sheets" can be downloaded (PX2032); and

---

[10] An unknown, anonymous source still must be a "single" source, which ultimately turns out to be Plaintiff, not a hodgepodge of other companies, generic sources and Defendants.  2 McCarthy § 15:42 ("Of course, to establish a secondary meaning, the survey introduced by a litigant must prove that buyers associate the designation with it, not with another company and certainly not associate it with the opponent in the case."); *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 315 n.7 (6th Cir. 2001) ("While the law allows secondary meaning to be established by demonstrating that the public is aware that the product comes from an anonymous source, there must be evidence indicating that it is a single, anonymous source.").

- One single-page flier that lists the "Complete Portfolio of Formulations" of "OMNI by OSRX drops" (PX1161).

Based on this record, no reasonable trier of fact could conclude that Defendants' use of the purported marks was "likely to confuse an appreciable number of people as to the source of the product." *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1085 (9th Cir. 2005) (plaintiff "must show sufficient evidence to permit a rational trier of fact to find that confusion is 'probable,' not merely 'possible'").

In each instance, it is immediately obvious that Defendants are the source due to Defendants' prominent branding, color scheme and styling, which bear no resemblance to Plaintiff's (*compare, e.g.*, PX2013, PX2032 to PX227, PX228). Courts routinely find no likelihood of confusion as a matter of law where, as here, the overall impression is so visually dissimilar to anything related to Plaintiff, and Defendants' affirmative branding is so prominent, that it is "implausible" a "consumer would be deceived." *Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1080-81 (9th Cir. 2020) (summary judgment affirmed where overall impression created no likelihood of confusion even though defendant used same word mark).[11] Moreover, within the few examples that do exist, Defendants' use of the abbreviations is fleeting, hard to find and nondescript, such that no

---

[11] *See also Arcona*, 976 F.3d at 1080-81 ("the marks should be 'considered in their entirety and as they appear in the marketplace'") ("no reasonable consumer would be confused by these two products because the packaging, size, color, shape, and all other attributes—other than the term 'EYE DEW'—are not remotely similar") ("it is implausible that a consumer would be deceived because the products had their respective housemarks ('Farmacy' vs. 'Arcona') prominently on the packaging") ("Despite Arcona's 'general, conclusory allegations of 'willfulness,' it has produced no evidence that Farmacy intentionally copied its marks. In addition, Farmacy's dissimilar packaging and rampant use of its housemark 'flatly belie[s] any such notion.'"); *Katzin Leather, Inc. v. Roadwire, LLC*, 2022 WL 17101245, at *6-7 (C.D. Cal. May 6, 2022) ("viewing the parties' use of [the mark] in the context in which they appeared to consumers, the Court finds a reasonable consumer would not be likely to be confused despite the use of the same phrase," where "prominent placement of Katzkin's and Roadwire's names on their respective websites renders it implausible that a reasonable consumer would be likely to be confused"); *CG Roxane LLC v. Fiji Water Co. LLC*, 569 F. Supp. 2d 1019, 1033 (N.D. Cal. 2008) ("Although the wording of the marks is similar, the marks should be compared in the totality of the circumstances when determining a likelihood of confusion") ("Since the trade dress of the bottles is markedly dissimilar and defendant uses the mark on the back label near its housemark, the marks are not similar based on the totality of the circumstances") ("The differences in the products as a whole are so striking that there is no likelihood of confusion").

reasonable person could interpret them as a source identifier, much less a confusing one. *See Dfinity Found. v. Meta Platforms, Inc.*, 2022 WL 16857036, at *6 (N.D. Cal. Nov. 10, 2022) (finding use of mark "is so fleeting that it cannot be a source of customer confusion"); *Nelson-Ricks Cheese Co. v. Lakeview Cheese Co.*, 331 F. Supp. 3d 1131, 1149 (D. Idaho 2018) (finding use of mark in very small print at the bottom of a product information sheet unlikely to give rise to confusion), *aff'd* 775 F. App'x 350, 352 (9th Cir. 2019) ("Given the difficulty in finding the 'About Us' page" and "the difficulty in seeing the mark on the 'Pack Size' page, there is no evidence in the record that Lakeview caused confusion as to the origin of the mark"). Particularly so here, where eye doctors understand them to signify common generic medications (*supra* 2-3). *See Dorr-Oliver, Inc. v. Flid-Quip, Inc.*, 94 F.3d 376, 383 (7th Cir. 1996) ("consumers are generally more likely to think that a competitor has entered the market with a similar product," rather than "assume that the two manufacturers are associated in some way").

There also is zero evidence of actual confusion. A lack of actual confusion "is weighed heavily" when "the particular circumstances indicate such evidence should have been available" (*AMF Inc. v. Sleekcraft Boats*, 599 F.3d 341, 353 (9th Cir. 2003)), such as where defendant engages in a "high volume of business" with no or merely "de minimis" instances of confusion. *See Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987). Despite the high volume of sales over many years, Plaintiff offered no survey evidence regarding confusion. *See Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 388 (2d Cir. 2005) (failure to conduct survey suggests no likelihood of confusion). Moreover, Plaintiff's witnesses, including John Saharek, Andrew Boll and Mark Baum, did not recall a single instance of actual confusion. *See* DX3002 at 181:05-11, 181:22-182:23 (Saharek); DX3005 at 88:13-16, 100:12-16, 103:7-11, 104:23-105:1, 134:10-12 (Boll); Tr. 107-207 *passim* (Baum).

Cindi White was the only witness who recalled one instance of purported confusion. However, her sole anecdote—about an unnamed doctor in Medford, Oregon—is neither relevant nor material. As Ms. White testified, an OSRX sales representative visited the

doctor's office and left a brochure. *See* Tr. 279:15-280:19. Two weeks later, when Ms. White arrived at the same office, the doctor initially thought that Ms. White was from OSRX (and she promptly corrected the doctor). *Id.* Importantly, Ms. White did not testify that the doctor encountered the subject marks, from either party, much less that the marks had anything to do with his apparent confusion. *See Dfinity*, 2022 WL 16857036, at *10 (examples must "represent the natural confusion of a consumer" "experiencing the marks organically as consumers in the marketplace"); *see also Am. Auto. Ass'n of N. Cal., Nev. & Utah v. Gen. Motors LLC*, 367 F. Supp. 3d 1072, 1107 (N.D. Cal. 2019) ("Mr. Haight's conclusory statements are not supported by detailed facts or evidentiary support. To the extent he mentions instances of confusion, Mr. Haight provides no details as to who specifically was confused, when the instances occurred, or how many times that type of confusion occurred.").[12]

In any event, Plaintiff does not contend that actual point-of-sale confusion is an issue in this market. Eye doctors must submit a prescription for these eye medications directly to the pharmacy, where the doctors must first register an account. *See, e.g.,* Tr. 277:13-21 ("I believe they have a Prescriber Portal where a new account can set up to start prescribing online through them"); PX2020. It is implausible that a doctor could register an account and prescribe medications through Defendants' pharmacy under the

---

[12] With respect to vague references of unnamed people at tradeshows inquiring "whether OSRX and Imprimis are the same" (Tr. 278:16-23), courts have routinely rejected similar examples of purported confusion in granting summary judgment based on no likelihood of confusion. *See Dfinity*, 2022 WL 16857036, at *10 ("[T]hese replies indicate a clear understanding that Meta and Dfinity represent different entities, and Dfinitiy's original tweet prompted the connection and discussion of similarities between the marks or possible partnerships"); *Aurora World, Inc. v. Ty Inc.*, 719 F. Supp. 2d 1115, 1123-24, 1160-61 (C.D. Cal. 2009) (emails discussing the competitor's toys as a "[t]otal rip off" and "exact copies" of the plaintiff's toys did not represent evidence of actual confusion because the authors "understand there are at least two different plush toy manufacturers"); *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 n.7 (9th Cir. 2002) ("Cohn received several dozen inquiries over the years about whether the parties were related. Without some other evidence of actual confusion, however, these inquiries are too ambiguous to demonstrate actual confusion."); *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1079 (2d Cir. 1993) ("It was proper for the trial court to consider this testimony not as evidence of actual confusion, but rather as showing only queries into the possible relationship between the parties' publications.").

1    mistaken belief that it was Plaintiff's, much less due to confusion over the marks. Plaintiff

2    offered no evidence that anything like that ever occurred.

3     Unable to show a likelihood of conventional confusion, Plaintiff pivoted to a theory

4    of initial interest confusion, conceding in its closing argument that initial interest

5    confusion was the only type at issue.[13]  Plaintiff misunderstood the doctrine, and—in any

6    event—there is no evidence of it in this case.

7     "Initial interest confusion has been equated to a 'bait and switch' scheme," which

8    "occurs when potential customers are lured away from a trademark holder's product to a

9    competitor's product through the deceptive use of the holder's mark." *Designer Skin, LLC*

10   *v. S&L Vitamins, Inc.*, 560 F. Supp. 2d 811, 818 (D. Ariz. 2008).  "Deception, it bears

11   emphasizing, is essential to a finding of initial interest confusion," as illustrated in the

12   "Ninth Circuit's oft-quoted example of initial interest confusion":

13   > Suppose West Coast's competitor (let's call it "Blockbuster") puts up a
14   > billboard on a highway reading – "West Coast Video: 2 miles ahead at Exit
     > 7" – where West Coast is really located at Exit 8 but Blockbuster is located
15   > at Exit 7.  Customers looking for West Coast's store will pull off at Exit 7
     > and drive around looking for West Coast.  Unable to locate West Coast, but seeing the
16   > Blockbuster store right by the highway entrance, they may simply rent there.

17   *Id.* (citing *Brookfield Commc'ns, Inc. v. W. Coast Ent'mt Corp.*, 174 F.3d 1036, 1064 (9th

18   Cir. 1999)).  Plaintiff did not come close to showing anything like that at trial.

19    Here, Plaintiff's initial interest confusion theory "is little more than a hypothetical

20   as [Plaintiff] cannot provide a single example of initial interest confusion happening."

21   *Nelson-Ricks Cheese*, 331 F. Supp. 3d at 1143, *aff'd*, 775 F. App'x 350.  Worse, Plaintiff

22   never even explained what the "bait and switch" scheme was or how it worked.  The only

23   testimony remotely related to initial interest confusion was Mr. Baum's subjective belief

24   that it was easier for Defendants to get "their foot in the door" with doctors by using the

25   same abbreviations as Plaintiff.

26

27    [13] *See* Tr. 687:1-6 ("But, in general, this is not the type of purchase that's made in the
     aisle of a grocery store.  But that's not the type of confusion we are -- we are looking at
28   here and that we're concerned about here.  The type of confusion we are concerned with
     here is the following: It's called 'initial interest confusion.'").

- "They copied our stuff. And that's how they got their foot in the door with our customers." Tr. 148:8-10.

- "They -- we spent millions and millions of dollars, created relationships with thousands of customers, and the easy way around things, the easy way to do things, the shortcut is to just take someone else's brands, use them as your own, and go to those same customers and tell them you've got what they what. And that's what they did." Tr. 150:20-151:2.

- "The reason why they use them and the reason why they've copied them is because doctors know the brands we built, and they're really valuable." Tr. 154:5-10. [14]

His self-serving opinions are too vague, abstract and hypothetical to be evidence of initial interest confusion. There is nothing in the record that illustrates what his "foot in the door" analogy means in concrete terms. A "court cannot simply assume a likelihood of initial interest confusion, even if it suspects it. The proponent of such a theory must prove it." *Vail Assoc., Inc. v. Vend-Tel-Co.*, 516 F.3d 853, 872 (10th Cir. 2008). A plaintiff cannot satisfy its burden merely by having its CEO say, "defendants did a bait-and-switch." Mr. Baum's "foot in the door" testimony is equally threadbare. Indeed, in its closing argument, Plaintiff invented more hypotheticals, rather than cite *actual* evidence of initial interest confusion:

> That's when, in the early days, an OSRX salesperson went to the doctors and said, Hey, we've got the PRED-MOXI. And the doctor said, Come on in I want to hear more. That's when they sent emails saying, We just got our PRED-GATI-BROM, and the doctor says, I've heard of that. That seems to be a market leader. I want to hear more.

Tr. 687:11-16. Simply put, there is no evidence of any of these fictional interactions.

Further, initial interest confusion could not arise out of the purportedly infringing uses that Plaintiff adduced at trial, where Defendants always made it painfully obvious that OSRX was the source in its materials (*supra* 12-14). Courts routinely hold that a competitor who clearly labels itself as the source of an advertisement does not create initial

---

[14] The only plausible inference is that eye doctors are familiar with the marks because they instantly know them as abbreviations for some of the most prescribed, generically available drugs. No doctor would assume the generic name for a drug is some kind of brand. *See Dorr-Oliver*, 94 F.3d at 383 ("consumers are generally more likely to think that a competitor has entered the market with a similar product," not "assume that the two manufacturers are associated in some way").

interest confusion.[15]  As the court explained in *Network Automation*:

> [I]f a shopper en route to the Calvin Klein section is diverted by a prominently displayed Charter Club (Macy's own brand) collection and never reaches the Calvin Klein collection, it could not be said that Macy's had infringed on Calvin Klein's trademark by diverting the customer to it within a clearly labeled, but more prominent display.

638 F.3d at 1148.  Or, more bluntly, "what appears to concern [Plaintiff] is not so much initial-interest confusion, but initial interest, period." *Groeneveld Trans. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 519 (6th Cir. 2013).

Finally, the examples of purportedly infringing use cannot give rise to initial interest confusion for more practical reasons.  Most are screenshots of webpages deep within Defendants' website.  By the time anyone navigates to such pages, it is too late for initial interest confusion.  *See Designer Skin*, 560 F. Supp. 2d at 819 ("An internet searcher cannot possibly be deceived into initially visiting a website by the look of the website itself: the website is not viewed until the searcher arrives.").  The others similarly arise only after a potential customer (or existing customer) already knows she is receiving information from Defendants.  Initial interest confusion is also unlikely where, as here, relevant consumers are "sophisticated" and would "exercise a relatively high degree of care" in their purchasing decisions.  *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 766 (8th Cir. 2010) (affirming summary judgment).

## IV.   ACTUAL DAMAGES

The jury had no basis to find that Plaintiff suffered actual damages, much less $14.5 million in lost profits.  Plaintiff effectively concedes that it did not try to prove causation

---

[15] *Sen v. Amazon.com, Inc.*, 2020 WL 4582678, at *6 (S.D. Cal. Aug. 10, 2020) ("Clear labeling can eliminate the likelihood of initial interest confusion"), *aff'd*, 2021 WL 6101385 (9th Cir. 2021); *Multi Time Machine, Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 937-38 (9th Cir. 2015) (summary judgement of trademark claims is appropriate "where there is clear labeling to avoid the possibility of confusion—including initial interest confusion—resulting from the use of another's trademark"); 4 McCarthy § 25A:7 ("The Ninth Circuit said attention should be focused on the visual appearance of the defendant's advertisement on the search engine results page, because the risk of confusion is 'that while using [plaintiff's] mark to search for information about its product, a consumer might be confused by a results page that shows a competitor's advertisement on the same screen, when that advertisement does not clearly identify the source'") (citation omitted).

or amount.  Instead, Plaintiff proceeded as if the jury had been asked to decide the Lanham Act's equitable disgorgement of profits remedy, which it was not.  That relief is subject to an entirely different standard of proof and is for the Court to decide, as part of a holistic weighing of equitable factors.  Accordingly, the Court should enter a judgment of no damages or, alternatively, order a new trial or order remittitur.

When seeking damages, a plaintiff must prove both that it actually incurred damages and the amount of those damages.  *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 620-21 (9th Cir. 1993).  "Damages are typically measured by any direct injury which a plaintiff can prove, as well as any lost profits which the plaintiff would have earned but for the infringement."  *Id.* (citation omitted).  Plaintiff's only theory of actual damages is that it lost sales due to Defendants' alleged trademark infringement (i.e., lost profits).  Thus, Plaintiff must prove that there were "sales that would have occurred had it not been for the infringing conduct."  *Nelson-Ricks Cheese*, 331 F. Supp. 3d at 1144 (citing *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993).

## A.    There Is No Evidence of Lost Profits

Plaintiff's damages expert, Robert Wunderlich, merely assumed that all of Defendants' sales were caused by the alleged infringement, purportedly believing it was Defendants' burden to disprove causation.  Tr. 431:2-434:19, 438:18-439:24, 441:2-7.  Even if Defendants "made a sale to a customer, and they did not use the alleged mark with that customer," Dr. Wunderlich still attributed those sales to infringement.    Tr. 440:8-441:7.  When confronted by the fact that the abbreviations do not appear on any of the products, Dr. Wunderlich did not explain why he still assumed the marks were used in connection with all of Defendants' sales, and he refused to "speculate" whether or how any customer was ever exposed to the marks.  *Id.*

Thus, Dr. Wunderlich provided no evidence that any of Defendants' customers ever encountered the purported marks, which is not an insignificant gap, given the dearth of evidence showing Defendants' actual use of the abbreviations (*supra* 12-14).  In turn, he could not provide or cite any evidence that Defendants' sales occurred as a result of

customers being confused by Defendants' use of the purported marks.

Even before trial, the Court was aware that Dr. Wunderlich would not be used to establish causation or the existence of any actual damages, and the Court admonished Plaintiff that it would need other evidence to connect Defendants' sales to Plaintiff's lost profits. *See* Tr. 7:2-11. It is therefore telling that—through Dr. Wunderlich—Plaintiff told the jury it was not required to make an affirmative showing of its lost profits. "It showed no such loss, and implicitly concedes this by arguing that it was not required" to do so. *Ill. Tool Works, Inc. v. Rust-Oleum Corp.*, 955 F.3d 512, 516 (5th Cir. 2020).

Plaintiff admits it has no evidence of diverted sales or lost customers due to the alleged infringement. *See* DX3004 at 128:19-129:13 (Boll); DX3000 at 90:16-91:17, 96:17-98:15 (White); DX3002 at 181:5-21 (Saharek). To the extent Plaintiff ever lost a sale to Defendants, Plaintiff could not identify any, could not say why it lost any of them, could not say when it lost any of them, and could not provide even a ballpark estimate of how many sales were lost to Defendants. *See* DX3000 at 90:16-91:17, 96:17-98:15, 102:1-7 (White); DX3004 at 128:19-129:13 (Boll).[16] Plaintiff also never showed any sales declines, missed forecasts or shortfalls in its own results, much less explain why they were attributable to infringement, rather than natural demand or other market factors. Plaintiff "did not show a loss for which it needs compensation." *Ill. Tool Works*, 955 F.3d at 516.

Absent such evidence, there is no support for Plaintiff's bald claim that Defendants' sales "would have gone to Imprimis absent the infringement." Tr. 689:15-16. As the court in *Nelson-Ricks Cheese* noted regarding a similar claim for lost profits:

> NRCC cannot prove even a single dollar in damages. All NRCC relies upon for its damages claim is its CEO, Michael Greenberg's, unsubstantiated statement that "I'll just make the claim that half the sales of any Banquet label product, I would have had if he wouldn't have mislead people maybe." "Just mak[ing] a claim" that "maybe" "half the sales" "would have" been NRCC's is a far cry from proving an accurate amount of damages, let alone that any even exist. NRCC has not met the standard required for damages as it has not produced any admissible evidence regarding lost sales or established that it

---

[16] *See tagTrends, Inc. v. Nordstrom, Inc.*, 2014 WL 12561604, at *7 (C.D. Cal. Sept. 30, 2014) ("There is absolutely no actual evidence that any of these other brands encountered the language on the Nordstrom supplier website and became confused regarding the relationship between TT Global and tagTrends.").

1    has incurred any other damages and the amounts of those damages.

2    331 F. Supp. 3d at 1144; *see also JIPC Mgmt, Inc. v. Incredible Pizza Co.*, 2009 WL

3    10671438, at *15 (C.D. Cal. June 24, 2009) (plaintiff "was required to come forward with

4    evidence of lost sales to avoid partial summary judgment," but "it adduced no evidence,

5    and offered no argument that it had actually lost sales"); *Am. Auto. Ass'n*, 367 F. Supp. 3d

6    at 1106-08 (summary judgment granted on actual damages).

7          Further, as explained *supra* 14-17, Plaintiff has no evidence of actual confusion, let

8    alone evidence that purchasing decisions were affected by such confusion.  It is axiomatic

9    that Plaintiff cannot establish actual damages unless it can show actual confusion.  *See* 4

10   McCarthy § 30:74 ("recovery of damages requires proof that some consumers were

11   actually confused or deceived"), 3 McCarthy § 23:12 ("a plaintiff who seeks money

12   damages must introduce evidence of actual consumer confusion").  With no evidence of

13   actual confusion—let alone what it looked like or how often it arose—it is impossible to

14   find that Defendants gained a single sale because of the alleged infringement.  *See Am.*

15   *Auto. Ass'n*, 367 F. Supp. 2d at 1106 (summary judgment granted where witnesses "were

16   unaware of any specific instances of consumers downloading the MAVEN GIG app under

17   the mistaken belief that it was [Plaintiff's] GIG car share app, or vice versa"); *tagTrends*,

18   2014 WL 12561604 at *6 ("Plaintiffs simply assume" any "profits realized by TT Global"

19   are "damages suffered by Plaintiffs" without showing how the "website 'deceived' any of

20   these manufacturers into doing business with TT Global rather than Plaintiffs").

21         Moreover, Plaintiff unsuccessfully pivoted to initial interest confusion because

22   actual point-of-sale confusion is unlikely.  *Supra* 15-17.  As explained in *Avco Corp v.*

23   *Turn & Bank Holdings, LLC*, point-of-sale confusion is what matters for lost profits:

24         [T]here is no evidence that any [consumers] were confused about the identity
         of the manufacturer of servos *at the time they purchased any servos*. This is
25        critical in a determination of damages, as plaintiffs may only recover profits
         that they 'would have earned but for the infringement.' Absent confusion
26        during the purchasing process, there is no evidence of actual lost profits[.]

27   659 F. Supp. 3d 483, 502-03 (M.D. Pa. 2023) (citation omitted), *aff'd*, 2024 WL 3439771

28   (3d Cir. 2024).  Plaintiff does not contend that any eye doctor mistakenly prescribed drugs

through Defendants' pharmacy. *Supra* 12-17. Nor could it.[17]

Finally, contrary to what Plaintiff suggests, it is not reasonable to presume that any sale by Defendants would have gone to Plaintiff, absent the infringement, merely because the parties were competitors. *See* ECF No. 351 at 13-14.

At the outset, the Court already rejected Plaintiff's overly narrow definition of the relevant market, which is not a "two-player" market, not limited to compounding pharmacies, and "prescribers have many options," including large branded and generic pharmaceuticals, as well as other compounding pharmacies. ECF NO. 266 at 18-19. As the parties testified, the largest addressable market for both parties is the conventional "multiple drop regimen," which doctors prescribe to commercial pharmacies. *Supra* 4. It is thus unreasonable to presume "all" of Defendants' sales would have gone to Plaintiff, rather than one of these more dominant market players.

Plaintiff also failed to analyze whether it would have obtained sales absent the alleged infringement. Plaintiff argues that, absent the alleged infringement, "defendants never would have gotten the business off the ground" and "a reasonable juror could have concluded that if defendants had not succeeded, their sales would have gone to Imprimis." ECF No. 351 at 15. It does not matter whether Plaintiff would have made sales if Defendants went out of business in 2014. The "relevant question is not whether, in the absence *of [defendant]*, any sales would have instead gone to [plaintiff]," but rather, "in the absence *of the infringement by [defendant]*, any sales would have gone to [plaintiff]." *Avco*, 659 F. Supp. at 502-03 (emphasis added). Assuming Defendants out of existence does not prove whether sales were made due to infringement.

### B. There Was No Defensible Basis to Calculate Lost Profits

Because there was no evidentiary basis to link Defendants' sales, Plaintiff's losses or the alleged infringement, the jury's quantification of damages was based on speculation

---

[17] None of Plaintiff's witnesses offered evidence of confusion that was specific enough to avoid judgment as a matter of law. *See Am. Auto. Ass'n*, 367 F. Supp. 3d at 1107 ("To the extent he mentions instances of confusion, Mr. Haight provides no details as to who specifically was confused, when the instance occurred, or how many times that type of confusion occurred.").

and conjecture.  An award of lost profits must be supported by "reasonable certainty," which does not require "absolute exactness," but does require a "reasonable basis for computation" to ensure that the award is not "remote and speculative."  *Lindy Pen*, 982 F.2d at 1407-08 ("a plaintiff must make a 'prima facie showing of reasonably forecast profits'"); *Hansen Beverage Co. v. Vital Pharm., Inc.*, 2010 WL 3069690, at *7 (S.D. Cal. Aug. 3, 2010); *McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 361 (9th Cir. 1996) (same).  The notion that Defendants' profits appropriately measure Plaintiff's lost profits, since such sales purportedly "would have gone to Imprimis absent the infringement" (Tr. at 689:15-16), is all or nothing.  No one gave the jury a conversion factor for the relationship between Defendants' profits to Plaintiff's losses.

Here, the jury awarded $14.5 million in actual damages, of which $10.5 million was for the seven marks on the supplemental register (PRED-MOXI-BROM, PRED-GATI-BROM, PRED-BROM, MOXI-BROM, TIM-LAT, TIM-BRIM-DOR and TIM-BRIM-DOR-LAT) and $4 million was for the two marks on the principal register (PRED-MOXI and DEX-MOXI).  *See* ECF No. 342 at 4.  The arbitrariness of the damages award itself shows that the jury had no reasonable basis to calculate Plaintiff's actual damages.  The jury awarded $4 million in "lost profits" to Plaintiff for PRED-MOXI and DEX-MOXI, even though Plaintiff told the jury that Defendants' total profits for those two products was only $1 million, based on approximately $3 million in revenues.  *See* Tr. 688:9-689:14.  While the jury awarded Plaintiff approximately 400% of the claimed profits for the two marks on the principal register, it awarded roughly 60% of the $18 million in claimed profits for the seven marks on the supplemental register.  *See* Tr. at 689:4-14.

There is no way to explain how the jury reached its $4 million figure, nor why it applied vastly different percentages (400% vs. 60%) to Defendants' profits.  Plaintiff adduced no evidence about the frequency of infringement, the frequently of confusion, or how frequently confusion led to sales, let alone whether or how often those sales otherwise ***would have gone to Plaintiff***.  The jury was left to pick a number, out of thin air, between

1    0% and 100% of Defendants' sales (or, apparently 400%). That is not a reasonable basis,

2    and the amount of the damages is unsupported. "Using a percentage of some number

3    unrelated to the plaintiff's injury is an unacceptable way to estimate damages." *Zazu*

4    *Designs v. L'Oreal, S.A.*, 979 F.2d 499, 506 (7th Cir. 1992) (reversing damages award).

5    **V.   WILLFULNESS**

6        The evidence was insufficient to support the jury's finding of willfulness. Willful

7    infringement involves a "deliberate intent to deceive." *San Miguel Pure Foods Co. v.*

8    *Ramar Int'l Corp.*, 625 F. App'x 322, 324-25 (9th Cir. 2015). Conduct must be "willfully

9    calculated to exploit the advantage of an established mark." *Lindy Pen*, 982 F.2d at 1405.

10   Courts routinely grant summary judgment where the undisputed facts demonstrate that the

11   defendant selected the disputed mark without knowledge of the plaintiff's mark. *See Scat*

12   *Enters., Inc. v. FCA USA LLC*, 2017 WL 5896182, at *2 (C.D. Cal. June 8, 2017);

13   *Groupion, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1081-82 (N.D. Cal. 2012).

14       Plaintiff's only evidence of willfulness is one email from late 2019, sent by Eric

15   Gardner, which acknowledges that "Pred-Gati-Brom" and "Pred-Brom" are "trademarked

16   by Imprimis," and instructs a marketing vendor ***not*** to "use it in our ad copy." PX202.

17       This email fails to create a triable issue regarding willfulness. At the outset, the

18   email is irrelevant because knowing use of a mark, with the belief that there is no

19   confusion, does not constitute willful infringement. *Lindy Pen*, 982 F.2d at 1406. Mere

20   awareness is not enough to demonstrate willfulness, and nothing about the email suggests

21   that Defendants believed anyone would be confused. Much less that Defendants believed

22   that confusion would somehow benefit them or that Defendants developed some strategy

23   to capitalize on Plaintiff's purported goodwill.[18]

24

---

25   [18] Defendants were not able to offer their best evidence against the suggestion because
     of rulings that excluded compelling evidence about Plaintiff's truly awful track record
26   and lack of goodwill. ECF No. 316 (granting ECF Nos. 296, 297); Tr. 534:15-536:13. If
     Defendants had been allowed to show the staggering number of regulatory violations,
27   recalls, quality issues, and health problems (including Plaintiff causing the death of a
     patient), it is doubtful that the jury would have believed Plaintiff's suggestion that
28   Defendants were trying to "freeride" off Plaintiff's purported goodwill. The Court should
     order a new trial due to the unfairness of excluding such evidence.

1    More importantly, Defendants never used the abbreviations as trademarks in the

2    first place, and Plaintiff never established otherwise.  Defendants merely used them ***qua***

3    ***abbreviations*** for well-known generic medication names, which are indisputably a

4    mouthful.  *See* Tr. 529:2-532:13.  Plaintiff offered no affirmative evidence controverting

5    that self-evident explanation.  Instead, Plaintiff merely asserted—through counsel's cross-

6    examination of Defendants' witnesses—that Defendants used the abbreviations for a more

7    sinister purpose.  Then, during its closing argument and in post-trial briefing to this Court,

8    Plaintiff cited Defendants' denials and suggested that the jury was free to reject them as

9    noncredible.  If that were a sufficient evidentiary basis, then ***no*** case could be dismissed

10   as a matter of law.  A plaintiff must have affirmative evidence to back up the allegation,

11   or else the issue should not be put to the jury in the first place.

12   Finally, no reasonable trier of fact could infer an intent to deceive based on the

13   overall commercial impression of Defendants' advertisements.  *Supra* 12-17.

14   Defendants are entitled to judgment as a matter of law on willfulness.[19]

---

[19]   The lack of evidence of willfulness shows why the actual damages and punitive damages awards here were "excessive" and "monstrous," *supra* 1-2.  The same can be said regarding the lack of evidence on confusion, causation, the weakness of the purported marks.  The jury's actual damages and punitive damages awards bear no relationship to either (i) the gravity of Defendants' conduct; (ii) Defendants' actual profits during the time period, which were negative or *de minimis* (Tr. 444:9-445:2, 566:10-567:6, 575:9-22); or (iii) any rational effort to estimate the "harm" Plaintiff actually suffered.  Additionally, there was no evidence in the record to comply with California's requirement to consider "evidence of defendants' financial worth in considering the appropriateness of the punitive award."  *See Adams v. Murakami*, 54 Cal.3d 105 (1991).  Defendants were also prejudiced as to damages by the fact that Dr. Wunderlich was allowed to testify, for the reasons raised previously (*see, e.g.,* ECF No. 294).  Finally, it is unclear whether the jury even agreed to the amount of damages, as previously raised by Juror No. 7.  For all of these reasons, if the Court declines to order judgment as a matter of law, it should minimally order a new trial or remittitur on actual damages and punitive damages.

Separately, the jury was not asked to make a finding on Defendants' fair use affirmative defense, which confused the jury and unfairly prejudiced Defendants.  Given the lack of evidence of willfulness and the lack of evidence that either party used the abbreviations *qua* trademarks, the Court should order judgment as a matter of law on its fair use affirmative defense or, alternatively, a new trial.

Dated: February 28, 2025          WILSON SONSINI GOODRICH & ROSATI
                                  Professional Corporation

                                  By:  */s/ Dylan J. Liddiard*
                                         Dylan J. Liddiard

                                  *Attorneys for Defendants*
                                  *OSRX, Inc. and Ocular Science, Inc.*