# EXHIBIT B

1          UNITED STATES DISTRICT COURT

2      FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3
IMPRIMISRX, LLC,                )  Case No. 21-cv-1305-BAS
4                                )
                      Plaintiff, )  November 12, 2024
5       vs.                      )
                                 )  Jury Trial, Day 1
6  OSRX, INC., et al.,           )
                                 )
7                     Defendant. )
  _____ )
8                                )
  AND RELATED CROSS-ACTION       )
9  _____)

10

11        REPORTER'S TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE CYNTHIA A. BASHANT
12           UNITED STATES DISTRICT JUDGE

13           VOLUME 1, PAGES 1 - 211

14

15        (APPEARANCES ON FOLLOWING PAGE)

16

17

18

19

20

21  REPORTED BY:

22  ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
  U.S. OFFICIAL COURT REPORTER
23  U.S. District Court Clerk's Office
  333 West Broadway, Suite 420
24  San Diego, California  92101

25  Reported stenographically; transcribed with CAT software.

1    about my client in 2016.

2           At the time, you'll see references to PRED-MOXI.

3    They're suing us for that today.  PRED-KETOR, they dropped that

4    just a couple weeks ago.  DEX-MOXI.  And what do they do, they

5    call these Ocular Science formulations.  This is 2016.  They

6    knew back in 2016 we were using these names to describe our

7    products.  They didn't sue us for them back then.  They didn't

8    claim that we were violating any trademarks that describe the

9    active pharmaceutical ingredients in compounds such as

10   PRED-MOXI.

11          And after the parties settled that first lawsuit and we

12   paid them a whopping $30,000, we didn't hear anything from

13   Imprimis or Mr. Baum for years and years and years.

14          So what changed?  Well, you'll hear that in 2020,

15   Mr. Baum and Imprimis wanted to buy my client.  They wanted to

16   buy Ocular.  The evidence will show that Mr. Baum contacted

17   Mr. Sampietro, Ocular's CEO, to see if he was willing to sell

18   his company.

19          And as people may recall in the March/April 2020 time

20   period, that was right when COVID was coming on board.

21   Everything was shutting down.  Elective procedures, cataracts,

22   opportune time for Mr. Baum to reach out to my client, a much

23   smaller company, maybe I can buy them on the cheap.

24          Mr. Baum thought Ocular was very desperate and just

25   sell the company.  Well, you'll hear that Mr. Sampietro was open

1  to negotiations if he could obtain a fair price for his company.

2  But he would ultimately not agree to the terms that Mr. Baum was

3  willing to pay, and those discussions were called off in

4  late 2020.

5       At the time, was Imprimis worried about Ocular's use of

6  these abbreviations?  Was Imprimis thinking that there was some

7  type of huge problem here?  The answer is no.  And you'll see --

8  and it's Exhibit DX-80, you'll see here's an email exchange

9  between John Saharek, who's the president of Imprimis.  They're

10  not bringing him here to testify in this trial live.  And you'll

11  see that Mr. Saharek writes to Mr. Baum on October 12, 2020,

12  "Any issue with us having legal, send OSRX a cease and desist on

13  using our registered trademarks?"

14       If you can scroll down a little bit.  Are you able to

15  do that?  You'll see, here are the trademarks.

16       So the president of Imprimis in October of 2020 says to

17  Mr. Baum, You want us to send a demand letter to them, tell them

18  to knock it off and not use these trademarks?  What does

19  Mr. Baum say on October 12th, 2020?  "Hold off for now."

20  Basically, do nothing.

21       I took Mr. Baum's deposition, and I asked him, What do

22  you mean hold off for now?  Why?  I don't recall why.  And

23  that's going to be his answer in this court.

24       And so when those negotiations broke down and my client

25  refused to sell to Mr. Baum, without any warning at all -- no

1    patents.

2         And you'll see -- and you didn't hear much from the

3    other side in their opening statements, about anything to do

4    with the PTO.  But you'll see that the PTO had a number of

5    concerns with the Imprimis applications for its trademarks,

6    including that Ocular Science was already selling products that

7    used those abbreviations.

8         In addition, the PTO repeatedly explained to Imprimis

9    that these abbreviations of ingredients is not something that

10   you can -- not something that you can trademark.  Imprimis did

11   not care.  They made up all kinds of excuses and arguments.  But

12   at the end of the day, the evidence is going to show that the

13   PTO denied registration for the vast majority of these marks

14   that are at issue here in this case, except for a few that snuck

15   by.

16        We will discuss how Imprimis managed to sneak a few

17   past the PTO and managed to have them included on what will be

18   called the Primary Register.  That will be explained in more

19   detail later.

20        One of those marks that managed to sneak through at the

21   PTO and go onto this Primary Register was a mark called

22   PRED-KETOR.  That was one of the marks that Imprimis initially

23   sued us on.  There was 10 in this case.  But PRED-KETOR is no

24   longer part of this case.

25        Imprimis informed us just a few weeks ago that it was

1        But going back to the PTO, you'll see that the PTO

2    repeatedly explained that abbreviations of ingredients are

3    merely descriptive, merely descriptive, of the product itself.

4        So let's pull up Slide 5.  And you're going to see a

5    lot of communications back and forth with the USPTO between

6    Imprimis and the PTO with respect to these trademarks.  But

7    let's just take a couple of them.

8        This first one is a letter from the -- or exchange

9    communications from the PTO to Imprimis.  And it's DX-41.  And

10   this is for PRED-GATI-BROM.  And let's see what the PTO said in

11   the Final Action Letter to Imprimis in connection with this

12   particular mark that Imprimis is assert anything this case.

13        This is the final action.  It says, The mark is merely

14   descriptive.  Registration is refused because the applied-for

15   mark merely describes an ingredient of the applicant's goods.

16   An abbreviation, initialism, or acronym is merely descriptive

17   when it is generally understood as substantially synonymous with

18   the descriptive -- descriptive words it represents.

19        And here, the PTO goes on to say, to inform Imprimis,

20   In the present case, the previously attached evidence shows that

21   the applicant's mark, PRED-GATI-BROM, is an abbreviation for the

22   wording prednisolone, gatifloxacin, and bromfenac.

23        And lastly -- on this page, you'll see that the PTO

24   says, Lastly, a relevant consumer -- and here, that's a doctor,

25   an eye doctor -- viewing the applicant's mark in connection with

1    the identified goods would recognize it as equivalent of the

2    descriptive words it represents, PRED-GATI-BROM, as a

3    combination of known abbreviations for the chemicals that make

4    up applicant's pharmaceutical preparations.

5           Let's just look at one more -- and pardon my opening.

6    Let's pull up DX-44.  This is for PRED-BROM.  This is more

7    communications between Imprimis and the PTO.

8           And here, the PTO, same issue, The mark is merely

9    descriptive.  Registration is refused because the applied-for

10   mark merely describes ingredients of the applicant's goods.

11          And if you go on to the next page, .03, here, what --

12   the PTO even goes further, and they tell Imprimis, In addition

13   to being merely descriptive, the applied-for marks appears to be

14   generic -- generic -- in connection with the identified goods,

15   and therefore, incapable of functioning as a source identifier

16   for applicant's goods.

17          That's what the PTO is saying, the U.S. Government.

18   Imprimis disagrees with the PTO.  Imprimis says the PTO has had

19   it wrong all the time, and that these marks have now acquired

20   something called secondary meaning.

21          And what they're going to do to try to prove secondary

22   meaning is they're going to try to prove it with surveys.  But

23   here's the catch.  The surveys, as you will see, didn't go so

24   well for Imprimis.

25          And we want you to listen very carefully to their

1    survey expert -- his name is Mr. Keegan -- and listen to whether

2    Mr. Keegan actually tells you that these marks have achieved

3    sufficient amount of secondary meaning.  He will not tell you

4    that because he cannot tell you that.  His surveys just show how

5    weak these marks really are.

6            You'll also hear from Mr. Keegan that he didn't conduct

7    a proper survey -- or you'll also hear that Mr. Keegan did not

8    conduct a proper survey.  Many of you have heard the term or the

9    phrase "control group" or "control" in these type of studies.

10   Those control groups or controls are very important.

11           Mr. Keegan didn't use a control or a control group when

12   he did his studies here.  And the evidence will show that that

13   was a fatal error that renders his survey useless and

14   unreliable.

15           So if you listen carefully to the evidence, you'll see

16   that Imprimis has not and cannot establish secondary meaning for

17   any of the marks.

18           On top of that, you will hear evidence about a second

19   survey.  We had to hire a survey expert as well.  His name is

20   Dr. Andreas Groehn.  And his survey even shows -- he did a

21   survey that shows the terms are generic, just like the PTO said.

22           And so where does that leave us?  The evidence will

23   show that the PTO got it right the first time.  These are

24   commonly used abbreviations that make it easier for doctors,

25   companies, and patients to discuss the ingredients of the

1    survey expert -- his name is Mr. Keegan -- and listen to whether

2    Mr. Keegan actually tells you that these marks have achieved

3    sufficient amount of secondary meaning.  He will not tell you

4    that because he cannot tell you that.  His surveys just show how

5    weak these marks really are.

6          You'll also hear from Mr. Keegan that he didn't conduct

7    a proper survey -- or you'll also hear that Mr. Keegan did not

8    conduct a proper survey.  Many of you have heard the term or the

9    phrase "control group" or "control" in these type of studies.

10   Those control groups or controls are very important.

11         Mr. Keegan didn't use a control or a control group when

12   he did his studies here.  And the evidence will show that that

13   was a fatal error that renders his survey useless and

14   unreliable.

15         So if you listen carefully to the evidence, you'll see

16   that Imprimis has not and cannot establish secondary meaning for

17   any of the marks.

18         On top of that, you will hear evidence about a second

19   survey.  We had to hire a survey expert as well.  His name is

20   Dr. Andreas Groehn.  And his survey even shows -- he did a

21   survey that shows the terms are generic, just like the PTO said.

22         And so where does that leave us?  The evidence will

23   show that the PTO got it right the first time.  These are

24   commonly used abbreviations that make it easier for doctors,

25   companies, and patients to discuss the ingredients of the

1    products without using long, complex scientific words.

2              At the end of the trial, I'll come back and I'll ask

3    you to make several findings.  One is that -- we will ask you to

4    make is that Imprimis misled and was not truthful with the FDA

5    when it snuck three of the marks on the Primary Register.

6              Second, that these abbreviations have not achieved

7    sufficient level of secondary meaning.

8              Third, that these abbreviations and marks are just

9    generic in the industry.

10             Fourth, that Ocular and OSRX, my client -- my clients,

11   did not infringe on these trademarks, and no one was confused or

12   likely to be confused by my clients' use.

13             And finally, even if Ocular and OSRX used these

14   abbreviations to describe its drug compounds, they were used

15   fairly by my client to merely discuss the formulations of the

16   product and that they have every right to sell.

17             Thank you, and we look forward to presenting our case.

18             THE COURT:  Okay, ladies and gentlemen, we're going to

19   go ahead and take our lunch recess at this time.  We'll take an

20   hour.  If you take a look, it looks like it's -- our clock

21   says 12:15, so if you could check your clock and make sure it's

22   the same.  We'll see you back at 1:15.  You're reminded you're

23   not to discuss the case with anyone or do any research about the

24   case.  And we'll see you back at 1:15.

25        (Jury out at 12:16 p.m.)

**MARK BAUM - DIRECT EXAM (MR. WESLEY)**

1    *DIRECT EXAMINATION*

2    *BY MR. WESLEY:*

3    *Q.* And good afternoon, Mr. Baum.

4    **A.  Good afternoon.**

5    *Q.* Are you the founder of the Imprimis business?

6    **A.  I am.**

7    *Q.* And what is your current role with the business?

8    **A.  I am the Senior Executive of the parent company.**

9    *Q.* And who is the parent company?

10   **A.  Harrow.**

11   *Q.* And have you been involved in the management of the Imprimis

12   compounding business throughout its existence?

13   **A.  Yes.**

14   *Q.* And did you personally decide to file this lawsuit?

15   **A.  I did.**

16   *Q.* Why?

17   **A.  We created or saw an opportunity on the market to do**

18   **something really special.  And we built products in the market**

19   **that were really unique, that no one had ever really done before**

20   **to help patients.  And we built a business model that was**

21   **special.**

22   **    And we got investors to give us money so that we could take**

23   **a lot of risk and build this business literally from scratch.**

24   **And we struck lightning, I mean, in a bottle.  It took off and**

25   **the market responded really well.  And we built a brand around**

**MARK BAUM - DIRECT EXAM (MR. WESLEY)**

1   **the work that we had done, and it was amazing.**

2   **    But the defendants copied our brands with formulations like**

3   **ours and wouldn't stop.  We asked them to stop over and over**

4   **again, and they wouldn't stop using our brands.  And so we had**

5   **to file this lawsuit to try and get them to stop.**

6   *Q.*  Okay.  Well, before we take a deeper dive into the business

7   and the trademarks, let's just pick up a little bit about you,

8   the man.

9   Where did you grow up?

10  *A.*  **I'm from Houston, Texas.**

11  *Q.*  And tell us a little bit about your upbringing.

12  *A.*  **You know, lower middle-class upbringing.  My father was a**

13  **shoe salesman when I was a kid, graduated from the 10th grade.**

14  **My mother is a high school graduate.**

15  **    I didn't live at home long.  I moved out when I was young,**

16  **when I was 15 years old.  I've been living on my own since I was**

17  **15.  And I've always been interested in business to try and**

18  **support myself.  And I've always been interested in**

19  **entrepreneurship and ways that I could create things, not only**

20  **for myself and so that I could survive, but also that I -- you**

21  **know, that would help society and that would benefit customers.**

22  *Q.*  Can you give us a brief example of one of your -- the

23  businesses you created or were involved in creating prior to

24  Imprimis?

25  *A.*  **Sure.  The first business that I started when I finished**

MARK BAUM - DIRECT EXAM (MR. WESLEY)

1  drop-free.  Very excited for you guys.

2      Do you see that?

3  **A.  Yes.**

4  *Q.*  And did Dr. Goldberg express similar excitement towards you

5  around this time?

6  **A.  Yes.**

7  *Q.*  Did any other doctors?

8  **A.  Yes.**

9  *Q.*  Okay.  And when Imprimis, at this time, early days,

10  still 2014, were any compounded drug manufacturers -- I'm not

11  talking about the Eli Lilies or the Bausch + Lombs of the

12  world -- compounded drug manufacturers, were they branding their

13  drugs like Imprimis started to do?

14  **A.  No one had ever, to my knowledge, branded a compounded**

15  **medication.  It was a completely new idea.**

16  *Q.*  And in your view, was the branding important to your

17  success?

18  **A.  It was critical.  It's what allowed us to grow the business.**

19  **It's what the doctors knew.**

20  *Q.*  Okay.  Let's look at that branding.  And we heard during

21  opening, there are nine trademarks at issue in this case.

22      **MR. WESLEY:**  And, Mr. Laiolo, if you could pull up the

23  demonstrative we saw.

24  ***BY MR. WESLEY:***

25  *Q.*  Are these the nine trademarks, Imprimis trademarks, that you

1  understand the company is suing over?

2  **A. Yes.**

3  *Q.* And were you involved in coming up with these names?

4  **A. I was.**

5  *Q.* And tell us about that.

6  **A. It's -- it's a creative process. It's funny, we actually**

7  **just got a new dog, and so we've been trying to name the dog,**

8  **and so it's almost very similar coming up with different names,**

9  **except this is much more complex.**

10     **We took all of these words and put them on a whiteboard, and**

11  **looked at different combinations of the formulations, shortened**

12  **versions of parts of the formulations, and looked at just all**

13  **sort of different combinations. And we came up with these.**

14     **These were going to be the -- the trademarks, hopefully, if**

15  **they were issued, that we wanted to build our business around.**

16  *Q.* And let's take a look at Exhibit 227, page 18, please.

17  Actually, let's go 19, please.

18        ***MR. WESLEY:*** Okay. Can you, Mr. Laiolo, blow up

19  PRED-GATI-BROM solution as an example? Thank you.

20  *BY MR. WESLEY:*

21  *Q.* And PRED-GATI-BROM is one of the trademarks in question;

22  correct?

23  **A. Yes.**

24  *Q.* And you created it?

25  **A. Yes.**

**MARK BAUM - DIRECT EXAM (MR. WESLEY)**

1   *Q.*  Okay.  So let's -- I want to be clear about certain things.

2       At the time you were creating these trademarks, the

3   individual words -- PRED, GATI, BROM -- and the others that

4   comprise the trademarks in question, were some of those already

5   in use as nicknames?

6   **A.  For some doctors, yes.**

7   *Q.*  Okay.  Were there other nicknames for those same chemicals

8   that you were aware of that were in use?

9   **A.  Oh, yeah, yes.**

10  *Q.*  Can you give us an example?

11  **A.  For prednisolone, Prednis.  The issue is, like, PRED is a**

12  **tough one because it could be prednisone, or it could be**

13  **prednisolone acetate or prednisolone sulfate.  There are**

14  **different forms of prednisolone.  But GATI would be gatiflox.**

15  **There are a lot of different abbreviations of these that are**

16  **common.**

17  *Q.*  But you ultimately chose which nickname to use; is that

18  right?

19  **A.  Right.  We took the big word, and we took the snippet of it**

20  **that we thought would be part of the word that we wanted to**

21  **brand and file our trademark on.  And that was what we were**

22  **going to invest in and build our business around.**

23  *Q.*  And did you decide the order in which you were going to list

24  these or incorporate these abbreviations?

25  **A.  Absolutely.  I mean, you could -- like I said, you could --**

MARK BAUM - DIRECT EXAM (MR. WESLEY)

1    and we did.  You can flip them around all different ways.  You

2    could put one word in front of the other, or, you know, one word

3    can be a little longer as a snippet.  There are all sorts of

4    different ways to do it.  These were the specific words that we

5    were going to trademark and build our business around.

6    Q.  And do you see it with PRED-GATI-BROM solution, after that,

7    it says prednisolone sodium phosphate, gatifloxacin, and

8    bromfenac?  Do you see that?

9    A.  Yes.

10   Q.  And are those the chemicals that are in the solution that

11   you trademarked as PRED-GATI-BROM?

12   A.  Yes.

13   Q.  And did you decide to not include, for example, sodium

14   phosphate within the mark?

15   A.  That's right.

16   Q.  And one other thing I want to be a hundred percent clear on.

17       Do you have any issue with others using different

18   abbreviations for these chemicals, or a different order?

19   A.  No.  If that was the case right now, we wouldn't be here.

20   Q.  And for all of the nine trademarks in question, before you

21   came up with those phrases, to your knowledge, had anyone else

22   used them?

23   A.  No.

24   Q.  And before selecting each mark, did anyone at the company do

25   a search for others already using those trademarks?

**MARK BAUM - DIRECT EXAM (MR. WESLEY)**

1    *A.*  **Yes.**

2    *Q.*  And who did that?

3    *A.*  **Well, I would do it on Google.  We had lawyers, you know,**

4    **all sorts of people doing searches to make sure that these were**

5    **unique.**

6    *Q.*  And to your understanding, did you or anyone affiliated with

7    the company find anyone else using any of the nine trademarks in

8    question?

9    *A.*  **No.**

10   *Q.*  To your knowledge, was Imprimis the first to use each of

11   these trademarks in commerce?

12   *A.*  **Yes.**

13   *Q.*  And when you were thinking about these trademarks, did you

14   think about any other brands that combine abbreviations of

15   chemicals into trademarks?

16   *A.*  **Sure.**

17   *Q.*  Can you give us an example or two of what you were thinking

18   about?

19   *A.*  **The one that we're all probably most familiar with is a drug**

20   **called Botox, which is the combination of Botulinum Toxin,**

21   **that's the "Bo" in Botox.  And the "tox" is toxin.  So Botulinum**

22   **Toxin, they combine.  They took the first snippets of the word**

23   **to create Botox.**

24       **And so that's kind of what we were doing when we were**

25   **creating our brands.  Clorox is another one, but there are**

**MARK BAUM - DIRECT EXAM (MR. WESLEY)**

1   others.

2   *Q.* So Clorox is a combination of two other chemicals, to your

3   understanding?

4   *A.* It is.

5   *Q.* Okay. So you've invented these new trademark terms. They

6   appear to be available for use.

7       Did you do anything to protect them?

8   *A.* We did. We sought to file a trademark application.

9   *Q.* Why?

10  *A.* Well, we were going to, as I said, build this business. We

11  didn't know if it was going to work, but we were going to invest

12  a lot of money and we wanted to invest in these brands. And if

13  we were successful, really regardless of whether we were

14  successful, we wanted to be able to protect what we created.

15  And that's why we filed these trademarks, the applications.

16  *Q.* And we've marked for identification the nine trademark

17  registrations in question. They're marked as Exhibits 165

18  through 173.

19      You've looked at those before today; correct?

20  *A.* I have.

21  *Q.* And are those, in fact, trademark registrations for the

22  marks in question?

23  *A.* They are.

24          *MR. WESLEY:* Move to admit Exhibits 165 through 173.

25          *THE COURT:* Any objection?

MARK BAUM - DIRECT EXAM (MR. WESLEY)

1    *A.* **I would say there is quite a bit of rigor.**

2    *Q.* And before a registration is issued, does any member of the

3    public have an opportunity to object to the registration?

4    *A.* **Yes.**

5    *Q.* So if somebody thought that a particular mark was generic or

6    descriptive, they would have the opportunity to object to

7    registration; is that right?

8    *A.* **Yes. That's how the system is supposed to work, as I**

9    **understand it.**

10   *Q.* And to your knowledge, did anyone object to any of these

11   marks being registered, any member of the public?

12   *A.* **No, no one did.**

13   *Q.* Okay. So to protect the trademarks, you said you registered

14   them with the U.S. Government.

15       Did you actually use the trademarks in commerce as well?

16   *A.* **For sure. It was the centerpiece of our business.**

17   *Q.* And who was the head of Marketing during this time?

18   *A.* **Cindi White.**

19   *Q.* Okay. So we're going to hear from Cindi White later in the

20   trial, so I'll save -- I'll save that for Ms. White. But let's

21   talk about the effect of the marketing and promotion of these

22   trademarks on your business.

23       You started using at least some of them late 2014,

24   early 2015?

25   *A.* **Yes.**

**MARK BAUM - DIRECT EXAM (MR. WESLEY)**

1   *Q.* And at that time, what was Imprimis' total sales revenue,

2   say, annually?

3   **A. Well, we literally started with nothing. We had no**

4   **products. We had no customers. We had no revenue. We had**

5   **nothing. I think the first year -- the first full year, we did**

6   **less than $2 million in revenue. And then it kind of took off**

7   **after that. But we started with nothing, really.**

8   *Q.* And what was Imprimis' total revenue, say, last year, 2023?

9   **A. We did a little over $80 million in revenue.**

10   *Q.* And so between the time you started using the trademarks and

11   currently, there was an increase of --

12   **A. All 80 -- whatever the revenue was, because we started from**

13   **scratch.**

14   *Q.* And do you believe that these nine marks played a role in

15   that?

16   **A. For sure. That's what we built our business around. That's**

17   **what we invested in.**

18   *Q.* Okay. Let's shift our focus now to the defendants, Ocular

19   Science and OSRX. And let's go back to a document we looked at

20   earlier and that's in evidence, 297, page 48.

21   Do you see that?

22   **A. Yes.**

23   *Q.* And this was the email from Dr. Goldberg expressing his

24   excitement about the business; right?

25   **A. Yes.**

**MARK BAUM - DIRECT EXAM (MR. WESLEY)**

1   *Q.* And did Dr. Goldberg ever actually consult for Imprimis?

2   **A. He did.**

3   *Q.* And was he actually ever provided confidential information

4   related to Imprimis branding and trademarks?

5   **A. Yes.**

6   *Q.* Can you tell us a little bit about that?

7   **A. We talked to him about everything we were doing. He was**

8   **obviously enthusiastic about the business, the products we were**

9   **making, the fact that we were, you know, creating these brands**

10   **around these products, and really everything we were doing.**

11   **And he was sort of a bigwig in the ophthalmology world and**

12   **he was really interested in us. And we were an upstart, so we**

13   **were really interested in him. And so he agreed to be a**

14   **consultant for us.**

15   *Q.* Why did you feel comfortable sharing this information with

16   him?

17   **A. Because he signed a contract, and he agreed to keep anything**

18   **that we gave him confidential, to not use it.**

19   *Q.* Let's take a look at pages 29 through 32 of Exhibit 297.

20   This appears to be a December 13th Advisory Panel Agreement

21   between Imprimis Pharmaceuticals and a Damien Goldberg.

22   Do you see that?

23   **A. I do.**

24   *Q.* Is this, in fact, an Agreement that Imprimis made with

25   Dr. Goldberg in December of 2013?

**MARK BAUM - DIRECT EXAM (MR. WESLEY)**

1  existing schedule.  For these reasons, it is in the best of

2  interest my family and my growing practice that I must resign my

3  consultancy.

4  　　Do you see that?

5  *A.*  **I do.**

6  *Q.*  And then finally, he goes on to say, I will do my very best

7  to minimize any disruption amongst the consulting team.  Should

8  you wish for me to work out my 30-day notice, I believe I will

9  be able to get a new team member up to speed and help the rest

10  of the team complete the current assignments with no glitches in

11  the process.  And then he goes on to thank you.

12  　　Do you see that?

13  *A.*  **I do.**

14  *Q.*  And when you read this in June of 2015, did you believe

15  Dr. Goldberg was telling you the truth?

16  *A.*  **I did.**

17  *Q.*  Do you now?

18  *A.*  **No.**

19  *Q.*  Why not?

20  *A.*  **Because, as it turned out, he was working with Mr. Sampietro**

21  **to take the information that we gave him, that we talked to him**

22  **about, that we trusted him with, to build a competing business,**

23  **to not only copy our formulations, but to use our brands.  And**

24  **he did it, and he wouldn't stop.**

25  *Q.*  And after you discovered that, did you discover that the

**MARK BAUM - DIRECT EXAM (MR. WESLEY)**

1    they were using.

2        And we ended up reaching a Settlement Agreement with them.

3    And the Settlement Agreement said in it that if the patents

4    issued that we had filed, that they would completely stop making

5    all of these formulations.  Like, stop.

6        And if they stopped making the formulations, they were not

7    going to be using our brands, either.  And so it was sort of a

8    one full swoop type of deal.

9    *Q.*  Let's take a look at that agreement.  We took a peak during

10   Counsel's opening.  It's Defendant's Exhibit 27.  This appears

11   to be the Settlement from the prior litigation.

12           ***MR. WESLEY:***  Move Defense Exhibit 27.

13           ***THE COURT:***  Any objection?

14           ***MR. LIDDIARD:***  No objection.

15           ***THE COURT:***  It may be admitted.

16       ***(Exhibit DX-27 admitted.)***

17   *BY MR. WESLEY:*

18   *Q.*  Okay.  And do you see here in paragraph 3 of the Settlement

19   Agreement that as part of the Settlement, Ocular -- I'm going to

20   start on the third sentence -- On or before the same date,

21   Ocular Science and its counsel shall deliver to counsel for

22   Imprimis a certification signed under penalty of perjury by

23   Anthony Sampietro that it has submitted via email and

24   First-Class mail to all customers on the customer list a letter

25   which reads, in Times New Roman font, no smaller than 14, the

**MARK BAUM - DIRECT EXAM (MR. WESLEY)**

1    following language --

2         **THE COURT:** You're going to have to slow down if you're

3    going to read it into the record, for our court reporter.

4    **BY MR. WESLEY:**

5    **Q.** Droplet is not Dropless, during X-period. OSI promoted a

6    product labeled Droplet, whose name sounded similar to Imprimis'

7    Dropless products. Please be advised that Dropless products may

8    only be purchased through Imprimis.

9         Do you see that?

10   **A.** Yes.

11   **Q.** And so as part of the resolution of that lawsuit, was Ocular

12   Science agreeing to notify customers that it had improperly used

13   the Droplet mark?

14   **A.** Yes.

15   **Q.** And if you turn to the next page, paragraph 4 says that

16   Ocular Science or its insurance carriers shall deliver to

17   Imprimis a payment of $30,000.

18        Do you see that?

19   **A.** Yes.

20   **Q.** And was that also part of the Settlement?

21   **A.** It was part of it, yes.

22   **Q.** And then if you go down to paragraph 5, it describes Ocular

23   Science being liable to pay Imprimis royalties on sales of

24   products constituting formulations claimed in the applications

25   for patents.

**MARK BAUM - DIRECT EXAM (MR. WESLEY)**

1    *A.*  **Yes.**

2    *Q.*  In your view, did that payment deter them from infringing

3    your trademarks in the future?

4    *A.*  **No.**

5    *Q.*  Did you see them infringe additional marks after that?

6    *A.*  **Yes.**

7    *Q.*  Where did you see it?

8    *A.*  **Trade shows, advertisements.  We heard about it from our**

9    **sales people.  They copied our stuff.  And that's how they got**

10   **their foot in the door with our customers.**

11   *Q.*  Let's take a look at Plaintiff's Exhibit 200.  This appears

12   to be an August 2022 printout from the OSRX website.

13       Do you see that?  Hold tight for one second.

14   *A.*  **Yes.**

15   *Q.*  And you've been to the OSRX website; right?

16   *A.*  **I have.**

17   *Q.*  And does this clearly and accurately depict the website as

18   of August 2022?

19   *A.*  **I believe so.**

20   *Q.*  Okay.

21           *MR. WESLEY:*  Move to admit Exhibit 200, please.

22           *MR. LIDDIARD:*  No objection.

23           *THE COURT:*  Plaintiff's 200 may be admitted.

24       **(Exhibit 200 admitted.)**

25   ///

**MARK BAUM - DIRECT EXAM (MR. WESLEY)**

1    *BY MR. WESLEY:*

2    *Q.* And this particular page is a prescriber account inquiry

3    form.

4         Do you see that?

5    **A. Yes.**

6    *Q.* And so if you scroll down, when the doctor is filling out

7    this form and has to say what medications they're interested in

8    prescribing, what do you notice?

9    **A. Our products, our trademarks.**

10   *Q.* Do you sell PRED-MOXI-BROM through OSRX?

11   **A. No.**

12   *Q.* All right. Let's take a look at -- oh, and by the way, this

13   was August of 2022?

14   **A. I believe so.**

15   *Q.* Was this after this lawsuit was filed?

16   **A. Yes.**

17   *Q.* Okay. Let's take a look at Exhibit 1161. This appears to

18   be an OSRX brochure.

19        Do you see this document?

20   **A. Yes.**

21   *Q.* And is this an OSRX brochure you've seen before?

22   **A. It is.**

23   *Q.* And you saw it in public?

24   **A. Yes.**

25             *MR. WESLEY:* Move to admit 116 -- Plaintiff's

MARK BAUM - DIRECT EXAM (MR. WESLEY)

1    Exhibit 1161.

2           *MR. LIDDIARD:*  No objection.

3           *THE COURT:*  Any objection?

4           *MR. LIDDIARD:*  No objection.

5           *THE COURT:*  Plaintiff's 1161 may be admitted.

6       **(Exhibit 1161 admitted.)**

7    **BY MR. WESLEY:**

8    *Q.*  And this says, Check out our complete portfolio of

9    formulations.

10      Do you see that?

11   **A.  I do.**

12   *Q.*  And then under Post-op Cataract and Refractive Care, do you

13   notice any of those -- those names?

14   **A.  I do.**

15   *Q.*  And are those your trademarks?

16   **A.  They are.**

17   *Q.*  And was OSRX using the same names for substantially the same

18   formulas as you were selling?

19   **A.  They were.**

20   *Q.*  And as a longtime executive of a compounded eye drug

21   company, can you think of any reason they would do that?

22   **A.  Well, of course.  They -- we spent millions and millions of**

23   **dollars, created relationships with thousands of customers, and**

24   **the easy way around things, the easy way to do things, the**

25   **shortcut is to just take someone else's brands, use them as your**

**MARK BAUM - DIRECT EXAM (MR. WESLEY)**

1  **own, and go to those same customers and tell them you've got**

2  **what they want.  And that's what they did.**

3  *Q.*  Now, we saw during opening, during counsel's opening, an

4  email from you to another executive where he was asking, Should

5  we send a cease-and-desist letter.  I think it was 2020.  And

6  you said, Hold off for now.

7     Do you remember that?

8  *A.*  **Yes.**

9  *Q.*  You were here for opening; right?

10 *A.*  **Yes.**

11 *Q.*  Okay.  And why did you say hold off for now if they're doing

12 all this?

13 *A.*  **We were in the process of negotiating a couple of things.**

14 **One, an acquisition.  But also in discussions with them just**

15 **stopping using our brands, which was really easy -- should have**

16 **been easy for them.**

17 *Q.*  And so who led those discussions on your end?

18 *A.*  **I was principally -- I was principally involved.**

19 *Q.*  And who led them for OSRX?

20 *A.*  **Mr. Sampietro.**

21 *Q.*  And did you meet with him personally?

22 *A.*  **I did.**

23 *Q.*  Did you speak on the phone?

24 *A.*  **I did.**

25 *Q.*  Did you ever raise this issue with him?

**MARK BAUM - DIRECT EXAM (MR. WESLEY)**

1  *A.*  **Of course.**

2  *Q.*  And what was said?

3  *A.*  **Basically told me he wasn't going to stop, that I couldn't**

4  **make him, and that I should go pound sand, effectively.  And**

5  **then he used this phrase, he said, "You get points for style,"**

6  **in kind of a smart way.  I remember that.**

7  *Q.*  Did the acquisition talks fall through?

8  *A.*  **They did.**

9  *Q.*  Did the infringement continue?

10  *A.*  **It certainly did.**

11  *Q.*  When is the last time you saw these marks on OSRX's website?

12  *A.*  **I think they're on there now, but up until a few days ago.**

13  *Q.*  Now, have you ever paid -- you, being Imprimis -- ever paid

14  royalties for the right to use somebody else's marks?

15  *A.*  **Of course.**

16  *Q.*  And are you familiar with others in the industry who pay

17  royalties for using trademarks?

18  *A.*  **Absolutely.**

19  *Q.*  And how are you --

20  *A.*  **It's common.**

21  *Q.*  How are you familiar with that?

22  *A.*  **Because we do it.**

23  *Q.*  And based on your experience, have you gained any knowledge

24  as to a standard royalty rate for use of a trademark?

25  *A.*  **Yes.**

**MARK BAUM - DIRECT EXAM (MR. WESLEY)**

1   *Q.*  And what's your -- what's been your experience?

2   *A.*  **It can be in the 5 percent range, and sort of the mid-single**

3   **digits, 5 percent all the way up to 20 percent.**

4   *Q.*  Did OSRX pay 5 percent?

5   *A.*  **No.**

6   *Q.*  Four percent?

7   *A.*  **No.**

8   *Q.*  What percent?

9   *A.*  **They paid zero percent.  Nothing.**

10  *Q.*  Okay.  Last point, how long has this case gone on?

11  *A.*  **Years.**

12  *Q.*  Was it expensive?

13  *A.*  **Yes.**

14  *Q.*  Time-consuming?

15  *A.*  **Very much so.**

16  *Q.*  Stressful?

17  *A.*  **Yes.**

18  *Q.*  Did you want to continue to litigate?

19  *A.*  **No.**

20  *Q.*  Why did you continue?

21  *A.*  **Because if we can't protect the ideas that we came up with,**

22  **the business that we created, if we can't protect these things,**

23  **you know, why would anybody ever start a company to begin with?**

24  **And when you can't make someone stop, you have to go to court.**

25  **That's what this is for.  But we don't want to be here, believe**

MARK BAUM - DIRECT EXAM (MR. WESLEY)

1    me.

2    *Q.*  And do you believe that these are valuable assets of the

3    company?

4    **A.  They're very valuable assets.**

5    *Q.*  And can you think of any reason why OSRX would spend all

6    this time and money and years fighting for the ability to use

7    these marks if they're not valuable to OSRX?

8    **A.  The reason why they use them and the reason why they've**

9    **copied them is because doctors know the brands we built, and**

10   **they're really valuable.**

11          *MR. WESLEY:*  Okay.  Thank you, Mr. Baum.  I think

12   that's all I have.

13          *THE COURT:*  Okay.  Why don't we take our afternoon

14   recess at this time.  Ladies and gentlemen, we'll take

15   a 15-minute recess.  You're reminded you're not to discuss the

16   case with anyone.  You're not to do any research about the case.

17   If you could be back in 15 minutes.

18      *(Jury out at 2:23 p.m.)*

19          *THE COURT:*  Okay.  We're outside the presence of the

20   jury.  I did have a question about numbering of exhibits.  So

21   you both numbered them one through something, and there's a

22   plaintiff's and a defendant's, is that the way you numbered them

23   in this case?

24          *MR. WESLEY:*  Regrettably, yes.

25          *MS. BURKHARDT:*  Our exhibits are consecutive,

**MARK BAUM - CROSS-EXAM (MR. LIDDIARD)**

1  Imprimis' request to register PRED-MOXI as a trademark; correct?

2  **A.  I don't know.**

3  *Q.*  Well, let's go to 007.  And you see here, it's on

4  official-looking caption.  It says, A response to office action.

5      Do you see that?

6  **A.  Yes.**

7  *Q.*  And the applicant is Imprimis Pharmaceuticals, Inc.?

8  **A.  Yes.**

9  *Q.*  And if you'd look down, the response to office action, it

10  says, Applicant, which is your company; correct?

11  **A.  Yes.**

12  *Q.*  Is responding to the office action mailed

13  December 14th, 2015.

14      Do you see that?

15  **A.  Yes.**

16  *Q.*  Does that help you in terms of this a response by your

17  company to the USPTO in connection with the -- the PRED-MOXI

18  mark?

19  **A.  Yes.**

20  *Q.*  Okay.  And if you go to DX -- page 8, or 0.008 of DX-11.

21  And the first full paragraph there, starting with, As evidence.

22      Are you with me?

23  **A.  I am.**

24  *Q.*  It says, As evidence in support of refusing registration

25  under Section 2(e)(1) of the Trademark Act, the examiner cites

MARK BAUM - CROSS-EXAM (MR. LIDDIARD)

1  to screenshots of a website owned by Ocular Sciences, which

2  shows use of applicant's mark in connection with pharmaceutical

3  compounds containing the same active ingredients.

4       Do you see that?

5  **A.  Yes.**

6  *Q.* Does that refresh your recollection or your memory that my

7  client was selling these compounds using these -- your marks

8  in 20 -- during this time period?

9  **A.  I don't know which specific formulation.  Is this for --**

10 *Q.* PRED-MOXI.

11 **A.  -- PRED-MOXI?  Yeah, I don't know if this is -- I think this**

12 **is a communication between the lawyer.  Let me just read the**

13 **rest of it, if you don't mind.**

14     **Right.  We say that it was -- they had it on their website.**

15 **And it was evidence of an unauthorized use of our mark.**

16 *Q.* And you go on to write here -- and your lawyers are the ones

17 drafting this to the PTO; correct?

18 **A.  When you file --**

19 *Q.* I'm asking, were your lawyers the ones that were drafting

20 the response?  That's my question, sir.

21 **A.  When you file --**

22 *Q.* Yes or no?

23 **A.  Pardon me?**

24 *Q.* Yes or no, did your lawyers prepare this?

25 **A.  We had -- yeah, lawyers are the ones that go back and forth**

MARK BAUM - CROSS-EXAM (MR. LIDDIARD)

1    **stuff specifically means.  That's what these -- people like, you**

2    **know --**

3    *Q.*  Like me?

4    **A.  -- like you and like the lawyers really know what all of**

5    **this stuff means, with all of the citations to laws and statutes**

6    **and stuff.**

7    *Q.*  All right.  Well, let's look at one more with respect to at

8    least PRED-MOXI.  Let's pull up DX-005.

9        And you recognize DX-005 as more communications between your

10   company and the USPTO related to the PRED-MOXI mark?

11   **A.  Yes.**

12   *Q.*  Okay.  And if you look at the second page, or go to 002, you

13   see it says, Section 2(e)(1)refusal, mark is merely descriptive.

14       Do you see that?

15   **A.  Where is that?**

16   *Q.*  If you can highlight, right up there --

17   **A.  Oh, yes, I see it.**

18   *Q.*  And the USPTO is telling your company that it's refusing

19   registration for this mark because the applied-for mark merely

20   describes an ingredient of applicant's goods; correct?

21   **A.  In this document, that's what that says.  I don't deny that.**

22   *Q.*  And it goes on to say, In the present case, applicant seeks

23   to register its mark, PRED-MOXI, do you see that, for

24   pharmaceutical compositions for ocular or intraocular surgery?

25   **A.  Yes.**

**MARK BAUM - CROSS-EXAM (MR. LIDDIARD)**

1    *Q.*   Are you with me?

2    **A.**   **Pardon me, yes.**

3    *Q.*   Okay.  And then underneath that, it says, A term that

4    describes an ingredient of the goods is merely descriptive.

5      Do you see that?

6    **A.**   **Where is that?  Oh.  A term that -- yes.  Like I said, this**

7    **is a back and forth between the lawyers and the USPTO.  It's a**

8    **small part --**

9        ***THE COURT:***   I don't think there's a question pending.

10   Wait for the question.

11        ***THE WITNESS:***   Oh, pardon me.

12   *BY MR. LIDDIARD:*

13   *Q.*   Let me rephrase.

14        ***MR. LIDDIARD:***   Before I forget, I would like to move

15   DX-5 into evidence.

16        ***THE COURT:***   Any objection to 5?

17        ***MR. WESLEY:***   No objection.

18        ***THE COURT:***   It may be admitted.

19     ***(Exhibit DX-5 admitted.)***

20   *BY MR. LIDDIARD:*

21   *Q.*   I'll withdraw my prior question, and I'll ask you another

22   one.  But still looking at DX-5, 002, still that paragraph, if

23   you go down to -- you see where it says, In this instance?

24   Scroll down.

25     Do you see -- if you can highlight, In this instance,

**MARK BAUM - CROSS-EXAM (MR. LIDDIARD)**

1    applicant indicates that PRED-MOXI is a -- and then it's in

2    bold -- term of art.

3        And the reference to the applicant here, that's Imprimis;

4    correct?

5    **A.  Yes.**

6    *Q.*  And it goes on to say, Is a term of art in the applicant's

7    industry for compounded formulations that include the active

8    ingredients prednisolone and moxifloxacin for ocular or

9    intraocular surgery.

10        Do you see that?

11    **A.  Yes.**

12    *Q.*  And it goes on to say, in connection with denying this

13    registration, that, Further, the attached evidence from Ocular

14    Science establishes that the term PRED-MOXI is used in

15    connection with pharmaceutical compounds containing the active

16    ingredients prednisolone and moxifloxacin.

17        Do you see that?

18    **A.  Yes.**

19    *Q.*  So as of this particular point in time, and this is 2015,

20    you are aware that my client was selling PRED-MOXI; correct?

21    **A.  I -- I don't know that I even reviewed this or got this.**

22        ***THE COURT:***  The question is, were you aware as of 2015

23    that Ocular Science was selling PRED-MOXI?

24        ***THE WITNESS:***  I was aware that they were selling a

25    prednisolone moxifloxacin formulation, yes.

**MARK BAUM - CROSS-EXAM (MR. LIDDIARD)**

1   *BY MR. LIDDIARD:*

2   *Q.*  And they were calling it PRED-MOXI; correct?

3   **A.  I don't recall how they were marketing it, no.**

4   *Q.*  In follow-on applications that your company filed with the

5   PTO, isn't it true that your company did not acknowledge to the

6   PTO that the abbreviations for the active pharmaceutical

7   ingredients in the compounded formulations were terms of art?

8   **A.  I don't know.**

9   *Q.*  For example, when your company filed an application for

10  DEX-MOXI with the USPTO, didn't it tell the USPTO at that time

11  that DEX-MOXI is not a term of art in the industry?

12  **A.  I don't know.**

13  *Q.*  Let's pull up DX-15.  And DX-15 is communications between

14  your company and the USPTO with respect to DEX-MOXI.

15      Do you see that?

16  **A.  Yes.**

17          *MR. LIDDIARD:*  I'd like to move DX-15 into evidence.

18          *THE COURT:*  Any objection?

19          *MR. WESLEY:*  No objection.

20          *THE COURT:*  15 may be admitted.

21      **(Exhibit DX-15 admitted.)**

22  *BY MR. LIDDIARD:*

23  *Q.*  And let's look at the second page, 002, under the heading

24  Additional Statements.

25      And it says in the second -- do you see where it says,

**MARK BAUM - CROSS-EXAM (MR. LIDDIARD)**

1    trademark registrations for three of Imprimis' applications,

2    TIM-LAT, PRED-GATI-BROM, and TIM-BRIM-DOR-LAT.

3        Do you recall that?

4    *A.  I don't know, no.*

5    *Q.*  Let's pull up -- let's look at the TIM-LAT documents, DX-31.

6        And do you recognize DX-31 as communications between your

7    company and the USPTO with respect to the TIM-LAT mark?

8    *A.  Is this -- this is the one with 32 different attachments?*

9    *Q.*  Correct.

10   *A.  Yes.*

11            *MR. LIDDIARD:*  Move DX-31 into evidence.

12            *THE COURT:*  Any objection?

13            *MR. WESLEY:*  No objection.

14            *THE COURT:*  31 may be admitted.

15       *(Exhibit DX-31 admitted.)*

16   *BY MR. LIDDIARD:*

17   *Q.*  If we look at .002 -- sorry -- page .002, do you see where

18   there's a Section 2(e)(1) refusal heading, mark is merely

19   descriptive?  Do you see that?

20   *A.  Yes.*

21   *Q.*  And it says -- The PTO says, Registration is refused because

22   the applied-for mark merely describes an ingredients -- an

23   ingredient of applicant's goods.

24       Do you see that?

25   *A.  Yes.*

1    **MR. ARLEDGE:**  If that's what the Court wants us to do,

2    we're happy to do it.

3    **THE COURT:**  I think it will be much clearer since we've

4    got all these.  I don't know how many exhibits you have that are

5    in the 1 through 132 that you're planning on introducing.

6    Hopefully, it won't be many.

7    **MR. ARLEDGE:**  I don't know either.  But we can figure

8    it out.

9    **THE COURT:**  All right.  We're in recess until tomorrow

10   morning.

11   **(Proceedings adjourned at 4:00 p.m.)**

12   **\*\*\***

13   *REPORTER'S CERTIFICATE*

14        I, Anne Roldan, certify that I am a duly qualified
     and acting Official Court Reporter for the United States
15   District Court, that the foregoing is a true and accurate
     transcript of the proceedings as taken by me in the
16   above-entitled matter on November 12, 2024; and that the format
     used complies with the rules and requirements of the United
17   States Judicial Conference.

18   Date:  November 13, 2024

19

20   *Anne Roldan, RMR, CRR, CSR 13095*

21

22

23

24

25

1   UNITED STATES DISTRICT COURT

2   FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3
    IMPRIMISRX, LLC,                    )   Case No. 21-cv-1305-BAS
4                                       )
                        Plaintiff,      )   November 13, 2024
5        vs.                            )
                                        )   Jury Trial, Day 2
6   OSRX, INC., et al.,                 )
                                        )
7                       Defendant.      )
    _____)
8                                       )
    AND RELATED CROSS-ACTION            )
9   _____)

10

11          REPORTER'S TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE CYNTHIA A. BASHANT
12             UNITED STATES DISTRICT JUDGE

13          VOLUME 2, PAGES 212 - 447

14

15          (APPEARANCES ON FOLLOWING PAGE)

16

17

18

19

20

21  REPORTED BY:

22  ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
    U.S. OFFICIAL COURT REPORTER
23  U.S. District Court Clerk's Office
    333 West Broadway, Suite 420
24  San Diego, California  92101

25  Reported stenographically; transcribed with CAT software.

**ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)**

1    part.

2              *MR. LIDDIARD:* It's not impeachment.  I just read it.

3              *THE COURT:* I don't have it in front of me.

4              *MR. ARLEDGE:* He is also a party witness, so it doesn't

5    have to be.

6              *THE COURT:* Let me see the transcript.  Thank you.

7    Page 84?

8              *MR. ARLEDGE:* Eighty-four, lines 4 through 18.

9              *THE COURT:* Overruled.  But just, I would say, lines 10

10   through 12, really.

11             *MR. ARLEDGE:* I was thinking at least 10 through 15, if

12   that's all right, your Honor.

13             *THE COURT:* That's fine.

14        **(As read by Mr. Arledge:)**

15             **"A.  For the longest time, Imprimis had kind of a**

16             **stranglehold, a monopoly on the compounded**

17             **ophthalmologic space.  If you didn't want to use**

18             **FDA-approved products or Big Pharma products,**

19             **however you want to characterize them, you really**

20             **had one choice for postoperative cataract surgery."**

21   *BY MR. ARLEDGE:*

22   *Q.* That was your testimony?

23   *A.* **It was.**

24   *Q.* Okay.

25   *A.* **Do you want me to explain it?  Because I feel like the**

**ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)**

1   **creative latitude you have when deciding which one goes where or**

2   **how you place them.**

3       **We follow the way our medications flow on the label when we**

4   **spell out the entire active pharmaceutical ingredient in the**

5   **concentration.  And then that flow is dictated by a regulatory**

6   **team, which I'm not a regulatory expert.  You guys can hear from**

7   **Amy Frost later, and she can probably explain more specifically**

8   **why -- what those guidance are.**

9       **But the abbreviations would just follow the standard listing**

10  **of the medications on our label, so...**

11  *Q.*  Mr. Garner, do you not want to answer the question I asked?

12  Because you changed it.

13  *A.*  **I think I am answering your question.**

14  *Q.*  Let's try it again.

15  What I'm asking you is about industry standard.  I'm not

16  asking about regs.  I'm not asking about Amy Frost.  She can

17  testify for herself.

18  I'm asking you whether you when you joined OSRX, whether

19  TIM-BRIM-DOR-LAT was the industry standard way of referring to

20  that combination of drugs?

21  *A.*  **It would be the standard way to refer to the abbreviated**

22  **version of those medications combined into one compound --**

23  *Q.*  Okay.

24  *A.*  **-- based on the flow of the medications.**

25  *Q.*  Now, can we agree that TIM-BRIM-DOR-LAT was a product that

**ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)**

1  Imprimis also sold?

2  **A.  Yes.**

3  *Q.*  And they sold it before OSRX.

4  **A.  I don't have the dates in front of me.  It's very likely**

5  **could be true, yes.**

6  *Q.*  And they came up with that combination in that order before

7  OSRX.

8  **A.  They came up with that combination?**

9  *Q.*  Yes, in that order before OSRX.

10  **A.  They compounded it, yes.**

11  *Q.*  In fact, if we look at this list of drugs, with every single

12  one of them, Imprimis was the first company to sell the product;

13  right?

14  **A.  I'm not sure that's correct.  I see DEX-MOXI on your list,**

15  **and I believe we developed that product first.**

16  *Q.*  So you think you were first on DEX-MOXI?

17  **A.  I do.**

18  *Q.*  Okay.  How about the other eight?

19  **A.  They got them to market before we did, yes.**

20  *Q.*  And they -- and they came up with the specific combination

21  of abbreviations, as you're calling them, before you did; right?

22  **A.  They abbreviated the medications, yes.**

23  *Q.*  And put them in that order; right?

24  **A.  The order that's dictated by guidance, correct.**

25  *Q.*  Listen, are you a regulatory expert?

ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)

1  **A.  I'm not.**

2  *Q.*  You told me that Amy Frost is going to testify later; right?

3  **A.  I did.**

4  *Q.*  Can we wait for her to talk about that area of expertise and

5  have you focus on my questions?

6  **A.  Whatever you need.**

7  *Q.*  Okay.  Now, these names that we're looking at here, these

8  are names that Imprimis was spending money to market; right?

9  **A.  They were marketing their formulations, yes.**

10  *Q.*  And by the time -- by the time you became an employee of

11  OSRX, with some of these formulations, they had been -- they had

12  been marketing them for at least a few years.

13  **A.  Yes.**

14  *Q.*  And spent a lot of money doing it; right?

15  **A.  I would assume so.**

16  *Q.*  Now, when you started full time at OSRX in 2019, it seemed

17  to you that using these particular combinations of names would

18  make it much easier to talk to doctors about the drugs; right?

19  **A.  Absolutely.  That's the manner in which they speak about the**

20  **drugs.  That's the reason Imprimis combined them the way they**

21  **did.**

22  *Q.*  Your perception was that everybody in the industry would use

23  TIM-PRIM-DOR-LAT for that combination of drugs; right?

24  **A.  If a doctor was speaking to you shorthand, which physicians**

25  **do daily, it's their standard procedure.  If they were asking**

**ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)**

1 **for a combination of those medications, yes, they would**

2 **abbreviate it that way in shorthand.**

3 *Q.* And that's true of all of the names on our list here; right?

4 *A.* **Yes.**

5 *Q.* All right.  But there was a problem for you, and the problem

6 was that you understood that Imprimis had trademarks on these

7 names, and you knew you weren't supposed to use them; isn't that

8 right?

9 *A.* **So I first became somewhat aware -- again, I'm not a -- I'm**

10 **not an expert on trademarks.  I'm certainly not a trademark**

11 **attorney.  But in 2019, late 2019, I did notice they started**

12 **using the registered trademarks, similar to the TM on these,**

13 **which was a huge surprise to me, again, because these are**

14 **generic and they're descriptive by nature.  But I did become**

15 **aware they were trying to lay claim to that, yes.**

16 *Q.* Well, not only did you know they were trying to lay claim to

17 it, you knew that they did, in fact, have trademark

18 registrations on some or all of these names at the time; right?

19 *A.* **I saw the symbols.**

20 *Q.* And what you knew was that you weren't supposed to be using

21 them as a result; right?

22 *A.* **That's not true.  I think it was -- there were situations**

23 **where you had to decide if you want to be effective or right.**

24 **Again, I think the validity and the veracity of these trademarks**

25 **is absolutely weak, based on the fact, again, that these are**

ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)

1    industry standard descriptions describing -- they're just

2    describing active pharmaceutical ingredients in the drop itself,

3    and the manner in which physicians, veterinarians, anyone in the

4    medical field using PRED, for example --

5         I grew up on a ranch.  I heard the word PRED all the time

6    because it's used for cattle.  DEX, used for horses.  Short for

7    dexamethasone.  So we always challenged the veracity of the

8    trademarks.  And there were situations where it was worth using

9    the abbreviations, and there were situations where it wasn't,

10   because we have a very litigious competitor, as you guys can

11   see.  It's why we're here today.

12   Q.  Very litigious competitor, you knew that back in 2019?

13   A.  I did.

14   Q.  You were concerned you might get sued by Imprimis back

15   in 2019?

16   A.  We'd already been sued by Imprimis in 2017.  My first intro

17   to the company, I actually met the CEO the day before.  First

18   time Tony and I ever made was the day before he was heading down

19   to San Diego for a trademark infringement trial with Imprimis.

20   Q.  Okay.  And that's why I want you to look at what's been

21   marked as Exhibit 202.

22        Exhibit 202 is an email you sent also to Annika Curren,

23   again, the outside marketing person that you used; right?

24   A.  Correct.

25             MR. ARLEDGE:  Okay.  I'd move to admit Exhibit 202.

**ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)**

1        *MR. LIDDIARD:*  No objection.

2        *THE COURT:*  202?

3        *MR. ARLEDGE:*  202.

4        *THE COURT:*  It may be admitted.

5      *(Exhibit 202 admitted.)*

6    *BY MR. ARLEDGE:*

7    Q.  In this email, Annika Curren is doing some marketing work

8    for OSRX.

9        Can we agree on that?

10   **A.  Yes.  She's putting together a Google Asset ad buy, yes.**

11   Q.  I want to look at what you said at the very top of the page

12   on October 21st, 2019.  Let's blow that up.

13       You tell Annika Curren, "Also, PRED-GATI-BROM, PRED-BROM is

14   trademarked by Imprimis.  We cannot use it in our ad copy."

15       Do you see that?

16   **A.  I do.**

17   Q.  Okay.  And so you instructed her not to use it?

18   **A.  In that instance.  I think it's a perfect example, actually,**

19   **of what I was just saying.  There are situations where you need**

20   **to be effective or you need to be right.  And I was choosing to**

21   **be effective.  We were smaller -- a much smaller company**

22   **in 2019.**

23       **Litigation is extremely expensive.  It's why I believe we**

24   **get put through it quite often.  It can be a competitive tactic,**

25   **especially with a smaller company.  And my goal here in a very**

ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)

1  **widely publicized ad buy on Google, where we were bidding on**

2  **competitor ad words, was to not put us in a situation to give**

3  **our competitor an opening to sue us.**

4  *Q.* Sir, I think I asked you whether you said that, and you

5  spoke for about 45 seconds or a minute.  Let me ask you if you

6  can do this for me.  All of the facts that you want to talk

7  about, they're going to be able to ask you about all that.

8      You know that; right?

9  *A.* **I do.**

10  *Q.* Okay.  Because it's going to take us forever if you can't

11  just focus on my question.

12      Does that make sense?

13  *A.* **It does.**

14  *Q.* All right.  Now, what you did mention a second ago is that

15  you had concerns that the use of these terms might get you sued.

16  *A.* **I did.**

17  *Q.* And so in this particular case, you told Annika, "We can't

18  use them."  Yes?

19  *A.* **Correct.**

20  *Q.* But in other cases, you did continue to use them.

21  *A.* **The PRED-GATI-BROM with the hyphens displayed here, or are**

22  **you referring to the plus symbols in between?**

23  *Q.* Both.

24  *A.* **There are instances we've used both forms of the**

25  **abbreviation, yes.**

ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)

1  *Q.*  To this day, if we go to the OSRX website, you're still

2  using many of these terms; right?

3  **A.  With one distinction.  Ours have plus symbols in between.**

4  **And, again, that was our way of extending kind of an olive**

5  **branch to our competitor where, again, we don't -- we challenged**

6  **the veracity of their trademarks.**

7  **We think they're descriptive.  We know they're descriptive.**

8  **However, we'll put a plus symbol in between ours if that helps**

9  **differentiate in their mind.  And hopefully, again, we won't get**

10 **sued and have to go through that rigmarole.**

11 *Q.*  All right.  So let's explain to everybody what you're

12 talking about.

13 You continued to use PRED-GATI-BROM; right?

14 **A.  With a plus symbol separating the ingredients, yes.**

15 *Q.*  Well, hold on a second.

16 I think we'll see that you continued to use it even without

17 the plus symbol in some circumstances; right?

18 **A.  There are probably some.**

19 *Q.*  Yeah, there are.

20 But what you're saying is --

21 *THE COURT:*  Are you testifying, Counsel, or are you

22 asking questions about it?

23 *MR. ARLEDGE:*  I'm asking questions about it.

24 *THE COURT:*  Okay.

25 ///

ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)

1    *BY MR. ARLEDGE:*

2    *Q.* Well, but what you're saying is that you made a -- you made

3    a change, at least in some of your documentation, as to how you

4    refer to these names; right?

5    **A. Are you speaking of the specific instance you have on the**

6    **screen or --**

7    *Q.* I'm speaking of the thing you just talked about a minute

8    ago, the plus.

9    **A. Yeah. We got sued in '21, and so we made a decision at that**

10   **point to make sure we put a plus between everything. Again, we**

11   **weren't going to back off the abbreviations, because, again,**

12   **they're descriptive, industry standard abbreviations for those**

13   **medications, and we're not going to be iced out of the ability**

14   **to communicate with our customers on their level.**

15   *Q.* So this is what you did (*indicating*); right? Put a plus

16   there?

17   **A. Correct.**

18   *Q.* What was the name of your product prior to putting the plus

19   between those? What did you call it?

20   **A. Well, if you're speaking about formally, it would be**

21   **prednisolone, gatifloxacin, and bromfenac. You can put the**

22   **concentrations there. Obviously, they each have their own**

23   **unique concentration.**

24   **And, again, they're listed in that order, as I understand**

25   **it, due to their concentrations. PRED is the strongest at**

**ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)**

1  **1 percent, and then it descends down from there all the way to**
2  **BROM.  If we're speaking about it shorthand, it would be**
3  **PRED-GATI-BROM.**

4  *Q.*  You're filibustering with me again.  I asked you how you

5  pronounce this.

6      What's the name of -- what's the name of the term when you

7  have -- when you have the dashes?  How do you say that?

8  *A.*  **PRED-GATI-BROM.**

9  *Q.*  And then you added the pluses, and how did you say it then?

10 *A.*  **PRED-GATI-BROM.**

11 *Q.*  So we're talking about the same three terms; right?

12 *A.*  **Yes.**

13 *Q.*  In the same order; yes?

14 *A.*  **Yes.**

15 *Q.*  And said exactly the same way; right?

16 *A.*  **Yes.**

17 *Q.*  Okay.  Now, all the stuff that -- all the stuff you keep

18 wanting to tell me about how Imprimis is wrong that they own

19 this mark, did OSRX actually go to the USPTO and tell them they

20 needed that to stop?

21 *A.*  **I'm not sure.**

22 *Q.*  You've never asked that question?

23 *A.*  **I haven't.**

24 *Q.*  Okay.  Well, I want to look at -- I want to look at

25 Exhibit -- I want to look at what's been marked as Exhibit 2115.

**ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)**

1  *Q.*  And you can advertise on the site also; yes?

2  **A.  Yes.**

3  *Q.*  Okay.  And so this email trail is discussions between you

4  and Dr. Wright about putting OSRX's medications up on his

5  ODspecs website?

6  **A.  Correct.**

7  *Q.*  Okay.  And one of the products that you were talking about

8  with him -- oh, I'm sorry.

9          ***MR. ARLEDGE:***  Your Honor, I move to admit Exhibit 2115.

10          ***THE COURT:***  Any objection?

11          ***MR. LIDDIARD:***  No objection.

12          ***THE COURT:***  2115 may be admitted.

13      ***(Exhibit 2115 admitted.)***

14  ***BY MR. ARLEDGE:***

15  *Q.*  All right.  Some of the products you're talking about here

16  are the TIM-BRIM-DOR-LAT, TIM-BRIM-DOR, these products here;

17  right?

18  **A.  Correct.**

19          ***MR. ARLEDGE:***  Okay.  I want to go to -- I want to go to

20  the second page of this email trail, George.

21          Okay.  Let's just blow up the top -- the top -- the

22  portion that Dr. Wright is writing at the top of page 2.

23  ***BY MR. ARLEDGE:***

24  *Q.*  Okay.  So Dr. Wright is telling you that he's added the

25  glaucoma meds.  And then he tells you, "The Imprimis products

1  have trademarked product names."

2      Now, you knew that; right?

3  **A.  Correct.**

4  *Q.*  Then he says, "The Omni products do not that I could find."

5      There, he is referring to your products; right?

6  **A.  Yes.**

7  *Q.*  And so he says, "I used BrimoDor, TimoBrimoDor,

8  TimoBrimoDorzoLat as my server file names.  No doubt you've

9  considered the issue.  Let me know if you want any changes."

10      Do you see that?

11  **A.  I do.**

12  *Q.*  Let's unpack that.

13      What he's suggesting is that what he would put up on his

14  website are different abbreviations than what we see up on that

15  list; right?

16  **A.  He is offering alternative, yes.**

17  *Q.*  Yeah.

18      And the reason he is offering the alternative is because

19  Dr. Wright knows that Imprimis actually has trademarks on those

20  names?

21          *MR. LIDDIARD:*  Objection.  Calls for speculation.

22          *THE COURT:*  Sustained.

23  *BY MR. ARLEDGE:*

24  *Q.*  Your understanding was that he was suggesting you use

25  different names because of the trademark that Imprimis had on

ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)

1    the products; right?

2    **A.   He was offering an alternative for his site, because I'm**

3    **sure he saw the symbols, I'm assuming.   And Imprimis may also**

4    **advertise on that site.   So he was offering something that would**

5    **keep us from getting sued.**

6    *Q.* He is an eye doctor, Dr. Wright; yes?

7    **A.   Yeah.   He's an OD.**

8    *Q.* He's an OD that didn't know what the standard industry terms

9    are that everybody uses?

10        *MR. LIDDIARD:* Objection.  Argumentative.

11        *THE COURT:* Sustained.

12   *BY MR. ARLEDGE:*

13   *Q.* Well, I mean, he was suggesting -- he was suggesting terms

14   that nobody in the industry uses; right?

15   **A.   He was actually --**

16        *MR. LIDDIARD:* Objection.  Calls for speculation.

17        *THE WITNESS:* He was --

18        *THE COURT:* Wait.  Overruled.  Is that correct, he was

19   suggesting terms that nobody in the industry uses?

20        *THE WITNESS:* I have not seen those terms used, no.

21   *BY MR. ARLEDGE:*

22   *Q.* And he says, "No doubt you've considered the issue."

23        You understood him to be referring to the trademark issue?

24   **A.   The issue of the standard abbreviated terms Imprimis has a**

25   **trademark registration on.   And that causes an issue, because he**

1   was trying to list them in the industry standard way and ran

2   into this issue.  That's what he's referencing.

3   *Q.* Hold on.  He was trying to list them in the industry

4   standard way.

5       What are you talking about?

6   *A.*  **This email was sent in response to when he was going to**

7   **place the products on his website.  He was going to obviously**

8   **list these very, very long APIs in abbreviated format to fit his**

9   **format on the site.  There is limited space.**

10      **And he clearly saw that there is a registered trademark on**

11  **the industry standard way that you would abbreviate these**

12  **medication combinations.  And he's coming back and saying, I'm**

13  **not sure if you're aware of this.**

14      **This was unprompted, as far as I can tell.  So he had**

15  **actually -- this tells me he was trying to list it in the manner**

16  **Imprimis has them listed, because it is a standard, and he ran**

17  **into that registered trademark, and he is offering a**

18  **workaround -- a unique workaround for that.  That's the way I**

19  **read this email.**

20  *Q.* You said something interesting  "This was unprompted," you

21  said.  Right?

22  *A.*  **The suggestions?**

23  *Q.* Yeah.

24  *A.*  **I don't believe I asked him for suggestions.  I don't recall**

25  **asking him for those.**

ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)

1   *Q.* Right. His suggestions to you were unprompted.

2   **A. I believe so. I don't have the entire email in front of me,**

3   **but that would be my recollection.**

4   *Q.* He saw that Imprimis had trademarks on these names and

5   assumed that OSRX would want to respect the trademarks and use

6   something different; right?

7   **A. You'd have to ask him. He's offering an option -- an**

8   **alternative to us.**

9   *Q.* And he literally -- he literally used these other -- these

10  other terms on the website and then asked you if that was okay;

11  right?

12  **A. He did. Not all the terms are different. If you look at**

13  **it, I can still see LAT, still see DOR. And then he modified,**

14  **looks like TIM and BRIM and put an O at the end, the next letter**

15  **in the spelling.**

16  *Q.* And was he right, you had, in fact, considered the issue?

17  **A. Considered whether or not we could use the industry standard**

18  **abbreviations? Yeah, it was an issue for us. We couldn't --**

19  **again, we're having a hard time speaking to our customers in the**

20  **manner in which they speak.**

21  *Q.* I'm curious about that.

22  You were unable to identify TIM-BRIM-DOR-LAT unless you use

23  TIM-BRIM-DOR-LAT?

24  **A. It's the most efficient way to communicate when you're**

25  **shorthand or in casual conversations or emails or restricted ad**

ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)

1  **space.  It's far more efficient to abbreviate those extremely**

2  **long, active pharmaceutical ingredients.  And, again, it's the**

3  **way doctors speak to them in shorthand as well.  Doctors, again,**

4  **live on shorthand.**

5  *Q.* Again, all of the doctors use these terms on that page.

6      We can agree on that; right?

7  **A.  If they're ordering those medications, they're going to ask**

8  **us for those medications, whether it's in long form or short**

9  **form.  If it's short form, I agree that would be the way they'd**

10 **ask.**

11 *Q.* At some point in some way, these terms became the industry

12 standard.

13     We can agree on that; right?

14 **A.  Yes.**

15 *Q.* And because everybody knew these names, these are the names

16 that doctors liked to use; right?

17 **A.  When you say "names," we need to parse this out.  Are you**

18 **talking about MOXI or PRED, or are you talking about the**

19 **combination of multiple -- multiple medications?**

20 *Q.* I'm talking about literally these medication names that are

21 listed here, where you're sticking different pieces together.

22 Okay?

23     And all I'm asking you to agree with me on, sir, is that at

24 some point, in some way, these became the terms that the doctors

25 started to use.  Right?

**ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)**

1  *A.  They would use those terms if they were asking for that*
2  *compounded medication, yes.*

3  *Q.*  And because the doctors used these terms, you wanted to use
4  these terms; yes?

5  *A.  Correct.*

6  *Q.*  One of the benefits was that it saves you a little bit of
7  time when it comes to typing things out; right?  Because you
8  don't have to type out the long name.  You can type out the
9  short name; yes?

10  *A.  Correct.*

11  *Q.*  Okay.  The other benefit was, though, that if you want to
12  sell those combinations, an email that uses those terms is one
13  that's more likely to be responded to; yeah?

14  *A.  I couldn't -- I couldn't agree with that.  I don't have any*
15  *data to support that.*

16  *Q.*  Okay.  So is it your position that using "TimoBrimoDorzoLat"
17  would have the same impact in the marketplace?

18  *A.  I haven't measured that specifically.*

19  *Q.*  So you don't know one way or the other?

20  *A.  In that instance you're referencing, no.*

21  *Q.*  Okay.  But what you did tell Dr. Wright is you did not want
22  to use his alternatives; right?

23  *A.  Could I see the rest of the email?*

24  *Q.*  You can.  Let's go to his response.

25        *MR. ARLEDGE:*  It's up, the next page.  Here we are.

**ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)**

1   Let's blow up this portion right here.

2           *THE WITNESS:*  I see it now.

3   *BY MR. ARLEDGE:*

4   *Q.*  Your response to him was that you didn't want to use his

5   alternatives to avoid the trademark issue.

6       You wanted to use the names that Imprimis uses, just with a

7   plus in between them; yes?

8   *A.  I wanted to use the standard abbreviations, again, that are*

9   **used in the industry, because you have more credibility with**

10  **doctors if you are using the correct abbreviations that they use**

11  **versus some wonky kind of exaggerated version like Dr. Wright**

12  **was offering in his email.**

13  *Q.*  Okay.  So you do agree with me that it's useful in your

14  sales to use the same terms that Imprimis was using, rather than

15  a made-up term like what Dr. Wright was using?

16  *A.  What I said was, again, it gives you credibility with the*

17  **doctors, and so you're managing that perception in that**

18  **instance.  I don't have statistics that I could point to, to**

19  **your earlier question, is what I was responding to there.**

20  *Q.*  You prefer your marketing to be effective rather than

21  ineffective; right?

22  *A.  I sure hope so.*

23  *Q.*  And that's one of the reasons why you wanted to use the

24  specific combinations in the specific order that we see up on

25  the board here; right?

ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)

1    *A.  I feel like I've answered that.*

2    *Q.*  The answer is "yes"?

3    *A.  Again, you're going to accuse me of going into too much*

4    *context, but the reason that we want to use them situationally,*

5    *there are situations where we use the entire API name, and we*

6    *put the concentrations, and we go as far as saying prednisolone*

7    *phosphate, moxifloxacin, HCl -- oh, I'm sorry.*

8    *And then there are situations that call for abbreviated*

9    *versions of those medications.*

10   *Q.*  Hey, Mr. Garner, have you ever looked to see whether there

11   are other abbreviations that are used for these drugs?

12   *A.  No, I haven't.  Not that I recall.*

13   *Q.*  Are there other abbreviations that can be used for some of

14   these drugs?

15   *A.  They're not the abbreviations that I hear.*

16   *Q.*  I know that you hear the names that Imprimis uses.  I'm

17   asking you whether there are also other abbreviations that are

18   used in the medical world.

19   Do you know?

20   *A.  You would have to ask a physician that question.  But I'm*

21   *telling you, based on my experience, what I'm hearing and what*

22   *I'm not hearing.*

23   *What I'm hearing doctors say and what I've heard doctors*

24   *say, again, since going back to when I, you know, was working*

25   *with veterinarians -- I grew up on a ranch -- the word PRED was*

**ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)**

1  *Q.* Which ones did you have a role in?

2  **A. Anything that came on post-2019, on some level.**

3  *Q.* Which ones were those?

4  **A. PRED-MOXI-BROM, TROP-PHEN, BRIM-DOR, things like that.**

5  *Q.* By the time those came around, OSRX had already adopted a

6  naming style for its drugs; right?

7  **A. Like I said earlier, the naming style is actually dictated**

8  **by the way they're listed on our label when you spell out the**

9  **entire API, and so we just follow that with the shorthand, yeah.**

10  *Q.* No, let me ask you again.

11  By the time those later drugs were named, OSRX had already

12  adopted a naming convention for its drugs, a way of naming them;

13  right?

14  **A. I think I just answered that question.**

15  *Q.* The answer was yes; right?

16  **A. The answer was we follow the way it's listed on our labels.**

17  *Q.* All of the discussion you've been giving me about the

18  reasons why OSRX named their drugs the way they named them, for

19  most of the drugs, it came before you were even involved; right?

20  **A. There were medications that predated my involvement with the**

21  **company, yes.**

22  *Q.* So every time I asked you a question, and you started

23  talking about how we did it because it's industry standard, and

24  this and that, that was all stuff that you weren't even a part

25  of; right?

**ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)**

1    **A. A part of -- can you re-ask that question?**

2    *Q.* Well, what I'm saying is you kept wanting to interject

3    things that you actually didn't have personal knowledge of,

4    because it all came before you were there; right?

5    **A. There were medications that predated me, correct.**

6    *Q.* Okay.  The person who decided what order these drugs would

7    go on the drug label, was that you or was that somebody else?

8    **A. It was not me.**

9    *Q.* All right.  Were you around when that decision was made?

10    **A. Again, medications that we formulated prior to my arrival, I**

11    **wouldn't have been involved in or had any tangential awareness**

12    **of.  Medications that came during my employment, I would have**

13    **had awareness of, yes.**

14    *Q.* Awareness of, but you weren't the decision-maker even on

15    those; right?

16    **A. In the order they're listed, correct.**

17    *Q.* All right.  Let me ask you this.  Let's take -- let's take

18    PRED-MOXI-BROM for just a second.  Okay.  Now, let's assume for

19    a second that in naming its products, that OSRX really thought

20    it had to use abbreviations.  Okay?  Let's just start with that.

21    And let's assume that OSRX believed it had to use these specific

22    abbreviations rather than others that might be available.

23       Do you follow me so far?

24    **A. I'm following you.**

25    *Q.* Okay.  Now, even under those circumstances, you still have

**ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)**

1    six different possible combinations of these three; right?

2    **A.  Yes.  Mathematically, yes.**

3    *Q.*  Yeah.  I mean, I think three factorial is what they taught

4    me in Algebra class, but that just means if you have three items

5    and you're trying to figure out the different possible

6    combinations, you multiply three times two times one, and that

7    gives you the answer; right?

8    **A.  You're smarter than I am.  I'll take your word for it.**

9    *Q.*  I had a good math teacher.

10       Okay.  So when it comes to PRED-MOXI-BROM, there were six

11   different combinations, even if you assumed had you to use

12   abbreviations and you had to use these abbreviations.

13       Do you agree with that?

14   **A.  Mathematically, there are that many combinations.  However,**

15   **like I said, you're leaving out a key part, which was we didn't**

16   **have the luxury.  Because like I said, again, it's -- as I**

17   **believe, it's dictated by regulatory guidance that, again, our**

18   **regulatory person can speak to.**

19   *Q.*  Sir --

20   **A.  So we didn't have the next four -- or other combinations**

21   **because they weren't options for us.**

22   *Q.*  Again, you're testifying for Ms. Frost.  Can you not do

23   that?

24            *THE COURT:*  Ask your question, Counsel.

25            *MR. ARLEDGE:*  All right.

ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)

1   *BY MR. ARLEDGE:*

2   *Q.* Now, if we -- if we look at -- oh, and the combination

3   that -- the combination that OSRX settled upon of the six, it

4   was exactly the same one that Imprimis uses; yes?

5   **A. The order is the same, yes.**

6   *Q.* All right.  Now, if we look at TIM-BRIM-DOR-LAT, now we have

7   four different terms; right?

8   **A. Yes.**

9   *Q.* That means four times three times two times one

10  combinations?

11  **A. You had the good math teacher, not me.**

12  *Q.* Even if -- even if we believe that you had to use

13  abbreviations, even if we believed had you to use those specific

14  abbreviations, that means there are 24 different combinations

15  that you could have come up with, with TIM-BRIM-DOR-LAT; right?

16  **A. If you're leaving out the piece that we had to list them in**

17  **a specific order, then, yes, you'd have that many mathematical**

18  **options.  But you keep leaving that piece out.**

19  *Q.* That's because that witness is going to testify later.

20      So I'm just asking you if we -- if we could combine them in

21  any order, there are 24 different combinations that are

22  possible; right?

23  **A. Mathematically, yes.**

24  *Q.* And you guys chose the exact same one that Imprimis uses;

25  right?

**ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)**

1   *Q.* You said olive branch, but is it possible that the reason

2   you added the plus is because at some point, you anticipated you

3   may have to sit in that seat, and you wanted to be able to tell

4   those people, Oh, we weren't using the same thing, we were using

5   something different? Isn't that the real reason?

6   *A.* No.

7       *MR. ARLEDGE:* All right. Do we have 2020 up?

8       *MR. LAIOLO:* *(Nods head.)*

9   *BY MR. ARLEDGE:*

10  *Q.* Okay. Sir, Exhibit 2020 is an email exchange involving a

11  Matt Gee.

12      Do you know who Matt Gee is?

13  *A.* **He is a former sales rep.**

14  *Q.* This is someone that reported to you at OSRX?

15  *A.* **He did not report directly to me. He reported to the Vice**

16  **President of Sales, Traci Inman, who reports to me.**

17  *Q.* Okay. So there's one layer between the two of you; yes?

18  *A.* **Yes.**

19  *Q.* And this is an email that Matt Gee exchanged with an Evelyn

20  Gordo-Silvas.

21      Do you see that?

22  *A.* **I do.**

23  *Q.* This is a customer or a potential customer of OSRX?

24  *A.* **I would have to read the whole email. I can't see all the**

25  **context of it.**

**ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)**

1    *Q.* Do you recognize that name?

2    **A. I don't.**

3    *Q.* All right. We'll go ahead and flip through and let you see

4    the email, then. Actually, you may have it in the hard copy.

5        *MR. ARLEDGE:* Your Honor, can I approach and turn to

6    the right page?

7        *THE COURT:* Sure. If it's 2020, can you find 2020 in

8    there?

9        *THE WITNESS:* Yeah.

10       *MR. ARLEDGE:* It will be 20 in that old book.

11       *THE COURT:* Twenty?

12       *MR. ARLEDGE:* Yeah, because we had to change the names.

13   Exhibit 20.

14       *THE WITNESS:* Okay.

15   *BY MR. ARLEDGE:*

16   *Q.* This is an email exchange between OSRX and a customer or

17   potential customer?

18   **A. Yeah. It appears to be an email exchange between our sales**

19   **rep and maybe a technician at an ophthalmologist's office.**

20       *MR. ARLEDGE:* I would move to admit Exhibit 2020,

21   your Honor.

22       *THE COURT:* Any objection?

23       *MR. LIDDIARD:* No objection.

24       *THE COURT:* It may be admitted.

25       *(Exhibit 2020 admitted.)*

ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)

1    *BY MR. ARLEDGE:*

2    *Q.* All right.  Mr. Gee writes, "I know you're swamped, so I'll

3    be brief.  My name is Matt Gee, your clinic's personal full-time

4    account executive with OSRX, the country's largest

5    ophthalmology-only compound pharmacy and maker of three-in-one

6    PRED-MOXI-BROM."

7         Do you see that?

8    *A.  I do.*

9    *Q.* Now, this is an example of OSRX's salespeople continuing to

10   use the names without the plus, but with the dash; yes?

11   **A.  It looks like he's -- yeah, he's abbreviating it here.**

12   *Q.* I didn't ask if it was abbreviated it.  I asked if he's

13   using PRED-MOXI-BROM with the dashes instead of the pluses.

14   **A.  He has a dash here.**

15   *Q.* Okay.  And this is something that your sales force continued

16   to do even after you adopted the plus?

17   **A.  The policy was that we were going to use a plus.  Obviously,**

18   **not all of my sales reps got that memo fully or adhered to it.**

19   **It's also very hard to -- it's the way, again, that physicians**

20   **will refer to it.  It's grammatically correct to use the dash.**

21        **So I get that it can be a little kludgy and take a little**

22   **time, maybe, to get used to using a symbol in the English**

23   **language versus just a dash.**

24   *Q.* Are you saying it's hard for your salespeople to follow your

25   instructions to put a plus?

ERIC GARNER - DIRECT EXAM (MR. ARLEDGE)

1    *A.  For this one, apparently it was, and he no longer works with*

2    *us for that reason.*

3    *Q.*  But you say that your training materials certainly made

4    clear that you were supposed to use a plus; yes?

5    *A.  It was a -- I believe it was a verbal policy that we put*

6    *out, yeah.*

7    *Q.*  Let's look at Exhibit 18.

8        Sir, turn to Exhibit 18 in that book, which is now 2018 in

9    the record.  I hate that I have to keep saying that.

10   *A.  (Complies.)*

11   *Q.*  Sir, Exhibit 2018 is a document sent by Traci Inman.

12       She was -- she was a Sales Supervisor at OSRX; is that

13   right?

14   *A.  Yeah.  At this point, she was a Senior Sales Rep, I believe.*

15   *Q.*  All right.  And it says, Subject, Training Docs.

16       These are training documents that were being provided to

17   OSRX's sales team?

18   *A.  Maybe I'm looking at the wrong thing.  You're referencing*

19   *Exhibit 19?*

20           *THE COURT:*  Eighteen.

21           *THE WITNESS:*  Eighteen.

22           *MR. ARLEDGE:*  Yep, 2018.

23   *BY MR. ARLEDGE:*

24   *Q.*  Do you see the subject of the email, "Training Docs"?

25   *A.  Oh, I see what you're talking about.  Yes.*

CYNTHIA WHITE - DIRECT EXAM (MR. LAIOLO)

1    Are these products important to Imprimis' business?

2  **A.  Very.**

3  *Q.*  Why?

4  **A.  They make up about 75 percent of our business.**

5  *Q.*  So I want to understand how much Imprimis spends on

6  marketing overall.

7    What is Imprimis' current marketing budget?

8  **A.  Our current marketing budget is about 1.3 million annually.**

9  *Q.*  And out of that 1.3 million annually, what percent is spent

10  on marketing these products?

11  **A.  I mean, it's the biggest portfolio we offer, so it's always**

12  **been a -- probably about 75 percent of the marketing budget.**

13  *Q.*  And as the VP, are you involved in deciding on the

14  strategies to market these products?

15  **A.  Yes.**

16  *Q.*  I want to talk about what those strategies are.

17    Could you describe for the members of the jury what sort of

18  strategies Imprimis uses to get those products out there into

19  the marketplace?

20  **A.  Sure.  At the beginning, I mean, we had to be very strategic**

21  **on, you know, how we really put out the awareness, because we**

22  **didn't have very big budgets.  And we knew we had to make sure**

23  **the doctors knew who we were, and knew what the products were**

24  **that we were selling and be able to recall them.  So we would**

25  **send emails, social, I would say digital, some print, and also**

**CYNTHIA WHITE - DIRECT EXAM (MR. LAIOLO)**

1  **conferences and trade shows we would attend.**

2  *Q.*  What about in-person sales calls, did you ever do any of

3  those?

4  **A.  Absolutely.**

5  *Q.*  And you, specifically, did you participate in in-person

6  sales calls?

7  **A.  Yes, I did.**

8  *Q.*  So where do these sales calls take place?

9  **A.  Anywhere -- all across the nation.  We have sales reps that**

10  **cover certain areas.**

11  *Q.*  Big cities, small towns?

12  **A.  Both, yeah.**

13  *Q.*  And in terms of who your customer base actually is, who does

14  Imprimis market these products to?

15  **A.  Primarily ophthalmologists and some optometrists.**

16  *Q.*  Do you have a rough percent breakdown between those two?

17  **A.  For these products, probably 90 percent ophthalmologists.**

18  *Q.*  Another method of marketing you mentioned was marketing

19  emails.

20  **A.  Mm-hmm.**

21  *Q.*  What do you mean by that?

22  **A.  Promotional emails we send out.  We have a database, and,**

23  **you know, that's one of the mass channels we use, say, where you**

24  **promote your products, the company brand.**

25  *Q.*  Now, Ms. White, I've got to confess, I receive a lot of

**CYNTHIA WHITE - DIRECT EXAM (MR. LAIOLO)**

1  marketing emails and I ignore a lot of them.

2      Does Imprimis actually receive responses to marketing emails

3  from their customers?

4  *A.* **We do.  And, I mean, the combination drop is probably our**

5  **most important product that really helped drive the awareness of**

6  **Imprimis as a brand.**

7  *Q.* And has Imprimis earned business as a result of these

8  marketing emails?

9  *A.* **Yes.**

10  *Q.* I want to show you what is marked as Plaintiff's

11  Exhibit 226.

12  *A.* **Is it going to be on the screen?**

13  *Q.* It will show up there in just a moment, yes.

14      Are you able to see it?

15  *A.* **Not yet.**

16  *Q.* There should be a binder on your desk that has the

17  plaintiff's exhibits.

18  *A.* **I see the other one.  I don't see the one with the 200 --**

19  *Q.* 226?

20  *A.* **Yeah.**

21  *Q.* Sorry, Ms. White.  One moment.

22          *THE COURT:*  There it goes.

23          *MR. LAIOLO:*  All right.

24          *THE COURT:*  Just wasn't hooked in.

25  ///

CYNTHIA WHITE - DIRECT EXAM (MR. LAIOLO)

1   **BY MR. LAIOLO:**

2   *Q.*  So can you see it on your screen now?

3   **A.  Yes.**

4   *Q.*  All right.  And looking through this document, what are we

5   looking at here?

6   **A.  It's our Combination Drop flyer.**

7   *Q.*  And what do you use this flyer for?

8   **A.  We send it to offices.  We provide it to them at**

9   **conferences, provide it to them at sales calls.**

10          *MR. LAIOLO:*  Move to admit Plaintiff's 226.

11          *THE COURT:*  Any objection?

12          *MR. TALPAS:*  No objection.

13          *THE COURT:*  226 may be admitted.

14      **(Exhibit 226 admitted.)**

15  **BY MR. LAIOLO:**

16  *Q.*  And, Ms. White, do these sales materials provide information

17  about Imprimis's products that are important to the customers?

18  **A.  Yes.**

19  *Q.*  I want to show you what's already in evidence as

20  Plaintiff's 227.

21      What are we looking at here, Ms. White?

22  **A.  This is our product catalog.**

23  *Q.*  And --

24  **A.  This -- oh, go ahead.**

25  *Q.*  Oh, no, go ahead.

CYNTHIA WHITE - DIRECT EXAM (MR. LAIOLO)

1   *A.*  **I was just going to say, this is our primary piece when the**

2   **reps are out in the field.**

3   *Q.*  And did you take part in putting this together?

4   *A.*  **Yes.  I wrote the original.**

5   *Q.*  And is this something that Imprimis sends out to doctors and

6   other customers?

7   *A.*  **Yes.  We send it out.  We provide it at conferences.  We**

8   **provide it at the physicians' offices.**

9   *Q.*  And does this catalog use Imprimis's trademarks that are on

10  that board right there?

11  *A.*  **It does.**

12  *Q.*  And is that true for most of the marketing materials that

13  you put out?

14  *A.*  **Yes.**

15  *Q.*  I'm going to show you Plaintiff's Exhibit 228.

16      Are you able to see it on your screen?

17  *A.*  **Yes, I am.**

18  *Q.*  What is this, Ms. White?

19  *A.*  **It's an updated -- or a previous version, I think, of the**

20  **Combination Drop flyer.**

21  *Q.*  And is this also marketing materials that use the trademarks

22  at issue on the board?

23  *A.*  **Yes, it is.**

24  *Q.*  And does this go out to doctors?

25  *A.*  **Yes.**

CYNTHIA WHITE - DIRECT EXAM (MR. LAIOLO)

1      **MR. LAIOLO:** Move to admit Plaintiff's 228.

2      **THE COURT:** Any objection?

3      **MR. TALPAS:** No objection, your Honor.

4      **THE COURT:** 228 may be admitted.

5      **(Exhibit 228 admitted.)**

6  **BY MR. LAIOLO:**

7  *Q.* And, Ms. White, have doctors ever called Imprimis and tried

8  to order the products on the board after you've sent out

9  products like this -- or advertising like this?

10 **A. Yes.**

11 *Q.* And I want to mention one of the other marketing channels

12 that you talked about besides marketing emails.

13     You also mentioned trade publications; right?

14 **A. Yes. Trade publications would include usually print**

15 **advertisements, and then also a lot of physician-written**

16 **articles.**

17 *Q.* And when you say physician-written articles, does Imprimis

18 pay physicians to write articles endorsing its products?

19 **A. No.**

20 *Q.* Then why do physicians endorse Imprimis's products?

21 **A. Because they love the products. I mean, to be honest, the**

22 **combination drops are the reason Imprimis has so much brand**

23 **equity.**

24 *Q.* What is brand equity?

25 **A. Just basically, I guess, loyalty in the brand, where doctors**

**CYNTHIA WHITE - DIRECT EXAM (MR. LAIOLO)**

1    **remember your brand or they -- they trust the brand.**

2    *Q.*  And another type of marketing that you mentioned was

3    conferences and trade shows.

4       Can you tell the jury about conferences and trade shows?

5    *A.*  **Sure.  We attend a lot of conferences where physicians will**

6    **go to kind of do continuous learning to receive credits**

7    **annually, and during that time, there is usually an exhibit hall**

8    **where companies will exhibit and kind of promote their products.**

9    *Q.*  And does Imprimis promote the products on this board at

10   conferences and trade shows like that?

11   *A.*  **Yes, we do.**

12   *Q.*  And where do these conferences and trade shows take place?

13   *A.*  **All over.  We attend typically four large trade shows, which**

14   **would be in big cities, like Chicago, and then many smaller**

15   **national and regional meetings.**

16   *Q.*  And the exhibit that you talked about, what does that look

17   like at one of these trade shows?

18   *A.*  **At a large trade show, usually we'd have big displays that**

19   **promote both the Imprimis brand, as well as our products**

20   **themselves.**

21   *Q.*  When you say a big display, using something in the courtroom

22   here, what size are we talking?

23   *A.*  **Wait, I'm sorry, can you repeat the question?**

24   *Q.*  Yeah.  If you could compare the size of the display to

25   something here in the courtroom, what would it be?  Counsel

CYNTHIA WHITE - DIRECT EXAM (MR. LAIOLO)

1   table, something else?

2   **A.   No.  I mean, it could be as large as, say, the doors; right?**

3   **Depending on if it's a large meeting, it's anywhere from, I**

4   **would say, a 10x10 space, so something like this, to maybe**

5   **something as large or even larger than the jury area.**

6   *Q.*  Larger than the jury area?

7   **A.  Mm-hmm.**

8   *Q.*  How much does a display like that cost?

9   **A.  Up to $200,000.**

10   *Q.*  $200,000.

11     Does Imprimis get customers from that sort of investment in

12   a trade show?

13   **A.  Yeah.  It's one of our -- it's one of our biggest drivers.**

14   *Q.*  And do -- have these specific products here been advertised

15   at trade shows like the ones you're describing?

16   **A.  Yes, they have.**

17   *Q.*  About how many trade shows a year does Imprimis attend?

18   **A.  At least 30-plus trade shows, if you include both national**

19   **and regional meetings.**

20   *Q.*  And what percent of those trade shows, if you have a rough

21   guess, do these products get advertised at?

22   **A.  So all of theme are advertised at -- I would say they're**

23   **advertised at all of the trade shows, just depending on the**

24   **prominence, will be dependent on the space that we have.**

25   *Q.*  Okay.  So all of these marketing efforts, Ms. White -- sales

CYNTHIA WHITE - DIRECT EXAM (MR. LAIOLO)

1  calls, trade publications, trade shows, marketing emails -- have

2  they worked?

3  **A. Yes.**

4  *Q.* So starting when you first got to Imprimis, how many

5  customers did Imprimis have?

6  **A. In 2014, we had zero customers; and now we service**

7  **over 12,000 customers annually.**

8  *Q.* Do you have any competition?

9  **A. We do.**

10  *Q.* Who is your primary competitor?

11  **A. I would say OSRX.**

12  *Q.* Do you know if OSRX sells products like these ones on the

13  board?

14  **A. Yes, they do.**

15  *Q.* Do you know the names that they came up with to name their

16  products?

17  **A. Similar to ours.**

18  *Q.* Are they similar or are they -- are they the same?

19  **A. They're the same with a -- yeah, a different dash, I guess,**

20  **now.**

21  *Q.* And are you aware of any rules or regulations that require

22  OSRX to name them exactly the same as Imprimis?

23  **A. No, I'm not aware of anything.**

24  *Q.* And in terms of products that you're selling, are there any

25  differences between Imprimis's products and OSRX's products?

**CYNTHIA WHITE - DIRECT EXAM (MR. LAIOLO)**

1  **A.  Yes.  Depending on the products, our Simple Drops portfolio,**

2  **which is three of the identified products, ours are**

3  **preservative-free, which is one of the reasons doctors really**

4  **like them.  Patients can't handle preservatives for a long**

5  **period of time.  Whereas OSRX's products are -- have**

6  **preservatives.**

7  *Q.*  So as the VP of Marketing, do you keep track of OSRX's

8  business?

9  **A.  Yeah, of course we do.**

10  *Q.*  Do you keep track of their website?

11  **A.  Yes, as well as their social posts.**

12  *Q.*  The types of advertisements that they make, do you keep

13  track of those, too?

14  **A.  Correct.**

15  *Q.*  Let's go ahead and look at Plaintiff's 2032.

16  Can you see it on your screen, Ms. White?

17  **A.  Not yet.**

18  **Yes.**

19  *Q.*  What are we looking at here?

20  **A.  This looks to be the Resources page of the OSRX website.**

21  *Q.*  What is a Resources page?

22  **A.  Looks like it's a page that has downloadable materials that**

23  **the doctors can use in the office.**

24  *MR. LAIOLO:*  Move to admit Plaintiff's 2032.

25  *THE COURT:*  Any objection?

1          *MR. TALPAS:* No objection.

2          *THE COURT:* It may be admitted.

3       *(Exhibit 2032 admitted.)*

4    *BY MR. LAIOLO:*

5    *Q.* Ms. White, are you able to tell when this was captured?

6    **A. May 17th of 2022.**

7    *Q.* And for this web page from May 17th, 2022, are there any of

8    Imprimis's trademarks that are on this web page?

9    **A. Yes, there are.**

10   *Q.* Which ones?

11   **A. PRED-MOXI-BROM, PRED-MOXI, MOXI-BROM, PRED-BROM,**

12   **PRED-GATI-BROM.**

13   *Q.* I want to go now to Plaintiff's 20 -- 220.

14      Can you see it?

15   **A. Yes, I can.**

16   *Q.* What is this, Ms. White?

17   **A. This looks to be a Prescriber's Account Setup page for their**

18   **Prescriber Portal?**

19   *Q.* What is a Prescriber's Account Setup page?

20   **A. I believe they have a Prescriber Portal where a new account**

21   **can set up to start prescribing online through them.**

22   *Q.* And is there any OSRX branding on this web page?

23   **A. Yes.**

24          *MR. LAIOLO:* Move to admit Plaintiff's 220.

25          *THE COURT:* Any objection?

CYNTHIA WHITE - DIRECT EXAM (MR. LAIOLO)

1    **MR. TALPAS:**  No objection.

2    **THE COURT:**  220 may be admitted.

3    **(Exhibit 220 admitted.)**

4   **BY MR. LAIOLO:**

5   **Q.**  Ms. White, can you tell from this web page what time it was

6   captured?

7   **A.  April --**

8    **MR. TALPAS:**  Objection, Your Honor.  Foundation.

9    **THE COURT:**  Sustained.

10  **BY MR. LAIOLO:**

11  **Q.**  Ms. White, a new Prescriber Portal like this, is this

12  something that doctors will use?

13  **A.  Yes.**

14  **Q.**  Will they use it to buy products like the ones on the board?

15  **A.  I believe it's to prescribe the products, yes, on the board.**

16  **Q.**  So, Ms. White, I want to explore whether Imprimis brand

17  names appearing on OSRX web pages has caused any problems for

18  Imprimis.

19      Has it caused any problems for Imprimis's marketing?

20  **A.  It's caused a lot of confusion over the years.**

21  **Q.**  Has any potential customer ever asked you whether OSRX and

22  Imprimis are the same?

23  **A.  Yes.  At conferences, and sometimes on sales calls.**

24  **Q.**  So conferences, you mentioned that Imprimis goes to about 30

25  a year?

CYNTHIA WHITE - DIRECT EXAM (MR. LAIOLO)

1    **A.  At least, yeah.**

2    *Q.*  Do you have an estimation of at how many of those

3    conferences a potential customer has asked you or another member

4    of the marketing team if Imprimis and OSRX are the same or

5    affiliated?

6        *MR. TALPAS:*  Objection, your Honor.  Foundation.

7    Speculation.

8        *THE COURT:*  Overruled.

9        *MR. LAIOLO:*  You can answer, Ms. White.

10        *THE WITNESS:*  Okay.  Yeah, I mean, I would say a few

11    years ago, it was probably half.  We would have to explain the

12    differences.

13    *BY MR. LAIOLO:*

14    *Q.*  And you also mentioned confusion on a sales call.

15        Do you have an example of a customer being confused about

16    the differences between OSRX and Imprimis on a sales call?

17        *MR. TALPAS:*  Objection, your Honor.  Speculation.

18    Hearsay.

19        *THE COURT:*  Overruled.

20        *THE WITNESS:*  I mean, it used to happen quite often.

21    But there was one example where I was on a sales call with a rep

22    in Medford, Oregon, and when we went in, we were talking to the

23    doctor, and he mentioned that he had just seen our rep two weeks

24    ago.

25    ///

CYNTHIA WHITE - DIRECT EXAM (MR. LAIOLO)

1    *BY MR. LAIOLO:*

2    *Q.* Had you sent another Imprimis representative to Medford,

3    Oregon two weeks before you got there?

4    **A. No. I mean, Medford, Oregon is not the easiest place to get**

5    **to, so that's why we knew we hadn't and part of the reason we**

6    **were there.**

7    *Q.* Why did that doctor think that someone from Imprimis had

8    visited?

9            *MR. TALPAS:* Objection, your Honor. Speculation.

10           *THE COURT:* Sustained.

11   *BY MR. LAIOLO:*

12   *Q.* Did the doctor indicate to you why he thought someone from

13   OSRX [sic] had visited?

14           *MR. TALPAS:* Objection. Hearsay.

15           *THE COURT:* Overruled.

16           *THE WITNESS:* I mean, we were there. We were talking

17   to him, and we had explained that we hadn't been there. We

18   started asking some questions, and he pulled out an OSRX

19   catalog. They left the catalog. That's why he thought.

20   *BY MR. LAIOLO:*

21   *Q.* Ms. White, have you ever provided customers with an OSRX

22   catalog?

23   **A. Of course not.**

24   *Q.* Ms. White, why does it matter if customers are confused

25   between the differences between Imprimis and OSRX?

CYNTHIA WHITE - DIRECT EXAM (MR. LAIOLO)

1    **A.  Well, for one, because they're not the same product.  And**

2    **it's -- it's confusing to a doctor when they think they're**

3    **purchasing our product and they're actually getting a different,**

4    **you know, product from someone else that may not be the same.**

5    *Q.*  Have you ever lost sales to OSRX?

6    **A.  Yes.**

7    *Q.*  Have you ever lost customers to OSRX?

8    **A.  Yes.**

9                    *MR. LAIOLO:*  No further questions at this time.

10                   *THE COURT:*  Cross-exam?

11

12                         *CROSS-EXAMINATION*

13   *BY MR. TALPAS:*

14   *Q.*  Good morning, Ms. White.

15   **A.  Good morning.**

16                   *MR. TALPAS:*  Can we pull up DX-76, please?

17   *BY MR. TALPAS:*

18   *Q.*  And what you see in front of you, this is an ImprimisRx

19   sales --

20                   *THE COURT:*  Don't see anything yet.

21                   *THE CLERK:*  Give it just a second.

22                   *MR. TALPAS:*  Oh, I'm sorry.

23      *(Pause.)*

24                   *THE COURT:*  Okay.  You're up.

25   ///

**CYNTHIA WHITE - CROSS-EXAM (MR. TALPAS)**

1  *Q.*  Okay.  And, now, ImprimisRx has a team of outside sales

2  reps; right?

3  **A.  Yes, we do.**

4  *Q.*  Okay.  And they physically travel around and visit eye

5  doctors at their offices?

6  **A.  Yes.**

7  *Q.*  And many times, you may be visiting the same doctors as

8  OSRX; right?

9  **A.  That's correct.**

10  *Q.*  Okay.  I'm sure the reps may even run into each other from

11  time to time?

12  **A.  I'm sure they have.**

13  *Q.*  Now, when they -- when your reps show up at an eye doctor's

14  office, you train them on how to distinguish ImprimisRx from

15  OSRX?

16  **A.  If it comes up, yes, if there's confusion.**

17  *Q.*  And if we zoom out of this page a little bit, that's what

18  these bullets are under, "Our advantages over them."  Right?

19  These are the points you want your reps to distinguish against

20  OSRX?

21  **A.  Yes, when comparing the two companies, exactly.**

22  *Q.*  And you're aware at the same time, OSRX sales reps have

23  their own strategies for competing against ImprimisRx; right?

24  **A.  I'm sure they do.**

25  *Q.*  Right.

**CYNTHIA WHITE - CROSS-EXAM (MR. TALPAS)**

1  *Q.* And that's because take, for example, PRED-GATI-BROM, it's a

2  formulation that contains the active pharmaceutical ingredients

3  PRED, GATI, and BROM; right?

4  *A.* **I mean, they do include the ingredients, yes.**

5  *Q.* Now, out in the field, you don't just compete with other

6  drug compounders; right?  You also compete with commercial

7  pharmacies?

8  *A.* **I mean -- what do you mean?**

9  *Q.* Well, a lot of doctors still prescribe the conventional

10  three-bottle drop regimen; right?

11  *A.* **Yeah.  I mean, that's how the market was originated.**

12  *Q.* Mm-hmm.

13  And when a doctor prescribes a conventional three-drop

14  regimen, you understand those typically go to commercial

15  pharmacies; right?

16  *A.* **They do.**

17  *Q.* And your sales reps are taught about the conventional

18  three-drop regimen; right?

19  *A.* **Yeah.  I mean, the reason we train them on the three --**

20  **three-drop traditional therapy is because our formulation, when**

21  **we came out with it, was to reduce the compliance issues that**

22  **doctors have with the three-drop regimen.**

23  *Q.* Right.

24  *MR. TALPAS:* Can we turn to page 87 of the sales

25  training book?

**CYNTHIA WHITE - CROSS-EXAM (MR. TALPAS)**

1  *Q.* All right.  And moxifloxacin is the active pharmaceutical

2  ingredient in Vigamox; right?

3  **A.  That's correct.**

4  *Q.* It's also the API, or active pharmaceutical ingredient,

5  that's in a lot of your formulations; right?

6  **A.  Yes, it is.**

7  *Q.* And Vigamox has been around forever; right?

8  **A.  Yes.**

9  *Q.* And you've heard of a drug called Zymaxid?

10  **A.  Yes, I have.**

11  *Q.* And that's other antibiotic?

12  **A.  That's correct.**

13  *Q.* Again, this is a big, name-brand antibiotic; right?

14  **A.  Yes.**

15  *Q.* And gatifloxacin is the API?

16  **A.  Yes, it is.**

17  *Q.* Okay.  And that's gatifloxacin, the same active ingredient

18  in a lot of your formulations; right?

19  **A.  Yes, it was.**

20  *Q.* And, again, Zymaxid's been around for a long time, too;

21  right?

22  **A.  That's correct.**

23  *Q.* And you've heard of Pred Forte?

24  **A.  Yes.**

25  *Q.* That's a steroid?

**CYNTHIA WHITE - CROSS-EXAM (MR. TALPAS)**

1   *A.*  **That's correct.**

2   *Q.*  Right.

3       They only knew because of drugs like Pred Forte and Vigamox

4   and bromfenac; right?

5   *A.*  **Well, there's other generics out there as well.  They know**

6   **the ingredients.**

7   *Q.*  Right.  They know the ingredients.

8       And that's why you put them in the name; right?

9   *A.*  **I mean, it was easy for them to recall.**

10  *Q.*  Well, you can't tell a doctor how to use prednisolone;

11  right?

12  *A.*  **That's correct.**

13  *Q.*  But if you put "Pred" in the name, a doctor is going to

14  think of Pred Forte and know exactly what to do with it; right?

15  *A.*  **I mean, I wouldn't necessarily say that, because there's**

16  **different "Preds" out there.  There's Pred Acetate, there's Pred**

17  **Phosphate.  So not necessarily.**

18  *Q.*  And you're a doctor, you know what those can be prescribed

19  for?

20  *A.*  **Well, I know there's different ingredients for Pred.**

21  *Q.*  And Counsel showed you PX-228, if we can pull that back up.

22  *A.*  **Yes, it's up.**

23  *Q.*  Okay.  And I'm looking at the -- this smaller print below

24  the blue print on each drug.

25  *A.*  **Okay.  The ingredients.**

**CYNTHIA WHITE - CROSS-EXAM (MR. TALPAS)**

1  *Q.* Correct.

2  And do you see the numbers in the parentheses in each of

3  those formulations?

4  **A. Yes.**

5  *Q.* And for PRED-GATI-BROM, PRED has the highest concentration;

6  right?

7  **A. Yes. I mean, I'm not sure what that means. But, yeah, it's**

8  **PRED 1 percent. I'm not sure what you're asking.**

9  *Q.* In PRED-GATI-BROM, the PRED is the highest concentration

10  ingredient --

11  **A. Of an ingredient in the product, yes.**

12  *Q.* Okay. And GATI, that's the second highest concentration in

13  that formulation?

14  **A. Yes, it is.**

15  *Q.* BROM has the third highest concentration in that

16  formulation?

17  **A. That's correct.**

18  *Q.* That's why it's PRED-GATI-BROM; right?

19  **A. No. Actually, until now, I've never even looked at it that**

20  **way.**

21  *Q.* If we could go back to DX-76.

22  Now, you refer to these common ingredients by abbreviations

23  as well, right, at ImprimisRx?

24  **A. Or acronyms, just depending on the formulation.**

25  *Q.* Well, independent of your formulation, if you're talking

**CYNTHIA WHITE - CROSS-EXAM (MR. TALPAS)**

1  about just the ingredient, you would use abbreviations to

2  describe them; right?

3  **A. Not all the time, but, sure.**

4  *Q.* Sometimes.  If we turn to page 32 of DX-76.

5      Do you see where it says, "Almost every surgery center uses

6  an intracameral antibiotic from somewhere.  Typically, they are

7  purchasing from a compounding pharmacy or they are drawing up

8  illegally from a Vigamox bottle."

9      Do you see that?

10  **A. That's correct.**

11  *Q.* And then below it, it says, "We can offer MOXI at a

12  competitive price if they want to use MOXI, and they can do it

13  legally by ordering from an FDA-registered facility."

14      Do you see that?

15  **A. Yes.**

16  *Q.* And so you're teaching your sales reps to tell doctors you

17  could get MOXI from Vigamox or you can get MOXI from us; right?

18  **A. I mean, we're -- basically, that's what we call our MOXI.**

19  **Moxifloxacin is MOXI.**

20  *Q.* And when it's in Vigamox, you also call it MOXI; right?

21  **A. I call it Vigamox.**

22  *Q.* Well, the ingredient is referred to as MOXI; right?

23  **A. Okay.  Yeah, it's a moxifloxacin.**

24  *Q.* It's easier to say MOXI; right?

25  **A. It is.**

CYNTHIA WHITE - CROSS-EXAM (MR. TALPAS)

1   *Q.*  Let's go to page 88, please.

2      And, again, you see under antibiotics, where it says,

3   "Moxifloxacin is used to inhibit the growth of bacteria and

4   prevent infections after surgery"?

5   **A.  Yes, I see that.**

6   *Q.*  It says the same thing about gatifloxacin?

7   **A.  That's correct, because they're both antibiotics.**

8   *Q.*  And then below that, you see it says, "GATI and MOXI are

9   fourth-generation fluoroquinolones"?

10   **A.  Yes.**

11   *Q.*  That -- that's true; right?

12   **A.  Yes.**

13   *Q.*  Okay.  And those are ingredients?

14   **A.  Moxifloxacin and gatifloxacin, yes.**

15   *Q.*  Right.

16      ***MR. TALPAS:***  All right.  No further questions.  Thanks.

17      ***THE COURT:***  Anything further?

18      ***MR. LAIOLO:***  Nothing from Plaintiff.

19      ***THE COURT:***  Okay.  Thank you.

20      Plaintiff may call your next witness.

21      ***MR. ARLEDGE:***  Plaintiff calls Anthony Sampietro.

22   **(Witness duly sworn.)**

23      ***THE CLERK:***  Thank you.  You can be seated.

24      Can you please state and spell your name for the

25   record?

ANTHONY SAMPIETRO - DIRECT EXAM (MR. ARLEDGE)

1   *Q.* You discussed Imprimis with Dr. Goldberg before jumping into

2   the venture where you're selling the sorts of products we see on

3   the board; yes?

4   **A. You're going to have to be more definitive with that**

5   **question.**

6   *Q.* Say again?

7   **A. You're going to have to be more definitive with that**

8   **question. When? Give me a date.**

9   *Q.* Well, I'm not sure I can tell you what you talked about on

10   October 16th, but what I'm saying is, when you were trying to do

11   the early work to jump into this business, you had discussions

12   with Dr. Goldberg about Imprimis.

13   **A. I had discussions with about 25 physicians, including**

14   **Dr. Goldberg.**

15   *Q.* When you were in the early stages of getting into this

16   business, you had discussions with Dr. Goldberg about Imprimis.

17   **A. Yes, and about 25 other physicians.**

18   *Q.* And, in fact, Dr. Goldberg, at one point, even gave you some

19   PowerPoint presentation that he had gotten from Imprimis that he

20   thought you should emulate.

21   Do you remember that?

22   **A. I don't recall.**

23   *Q.* Do you want to see it?

24   **A. Sure.**

25   *Q.* Let's look at Exhibit 199.

**ANTHONY SAMPIETRO - DIRECT EXAM (MR. ARLEDGE)**

1    *Q.*  All right.

2    *A.*  **I don't see it, but okay.**

3    *Q.*  This document came from you, didn't it?

4    *A.*  **I'm sorry, one more time?**

5    *Q.*  Didn't this document come from you?

6    *A.*  **No, it didn't come from me.**

7    *Q.*  This document wasn't produced in this litigation from your

8    company?

9    *A.*  **I don't know.  I have no recollection of it.**

10   *Q.*  Do you see any Imprimis people who are part of this email

11   trail?

12   *A.*  **No.**

13   *Q.*  All right.

14        ***MR. ARLEDGE:***  Your Honor, I would move to admit

15   Exhibit 199.

16        ***THE COURT:***  It's already in.

17        ***MR. ARLEDGE:***  All right.

18   *BY MR. ARLEDGE:*

19   *Q.*  So what Dr. Goldberg says in the subject line there is,

20   "Good strategy slides to emulate."

21        Do you see that?

22   *A.*  **I do.**

23   *Q.*  Okay.  And then if we go to the second page, we can see what

24   this is.

25        This is a presentation that Mark Baum had put together in

**ANTHONY SAMPIETRO - DIRECT EXAM (MR. ARLEDGE)**

1   October of 2014; yes?

2   **A.  Appears to be that, yeah.**

3   *Q.*  And when -- once the business was up and running, your

4   business, the compounding pharmacy business --

5   **A.  Okay.**

6   *Q.*  -- you continued to have discussions with Dr. Goldberg about

7   Imprimis; right?

8   **A.  Sure.**

9   *Q.*  I mean, they were a competitor in the space, so sometimes

10   you would talk about them.

11   **A.  Of course.**

12   *Q.*  And, in fact, they were a competitor in the space that you

13   had some friction with from time to time.

14   **A.  Not time to time, since the creation of the company.**

15   *Q.*  So you --

16   **A.  They've been suing us.**

17   *Q.*  So you constantly had conflict with Imprimis?

18   **A.  Absolutely.**

19   *Q.*  All right.  And if I understand your testimony from earlier

20   in the case, Dr. Goldberg never told you in any of these

21   conversations you had with him where Imprimis came up that he

22   had been an Imprimis consultant.

23      Is that your testimony?

24   **A.  I didn't say that.  Read it back.**

25   *Q.*  You didn't say that?

ANTHONY SAMPIETRO - DIRECT EXAM (MR. ARLEDGE)

1        **THE COURT:** Can I see a copy?

2        **THE CLERK:** Can she see a copy?

3        **MR. ARLEDGE:** Of course.

4    **(Pause.)**

5        **THE COURT:** Sustained.

6        **MR. ARLEDGE:** Your Honor, party admission?

7        **THE COURT:** Sustained.

8 **BY MR. ARLEDGE:**

9 **Q.** You testified a few minutes ago where you were talking about

10 these other compounding pharmacies that are competitors.

11    Do you remember that?

12 **A. Yeah.**

13 **Q.** Are they competitors in that they're selling the same

14 products?

15 **A. I don't know the exact same products, but, roughly, yeah.**

16 **Q.** Well, are there competitors in the marketplace right now

17 that are selling the same products that we have listed up on

18 this board?

19 **A. I don't know the exact products, but probably four or five**

20 **of them.**

21 **Q.** Okay. And so I take it that your testimony must be that

22 they must use these same names to sell the product; right?

23 **A. They do.**

24 **Q.** Okay. Who is it that's using these same names to sell the

25 products?

ANTHONY SAMPIETRO - DIRECT EXAM (MR. ARLEDGE)

1  *A.*  **I believe PQ is one of them.  Sweet Grass, Designer Drugs.**

2  **That's it for now.  Those are the ones I can remember off the**

3  **top of my head.**

4  *Q.*  All right.  Do you know whether we can find any sales

5  materials or marketing materials for those companies in the

6  thousands of pages we have here?  Do you know?

7  *A.*  **If you did your research, sure.**

8  *Q.*  I did.

9     I'm asking whether you know whether there are marketing

10  materials from those companies that show them using these names?

11  *A.*  **You can probably bring it up on the Internet.  PQ, look at**

12  **what they're doing, and then show it to everybody.**

13  *Q.*  Okay.  We'll look for that.

14     Sir, did you -- when you were having your deposition taken,

15  did you think that there might be some tactical value or some

16  strategic benefit to pretending that you didn't remember very

17  much?

18  *A.*  **No.**

19        *MR. LIDDIARD:*  Objection.  Argumentative.

20         *THE COURT:*  Sustained.

21  *BY MR. ARLEDGE:*

22  *Q.*  Well, when you were reading your deposition transcript the

23  other day, did you get the impression that there were lots of

24  things that you said you could not remember?

25  *A.*  **No.**

**ANTHONY SAMPIETRO - DIRECT EXAM (MR. ARLEDGE)**

1   selling similar products with the same name that you adopted?

2   *A.*  **I knew that there were a lot of people using the compounded**

3   **products for all sorts of different ailments, not just**

4   **PRED-GATI-BROM.  You said PRED-MOXI or DEX-MOXI are the ones**

5   **that we came up, with so you essentially copied us with those**

6   **products, according to your document.  So I'm not sure what**

7   **you're asking here.**

8   *Q.*  Well, let me see if I can clarify.

9       At the time you started selling your compounded products,

10  did you know that Imprimis was selling similar products with the

11  exact same name that you adopted?

12  *A.*  **No.  They weren't the same exact name.  I mean, they're**

13  **abbreviations for commonly used medications in the marketplace.**

14  **So we came out with, I think, PRED-MOXI-KETOR.  I think that was**

15  **one of our first products.  I think that DEX-MOXI, which was**

16  **ours, not yours -- and you said PRED-MOXI was.  I'm not aware if**

17  **you guys were selling PRED-MOXI at the time.  That was a**

18  **response to our consultants telling us these are the products**

19  **that they want.**

20  *Q.*  Let's go back to the very beginning of your answer.

21      Did you tell me they weren't the same names?  You didn't use

22  the exact same names they were using?  Is that your testimony?

23  *A.*  **No.  My testimony is those are commonly used abbreviations**

24  **for APIs, active pharmaceutical ingredients.  Imprimis did not**

25  **create the abbreviation PRED or GATI.  And no one uses PRED-C or**

ANTHONY SAMPIETRO - DIRECT EXAM (MR. ARLEDGE)

1   *A.* **Well, I think you're proving my point, that that's a**

2   **commonly used abbreviation.**

3   *Q.* It could mean many different things.

4   *A.* **But it's a commonly used abbreviation in this context for**

5   **pre- and post-op care for cataract surgery.  That was it.  It's**

6   **a steroid.**

7   *Q.* Have you ever looked in the medical literature to see what

8   else PRED can mean?

9   *A.* **No.**

10  *Q.* Have you ever looked in the medical literature to see what

11  other abbreviations there are out there of prednisolone?

12  *A.* **Again, no, because we're in ophthalmology.  That's really**

13  **what I care about.  But here again, you're proving my point.**

14  **It's a commonly used abbreviation for an active pharmaceutical**

15  **ingredient.  And it could have multiple meanings, sure.  It's an**

16  **abbreviation for, I'm sure, other commonly used active**

17  **pharmaceutical ingredients.  They didn't come up with it.**

18          *MR. ARLEDGE:*  You know, I think I'm going to transition

19  to a different point.  Would it be okay to break early or do you

20  want me to use the five minutes?

21          *THE COURT:*  Sure, we can break early.  Ladies and

22  gentlemen, you're reminded you're not to discuss the case with

23  anyone.  You're not to do any research about the case.  And if

24  you could be back at five of 1:00, we will resume at that time.

25  Thank you.

ANTHONY SAMPIETRO - DIRECT EXAM (MR. ARLEDGE)

1    *Q.* And it's titled a "Pitch Deck."

2        What's a pitch deck?

3    **A. Typically, it's an investor deck that you send to potential**

4    **investors.**

5    *Q.* This is a document that you would give to people if you're

6    trying to get them to invest money in your company; right?

7    **A. That's typically what a pitch deck is, yeah.**

8    *Q.* And I take it that you're very careful to be honest in a

9    document like that; right?

10   **A. Yes.**

11           *MR. ARLEDGE:* Your Honor, I would move to admit

12   Plaintiff's 2163.

13           *THE COURT:* Any objection?

14           *MR. LIDDIARD:* No objection.

15           *THE COURT:* It may be admitted.

16       **(Exhibit 2163 admitted.)**

17           *MR. ARLEDGE:* Let's go to page 8 of this document,

18   please.  Perfect.

19   *BY MR. ARLEDGE:*

20   *Q.* All right.  On page 8 of this investor document, we see the

21   heading "competition."

22       Do you see that?

23   **A. Mm-hmm.**

24   *Q.* This is a document that OSRX prepared?

25   **A. Yes.**

ANTHONY SAMPIETRO - DIRECT EXAM (MR. ARLEDGE)

1   *Q.* You reviewed it?

2   *A.* **Yes.**

3   *Q.* You approved it?

4   *A.* **Yes.**

5   *Q.* You sent it out to people asking them to give you money

6   after they read it?

7   *A.* **Yes.**

8   *Q.* Right under "competition," it says, "Ocular Science has only

9   two significant competitors in the compounded medication of

10  biologic spaces.  Imprimis (compounds) and Biotissue

11  (biologics)."

12      Do you see that?

13  *A.* **Correct.**

14          *MR. ARLEDGE:* All right.  Let's go to Exhibit 71,

15  George.

16  *BY MR. ARLEDGE:*

17  *Q.* Okay.  Sir, I've put up Exhibit 2071.  And if you look at

18  the top, this is -- this is an email trail that you were a part

19  of in May of 2015.

20      Do you agree with that?

21  *A.* **Yes.**

22  *Q.* And you're talking to a Dr. Kerry Assil?

23  *A.* **Assil.**

24  *Q.* And this was a potential customer?

25  *A.* **Yes.**

**ANTHONY SAMPIETRO - DIRECT EXAM (MR. ARLEDGE)**

1   *Q.* All right.

2       *MR. ARLEDGE:* I move to admit Exhibit 2071.

3       *THE COURT:* Any objection?

4       *MR. LIDDIARD:* No objection.

5       *THE COURT:* 2071 may be admitted.

6   *(Exhibit 2071 admitted.)*

7   *BY MR. ARLEDGE:*

8   *Q.* Okay. Let's go to the second page of the document,

9 actually. So here, we see an email from Craig Andrews at

10 Imprimis to someone at AssilEye.com.

11   Do you understand that to be somebody who works for

12 Dr. Assil at his office?

13   *A. Yeah, I assume.*

14   *Q.* All right. And what you see is, you see a -- essentially a

15 pitch from a -- from an Imprimis salesperson here?

16   *A. Appears to be.*

17   *Q.* And there's a list of products that they are promoting,

18 PRED-MOXI, TRI-MOXI, PRED-KETOR, PRED-MOXI-KETOR, and PRED-KETOR

19 drops.

20   Do you see that?

21   *A. Mm-hmm.*

22   *Q.* Okay. And this -- this email from an Imprimis person was

23 then forwarded on to your company; right?

24   *A. Yeah. Could I see the first email page?*

25   *Q.* Yeah. I'm going to go back to it right now.

ANTHONY SAMPIETRO - DIRECT EXAM (MR. ARLEDGE)

1      Do you see that Dr. Assil then forwarded the Imprimis sales

2   document to you on May 12th, 2015?

3   **A.  Yep.**

4   *Q.*  And what you write is, "These guys will be our direct

5   competition."

6      Do you see that?

7   **A.  Yep.**

8   *Q.*  At the time, Imprimis was selling the products listed in

9   this email; right?

10  **A.  I assume so, yeah.**

11  *Q.*  And you were going to be selling those products at some

12  point in the future?

13  **A.  I can have the -- see the next page?**

14  *Q.*  Page 3?

15  **A.  Yeah -- no, keep going.  Page 2, please.  Yeah, we were**

16  **never going to sell TRI-MOXI.**

17  *Q.*  Okay.  And you weren't yet selling any of the others; right?

18  **A.  I don't remember the exact date when we started selling the**

19  **product.**

20  *Q.*  Well, you did speak in the future tense, that you will be

21  competitors with Imprimis; right?

22  **A.  Yeah.**

23  *Q.*  So as of May of 2015, you weren't yet competitors, but at

24  some point, you were going to be?

25  **A.  Again, I don't know the date -- specific day we started**

ANTHONY SAMPIETRO - DIRECT EXAM (MR. ARLEDGE)

1    *Q.* And like the last one, it got forwarded to you; right?

2    **A. Correct.**

3         ***MR. ARLEDGE:*** Okay. Let's go ahead and keep going.

4    One more.

5    ***BY MR. ARLEDGE:***

6    *Q.* Okay. At the bottom of page 2 is your email response in

7    October 2015.

8         Do you see that?

9    **A. Mm-hmm.**

10   *Q.* You said, "Thank you for this valuable information. Texas

11   is going to be challenging from a logistical standpoint.

12   However, the ROI on your state is huge and worth the effort.

13   Please see my attached catalog. We will have essentially the

14   same drops."

15        Let's stop there.

16        As of October of 2015, Imprimis was selling to doctors'

17   offices in Texas, and you were not; is that right?

18   **A. I -- I guess. I can't remember the exact date we started**

19   **selling in Texas.**

20   *Q.* Well, whatever the exact date, what you're saying is that we

21   will, future tense --

22   **A. Sure.**

23   *Q.* -- have the same drops.

24        Do you agree with that?

25   **A. "Essentially" is the key, because I saw two of the drops**

**ANTHONY SAMPIETRO - DIRECT EXAM (MR. ARLEDGE)**

1   top of each other.  Ask the question, and then we'll hear the

2   answer.  What's the question?

3   *BY MR. ARLEDGE:*

4   *Q.*  Earlier, you were telling me in the Settlement Agreement, we

5   said that, but I think we can agree now that that was mistaken,

6   and you meant to say the Complaint; right?

7   **A.  Correct.**

8   *Q.*  Okay.  We can agree that the Settlement Agreement says no

9   such thing?

10   **A.  I'm not going to agree to anything.  I'm not reading it**

11   **right now.**

12   *Q.*  I can show it to you if you want.

13   **A.  Okay.**

14   *Q.*  You didn't look at it over lunch when you figured out your

15   mistake?

16   **A.  No.**

17   *Q.*  You looked at the Complaint over lunch?

18   **A.  I talked to my attorney, and the judge allowed it.  He**

19   **asked.**

20   *Q.*  Okay.  So it's the Complaint that says you were first.

21   **A.  Yes.**

22   *Q.*  All right.  And that's already in evidence.

23       All right.  Let's do this:  One of the other things that you

24   told me before the lunch break was that there were other

25   competitors that were selling the same products that OSRX and

ANTHONY SAMPIETRO - DIRECT EXAM (MR. ARLEDGE)

1   Imprimis were selling using these same names; right?

2   **A.  Again, some of the same names, yes.**

3   *Q.*  Okay.  One of them that you mentioned was Sweet Grass.

4   **A.  Yep.**

5   *Q.*  Okay.

6   **A.  I don't think the -- I don't know if they were selling it at**

7   **the time we entered the marketplace, but they are a competitor**

8   **currently.**

9   *Q.*  I wasn't asking about competitors.  I was asking you who

10  else is using those names, and you said Sweet Grass.

11      Remember that?

12  **A.  Sweet Grass was a competitor.  I'm sorry if I said it was**

13  **the same exact names.  I could be wrong.**

14  *Q.*  Well, did you check over lunch?

15  **A.  No.**

16  *Q.*  Okay.  Well, then, let's look at it now.

17  **A.  Okay.**

18      ***MR. ARLEDGE:***  Let's look at Exhibit 290.  All right.

19  Exhibit 290 is a three-page document.  Let's give him all three

20  pages so he can see what it is.

21  *BY MR. ARLEDGE:*

22  *Q.*  Does this look like a Sweet Grass document to you?

23  **A.  Well, it says Sweet Grass on top, sure.**

24  *Q.*  And this is a Sweet Grass document that's talking about one

25  of the products that's listed on this board over here; yes?

1  *A.* **BMP surgical drops, yep.**

2  *Q.* Which one?  Which product?

3  *A.* **The bromfenac moxifloxacin prednisolone.**

4  *Q.* PRED-MOXI-BROM, this one right here (*indicating*)?

5  *A.* **Yep.**

6  *Q.* Sir, is it true, as you testified before lunch, that Sweet

7  Grass is selling PRED-MOXI-BROM with the name PRED-MOXI-BROM?

8  *A.* **It was, right.  When you said who were the competitors in**

9  **the marketplace was what you said.  I told you Sweet Grass was**

10  **one of them.  So is PQ.  So is Designer Drugs.**

11  **And PQ recently changed, but they were using the**

12  **abbreviations, too.  So was Smart Drops, who was the competitor**

13  **I said was in the marketplace when we entered, and they used the**

14  **same abbreviations.  And then Mark sued them, and then bullied**

15  **them into an acquisition.**

16  *Q.* Sir, I asked you who else was using the same names.  You

17  told me Sweet Grass.

18  Can we agree that they're not?

19  *A.* **I was incorrect now, but I'm sure what happened previously**

20  **is that they probably were using the abbreviations --**

21  ***MR. ARLEDGE:***  Lack of foundation.

22  ***THE WITNESS:***  -- because you sued them and they

23  changed.

24  ***MR. ARLEDGE:***  Lack of foundation.  Move to strike.

25  ***MR. LIDDIARD:***  Objection.  This exhibit lacks

1   foundation.  Lack of authenticity.

2           **THE COURT:**  So I don't think there's a motion to admit

3   the exhibit, so I don't think there's anything to object to

4   there.  Lack of foundation to the answer is sustained.

5   **BY MR. ARLEDGE:**

6   *Q.*  What Sweet Grass is using to sell what both of these

7   companies call PRED-MOXI-BROM is they call it BMP; right?

8           **MR. LIDDIARD:**  Objection.  Lacks foundation.

9           **THE COURT:**  Overruled.  If you know.

10          **THE WITNESS:**  Could you repeat the question?

11  **BY MR. ARLEDGE:**

12  *Q.*  Sweet Grass doesn't call it PRED-MOXI-BROM.  They call it

13  BMP.

14  **A.  If I was a betting man, they used to, and Mark sued them --**

15          **MR. ARLEDGE:**  Move to strike.

16          **THE WITNESS:**  -- and they just changed it.

17          **MR. ARLEDGE:**  Lack of foundation.  Move to strike.

18          **THE COURT:**  Sustained.

19  **BY MR. ARLEDGE:**

20  *Q.*  I'm asking you -- I'm asking you how they sell the product,

21  sir.

22      Do they sell it as BMP?

23          **THE COURT:**  If you know.

24          **THE WITNESS:**  It appears to be the case in this

25  document.

ANTHONY SAMPIETRO - DIRECT EXAM (MR. ARLEDGE)

1    *BY MR. ARLEDGE:*

2    *Q.* Now, not only is that not using the same abbreviations, but

3    I think what we'd see is that they actually reverse the order

4    too, don't they?

5    **A. In this document, they do.**

6    *Q.* Bromfenac -- bromfenac comes first, and then moxifloxacin,

7    and then prednisolone; right?

8    **A. (No verbal response.)**

9    *Q.* I think earlier, your colleague was testifying that the

10   order is determined by the regulations. You have to do it in

11   this order.

12       Is it your testimony that Sweet Grass is now selling this in

13   violation of the regulations?

14   **A. I've had a regulatory, Amy Frost, and she dictates the order**

15   **of the products by concentration. I believe her. She's a very**

16   **good employee and a great C-level exec, so if she dictates and**

17   **says that, then I believe it.**

18       **Does that then say that they're probably doing something**

19   **wrong? Yes. Were they probably forced to do it because he sued**

20   **them? Yes.**

21   *Q.* All right. So you're relying on Amy Frost for that

22   information?

23   **A. A hundred percent.**

24   *Q.* Okay. Then we'll talk to her.

25           *MR. ARLEDGE:* Let's look at Exhibit -- oh, Your Honor,

**ANTHONY SAMPIETRO - DIRECT EXAM (MR. ARLEDGE)**

1    highest to lowest.

2        Is it your testimony that you named it TIM-BRIM-DOR because

3    the concentrations went from highest to lowest?

4    **A.  I never said TIM-BRIM-DOR.  I said you looked -- you said**

5    **PRED-GATI-BROM, and that's why I answered that question the way**

6    **I answered it, and that's what we were told by regulatory.  That**

7    **product had to be the name because of the concentrations.  The**

8    **TIM-BRIM-DOR was not something we discussed.**

9    *Q.*  And TIM-BRIM-DOR-LAT, that also isn't a situation where the

10    names are in order from highest concentration to lowest

11    concentration.

12        Can we agree on that?

13    **A.  Doesn't appear to be the case.**

14    *Q.*  And that's because the regulations don't apply to

15    TIM-BRIM-DOR and TIM-BRIM-DOR-LAT?

16    **A.  I don't know.**

17            **MR. ARLEDGE:**  Okay.  Let's look at Plaintiff's 2013,

18    please.

19    *BY MR. ARLEDGE:*

20    *Q.*  Does Exhibit 2013 show some of the OSRX products?

21    **A.  Blow it up for me, please.  Yep.**

22    *Q.*  Does it show TIM-BRIM-DOR and TIM-BRIM-DOR-LAT?

23    **A.  It does.**

24            **MR. ARLEDGE:**  Your Honor, I would move to admit

25    Exhibit 2013.

**ANTHONY SAMPIETRO - CROSS-EXAM (MR. LIDDIARD)**

1   company?

2   **A.  Yes.**

3   *Q.*  Wait, what are they selling?

4   **A.  They're selling an entire portfolio of name brand products**

5   **from -- they used to be Novartis's products, Vigamox, I think**

6   **nepafenac.  Triesence.  All name brand Big Pharma products.**

7   *Q.*  Did Harrow license those products, to your knowledge, from

8   that company, Novartis?

9   **A.  Sorry.  Can you repeat the question, please?**

10  *Q.*  Yes.  Did -- to your knowledge, did -- sorry -- Harrow

11  license those products from Novartis?

12  **A.  Yes.**

13          ***MR. LIDDIARD:***  If we can try DX-8 one more time.

14  **BY MR. LIDDIARD:**

15  *Q.*  Have you heard of APS Pharmacy?

16  **A.  Smart Drops?**

17  *Q.*  Smart Drops, yes.

18  **A.  Yes.**

19  *Q.*  Can you go to .005?  Do you see there's an order form?

20  **A.  I do.**

21  *Q.*  Do you see -- you recognize the order form as an order form

22  for Smart Drops?

23  **A.  I do.**

24  *Q.*  Can you read in --

25          ***MR. LIDDIARD:***  Can you highlight under "Medication

ANTHONY SAMPIETRO - CROSS-EXAM (MR. LIDDIARD)

1    Order"?

2              **THE COURT:**  This is not in evidence.

3              **MR. LIDDIARD:**  I'd like to move it into evidence, DX-8.

4              **THE COURT:**  Any objection?

5              **MR. ARLEDGE:**  Lack of foundation.

6              **MR. LIDDIARD:**  It's an email --

7              **THE COURT:**  Well, why don't you establish the

8    foundation.  Sustained.

9              **MR. LIDDIARD:**  Sure.

10   **BY MR. LIDDIARD:**

11   *Q.*  Let's go back to the first page.

12       Do you recognize it's an email from Mr. Goldberg to

13   yourself, February 23rd, 2016?

14   **A.  Yes.**

15   *Q.*  You received the email; correct?

16   **A.  Yes.**

17   *Q.*  Do you believe the information in the email is accurate?

18   **A.  I do.**

19   *Q.*  Do you know why you were receiving this email?

20   **A.  Because I'm the CEO of Ocular Science and OSRX.**

21             **MR. LIDDIARD:**  Move DX-8 into evidence.

22             **THE COURT:**  Any objection?

23             **MR. ARLEDGE:**  Same objection, foundation.

24             **THE COURT:**  Overruled.  It may be admitted.

25        **(Exhibit DX-8 admitted.)**

ANTHONY SAMPIETRO - CROSS-EXAM (MR. LIDDIARD)

1    **MR. LIDDIARD:**  Thank you.

2    **BY MR. LIDDIARD:**

3    *Q.*  Sir, if you can turn to page 005, the Smart Drops order

4    form.  Maybe we can highlight this under "Medication Order."

5        Are you with me?  Am I looking at that correctly, is that

6    PRED-MOXI?

7    **A.  Yes.**

8    *Q.*  That's what Imprimis calls it; correct?

9    **A.  Yes.**

10   *Q.*  And that's what you call it; correct?

11   **A.  Correct.**

12   *Q.*  Same with PRED-KETOR?

13   **A.  Correct.**

14   *Q.*  And PRED-MOXI-KETOR?

15   **A.  Correct.**

16   *Q.*  Okay.

17       **MR. LIDDIARD:**  No further questions at this time.

18   Thank you.

19       **THE COURT:**  Anything further?

20       **MR. ARLEDGE:**  Briefly.

21       Let's put that Exhibit 230 back up again real quick.

22   All right.  Pull up paragraph 18.

23   ///

24   ///

25   ///

ANTHONY SAMPIETRO - REDIRECT EXAM (MR. ARLEDGE)

1   The email that you showed us a minute ago that showed the

2   use of some of those names, that was from February of 2016?

3   **A. Yes.**

4   *Q.* Do you know how that compares to the trademark registration

5   process and when those trademarks were issued?

6   **A. Whose trademarks?**

7   *Q.* Well, the only person who has trademarks on those names is

8   Imprimis; right?

9   **A. I don't know.  I don't know the USPTO, but I'm assuming yes.**

10  *Q.* Okay.  So those are the trademarks I'm talking about.

11  **A. Okay.**

12  *Q.* Do you know when the trademarks issued?

13  **A. I'm sorry?**

14  *Q.* Do you know when the trademarks issued?

15       *MR. LIDDIARD:* Objection.  Vague as to which

16  trademarks.

17       *THE COURT:* Sustained.

18  *BY MR. ARLEDGE:*

19  *Q.* Do you know whether the trademarks related to the products

20  in this email, Defendant's 8, whether those trademarks issued

21  after this email we see on Exhibit 8?

22  **A. So you have to show me the whole email, please.  I can only**

23  **see the body of the email.**

24  *Q.* Well, you can see the date.

25  **A. It doesn't list the products.  Okay.**

ANTHONY SAMPIETRO - REDIRECT EXAM (MR. ARLEDGE)

1   *Q.* You can see the date of the email; right?

2   **A. I've got it, yeah.**

3   *Q.* And it's February 2016; yes?

4   **A. Yep.**

5   *Q.* Okay. Do you have -- do you have documents that show people

6   continuing to sell, using those names on the board, other than

7   your company after the trademarks issued?

8   **A. So our marketing and sales collateral, marketing literature**

9   **and sales collateral --**

10          *THE COURT:* I can't understand you. I'm sorry.

11          *THE WITNESS:* Too fast? I'm sorry. All right.

12          Our marketing material and sales collateral do not use

13   PRED, hyphen, GATI, hyphen, BROM. We use the commonly referred

14   to abbreviations for the API with a plus mark, which is not your

15   trademark.

16          *MR. ARLEDGE:* Move to strike as nonresponsive.

17          *THE COURT:* Sustained.

18   *BY MR. ARLEDGE:*

19   *Q.* My question is, are you going to show us a document of

20   somebody else using those names that comes after the trademarks

21   issued? Yes or no.

22   **A. I don't know. It's up to the attorneys.**

23          *MR. ARLEDGE:* No further questions.

24          *THE COURT:* Anything further?

25          *MR. LIDDIARD:* No, Your Honor.

MARK KEEGAN - DIRECT EXAM (MR. WESLEY)

1    **And in particular, do they perceive those names as emanating**

2    **from a single source, what we call secondary meaning.  It's kind**

3    **of a techie term.  But basically, do they think that those names**

4    **are describing a company, not a mix of companies or no company.**

5    *Q.*  And before getting into the mechanics of the survey, let's

6    just cut to the chase.

7          *MR. BISH:*  Your Honor, I think we need to have a

8    qualify as to the scope of his expertise first before talking

9    about the opinions.

10          *THE COURT:*  Overruled.

11   *BY MR. WESLEY:*

12   *Q.*  Let's cut to the chase.

13       What did you find?

14   *A.*  **Yes.  So the results of the study as I described it was that**

15   **among this relevant group of optometrists and ophthalmologists,**

16   **that this name, PRED-MOXI-BROM, had acquired secondary meaning.**

17   **Again, this identification of a single source at the level**

18   **of 35.5 percent.  And that PRED-GATI-BROM had acquired secondary**

19   **meaning at the level of 37.7 percent.**

20       **So my findings from -- based on this research was that about**

21   **a third of these relevant respondents are associating those**

22   **names with one company.**

23   *Q.*  And to your understanding in this scenario, a trademark

24   case, is it sufficient for consumers to identify that a

25   trademark emanates from a single source as opposed to being able

**MARK KEEGAN - DIRECT EXAM (MR. WESLEY)**

1   type of survey, in a more casual purchase situation, that

2   concern may exist.

3      But here, we have professionals with a product that is high

4   involvement.  So we rate these things on the level of

5   involvement of the consumer, in this case, the doctors.  And

6   this is a prescription.  It's done as a professional doctor.

7   It's something that their patients are putting in their eye.

8   This is as high involvement a product as I've ever dealt with in

9   my career, and among the professionals.

10     So all of those things eliminated for me the concern with

11  noise in measuring something relevant to their profession.

12  *Q.*  Okay.  And we touched on it earlier, but just to circle

13  back, what again were the results of the survey?

14  *A.*  Yes.  So here's a little more of a breakout here, again,

15  what we call secondary meaning, this association with one

16  company.  So you saw the question earlier.  They were asked

17  whether they associate with one company, more than one company,

18  no company, or don't know.  And I found with -- in the first

19  column, PRED-MOXI-BROM, that they associated that with one

20  company 35.5 percent of the time.

21     And you can see the cell size there is 141, so that's about

22  half of the respondents.  They were randomly assigned to either

23  of these two names.

24     And then PRED-GATI-BROM, association with one

25  company 37.7 percent of the time.  And this was among each name,

1 **the highest level of association among the range here that they**

2 **had.**

3 *Q.* Now, are you here to tell the jury the legal significance of

4 these numbers?

5 *A.* **I am not.**

6 *Q.* In your experience, is that an issue for the jury to

7 determine after being instructed on the law?

8 *A.* **Yes.  I'm just here to measure this and present it.**

9 *Q.* But as a marketing professional, do you think there's any

10 significance to these findings?

11 *A.* **I do.  I tell my clients all the time secondary meaning is**

12 **very hard to achieve.  We're inundated with marketing messages,**

13 **hundreds or thousands a day.  Doctors certainly are.  So this is**

14 **an uphill battle.  And I can see that in this case, they have**

15 **achieved this single-source association among about a third of**

16 **the doctors.  And that -- that seems like a lot of doctors to**

17 **me.**

18 *Q.* And so in your experience as a marketing professional, does

19 it take a lot of hard work and effort to get numbers like this?

20 *A.* **Absolutely.  This is one of the hardest things in marketing**

21 **to achieve.  And I would say, especially with an audience of**

22 **doctors, and a lot of effort is expended on this in many**

23 **circumstances.  And I can see that that is bearing fruit to the**

24 **extent that I've measured it here.**

25 *Q.* And you said that you picked these two marks because they

**MARK KEEGAN - DIRECT EXAM (MR. WESLEY)**

1   were representative of those other nine marks.

2      Do you think that these findings in any way can -- are

3   relevant to the other marks?

4   *A.* **Yes.  We have the same -- the family of marks.  We can see,**

5   **obviously, are abbreviated marks, hyphenated marks for a similar**

6   **family of drugs marketed by the same company to the same**

7   **audience.  So I would expect these results to be reflective**

8   **generally of the other marks at issue here.**

9   *Q.* And as part of your work in this case, did you review any

10   other evidence that was produced in this case, such as

11   deposition testimony?

12   *A.* **I did, yes.**

13   *Q.* And did you see any testimony that you found to be in any

14   way supportive of your findings?

15   *A.* **I did.  So I have a quote here from Mr. Garner that -- well,**

16   **I guess I should read it.  "You know, when they're reaching out**

17   **to us and asking for a PRED-MOXI-BROM, it's an abbreviated**

18   **version of saying they want prednisolone, moxifloxacin, and**

19   **bromfenac, which everybody in the industry knows."**

20   **So this is telling me that -- that this person, who is very**

21   **informed, I understand, in the industry and working in the**

22   **industry, has this perception that these marks are well-known.**

23   *Q.* And are you aware that the defendants retained a survey

24   expert of their own?

25   *A.* **Yes.**

**MARK KEEGAN - DIRECT EXAM (MR. WESLEY)**

1    *Q.* And his name is Andreas Groehn?

2    *A.* **Yes.**

3    *Q.* Did you review Mr. Groehn's work?

4    *A.* **I did.**

5    *Q.* And can you describe generally the survey that Mr. Groehn

6    performed?

7    *A.* **So he conducted a survey in the same way that I did in many**

8    **ways.  Measured names at issue in the case, two of which**

9    **overlapped with the names that I measured, PRED-MOXI-BROM and**

10   **PRED-GATI-BROM.**

11       **He asked a little bit of a different question, but he did**

12   **ask ophthalmologists and optometrists, so similar audience, and**

13   **he asked briefly -- and I'm sure you'll get this in detail --**

14   **but whether they saw the names as brand names or common names,**

15   **what we call a genericness survey.**

16       **And measured the extent to which this universe, this group**

17   **of doctors, perceived the names to be -- to be brand names.**

18   *Q.* And for the record, he tested six different trademarks; is

19   that right?

20   *A.* **Yes.**

21   *Q.* And did you find his results to be somewhat consistent

22   across all the marks?

23   *A.* **I did.  I wasn't that surprised to see the results here were**

24   **measuring different things, but we're really two sides of the**

25   **same coin.  Whether they're perceiving the brand to come from a**

1  **single source, whether they perceive the brand to -- the name,**

2  **excuse me, to be a brand.**

3      **This is a similar concept for consumers.  And I saw that**

4  **about third of the doctors were perceiving the names that he**

5  **measured as brand names.  So that seemed fairly consistent to**

6  **me.**

7  *Q.*  And so as I understand it, Dr. Groehn found that, give or

8  take, around a third of doctors recognized these marks as brand

9  names, is that what you're saying?

10  **A.  Yes.**

11  *Q.*  And in your survey, give or take, a little over a third of

12  doctors recognized the two marks you tested as coming from a

13  single source?

14  **A.  Yes.**

15  *Q.*  Now, as academics do, did you have some quibbles with his

16  methodology?

17  **A.  I did.**

18  *Q.*  Can you give us an example or two?

19  **A.  Sure.  So his -- I talked earlier about my mix and my**

20  **universe, my group of people that took the survey of**

21  **ophthalmologists and optometrists of about 70/30.  His was the**

22  **inverse of that, so more optometrists than ophthalmologists.**

23      **And I felt that this, from my understanding from my client,**

24  **was not quite reflective of the prescribing market.  So I looked**

25  **at the results, and I did find that ophthalmologists were more**

1　**likely to associate the names as brand names than were**

2　**optometrists.**

3　**    So I felt that the reported results were -- were lower than**

4　**they would have been had he had a mix like the mix that I used**

5　**in my study.**

6　*Q.*  So I understand, if we were really, really concerned with

7　ophthalmologists, based on your review of Dr. Groehn's data,

8　these numbers that we're looking at -- 30 percent for

9　PRED-MOXI-BROM, 23 percent for PRED-GATI-BROM, 30 percent for

10　PRED-KETOR -- those would be higher or they were higher?

11　*A.*  **They were higher.  It's not speculation.  You can look at**

12　**the results, and they're higher.**

13　*Q.*  And did Dr. Groehn use a control in his survey?

14　*A.*  **No.**

15　*Q.*  Okay.  And ultimately, combination of Dr. Groehn's findings,

16　your findings, your review of the evidence in this case, what is

17　your opinion in terms of the significance of the trademarks at

18　issue?

19　*A.*  **Sure.  So based on my findings, it was clear to me that --**

20　**that the relevant universe here, that these doctors were**

21　**associating the marks that I tested with a single company, about**

22　**a third of the time.  And that -- and then this was basically**

23　**consistent with Dr. Groehn's findings in terms of looking at**

24　**whether they were perceived as brands, it's about a third of the**

25　**time.**

ANDREW BOLL - DIRECT EXAM (MR. WESLEY)

1  ***A.  It was a business idea that I began working on with Mark.***

2  ***After I went to school in South Dakota, I moved to San Diego,***

3  ***which is where we started the business and started coming up***

4  ***with the idea to start the business.***

5  *Q.*  Now, we spent a lot of time looking at that chart.  And

6  pardon my writing.

7     Can you see it?

8  ***A.  I can.***

9  *Q.*  And are you familiar with those names?

10  ***A.  I am.***

11  *Q.*  And are those, in fact, Imprimis trademarks?

12  ***A.  I believe so.***

13  *Q.*  And have you witnessed how use of these names has affected

14  the business?

15  ***A.  Yes.  Customers, people associate those trademarks with our***

16  ***business.***

17  *Q.*  And earlier today, you weren't here, but we heard

18  Mr. Sampietro -- I wrote this down.  We were talking about other

19  pharmacies and whether they were using these.  And Mr. Sampietro

20  said if he was a betting man, he bets Mark Baum sued them to

21  stop using these marks.

22     Let's talk about that.

23     You're familiar with the company's litigation history;

24  right?

25  ***A.  I am.***

1                    *REPORTER'S CERTIFICATE*

2              I, Anne Roldan, certify that I am a duly qualified
    and acting Official Court Reporter for the United States
3   District Court, that the foregoing is a true and accurate
    transcript of the proceedings as taken by me in the
4   above-entitled matter on November 13, 2024; and that the format
    used complies with the rules and requirements of the United
5   States Judicial Conference.

6   Date:  November 14, 2024

7

8   *Anne Roldan, RMR, CRR, CSR 13095*

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

IMPRIMISRX, LLC,                    )   Case No. 21-cv-1305-BAS
                                    )
                    Plaintiff,      )   November 14, 2024
        vs.                         )
                                    )   Jury Trial, Day 3
OSRX, INC., et al.,                 )
                                    )
                    Defendant.      )
_____)
                                    )
AND RELATED CROSS-ACTION            )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CYNTHIA A. BASHANT
UNITED STATES DISTRICT JUDGE

VOLUME 3, PAGES 448 - 587


(APPEARANCES ON FOLLOWING PAGE)


REPORTED BY:

ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
U.S. OFFICIAL COURT REPORTER
U.S. District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California  92101

Reported stenographically; transcribed with CAT software.

**AMY FROST - DIRECT EXAM (MS. BURKHARDT)**

1      Do you recognize them?

2  **A.  I do.**

3  *Q.*  What are they?

4  **A.  These are our topical ophthalmics, two of them that we make.**

5  *Q.*  Are these the same bottles that patients receive from OSRX?

6  **A.  Yes.  Yes, they are.**

7  *Q.*  Are the ingredients listed on the bottles?

8  **A.  They are.**

9  *Q.*  What are they?

10  **A.  One of them is prednisolone phosphate, moxifloxacin, and the**

11  **other one is prednisolone phosphate, moxifloxacin, bromfenac.**

12  *Q.*  Is there a reason that they are listed in that order?

13  **A.  For these, we just list them in order of active**

14  **concentration, so the highest -- the higher ingredient is listed**

15  **first.**

16         *MS. BURKHARDT:*  Your Honor, may I approach to show the

17  bottles to the jury?

18              *THE COURT:*  Any objection?

19         *MR. ARLEDGE:*  No objection.

20         *THE COURT:*  You may.

21     *(Demonstrative shown to jury.)*

22  *BY MS. BURKHARDT:*

23  *Q.*  So you said there's a reason the ingredients are listed in

24  that order; correct?

25  **A.  Correct.**

**AMY FROST - DIRECT EXAM (MS. BURKHARDT)**

1  *Q.*  And so I think the bottle with the gray lid, that's

2  PRED-MOXI; is that correct?

3  **A.  Yes.**

4  *Q.*  And it's called PRED-MOXI because that's the shorthand that

5  follows the order of the ingredients the way they're listed on

6  the bottle; right?

7         ***MR. ARLEDGE:***  Objection.  Leading.

8         ***THE COURT:***  Sustained.

9  *BY MS. BURKHARDT:*

10  *Q.*  Why do you call it PRED-MOXI?

11  **A.  That's the shorthand.  That's how it's referred to when the**

12  **doctors order it, when the patients talk about it.  That's what**

13  **we call it.**

14  *Q.*  Do all of the formulations that OSRX offers follow the same

15  naming convention?  So you said, I think, these were highest

16  concentration to lowest concentration?

17  **A.  So the glaucoma ones do not.  That's more of just, like, a**

18  **clinical reason.  Because based on, like -- so glaucoma is high**

19  **intraocular pressure.**

20      **And when you start a patient on those medications, based on**

21  **the order of ingredients that you start them on, you clinically**

22  **wouldn't start them on a four-dose medication -- or sorry -- a**

23  **four-ingredient medication.  You start them on a two-ingredient**

24  **medication.**

25      **But then when you end up adding a third medication and a**

ANDREAS GROEHN - DIRECT EXAM (MR. BISH)

1    than Imprimis in his analysis.

2    *Q.* You heard Mr. Keegan provide an excuse for why he didn't use

3    a control in his survey.

4        Did you hear that testimony?

5    **A. Yes, I did.**

6    *Q.* That you don't need to implement a control when you're

7    surveying doctors, is that what he said?

8    **A. That's what I understand.**

9    *Q.* And in your view, is that a defensible position?

10   **A. It's an hypothesis that needs to be tested, but it's -- it**

11   **definitely needs to be tested.**

12   *Q.* Let's start with the basics.

13       What is a control in a survey?

14   **A. Yes.  Think of pharmaceutical development, where companies**

15   **develop medication.**

16       **They typically then, in human trials, give a group of**

17   **patients this medication.  And then they measure the**

18   **effectiveness of the treatment.**

19       **While they give one group, the test group, the medication,**

20   **the active ingredients, another group, the control group,**

21   **receives a placebo, so a pill that has no active drug component**

22   **in it.**

23       **The effectiveness -- the net effectiveness of the medication**

24   **is then measured as the -- the results for the test group minus**

25   **the results for the control group.  And the same needs to be**

Page 496

ANDREAS GROEHN - DIRECT EXAM (MR. BISH)

1  numbers would be lower in a net secondary meaning score?

2  *A.*  **The results would definitely be not -- not higher, because**

3  **you are subtracting something that is positive.  And so we can**

4  **expect that the results would be lower than what Mr. Keegan**

5  **reported yesterday.**

6  *Q.*  And based on your review of the record, has Mr. Keegan, in

7  prior cases, calculated net secondary meaning scores?

8  *A.*  **Yes.  I have seen reports by Mr. Keegan that discuss a net**

9  **secondary meaning, which means he included a control group in**

10  **those surveys in the past.**

11  *Q.*  Okay.  So what did you do to test whether or not the net

12  secondary meaning score would be lower for PRED-GATI-BROM and

13  PRED-MOXI-BROM?

14  *A.*  **Yes.  So the way to test this is to conduct the same survey,**

15  **but instead of giving the medical terms "active ingredient," the**

16  **placebo treatment.  And so in this case, instead of testing the**

17  **marks that Mr. Keegan had tested, I tested SULF-PRED, which is a**

18  **placebo in this case.**

19  *Q.*  And what did your -- what did the results of your survey

20  show?

21  *A.*  **So about 13 percent of respondents -- and those were all**

22  **physicians -- about 13 percent of respondents said that**

23  **SULF-PRED was -- came from one company or brand.  So the same as**

24  **what PRED -- what other respondents had said about**

25  **PRED-MOXI-BROM.**

ANDREAS GROEHN - CROSS-EXAM (MR. WESLEY)

1    **respondents would have said it's a brand name.**

2    *Q.* Most.

3       But we didn't ask them, did we? We didn't ask them why they

4    chose one or the other?

5    **A. Well, I clearly did not ask the respondents in our survey**

6    **about Taco Bell and McDonald's.**

7    *Q.* And the word "generic," that can mean different things in

8    different contexts; right?

9    **A. Possible.**

10   *Q.* Well, there's -- we're here for a medication case.

11      You're aware there's generics being sold; right?

12   **A. Yes.**

13   *Q.* And yet in the trademark context, it means something

14   different; right?

15   **A. I'm not an expert. You would have to ask the pharmaceutical**

16   **expert who was here earlier. But I believe that generics are**

17   **typically also sold under a brand name.**

18   *Q.* But the phrase in trademark law has a particular meaning;

19   right? You know that. That's what you're testing for.

20   **A. I'm not a legal expert.**

21   *Q.* A generic trademark is, for example, if I wanted to start

22   selling balls, kickballs, and I wanted to call my company

23   "Ball," that's a generic mark; right?

24   **A. I'm an economist. I'm not a lawyer.**

25   *Q.* But is it possible that some of the folks who answered your

ANDREAS GROEHN - CROSS-EXAM (MR. WESLEY)

1    survey generic were thinking generic drug, not generic

2    trademark?

3            *MR. BISH:* Object to form. Speculation.

4            *THE COURT:* Overruled. You may answer.

5            *THE WITNESS:* Well, as I had mentioned in my direct

6    testimony, we did include as a standard practice in Teflon

7    cases, Teflon surveys, we did include other brand names and

8    other common names. And we can go through the list. It's in my

9    report. And those were identified correctly most of the time.

10   *BY MR. WESLEY:*

11   *Q.* And you were asked to measure genericness; right?

12   **A. That is correct.**

13   *Q.* The purpose of the exercise is to determine whether these

14   marks on the board are generic; is that fair?

15   **A. Again, that is a legal construct. So none of -- none of the**

16   **respondents saw the term "genericness."**

17   *Q.* Okay. Well, they did, because they were asked, Is this a

18   common or generic name, or a brand name, so they were shown the

19   term; right?

20   **A. We could put up the slide again that has the exact question**

21   **that we used.**

22   *Q.* I think the jury will remember it.

23       But in terms of these marks, were you aware that they're all

24   registered with the Patent and Trademark Office?

25   **A. That is irrelevant for my work.**

ANDREAS GROEHN - CROSS-EXAM (MR. WESLEY)

1   *Q.*  And some of them are on the Supplemental Register, and some

2   of them are on the Principal Register.

3       But were you aware that to make either Register, a trademark

4   examiner had to look at these and say, These are not generic?

5           *MR. BISH:*  Object to form.  Calls for speculation.

6           *THE COURT:*  Sustained.

7   *BY MR. WESLEY:*

8   *Q.*  Well, are you saying you're more knowledgeable about whether

9   a mark is generic than an experienced trademark examiner?

10  **A.  I'm sorry, why are you asking that question?  Or can you**

11  **provide background to that question?**

12  *Q.*  I'm just asking -- the jury -- I believe you're here to

13  guide the jury in terms of determining whether or not these

14  marks are generic.  And they're registered, so we know that the

15  Trademark Office examiner said they're not.  And your survey is

16  apparently saying they may be.

17      So I'm wondering, do you think you're more reliable than a

18  trademark examiner on the issue of genericism?

19          *MR. BISH:*  Objection.  Argumentative.  Lacks

20  foundation.  Calls for speculation.  Assumes facts not in

21  evidence.

22          *THE COURT:*  Sustained.

23  *BY MR. WESLEY:*

24  *Q.*  Okay.  I'll move on.

25      We can agree, though -- I think both you and Mr. Keegan can

1 agree it's important to test the right people; right?

2 **A.  That is correct.**

3 *Q.*  If we're doing a secondary meaning or genericism survey for

4 a women's clothing store that sells to 90 percent women, you

5 probably don't want to test 90 percent men; right?

6 **A.  It depends.**

7 *Q.*  Oh, so it's -- so you're going to test whether or not a mark

8 for a women's clothing store that sells to 90 percent women,

9 there may be a situation where you'd test 90 percent men?

10 **A.  There are circumstances where that might make sense, but**

11 **it's speculation.  I would have to see the -- more details about**

12 **this.  And I don't want to speculate here.**

13 *Q.*  And we heard testimony earlier in this trial from Cindi

14 White that 90 percent, approximately, of Imprimis customers are

15 ophthalmologists.

16      Were you aware of that?

17 **A.  I heard that testimony.**

18 *Q.*  Were you aware of that before you created your survey?

19 **A.  I was not.**

20 *Q.*  Did you ask?

21 **A.  I did not have contact with Imprimis.**

22 *Q.*  And you, in your survey, at least your genericism survey,

23 mostly tested optometrists; right?

24 **A.  Well, the majority of the respondents to my survey were**

25 **optometrists, that is correct.**

ANDREAS GROEHN - CROSS-EXAM (MR. WESLEY)

1    *Q.* And the optometrist is the doctor who's at, say, Warby

2    Parker or LensCrafters.

3        He's not doing the surgery, is he?

4            *MR. BISH:* Object to form. Calls for speculation.

5            *THE COURT:* Sustained.

6    *BY MR. WESLEY:*

7    *Q.* Do you know if an optometrist does surgery, sir?

8            *MR. BISH:* Same objection.

9            *THE COURT:* Same ruling.

10   *BY MR. WESLEY:*

11   *Q.* Well, there was much greater recognition of these marks

12   amongst ophthalmologists, wasn't there?

13   **A. That is correct. But define "much greater." I found -- I**

14   **found that the difference was not remarkable.**

15   *Q.* And if you had tested 90 percent ophthalmologists

16   and 10 percent optometrists, it's fair to say those numbers you

17   came up with, those 30 percent, would have been higher; true?

18   **A. Well, you can take the results of my survey and add**

19   **different weights. And, yes, the results of the genericness**

20   **survey would be slightly higher. But it would not change the**

21   **general conclusion that there were less than 50 percent of**

22   **respondents who would see this as -- as a common name.**

23   *Q.* Well, Mr. Keegan did the exercise you're describing, and

24   amongst the ophthalmologists that you studied, 41 percent

25   responded brand name.

ANDREAS GROEHN - CROSS-EXAM (MR. WESLEY)

1    Do you take issue with that?

2    *A.  It is possible that this is the number.  And as I mentioned*

3    *earlier, this is still below 50 percent.*

4    *Q.*  And 43 percent of ophthalmologists said TIM-LAT was a brand

5    name.

6    Do you dispute that?

7    *A.  Again, it's less than 50 percent.*

8    *Q.*  And you knew going in that it would be better for this side

9    of the room if the numbers were lower; right?  You knew that?

10   *A.  Probably, yes.*

11   *Q.*  And it would be worse for the company that retained you if

12   they were higher; right?

13   *A.  Possibly.*

14   *Q.*  And this company paid you a lot of money, didn't they?

15   *A.  I -- I was paid for my services, yes.*

16   *Q.*  Hundreds of thousand of dollars; right?

17   *A.  That sounds different than what I had testified to in*

18   *deposition.  I think we had about $200,000 in fees.*

19   *Q.*  Okay.  No expense would be spared for you to do the survey

20   for this company; right?

21         *MR. BISH:*  Objection.  Argumentative.

22         *THE COURT:*  Sustained.

23   *BY MR. WESLEY:*

24   *Q.*  Okay.  Let's talk about this control issue.

25   And you knew that if a control group answered a higher

ERIC GARNER - DIRECT EXAM (MR. LIDDIARD)

1  get from us; the fact that you call our pharmacy, you get a live

2  Montanan who's happy to help you and happy to hear from you; the

3  fact that our customers can get ahold of the CEO on his personal

4  cell phone if they need to.

5      They can call me.  From our reps all the way down, service,

6  service, service is the name of the game.  We never miss the

7  opportunity to go the extra mile for a doctor or their patient.

8  And that's why people purchase from OSRX.

9  Q.  Okay.  Do you want people to associate your company with any

10  other companies?

11  A.  Absolutely not.

12  Q.  Why not?

13  A.  Again, like, what I started with, a brand is your identity.

14  It's who you are.  It's how you stand out.  And it's what makes

15  you different, a cut above the rest.  The last thing you want is

16  to build a brand that people would conflate with any others.

17  Q.  And you've sat in and watched some of the testimony in the

18  case; correct?

19  A.  I did.

20  Q.  And have you heard testimony coming in from the other side

21  where there's references to, We just want them to not use these

22  marks, and they're on their website, words to that effect, did

23  you hear that?

24  A.  Yes.

25  Q.  I don't know if we can pull it up, but did you go and check

ERIC GARNER - DIRECT EXAM (MR. LIDDIARD)

1   *Q.*  And there's no -- no references to any of the abbreviated

2   drug names on this particular website, is there?

3   **A.**  **Yeah, not to my knowledge, no.**

4        *MR. LIDDIARD:*  Let's pull up the OSRX.com website.

5        *THE WITNESS:*  It's OSRXpharmaceuticals.com.

6        *THE COURT:*  Hope you have a hotspot.

7        *MR. BISH:*  We do.

8        *THE COURT:*  We don't have any Internet.

9        *THE CLERK:*  No, they have one.

10   *BY MR. LIDDIARD:*

11   *Q.*  Great.  We have the website, the homepage.

12     Can you just look and tell me where we could possibly find

13   any references to the abbreviated drugs on this website?

14   **A.**  **Yeah.  The two that, off the top of my head, you can -- if**

15   **you go into the "Ophthalmic Medication" portfolio, click on**

16   **"Post-op Care."**

17     **And then below, you'll see our formulations listed, and with**

18   **images of them, as well as the active ingredients.  And then**

19   **you'll see that blue link for "Potential Adverse Events and**

20   **Contraindications," which is information that we provide to**

21   **physicians and patients if they're viewing the site.  So if you**

22   **click that link.**

23     **You'll see here that we have each API broken out by its**

24   **formal name below in the text.  But the header, to simplify this**

25   **and to sum it up, is just the acronym -- or the abbreviation for**

**ERIC GARNER - DIRECT EXAM (MR. LIDDIARD)**

1   *A.*  **That's our formulation, BRIM-DOR, brimonidine dorzolamide.**

2   *Q.*  Okay.  And is there any abbreviations on that bottle?

3   *A.*  **No.**

4   *Q.*  It specifies a full name?

5   *A.*  **It does.**

6   *Q.*  Is there any branding on the bottle?

7   *A.*  **There is.  Under the medication, the APIs that we list out,**

8   **there's the OMNI logo, which, again, is -- that's our branded,**

9   **trademarked representation of our entire portfolio.**

10  *Q.*  Is there any reference to OSRX on the bottle as well?

11  *A.*  **Yeah.  There should be on the back.  Yes.  If you go**

12  **through, it lists all the active ingredients, the inactives.  It**

13  **has some patient information.  Then it clearly lists, "This is a**

14  **compounded drug, OSRX, Inc."  And it has our address, phone**

15  **number.**

16          *MR. LIDDIARD:*  Thank you.  No further questions.

17          *THE COURT:*  Cross-exam?

18          *MR. ARLEDGE:*  I do, and I think it will be brief, but I

19  don't think it will be three-minutes brief.  Should we --

20          *THE COURT:*  How long do you think it will be?

21          *MR. ARLEDGE:*  Twenty-five?

22          *THE COURT:*  Twenty-five minutes?

23          *MR. ARLEDGE:*  I think so.

24          *THE COURT:*  Okay.  Direct was only 10 minutes, but

25  okay.  We'll take a break, ladies and gentlemen.  If you could

ERIC GARNER - CROSS-EXAM (MR. ARLEDGE)

1          *MR. LIDDIARD:* Objection. Calls for speculation.

2          *THE COURT:* Overruled. I'll allow it.

3          *THE WITNESS:* It's a -- it's a common way, but I

4   couldn't say necessary it's the most common way.

5   *BY MR. WESLEY:*

6   *Q.* All right. And you sometimes buy AdWords in order to get

7   doctors to your website?

8   **A.  Correct.**

9   *Q.* And when you buy those AdWords, do you occasionally use some

10  of these disputed terms?

11  **A.  We bid on those terms.  We don't use them in our ad copy or**

12  **any of the pages that we direct into.**

13  *Q.* What do you do with them exactly?

14  **A.  We bid on those search terms.**

15  *Q.* Okay. What does that mean?

16  **A.  It means that --**

17         *MR. LIDDIARD:* Objection. Outside the scope.

18         *THE COURT:* Overruled.

19         *THE WITNESS:* The way Google Ad Buys work is you can

20  bid on certain search terms. When they come up when those words

21  are searched, it will serve an ad and it will present your ad

22  copy onto that user in Google.

23  *BY MR. ARLEDGE:*

24  *Q.* I see.

25       So the terms that you bid on, if somebody types that into

ERIC GARNER - CROSS-EXAM (MR. ARLEDGE)

1    Google, then that will help your ad appear on the screen for

2    that person at the computer; is that fair?

3    **A.   Yeah.   And it will appear as an ad.   It will be denoted.**

4    **I'm sure everyone here has seen them.   You get served them all**

5    **the time.   It's extraordinarily common in marketing,**

6    **advertising.**

7    **     And there's other factors too that will determine whether**

8    **you get served the ad.   There's geotargeting.   There's other**

9    **ways to limit it.   You can bid on a very narrow scope, as well.**

10   **There's a very wide one if you want.**

11   *Q.*   And you've bid on some of these disputed terms?

12   **A.   We have, yes.**

13   *Q.*   And you've bid on these disputed terms plus Imprimis, its

14   name; right?

15   **A.   Correct.**

16   *Q.*   And that's because if somebody is typing Imprimis and one of

17   these disputed terms, that may direct them to your

18   advertisement?

19   **A.   So we have a similar customer base, yes.   And, again, it's a**

20   **very common tactic, not just in this industry, but in others.**

21   *Q.*   Let's put up -- oh, by the way, one of the ways that you

22   contact doctors is salespeople may send emails to doctors'

23   offices?

24   **A.   Our sales reps do use email, yes.**

25   *Q.*   Right.   We looked at one the other day that Matt Gee had

**DAVID HALL - DIRECT EXAM (MR. BISH)**

1  Mr. Hall?

2  **THE COURT:**  Is this an exhibit number?

3  **MR. BISH:**  Attachment 3 to the report.  It's just for

4  demonstrative purposes.

5  **THE COURT:**  Okay.  I'm not showing it at this point.

6  We're just showing it to the witness.  Go ahead.

7  **THE WITNESS:**  It is -- looks like Attachment 3 to my

8  report.  If it could be zoomed out, it would confirm that,

9  but -- there we go.  Yes, Attachment 3 to my May 2023 report.

10  *BY MR. BISH:*

11  *Q.*  And what is Attachment 3?

12  **A.  It is the financial information, as the source down below**

13  **indicates, from Harrow Health 10-K filings for the years 2016**

14  **through 2022, and also reflected on Dr. Wunderlich's report,**

15  **Schedule C1.**

16  *Q.*  And is there information in this attachment about operating

17  expenses?

18  **A.  Yes.  And the source of the financial statements comes --**

19  **takes in account or is the basis for the columns all the way**

20  **over to the total column, the fourth column from the right, that**

21  **is the June 2015/December 2022 total column.  That's the**

22  **information that comes from the financial source I cite.**

23  **The columns to the right of that are Dr. Wunderlich's**

24  **analysis reflected in his Schedule C.  And I mentioned earlier**

25  **the gross profit and then the operating expenses.  If we look at**

DAVID HALL - DIRECT EXAM (MR. BISH)

1    **the --**

2          ***THE COURT:*** I just want to make sure you understand,

3    the jury isn't seeing what you're seeing.

4          ***THE WITNESS:*** I see.

5          ***THE COURT:*** You're the only one looking at it right

6    now.

7          ***THE WITNESS:*** Thank you.  Sorry.

8          ***THE COURT:*** Okay.

9    *BY MR. BISH:*

10   *Q.*  Yeah.  So the question is, you analyzed operating expenses

11   of the plaintiff -- one of the plaintiff -- of the Harrow

12   entities; correct?

13   *A.*  **That's correct.**

14   *Q.*  And did you calculate a percentage of revenue attributable

15   to the operating expenses?

16   *A.*  **I observed the percentage of operating expenses, which can**

17   **be calculated by dividing a single number of the operating**

18   **expense line item by the total revenue line at the top.  And you**

19   **can get a sense of year to year, the operating expenses as a**

20   **percent of revenue.**

21   *Q.*  And as a rough matter, what's that -- what's that

22   percentage?

23          ***MR. WESLEY:*** Your Honor, may we have a sidebar on this?

24          ***THE COURT:*** Sure.  Excuse us for a minute, ladies and

25   gentlemen.

DAVID HALL - DIRECT EXAM (MR. BISH)

1    it up.  You, Judge, decide disgorgement of profits.

2          So I'm allowing these profits to come in as actual

3    damages, not as disgorgement of profits, so it is relevant what

4    the plaintiff would have made on this.

5          *MR. WESLEY:*  Understood.  I had a different

6    understanding of what we were doing on profits and damages.  My

7    apologies.

8          *THE COURT:*  Okay.

9       *(End of sidebar; in open court.)*

10   *BY MR. BISH:*

11   *Q.*  Back to my inartful question, sir.

12      Can you approximate the percent of revenue attributable to

13   operating expenses?

14   **A.  Yes.  It's in the 70 percent range in total.  And for the**

15   **seven-year period, it varies a little bit year to year, but**

16   **looking at each year, it's approximately in the 70 percent range**

17   **of the revenue.  So if you divided operating expenses by the**

18   **revenue number, you'd get .7-something or 70 percent.**

19   *Q.*  And then do I understand what you explained earlier, that

20   Dr. Wunderlich applied a 50 percent number to that figure?

21   **A.  He did.  He determined that, in his opinion, 50 percent of**

22   **the biggest category within operating expenses, which is the**

23   **selling/general administrative costs, he determined and**

24   **concluded that half of those costs were fixed in nature and half**

25   **were variable.**

**DAVID HALL - DIRECT EXAM (MR. BISH)**

1   *Q.* And for purposes of your report, you didn't take issue with

2   that assumption?

3   *A.* **I did not. I reflected them here and addressed it in my**

4   **report as far as his variable cost of operating expenses**

5   **conclusion.**

6   *Q.* Okay. We'll go back to the jury screens now.

7   Looking at Slide 7, what are you showing here?

8   *A.* **I am graphically depicting what an earlier schedule showed,**

9   **when I had subtotaled the PRED-MOXI and DEX-MOXI based on their**

10  **status in the Register's office of primary or -- and the -- all**

11  **others being the other status in the Register. And so I wanted**

12  **to graph that out by year. But it's a bar graph depiction of**

13  **that earlier schedule I discussed and described.**

14  *Q.* So the marks that are on the Primary Register, those are

15  reflected in the green?

16  *A.* **Yes. And, again, I should point out, all the figures in**

17  **these graph are in thousands. So when you see 608 in the box**

18  **for PRED-MOXI, that's $608,000.**

19  *Q.* And that's revenue; right? That's not --

20  *A.* **It is revenue, not gross profit.**

21  *Q.* And certainly not net profits?

22  *A.* **That's correct.**

23  *Q.* Okay. And I see here that you inserted the Keegan secondary

24  meaning study in 2023.

25  Were you here in the courtroom yesterday when Mr. Keegan was

**ANTHONY SAMPIETRO - CROSS-EXAM (MR. ARLEDGE)**

1   *A.*  A hundred percent.

2           *MR. LIDDIARD:*  Okay.  Thank you.  No further questions.

3           *THE COURT:*  Cross-exam?

4

5                    *CROSS-EXAMINATION*

6   *BY MR. ARLEDGE:*

7   *Q.*  Hi, sir.

8   *A.*  Hi, Chris.

9   *Q.*  The revenues and profit figures you gave a few minutes ago,

10  was that for Ocular Science or OSRX?

11  *A.*  It's OSRX.

12  *Q.*  And then OSRX's profits then go up to Ocular Science, is

13  that how it works?

14  *A.*  So Ocular Science is the management service organization for

15  OSRX.  Two separate C-corporations.  They're affiliates of each

16  other.  And so we bill for services.

17      Those services include marketing, sales, finance, patent and

18  trademark, whatever else.

19  *Q.*  Just to make sure I understand, OSRX is essentially working

20  for Ocular Science in selling the products; yes?

21  *A.*  Say the question again?

22  *Q.*  And I may have missed it.  I thought what you were saying is

23  that Ocular Science uses OSRX to -- to sell the products, and

24  essentially they pay OSRX for those efforts.

25      Is that fair?

**ANTHONY SAMPIETRO - CROSS-EXAM (MR. ARLEDGE)**

1   **A.  No.**

2   *Q.* All right.  Can you say it again?  Because I think I missed

3   it.

4   **A.  Okay.  Management service organization.**

5   *Q.* Okay.

6   **A.  And there's a Management Service Agreement between the**

7   **affiliates, which are two separate C corps.**

8   *Q.* All right.  So OSRX is the C-corp that actually sells the

9   medications; yes?

10  **A.  Correct.**

11  *Q.* And then money comes into OSRX for those sales?

12  **A.  Correct.**

13  *Q.* And after OSRX has paid costs, there is some amount of

14  profit hopefully left over; right?

15  **A.  Hopefully.  There wasn't much.**

16  *Q.* Well, what happens to the profit that's left over?  Does

17  some of that profit go to Ocular Science?

18  **A.  I'm not sure.  I don't have the accounting in front of me.**

19  *Q.* Well, I'm not asking you for exact numbers of how much goes

20  up, but does some of the profit go from OSRX to Ocular Science?

21  **A.  I would imagine, yes.**

22  *Q.* Okay.  And how is that determined?

23  **A.  That would be my accountant's -- my CPA and my CFO's**

24  **determination.**

25  *Q.* Let me ask you this.  The last numbers that we saw on

ANTHONY SAMPIETRO - CROSS-EXAM (MR. ARLEDGE)

1  revenues were November of 2022, which is two years ago.

2      Have OSRX's revenues increased or decreased on an annual

3  basis since then?

4  **A. Since 2022?**

5  *Q.* Yeah.

6  **A. Increased.**

7  *Q.* And did they increase in both 2023, and so far in 2024?

8  **A. Yes.**

9  *Q.* And the profits, what are the profits in -- what were the

10  profits in 2023?

11  **A. The profits in 2023 were $1.7 million.**

12  *Q.* What about 2024?

13  **A. We're not done with 2024 yet.**

14  *Q.* What are they so far?

15  **A. I can't tell you that.  I don't know yet.**

16  *Q.* No idea?

17  **A. When we close out the year, then I'll be able to tell you.**

18  *Q.* Okay.  Are the numbers looking better or worse than last

19  year?

20  **A. As far as profitability?**

21  *Q.* Yeah.

22  **A. Probably worse.**

23  *Q.* Okay.  The cost numbers that you were talking about a second

24  ago, did you ever give those to your expert, Mr. Hall?

25  **A. No.**

1    to, or we can just go through them together if you're here at

2    9:30.

3          **MR. LIDDIARD:**  Thank you.

4          **MR. WESLEY:**  Thank you, your Honor.

5          **THE COURT:**  Thank you.

6       **(Proceedings adjourned at 3:12 p.m.)**

7                          **\*\*\***

8                  *REPORTER'S CERTIFICATE*

9          I, Anne Roldan, certify that I am a duly qualified
     and acting Official Court Reporter for the United States
10   District Court, that the foregoing is a true and accurate
     transcript of the proceedings as taken by me in the
11   above-entitled matter on November 14, 2024; and that the format
     used complies with the rules and requirements of the United
12   States Judicial Conference.

13   Date:  November 15, 2024

14

15   *Anne Roldan, RMR, CRR, CSR 13095*

16

17

18

19

20

21

22

23

24

25

1          UNITED STATES DISTRICT COURT

2      FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

IMPRIMISRX, LLC,                )  Case No. 21-cv-1305-BAS
4                               )
                      Plaintiff, )  November 19, 2024
5       vs.                     )
                                )  Jury Trial, Day 5
6   OSRX, INC., et al.,         )
                                )
7                     Defendant. )
   ─────────────────────────────)
8                               )
   AND RELATED CROSS-ACTION      )
9   ─────────────────────────────)

10

11          REPORTER'S TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE CYNTHIA A. BASHANT
12            UNITED STATES DISTRICT JUDGE

13          VOLUME 5, PAGES 629 - 738

14

15          (APPEARANCES ON FOLLOWING PAGE)

16

17

18

19

20

21   REPORTED BY:

22   ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
     U.S. OFFICIAL COURT REPORTER
23   U.S. District Court Clerk's Office
     333 West Broadway, Suite 420
24   San Diego, California  92101

25   Reported stenographically; transcribed with CAT software.

1    Imprimis owns these marks, they're valid, and others can't --

2    others can't use them.

3           And now the question is damages, and that's Question 4.

4    "What is the total amount of damages attributable to the

5    infringement of the following marks?"  And the verdict form

6    splits them up.  Four deals with the seven marks that are on the

7    Supplemental Register, and five deals with the two marks that

8    are on the Principal Register.

9           So let me talk briefly about damages.  We all saw the

10   sales numbers, from not just our expert, but the Defendants'

11   expert.  And so $1,690,000 was the sales revenue for the two

12   marks that are on the Principal Register, and $32,475,000 was

13   the total revenue that the Defendants made for the marks on the

14   Supplemental Register.

15          But you may recall -- and I'll remind you -- that these

16   numbers are actually through 2022.  And our expert said that his

17   understanding was we asked for the numbers for '23 and '24, and

18   we weren't provided, and OSRX didn't provide the numbers for

19   those years to its own expert.  So without those numbers, we

20   have to do what we can.

21          But what we do know is that they testified that their

22   revenues for these products were going up in '23, '24.  And in

23   evidence was the fact that they made $13 million on the products

24   on the Supplemental Register, and about 770,000 per year in the

25   last year on the products on the Principal Register.

1    So if we assume they did just as well in 2022 as they

2    did in '23 and '24, then you would add two years of 770, so

3    we'll call it 1.4 million.  We'll just round down to 3 million.

4    And if you assume that you added 13 million a year for

5    two years, that's 26 million.  And that's going to

6    be 58 million.  So for a total of about -- we'll call

7    it $60 million.

8    Now, we heard from their expert that they have costs.

9    They have -- that these are just the money that's paid in to --

10   to pay for the products.  And that seems reasonable.  So we're

11   going to take their expert's profit analysis and apply it here.

12   And so for these numbers, 3 million, he said their profit margin

13   was about 30 percent.  So we're going to say about a million

14   bucks.  And for these, 30 percent is about 18 million.

15   And these are revenues that would have gone to Imprimis

16   absent the infringement.  We know the revenues wouldn't have

17   gone to another competitor.  We know that, because there are no

18   competitor -- there are no other competitors for these

19   particular formulations.

20   You may remember Eric Garner's testimony, saying that

21   for the longest time, Imprimis had a stranglehold on this

22   compounded eyedrop market.  There are two alternatives in the

23   space.  The sale didn't go to Defendants, it went to us.  And we

24   don't need to speculate about that.  This is what they --

25   Defendants said to their own investors.

1    That's Exhibit 1 -- Exhibit 41 is an example.  After arguing all

2    kinds of nonsense, like that "TIM" stands for Traditional Indian

3    Medicine, and that "LAT" means the latissimus dorsi, the PTO

4    rejected those excuses and found -- Slide 30 -- that in the

5    presence case, the evidence of record leaves no doubt that the

6    marks -- the mark is merely descriptive.

7          The PTO then wrote in all caps, "This refusal is now

8    made final."  31.  In other words, knock it off.  This is not a

9    protectable mark.

10          So that is why these seven marks are on the

11   Supplemental Register, because they are not protectable.

12   They're merely descriptive.  Unless they acquire secondary

13   meaning, which we'll come back to.

14          And why are they merely descriptive?  Because they

15   merely describe the active product ingredients using widely

16   known abbreviations that existed long before ImprimisRx.  You

17   heard testimony that DEX is even used with -- you know, on farms

18   and in the veterinary context.

19          The PTO was right in 2017, and they are right today.

20   These are not inherently distinctive marks, and as such, they

21   deserve no protection.

22          So now let's talk about where these names came from.

23   Mr. Baum told us that he personally came up with them in a

24   conference room on a whiteboard, moving them all around, you

25   know, coming up with different combinations.

1   "goofy."  There are all kinds of dogs that are goofy and there

2   are goofy dogs in the world.  You are allowed to describe the

3   attributes of things, even when it's trademarked.

4          It comes from the First Amendment.  Companies are

5   absolutely entitled to use trademarked words if they are doing

6   so to fairly and accurately describe their own products.

7          American Airlines.  Counsel used that as an example.

8   Fair.  American Airlines has acquired secondary meaning.  That's

9   true.  Does that mean United can't say that "We are an American

10  airline"?  Of course it doesn't.  United is an American airline.

11  They're allowed to say that.

12         Now, American Airlines, that is a very distinctive mark

13  that took years and years, and a much bigger budget than you

14  heard testimony here about.  And that's the point of secondary

15  meaning.  It's hard.  It's very hard.  It's a very hard burden.

16         This fair use, this is also why the PTO -- it's one

17  reason why the PTO asks people, "Does your abbreviation or your

18  name have any meaning in the field."  Because if so, other

19  people can use it.  That's fair use.

20         Here, doctors and the companies that sell these

21  products need to be able to communicate with each other

22  accurately and competently.  It's very important to understand

23  what people are putting into their eyes.

24         The evidence is overwhelming that OSRX uses these

25  abbreviations to accurately communicate with doctors and

1    patients about the ingredients of its products.

2           PRED-BROM, you saw the PRED-BROM bottle in the jury

3    box.  That describes a product with prednisolone and bromfenac.

4    And whether or not Mr. Baum really sat in a room with a

5    whiteboard, the fact of the matter is that PRED-BROM is listed

6    in order of concentration.  That is a good reason for the order

7    of the abbreviation.  It's useful to doctors.  It's accurate

8    communication.  It's fair use.

9           Imprimis does not have the right to bully OSRX or

10   anyone else to switch the order of abbreviations in a way that

11   would be less accurate and less descriptive of the products at

12   issue.

13          Now, you heard testimony about trade shows.  We'll come

14   back to that.  I mean, imagine if a doctor walks up to the OSRX

15   trade booth and says, "Hey, do you have PRED-BROM?"  These folks

16   want us to say, "No, no, we don't have PRED-BROM, we have

17   BROM-PRED."  And a doctor is, "So what's the difference?"

18          "Well, it's the same, it's just we can't say that."

19   Come on.  That's not the way the real world works.

20          I also want us to be very clear, OSRX is not using

21   these as trademarks.  Mr. Garner explained that his brands are

22   OSRX and OMNI.  Let's go to Slide 45.  Those are our brands.

23   Those are our trademarks.  Ocular and OSRX each have their own

24   logos.  Slide 46 is an example of his testimony.

25          They're on the bottle.  You saw the bottle.  Slide 47.

1    Now, you also saw one or two examples of emails -- I

2 think 52 might be an example -- where our folks, you know, used

3 it with a hyphen in an email.  This is no different than the

4 trade show example.

5    If a doctor emails and says, "Hey, do you folks have a

6 PRED-BROM compound," we can of course respond and say, "Yes, we

7 have a PRED-BROM compound."  They do not have a monopoly over

8 these marks.  It's fair use.  This is competition.

9    If Imprimis wanted a brand that others couldn't use

10 under any circumstances, then they should have used that

11 whiteboard to come up with a better name.  Choose a better

12 brand.

13    My friend, Mr. Keegan, had examples of -- of famous

14 marks.  Be creative.  Do your job.  If you're going to use -- if

15 you're going to use an abbreviation that has meaning and

16 significance in your field, that describes an ingredient, you'd

17 better be -- you'd better be sure that your competition is

18 allowed to use those abbreviations under the doctrine of fair

19 use.  And it's not trademark infringement.  Again, that's

20 Instruction 19.  Take a close look at it.  I think you'll see

21 that describes this case to a tee.

22    Now, I'm going to briefly discuss surveys, my favorite

23 topic.  As I told you earlier, the PTO got it right

24 in 2017, 2018, and in 2020 when they denied the marks.  But

25 let's walk through why we did these surveys, why Mr. Groehn and

1    lawsuit in July of 2021.  It obtained a license in August the

2    following month, and sued my client when it didn't even have a

3    license.

4         And with respect to PRED-MOXI-BROM, Imprimis didn't

5    even obtain a license for that -- for that product until -- or

6    that mark until August of 2022, a year later.

7         Now, let's turn quickly to Question No. 3 on the form,

8    "Has ImprimisRx proven that Defendants OSRX infringed any of the

9    trademarks and engaged in unfair competition?"  We submit that

10   the answer to each one of these questions should be no as well.

11   You've heard now fair use, you have an instruction on it.

12        And fair use is a very significant -- and we believe

13   that you should find for our client and check no to each one of

14   these boxes, because my client was fairly using these marks to

15   describe its products, these abbreviations of the active

16   pharmaceutical ingredients in the eyedrop.

17        And you heard my client doesn't use -- these are not

18   trademarks, according to my client.  My client has OSRX as a

19   logo and a brand.  OMNI is the brand that it markets and sells

20   eyedrops under.

21        The only function of these particular marks or

22   abbreviations is so that my client can communicate with the eye

23   doctors with regards to what is in the actual product itself.

24        And you heard Ms. Frost -- or Dr. Frost, a licensed

25   pharmacist who's been practicing for a very long time.  She came

1   back into the jury room, and that whatever you're -- if you're

2   sending just a thumb drive back there, that you're all in

3   agreement that there is only on the thumb drive the exhibits

4   that have been admitted into evidence.  We did have one trial

5   where all kinds of other things went back into the jury room by

6   mistake.  So I leave that in your hands.  I'm not looking at the

7   thumb drive to make sure that's accurate.

8           Will you stipulate that the jury may be excused, either

9   for breaks or for lunch or at the end of the day, and brought

10  back in without all of you being present?

11          **MR. BISH:**  Yes.

12          **MR. ARLEDGE:**  Yes, Your Honor.

13          **THE COURT:**  Okay.  All right.  We'll let you know.

14      **(Jury deliberation began at 12:21 p.m.)**

15      **(Jurors excused for the evening at 4:00 p.m.)**

16                          ***

17                  *REPORTER'S CERTIFICATE*

18          I, Anne Roldan, certify that I am a duly qualified
    and acting Official Court Reporter for the United States
19  District Court, that the foregoing is a true and accurate
    transcript of the proceedings as taken by me in the
20  above-entitled matter on November 19, 2024; and that the format
    used complies with the rules and requirements of the United
21  States Judicial Conference.

22  Date:  November 19, 2024

23  _____

24  *Anne Roldan, RMR, CRR, CSR 13095*

25