DYLAN J. LIDDIARD (BAR NO. 203055)
DALE R. BISH (BAR NO. 235390)
THOMAS J. MARTIN (BAR NO. 150039)
CHARLES A. TALPAS (BAR NO. 308505)
MIKAELA BURKHARDT (BAR NO. 328112)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 493-9300
Email: dliddiard@wsgr.com

*Attorneys for Defendants OSRX, Inc. and Ocular Science, Inc.*

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMPRIMISRX, LLC, <br><br> Plaintiff, <br><br> v. <br><br> OSRX, INC., OCULAR SCIENCE, INC., <br><br> Defendants. | Case No. 3:21-CV-01305-BAS-DDL <br><br> **REPLY IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL** <br><br> Hearing Date: April 25, 2025 <br> Courtroom: 12B <br> Judge: Hon. Cynthia A. Bashant <br><br> **NO ORAL ARGUMENT UNLESS ORDERED BY THE COURT** |
| OSRX, INC., OCULAR SCIENCE, INC., <br><br> Counterclaimants, <br><br> vs. <br><br> IMPRIMISRX, LLC, <br><br> Counterdefendant. | |

Plaintiff largely ignores Defendants' arguments in the opening brief. As a matter of law, generic drug names cannot be trademarks. It makes no difference that Plaintiff merely used the first syllable of those generic drug names—doctors "still know" exactly what they mean. Plaintiff also fails to explain how it could show secondary meaning when its own survey expert tested only two of the nine marks, saw indicia of genericness, and could not opine that the marks showed a sufficient level of secondary meaning. Further, Plaintiff had no confusion survey, disclaimed point-of-sale confusion, and came to trial with hypothetical examples of initial interest confusion. Finally, Plaintiff knew that it could never show that it lost a single sale due to the alleged infringement, much less show causation sufficient to establish actual damages.

Minimally, the verdict on liability and damages was against the clear weight of the evidence, justifying a new trial and/or remittitur. Plaintiff tacitly concedes as much by failing to assess any arguments or evidence under the more lenient Rule 59 standard, which allows courts to weigh evidence, make credibility determinations, consider probable juror confusion and improper expert testimony, and grant relief on any ground necessary to prevent a miscarriage of justice. *See Hendrix LLC v. Hendixlicensing.com Ltd*, 762 F.3d 829, 841-42 (9th Cir. 2014). By itself, the fact that the jury found all nine asserted marks acquired secondary meaning, when Plaintiff's survey (its main evidence) tested only two of them, justifies a new trial on liability. Further, the damages awarded bear no relationship to the facts, to Plaintiff's purported "losses," or to Defendants' financial condition. It is a windfall to Plaintiff and unjustifiably ruinous to Defendants.

## I. **VALIDITY**

### A. **Plaintiff's Own Admissions Prove Genericness as a Matter of Law or, at a Minimum, Establish that the Verdict Was Against the Clear Weight of the Evidence**

Plaintiff entirely ignores Defendants' main argument regarding genericness, which is based on three undisputed facts: (i) Plaintiff admits that the full medication names (e.g., timolol-latanoprost) are the generic terms for the products at issue; (ii) Plaintiff admits that the purported marks (e.g., TIM-LAT) are abbreviations of those generic terms; and

(iii) Plaintiff admits that eye doctors "know" the abbreviations signify the generic terms. *See* Mot. 2-3. It is black letter law that "an abbreviation of a generic name" is itself generic if it "still conveys to the buyer the original generic name connotation of the name which is abbreviated." *Id.* (citing 2 McCarthy § 12:37). Thus, if eye doctors "know" TIM-LAT means timolol-latanoprost, as Plaintiff readily admits, then TIM-LAT is generic.

This justifies entry of judgment or, at the very least, establishes that the verdict on validity was against the clear weight of the evidence (*see also* Mot. 3-8).

### B.     Plaintiff Has No New Counter Arguments

Plaintiff continues to assert the same flawed legal arguments, which Defendants predicted and dispelled since the prior round of briefing. Specifically, it primarily relies on made-up legal doctrines about composite terms and abbreviations of generic elements, immaterial arguments about secondary meaning, immaterial arguments regarding the PTO, and Defendants' failure to use alternative abbreviations. Defendants have addressed those arguments thoroughly in three prior briefs (Mot. 8-11; ECF No. 350-1 at 8-11; ECF No. 352 at 3-5), so Defendants will refrain from restating the same arguments for a fourth time, except to make a few brief points.

First, as its main argument, Plaintiff continues to rely on made-up legal doctrines and distortion of a jury instruction. Contrary to what Plaintiff argues, Jury Instruction No. 12 merely states that "the word '*apple*' is descriptive" when used in "'CranApple' to designate a cranberry-apple juice." ECF No. 344, Instr. 12 (emphasis added).[1] It is part of an exemplar progression designed to illustrate that the same term, "*apple*," may vary in distinctiveness in different contexts. It is not intended to stand in isolation from the broader example, which also states that "*apple*" is generic when "used to identify the fruit

---

[1] Despite what Plaintiff argues, the "CranApple" example has nothing to do with "unique combinations of particular abbreviations of generic terms," and it certainly does not say that they are "the framework" for descriptive trademarks. Opp. 6. Nor does it state: "the generic 'apple' merges with an abbreviation for the generic 'cranberry' ('cran') to create the model descriptive trademark in this circuit." *Id.*

from an apple tree." *Id.*[2]

In any event, here, Plaintiff admits timolol-latanoprost *is* the generic term for the product, so the juice example (where apple is just one ingredient in the juice) is unnecessary and inapt. There is no reason to debate whether timolol and latanoprost are just "ingredients" of the thing, like apples-to-juice, or the name of the thing itself, like apples-to-apples. Plaintiff acknowledges as much when it argues that "Xalacom is only ***one*** registered trademark for timolol-latanoprost." Opp. 7; *see also* Mot. 10 n.9.

Second, Plaintiff fails to address the fact that the verdict on validity was contrary to the same instruction. As Plaintiff admits, TIM-LAT is an abbreviation of the generic name for the product. Opp. 6, 10. Per Jury Instruction No. 12, if "the majority of relevant consumers would understand the term to name the type of product rather than the manufacturer, the primary significance of the term is generic and not entitled to protection." ECF No. 344, Instr. 12. A central theme in Plaintiff's case was:

> [D]octors know that "pred" means prednisolone, "gati" means gatifloxacin, and "brom" means bromfenac. So it would not matter the order in which you placed those terms; ***doctors would still know what the product was***.

ECF No. 351 at 6-7 (emphasis added). Accordingly, Jury Instruction No. 12 alone would

---

[2] Moreover, Jury Instruction No. 12 does not state whether "*CranApple*" is descriptive at all, just that "*apple*" is descriptive therein. To the extent it implied, without stating, that "*CranApple*" is descriptive, it is misaligned with current law, which holds that a word identifying a key ingredient in a beverage is generic. *See, e.g.*, *In re Sirob Imports, Inc.*, Serial No. 78647047 (T.T.A.B. 2010) (the "proposition that the term lemon, orange, grapefruit, or apple would not be generic for lemon juice, orange juice, grapefruit juice, and apple juice, respectively is contrary to both logic and experience"); *In re Jackfrombrooklyn Incorporated*, Serial No. 90884812 (T.T.A.B. 2023) (SOREL generic for liqueur containing sorrel hibiscus plant); *In re The Original Pickle Shot, Inc.*, Serial No. 88409422 (T.T.A.B. 2021) (PICKLESHOT generic for alcohol and pickle juice). Plaintiff appears confused, claiming "*apple*" is "*generic*" in "CranApple" but "merges" to become "descriptive." Opp. 6 ("the *generic 'apple'* merges with an abbreviation for the generic 'cranberry' to create the model descriptive trademark in this circuit"). Given the particular facts of this case, jurors were probably confused and improperly swayed by it, which may explain how they entered a verdict that was, at minimum, against the "clear weight of the evidence." *See Experience Hendrix*, 762 F.3d at 846-57 (grant of new trial affirmed due to probable confusion over jury instruction).

1  compel a jury to find that the purported marks are generic.

2  Second, *E.T. Browne v. Cococare Prods., Inc.*, 538 F.3d 185 (3d Cir. 2008) does not help Plaintiff because, unlike in that case, the parties here agree about what the generic name of the product is. In *E.T. Browne*, the dispute was whether the "proper genus" of the product was a "cocoa butter *formula*" or a "cocoa butter *lotion*." 538 F.3d at 194-98 (emphasis added). The court reasoned that "formula" was not an obvious descriptor for a type of skincare product, as opposed to things like "baby formula" or "algorithms or recipes," noting that other competitors do not use the word "formula" in relation to skincare products. *Id.* Thus, *E.T. Browne* is inapposite because everyone agrees what the "proper genus" is in this case: timolol-latanoprost (and likewise for the other compounds).

Third, while Plaintiff gives short shrift to one of its prior mainstay arguments (the availability of alternative abbreviations), it also revives an old argument that it effectively abandoned (PTO status). As before, however, Plaintiff cites no case law suggesting that its PTO statuses afford any evidentiary value. That is because they do not. As Defendants already explained, registration on the supplemental register cannot be used as evidence to show that a mark is not generic. *See* ECF No. 350-1 at 11. While the principal register confers a presumption of "inherently distinctiveness," the presumption is rebuttable, and Plaintiff concedes its marks are not inherently distinctive. *Id.* Because their registration on the principal register (for PRED-MOXI and DEX-MOXI) was not predicated on a showing of acquired distinctiveness, its registration status cannot be used as evidence of secondary meaning. *See* ECF No. 350-1 at 11-12 (citing 1 McCarthy § 11:43).

### C. Plaintiff Has No Evidence of Secondary Meaning

In the opening brief, Defendants focus on survey evidence and intentional copying because that was the only combination of factors that Plaintiff asserted as legally sufficient to support the jury's finding on secondary meaning. *See* Mot. 11; ECF No. 351 at 9. Plaintiff never argued that there was some other combination of evidence that was legally sufficient—and still does not. Plaintiff's complaint that Defendants did not discuss other immaterial factors, *see* Opp. 12, therefore rings hollow.

Plaintiff continues to ignore that it proffered a secondary meaning survey as to only two of its nine purported marks. *See* Mot. 11. Plaintiff still does not explain how there was a sufficient basis to find that these seven marks acquired secondary meaning.

Further, as to the actual survey results, Plaintiff ignores two critical arguments. First, Plaintiff ignores that its survey results do not show "a *single*, anonymous source," even though that is the legal theory on which it relies. Mot. 11-12 n.10. Second, Plaintiff *admits* that Mr. Keegan's survey results are not legally sufficient to show secondary meaning, as does Mr. Keegan himself, yet Plaintiff fails to cite any analogous case where secondary meaning was found based on similar survey results. Mot. 11-12.

## II. LIKELIHOOD OF CONFUSION

Plaintiff ignores the vast majority of arguments on likelihood of confusion.

First, as Plaintiff admits, the purported marks do not appear on the medication bottles because regulations require the full generic medication name to be printed on the label. *See* Mot. 12; Opp. 8. Instead, Plaintiff relies on seven instances where Defendants actually used the abbreviations in external communications. *See* Mot. 12-13. Plaintiff does not explain how it was reasonable for the jury to find that these seven *de minimis* exhibits were "likely to confuse an appreciable number of people." Mot. 12-14, 17-18.

Second, citing *Arcoma* and similar cases, Defendants invited a comparison between these seven exhibits and examples of Plaintiff's own advertising and branding, since the visual dissimilarity is so striking that nobody could be confused regarding the source. *See* Mot. 13-14 & n.11. Plaintiff does not dispute the striking dissimilarity. *See* Opp. 16.

Third, Defendants cited several analogous cases, which instruct that Plaintiff's single anecdote about an unnamed doctor in Medford, Oregon cannot be evidence of actual confusion. *See* Mot. 14-15 & n.12. Plaintiff responds to none of these cases. Instead, Plaintiff misrepresents the trial evidence regarding the anecdote. Most saliently, no witness stated that the doctor ever saw or heard either party using the abbreviations in question. *See* Mot. 14-15. Plaintiff falsely implies that the doctor did, but the actual evidence does not support that implication. *Compare* Opp. 16 ("Why might this doctor

confuse Defendants and Imprimis? Could it be the use of the same exact names for the same exact products?"), *with* Mot. 14-15 (citing Tr. 279:15-280:19).[3]

Last, but not least, Plaintiff ignores that it gave up on point-of-sale confusion and, instead, only tried to prove initial interest confusion. *See* Mot. 15-18. Defendants showed that Plaintiff offered only vague, *hypothetical* examples of initial interest confusion, that Plaintiff never explained what the actual bait and switch scheme was, and that Defendants' use of the abbreviations is inconsistent with a theory of initial interest confusion in the first place. *Id.* Plaintiff ignores these arguments entirely.

## III. ACTUAL DAMAGES

### A. Plaintiff Failed to Show Causation or Justify the Use of Defendants' Profits as a Proxy for Its Own Damages

As Defendants argued in the opening brief, Plaintiff did not try to show causation or amount at trial, the fundamental prerequisites of actual damages. *See* Mot. 19-22. Plaintiff's principal response is that it was not required to do so. *See* Opp. 17-20. Not so.

The parties and the Court have grappled with the distinction between: (i) using a defendants' profits as an evidentiary proxy for a plaintiff's actual damages and (ii) the Lanham Act's equitable remedy of disgorgement of defendant's profits. Only the former should have been presented at trial. *See F21 OpCo, LLC v. Airwair Int'l Ltd.*, 2023 WL 2626368, at *2 (C.D. Cal. Feb. 17, 2023) ("When not tied to the plaintiff's actual damages, '[a] claim for disgorgement of profits under § 1117(a) is equitable, not legal"). Plaintiff has refused to recognize that there is a distinction between the two. That is why, at trial, Dr. Wunderlich wrongly claimed that all of Defendants' sales were due to the alleged infringement, unless Defendants could prove otherwise. *See* Mot. 19.

Unlike with the equitable disgorgement analysis, Plaintiff must prove *causation*, among other requirements, for Defendants' profits to be an appropriate benchmark for

---

[3] Plaintiff also ignores that vague testimony about unnamed doctors at trade shows are not examples of actual confusion, particularly where it is unclear why or how they were confused. *See* Mot. 15 n.12.

estimating its actual damages. *See Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407-08 (9th Cir. 1993) (denying an award of actual damages because plaintiff "declined to provide the court with any evidence of its loss caused by [the defendant's] wrong doing"); *Govino, LLC v. Goverre, Inc.*, 2018 WL 7348849, at *7 n.7 (C.D. Cal. Nov. 20, 2018) (defendant must first establish "actual loss to support an inference of damages in fact"). Dr. Wunderlich stating, without support, that he calculated profits "due to infringement" is not proof of causation: it is improper testimony that justifies a new trial. *Infra* 9-10.

Evidence relevant to causation would be a decrease in Plaintiff's own sales, an increase in Defendants' sales, along with some explanation reasonably tying such decrease or increase to Defendants' use of the infringing mark. *See Spin Master, Ltd. v. Zobmondo Ent., LLC*, 944 F. Supp. 2d 830, 837-38 (C.D. Cal. 2012) (evidence of sales plaintiff would have made but for defendant's wrongdoing); *Herman Miller, Inc. v. Blumenthal Distrib., Inc.*, 2019 WL 1416472, at *19-20 (C.D. Cal. Mar. 4, 2019) (evidence of sales data from both parties showed why it was reasonable to apply proxy theory of damages). Plaintiff has no such evidence. Mot. 18-23.

Further, where Plaintiff disclaims point-of-sale confusion, it is not possible for Plaintiff to suffer lost profits due to the alleged infringement, and Plaintiff cites no case law where lost profits have been found based on its theory of initial interest confusion—putting aside that Plaintiff has no evidence of that either. Mot. 21-22. After disclaiming point-of-sale confusion, Plaintiff pivoted to an odd and highly speculative causal theory, hypothesizing that Defendants "never would have gotten the business off the ground" but for the alleged infringement. Mot. 22. As Defendants showed, that is not a legally viable theory of causation to show lost profits. *Id.*; *see also Stop Staring! Designs v. Tatyana, LLC*, 2012 WL 12877991, at *1 (C.D. Cal. Feb. 21, 2012) (expert testimony that defendant had unfair "head start" by using plaintiff's trade dress unsupported; new trial granted), *aff'd,* 625 F. App'x 328 (9th Cir. 2015).

Plaintiff is also wrong to suggest that it may recover Defendants' profits as a proxy for its actual damages without connecting those profits to Plaintiff's actual losses and/or

Defendants' wrongful conduct. *See F21 OpCo*, 2023 WL 2626368 at *2. To the extent Plaintiff cites case law that justifies awarding defendant's profits, even if untethered to a plaintiff's lost profits, those authorities concern the Lanham Act's equitable disgorgement remedy. *See* Opp. 17-20.

Finally, Plaintiff wrongly argues that it is entitled to Defendants' profits as actual damages if it shows a competitive relationship between the parties. *See* Opp. 18-19. Not so. A proxy theory assumes that every one of the defendant's sales was diverted from the plaintiff. *Spin Master*, 944 F. Supp. 2d at 840. For one party's gained sales to serve as a proxy for the other's lost sales, those parties would have to be competitors. *Id.* at 840-41. But the converse is not always true. Just because parties are "competitors" does not mean that "a sale by the infringer" is "almost automatically a lost sale by the plaintiff." *Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 196 (1st Cir. 2012). Nor does it mean sales are due to "infringement" rather than simply the presence of another option. *See Avco Corp. v. Turn & Bank Holdings, LLC*, 2024 WL 3439771, at *3 (3d Cir. July 17, 2024). Thus, while a competitive relationship is a prerequisite for the proxy theory, it does not eliminate a plaintiff's obligation to show that a sale to defendant is almost automatically a lost sale for plaintiff. Here, there was no evidence of such a relationship presented at trial.[4]

### B. The Amount of Damages Bears No Connection to the Merits

Even if Plaintiff had proved causation (and it did not), the staggering disconnect between the merits of the case and the jury's verdict, on liability and damages, warrants relief under Rule 59. *See* Mot. 1-2, 25 n.19. As described above, there is no evidence that Plaintiff's purported marks had any value to Plaintiff or had anything to do with its *own* sales, let alone Defendants' sales. The evidence merely showed that the parties competed

---

[4] This Court already rejected Plaintiff's argument that the relevant market is a "two-player" market, holding there are "many options" for eye doctors. Mot. 22. Contrary to what Plaintiff argues, that does matter for the proxy theory. *See Vitamins Online, Inc. v. Heartwise, Inc.*, 2019 WL 6682313, at *25 (D. Utah Sept. 24, 2019) ("Because the market here is not a two-player market, but a multi-player market, the issue of causation does not 'almost vanish'" (citation omitted)).

on price and customer service. On these facts, the $34.9 million damages award is nothing short of a windfall for Plaintiff.

Additionally, the disconnect reflects that the trial went off the rails in multiple respects and was unfair to Defendants. *Stop Staring! Designs v. Tatyana, LLC*, 625 F. App'x 328, 330 (9th Cir. 2015) (court may grant new trial "where 'the trial was not fair to the moving party'" (citations omitted)). Particularly so with respect to damages.

First, after ruling that Dr. Wunderlich had no basis to opine on causation and excluding his lost profits model, it was unfair to allow Dr. Wunderlich to testify that Defendants earned tens of millions of dollars "due to" the alleged wrongdoing. *See* Mot. 19-20, 25 n.19. Dr. Wunderlich also falsely told the jury that it was Defendants' burden to show that any sales were *not* attributable to the alleged infringement, even though there was no evidence that any sales *were* attributable to the alleged infringement in the first place *and* the issue of equitable disgorgement was never supposed to be before the jury. *Id*. Allowing Dr. Wunderlich to present eight-figure revenue number, as an expert blessed by the Court, clearly prejudiced Defendants.

Indeed, the Ninth Circuit affirmed a district court's grant of a new trial on damages, in part due to similar improper testimony from Dr. Wunderlich. In *Stop Staring! Designs*, the court found that "Wunderlich's testimony as to causation was pure speculation" with no "foundation in the specifics of the situation or the industry more generally." 2012 WL 12877991, at *2, *aff'd*, 625 F. App'x 328 (9th Cir. 2015). "It is likely that Wunderlich's testimony was highly damaging to Defendants as it was virtually the only testimony that established any impact of the trade dress on the business of either party." *Id.*

Second, the jury's calculation of damages reflects that the trial was unfair to Defendants. To start, it remains unlikely that the jury intended to award $34.9 million in damages, based on Juror No. 7's declaration, which unequivocally states that the jury did not. ECF No. 350-3. The verdict form is the likely source of the confusion, since Question No. 7 is the only actual damages' question that asks the jury to identify its "award." ECF No. 342. Question Nos. 4 and 5 do not indicate that each attribution will amount to a

separate award, and such confusion is consistent with Juror No. 7's belief that the jury's response to Question No. 7 constituted the total award. *Id.*; ECF No. 350-3.

Third, it remains a mystery how or why the jury awarded $4 million for two purported marks (PRED-MOXI and DEX-MOXI) when the total *gross* revenues were only $3 million, which was Plaintiff's estimate of the total amount extrapolated through 2024. *See* Mot. 23-24; Tr. 688:9-689:14.

Fourth, Plaintiff argued, without evidence, that Defendants used the abbreviations in order to trade upon Plaintiff's goodwill. *See* Mot. 24 n.18. Defendants were hamstrung from offering compelling evidence against that theory, because the Court precluded Defendants from offering any evidence regarding Plaintiff's abhorrent reputation in the industry. *Id.* Plaintiff's chronic quality issues, FDA citations, and patient safety issues would have been potent evidence undermining Plaintiff's freeriding argument. *Id.*

Finally, the damages award bears no relationship to Defendants' actual financial condition. Uncontradicted testimony shows that: Defendants operated at a loss from 2017-2019 (Tr. 444:9-445:2); Defendants' *actual* net income was $100,000 in 2020, $309,000 in 2021, and $769,000 in 2022 (Tr. 566:10-567:6); and Defendants' actual profits were $1.7 million in 2023, and lower in 2024 (Tr. 575:9-22). Thus, the $34.9 million damages award is excessive under Rule 59 and improper under California law. *See* Mot. 25 & n.19.

Accordingly, while Defendants are entitled to judgment as a matter of law under Rule 50, the Court also should order a new trial and/or remittitur under Rule 59.[5]

---

[5] Defendants did not waive any arguments. Defendants attempted to move under Rule 50(a) at trial, but the Court interrupted and asked Defendants to renew the motion after the verdict (and Defendants did so). Tr. 463:6-14; 586:16-19. That is not waiver. *See Reeves v. Teuscher*, 881 F.2d 1495, 1498 (9th Cir. 1989) ("Although [defendants] attempted to move for a directed verdict after all the evidence was in, the court interrupted and told them to renew their motion after the verdict. They did so. In these circumstances their motion suffices, is timely, and they may challenge the sufficiency of the evidence.").

Dated: April 18, 2025

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: *s/ Dylan J. Liddiard*
Dylan J. Liddiard

*Attorneys for Defendants
OSRX, Inc. and Ocular Science, Inc.*