# EXHIBIT 1

1  ROB BONTA
   Attorney General of California
2  ANDREW M. STEINHEIMER
   Supervising Deputy Attorney General
3  KRISTINA T. JARVIS
   Deputy Attorney General
4  State Bar No. 258229
   1300 I Street, Suite 125
5  P.O. Box 944255
   Sacramento, CA 94244-2550
6   Telephone: (916) 210-6088
    Facsimile: (916) 327-8643
7  *Attorneys for Complainant*

8

9                          **BEFORE THE**
                        **BOARD OF PHARMACY**
10              **DEPARTMENT OF CONSUMER AFFAIRS**
                     **STATE OF CALIFORNIA**
11

12  In the Matter of the Accusation Against:      Case No. 7456

13  **HARROW HEALTH INC.**                        **ACCUSATION**
    **DBA IMPRIMIS NJOF LLC;**
14  **JOHN PHILLIP SAHAREK, PRESIDENT**
    **1705 Route 46, Ste. 6B**
15  **Ledgewood, NJ 07862**

16  **Nonresident Outsourcing Facility Permit**
    **No. NSF 133**
17
    **HARROW HEALTH INC.**
18  **and IMPRIMISRX NJ LLC**
    **DBA IMPRIMISRX**
19  **JOHN PHILLIP SAHAREK, PRESIDENT**
    **1705 Route 46, Ste. 4**
20  **Ledgewood, NJ 07854**

21  **Nonresident Pharmacy Permit No. NRP**
    **2062**
22  **Nonresident Sterile Compounding Permit**
    **No. NSC 101151**
23
                                   Respondents.
24

25                            <u>**PARTIES**</u>

26      1.    Anne Sodergren (Complainant) brings this Accusation solely in her official capacity

27  as the Executive Officer of the Board of Pharmacy (Board), Department of Consumer Affairs.

28  *///*

                                     1
─────────────────────────────────────────────────────────
(HARROW HEALTH INC. DBA IMPRIMIS NJOF LLC; and IMPRIMISRX NJ LLC, JOHN PHILLIP
                                     SAHAREK, PRESIDENT;) ACCUSATION

2. On or about December 9, 2019, the Board issued Nonresident Outsourcing Facility Permit number NSF 133 to Harrow Health Inc. doing business as (dba) Imprimis NJOF LLC; John Phillip Saharek, President (Respondent Outsourcer). The Nonresident Outsourcing Facility Permit was in full force and effect at all times relevant to the charges brought herein and will expire on December 31, 2024, unless renewed.

3. On or about April 10, 2019, the Board issued Nonresident Pharmacy Permit number NRP 2062 to Harrow Health Inc., 100% shareholder and ImprimisRX NJ LLC dba ImprimisRx, John Phillip Saharek, President (Respondent Pharmacy). The Nonresident Pharmacy Permit was in full force and effect at all times relevant to the charges brought herein and will expire on April 1, 2025, unless renewed.

4. On or about April 10, 2019, the Board issued Nonresident Sterile Compounding Pharmacy Permit number NSC 101151 to Harrow Health Inc., 100% shareholder, and ImprimisRX NJ LLC dba ImprimisRx, John Phillip Saharek, President (Respondent Pharmacy). The Nonresident Sterile Compounding Pharmacy Permit was in full force and effect at all times relevant to the charges brought herein and will expire on April 1, 2025, unless renewed.

## **JURISDICTION**

5. This Accusation is brought before the Board under the authority of the following laws. All section references are to the Business and Professions Code (Code) unless otherwise indicated.

6. Section 4300 of the Code states in pertinent part:

(a) Every license issued may be suspended or revoked.

…

(e) The proceedings under this article shall be conducted in accordance with Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of the Government Code, and the board shall have all the powers granted therein. The action shall be final, except that the propriety of the action is subject to review by the superior court pursuant to Section 1094.5 of the Code of Civil Procedure.

7. Section 4300.1 of the Code states:

The expiration, cancellation, forfeiture, or suspension of a board-issued license by operation of law or by order or decision of the board or a court of law, the placement of a license on a retired status, or the voluntary surrender of a license by a

2

licensee shall not deprive the board of jurisdiction to commence or proceed with any investigation of, or action or disciplinary proceeding against, the licensee or to render a decision suspending or revoking the license.

8.   Code section 4011 states:

The board shall administer and enforce this chapter and the Uniform Controlled Substances Act (Division 10 (commencing with Section 11000) of the Health and Safety Code).

9.   Code section 4303 states in pertinent part:

(b) The board may cancel, deny, revoke, or suspend a nonresident pharmacy registration, issue a citation or letter of admonishment to a nonresident pharmacy, or take any other action against a nonresident pharmacy that the board may take against a resident pharmacy license, on any of the same grounds upon which such action might be taken against a resident pharmacy, provided that the grounds for the action are also grounds for action in the state in which the nonresident pharmacy is permanently located.

10.   Code section 4307 states in pertinent part:

(a) Any person who has been denied a license or whose license has been revoked or is under suspension, or who has failed to renew his or her license while it was under suspension, or who has been a manager, administrator, owner, member, officer, director, associate, partner, or any other person with management or control of any partnership, corporation, trust, firm, or association whose application for a license has been denied or revoked, is under suspension or has been placed on probation, and while acting as the manager, administrator, owner, member, officer, director, associate, partner, or any other person with management or control had knowledge of or knowingly participated in any conduct for which the license was denied, revoked, suspended, or placed on probation, shall be prohibited from serving as a manager, administrator, owner, member, officer, director, associate, partner, or in any other position with management or control of a licensee as follows:

(1) Where a probationary license is issued or where an existing license is placed on probation, this prohibition shall remain in effect for a period not to exceed five years.

(2) Where the license is denied or revoked, the prohibition shall continue until the license is issued or reinstated.

## STATUTORY PROVISIONS

11.   Section 4301 of the Code states:

The board shall take action against any holder of a license who is guilty of unprofessional conduct or whose license has been issued by mistake. Unprofessional conduct shall include, but is not limited to, any of the following:

…

(j) The violation of any of the statutes of this state, of any other state, or of the United States regulating controlled substances and dangerous drugs.

…

(o) Violating or attempting to violate, directly or indirectly, or assisting in or abetting the violation of or conspiring to violate any provision or term of this chapter or of the applicable federal and state laws and regulations governing pharmacy, including regulations established by the board or by any other state or federal regulatory agency.…

12.    Section 4022 of the Code states

Dangerous drug or dangerous device means any drug or device unsafe for self-use in humans or animals, and includes the following:

(a) Any drug that bears the legend: Caution: federal law prohibits dispensing without prescription, Rx only, or words of similar import.

(b) Any device that bears the statement: Caution: federal law restricts this device to sale by or on the order of a _____, Rx only, or words of similar import, the blank to be filled in with the designation of the practitioner licensed to use or order use of the device.

(c) Any other drug or device that by federal or state law can be lawfully dispensed only on prescription or furnished pursuant to Section 4006.

13.    Section 4059 of the Code states in pertinent part:

(a) A person may not furnish any dangerous drug, except upon the prescription of a physician, dentist, podiatrist, optometrist, veterinarian, or naturopathic doctor pursuant to Section 3640.7. A person may not furnish any dangerous device, except upon the prescription of a physician, dentist, podiatrist, optometrist, veterinarian, or naturopathic doctor pursuant to Section 3640.7.

14.    Section 4129.2 of the Code states in pertinent part:

(b) A nonresident outsourcing facility shall compound all sterile products and nonsterile products to be distributed or used in this state in compliance with regulations of the board and with federal current good manufacturing practices applicable to outsourcing facilities.

15.    Section 4156 of the Code states:

A pharmacy corporation shall not do, or fail to do, any act where doing or failing to do the act would constitute unprofessional conduct under any statute or regulation. In the conduct of its practice, a pharmacy corporation shall observe and be bound by the laws and regulations that apply to a person licensed under this chapter.

16.    Section 4169 of the Code states in pertinent part:

(a) A person or entity shall not do any of the following:

…

///

(2) Purchase, trade, sell, or transfer dangerous drugs that the person knew or reasonably should have known were adulterated, as set forth in Article 2 (commencing with Section 111250) of Chapter 6 of Part 5 of Division 104 of the Health and Safety Code.

## **HEALTH AND SAFETY CODE**

17.    Health and Safety Code section 111250 states:

Any drug or device is adulterated if it consists, in whole or in part, of any filthy, putrid, or decomposed substance.

18.    Health and Safety Code section 111255 states:

Any drug or device is adulterated if it has been produced, prepared, packed, or held under conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health.

19.    Health and Safety Code section 111295 states:

It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any drug or device that is adulterated.

20.    Health and Safety Code section 111550 states in pertinent part:

No person shall sell, deliver, or give away any new drug or new device unless it satisfies either of the following:

(a) It is one of the following:

(1) A new drug, and a new drug application has been approved for it and that approval has not been withdrawn, terminated, or suspended under Section 505 of the federal act (21 U.S.C. Sec. 355).

(2) A new biologic product for which a license has been issued as required by the federal Public Health Service Act (42 U.S.C. Sec. 262).

…

(b) The department has approved a new drug or device application for that new drug or new device and that approval has not been withdrawn, terminated, or suspended…

## **FEDERAL REGULATIONS**

21.    Code of Federal Regulations (C.F.R.), title 21, section 211.198 states:

(a) Written procedures describing the handling of all written and oral complaints regarding a drug product shall be established and followed. Such procedures shall include provisions for review by the quality control unit, of any complaint involving the possible failure of a drug product to meet any of its specifications and, for such drug products, a determination as to the need for an

5

investigation in accordance with § 211.192. Such procedures shall include provisions for review to determine whether the complaint represents a serious and unexpected adverse drug experience which is required to be reported to the Food and Drug Administration in accordance with §§ 310.305 and 514.80 of this chapter.

(b) A written record of each complaint shall be maintained in a file designated for drug product complaints. The file regarding such drug product complaints shall be maintained at the establishment where the drug product involved was manufactured, processed, or packed, or such file may be maintained at another facility if the written records in such files are readily available for inspection at that other facility. Written records involving a drug product shall be maintained until at least 1 year after the expiration date of the drug product, or 1 year after the date that the complaint was received, whichever is longer. In the case of certain OTC drug products lacking expiration dating because they meet the criteria for exemption under § 211.137, such written records shall be maintained for 3 years after distribution of the drug product.

(1) The written record shall include the following information, where known: the name and strength of the drug product, lot number, name of complainant, nature of complaint, and reply to complainant.

(2) Where an investigation under § 211.192 is conducted, the written record shall include the findings of the investigation and followup. The record or copy of the record of the investigation shall be maintained at the establishment where the investigation occurred in accordance with § 211.180(c).

(3) Where an investigation under § 211.192 is not conducted, the written record shall include the reason that an investigation was found not to be necessary and the name of the responsible person making such a determination.

22.    C.F.R., title 21, section 211.22 states:

(a) There shall be a quality control unit that shall have the responsibility and authority to approve or reject all components, drug product containers, closures, in-process materials, packaging material, labeling, and drug products, and the authority to review production records to assure that no errors have occurred or, if errors have occurred, that they have been fully investigated. The quality control unit shall be responsible for approving or rejecting drug products manufactured, processed, packed, or held under contract by another company.

23.    C.F.R., title 21, section 211.25 states:

(a) Each person engaged in the manufacture, processing, packing, or holding of a drug product shall have education, training, and experience, or any combination thereof, to enable that person to perform the assigned functions. Training shall be in the particular operations that the employee performs and in current good manufacturing practice (including the current good manufacturing practice regulations in this chapter and written procedures required by these regulations) as they relate to the employee's functions. Training in current good manufacturing practice shall be conducted by qualified individuals on a continuing basis and with sufficient frequency to assure that employees remain familiar with CGMP requirements applicable to them.

///

///

24.     California Code of Regulations, title 16, (Regulations) section 1711 states in pertinent part:

(e) The primary purpose of the quality assurance review shall be to advance error prevention by analyzing, individually and collectively, investigative and other pertinent data collected in response to a medication error to assess the cause and any contributing factors such as system or process failures. A record of the quality assurance review shall be immediately retrievable in the pharmacy.

25.     Regulations section 1735.1 states:

(ae) "Quality" means the absence of harmful levels of contaminants, including filth, putrid, or decomposed substances, the absence of active ingredients other than those listed on the label, and the absence of inactive ingredients other than those listed on the master formula document.

26.     Regulations section 1735.2 states in pertinent part:

(g) The pharmacist performing or supervising compounding is responsible for the integrity, potency, quality, and labeled strength of a compounded drug preparation until the beyond use date indicated on the label, so long as label instructions for storage and handling are followed after the preparation is dispensed.

27.     Regulations section 1751.7 states in pertinent part:

(e)(1) Batch-produced sterile drug preparations compounded from one or more non-sterile ingredients, except as provided in paragraph (2), shall be subject to documented end product testing for sterility and pyrogens and shall be quarantined until the end product testing confirms sterility and acceptable levels of pyrogens. Sterility testing shall be USP chapter 71 compliant and pyrogens testing shall confirm acceptable levels of pyrogens per USP chapter 85 limits, before dispensing. This requirement of end product testing confirming sterility and acceptable levels of pyrogens prior to dispensing shall apply regardless of any sterility or pyrogen testing that may have been conducted on any ingredient or combination of ingredients that were previously non-sterile. Exempt from pyrogen testing are topical ophthalmic and inhalation preparations.

28.     Regulations section 1793.1 states in pertinent part:

Only a pharmacist, or an intern pharmacist acting under the supervision of a pharmacist, may:

(a) Receive a new prescription order orally from a prescriber or other person authorized by law.

29.     Regulations section 1793.3 states in pertinent part:

(a) In addition to employing a pharmacy technician to perform the tasks specified in section 1793.2, a pharmacy may employ a non-licensed person to type a prescription label or otherwise enter prescription information into a computer record

system, but the responsibility for the accuracy of the prescription information and the prescription as dispensed lies with the registered pharmacist who initials the prescription or prescription record. At the direction of the registered pharmacist, a non-licensed person may also request and receive refill authorization.

(b) A pharmacist may supervise the number of non-licensed personnel performing the duties specified in subdivision (a) that the pharmacist determines, in the exercise of his or her professional judgment, does not interfere with the effective performance of the pharmacist's responsibilities under the Pharmacy Law.

## <u>NEW JERSEY STATE LAW AND REGULATION</u>

30. New Jersey Pharmacy Practice Act, title 45, section 45:14-75 states in pertinent part:

…

b. The board may suspend, revoke, deny, restrict, or refuse to renew the permit of any pharmacy practice site on any of the following grounds:

(1) Findings by the board that any conduct of the permit holder or applicant is violative of any federal, State, or local laws or regulations relating to the practice of pharmacy;

…

(9) Violation of any of the provisions of the "New Jersey Controlled Dangerous Substance Act," P.L.1970, c.226 (C.24:21-1 et seq.) by the applicant, permit holder or occurring at the pharmacy practice site; or…

31. New Jersey Administrative Code, title 13, Law and Public Safety, Chapter 39, section 13:39-4.18 states:

a) All permit holders shall be responsible for compliance with all the rules, regulations and laws governing the practice of pharmacy.

b) Any permit holder may be held liable for violations of the New Jersey Pharmacy Practice Act, N.J.S.A. 45:14-40 et seq., and the rules in this chapter and may be subject to disciplinary action.

32. New Jersey Administrative Code, title 13, Law and Public Safety, Chapter 39, section 13:39-6.5 states:

a) A pharmacy intern, pharmacy extern, pharmacy technician, or pharmacy technician applicant in any pharmacy may perform the component functions of prescription handling described in N.J.A.C. 13:39-4.19, consistent with the requirements of this chapter. All steps performed by a pharmacy technician, pharmacy technician applicant, pharmacy intern, or pharmacy extern shall be documented in the pharmacy audit trail consistent with the requirements of N.J.A.C. 13:39-7.6.

b) Pharmacy interns and pharmacy externs may assist the pharmacist in performing the following tasks:

8

1    1) Retrieval of prescription files, patient files, and profiles and other such
2 records pertaining to the practice of pharmacy;

3    2) Data entry of prescription medication information, including the original or
refill date of the prescription, the number or designation identifying the prescription,
the practitioner's information, and the name, strength, and quantity of the prescribed
4 medication;

5    3) The collection of the following demographic information for the patient
profile: the name, address, and telephone number of the patient; the patient's age, date
6 of birth; or age group (infant, child, adult); gender; any allergies and idiosyncrasies of
the patient; and any medical conditions that may relate to drug utilization;
7
    4) Transcription of scanned prescription or medication order information into
8 the patient record;

9    5) Label preparation;

10    6) The counting, weighing, measuring, pouring, and compounding of
prescription medication or stock legend drugs and controlled substances, including
11 the filling of an automated medication system; and

12    7) Accepting authorization from a patient for a prescription refill, or from a
practitioner or his or her agent for a prescription renewal, provided that the
13 prescription remains unchanged.

14    c) The collection of the demographic information under (b)3 above may be
performed by unlicensed or unregistered personnel.
15

16    33.    New Jersey Administrative Code, title 13, Law and Public Safety, Chapter 39, section

17 13:39-7.1 states in pertinent part:

18    a) A pharmacist shall only fill a prescription issued by a practitioner licensed to
issue prescriptions in New Jersey and practicing in New Jersey if the prescription is
19 on a New Jersey Uniform Prescription Blank pursuant to N.J.S.A. 45:14-55 and
N.J.A.C. 13:45A27, except as provided in N.J.A.C. 13:39-7.10 and 7.11.
20

21    34.    New Jersey Administrative Code, title 13, Law and Public Safety, Chapter 39, section

22 13:39-7.5 states in pertinent part:

23    a) No drug or medicine other than a compounded prescription order, consistent
with (c) below, shall be sold or dispensed in any pharmacy within the State of New
24 Jersey until such drug or medicine has received New Drug Application (NDA),
Abbreviated New Drug Application (ANDA), Investigational New Drug Application
25 (INDA) or other Federal Food and Drug Administration (FDA) approval, where
required.
26

27 ///

28 ///

9

35.    New Jersey Administrative Code, title 13, Law and Public Safety, Chapter 39, section 13:39-11.23 states in pertinent part:

a) The pharmacy's policy and procedures manual shall set forth in detail the pharmacy's standard operating procedures with regard to compounded sterile preparations.

b) The policy and procedures manual shall include policies and procedures governing the following:

1) A risk-management program, including, but not limited to, documentation of incidents, adverse drug reactions, and product contamination.

…

9) A quality assurance program as set forth in N.J.A.C. 13:39-11.24;

…

36.    New Jersey Administrative Code, title 13, Law and Public Safety, Chapter 39, section 13:39-11.24 states in pertinent part:

a) The pharmacy's quality assurance program shall require, at a minimum, that:

1) A reasonable effort shall be made by the pharmacist to assure that compounded sterile preparations shall be kept under appropriate controlled conditions at the location of use by providing adequate labeling and verbal or written instructions regarding proper storage and administration as set forth by the product manufacturer, with each compounded sterile preparation dispensed;

2) The quality assurance program encompasses all phases of sterile compounding for each unique type of compounded sterile preparation dispensed;

3) After the preparation of every admixture, the contents of the container are thoroughly mixed and then visually inspected to ensure the absence of particulate matter in solutions, the absence of leakage from vials and bags, or any other defects, and the accuracy and thoroughness of labeling;

4) All pharmacists, pharmacy technicians, pharmacy interns, and pharmacy externs involved in compounding sterile preparations shall have their aseptic technique tested consistent with the requirements of N.J.A.C. 13:39-11.16;

5) All high-risk level compounded sterile preparations that are prepared in groups of more than 25 identical individual single-dose packages (for example, ampules, bags, syringes, vials), or in multiple-dose vials for administration to multiple patients, or that are exposed longer than 12 hours at two degrees to eight degrees Celsius and longer than six hours at warmer than eight degrees Celsius before they are sterilized, and all compounded sterile preparations whose beyond-use date has been exceeded, shall be tested to ensure that they are sterile before they are dispensed or administered. The USP membrane filtration method shall be used where feasible. Another method may be used if verification results demonstrate that the alternative is at least as effective and reliable as the membrane filtration method or the USP direct inoculation of the culture medium method, consistent with the

10

standards set forth in USP 797 concerning "Sterility Testing," 2012 edition, incorporated herein by reference, as amended and supplemented, and available for purchase at the United States Pharmacopeia website, www.usp.org.

i. When high-risk level compounded sterile preparations are dispensed before receiving the results of the sterility tests set forth in (a)5 above, the written quality assurance procedure shall require daily observation of the incubating test specimens and immediate recall of the dispensed compounded sterile preparations when there is any evidence of microbial growth in the test specimens. The patient and the physician of the patient to whom a potentially contaminated compounded sterile preparation was administered shall be notified immediately of the potential risk. Positive sterility tests shall require rapid and systematic investigation of aseptic technique, environmental control, and other sterility assurance controls in order to identify sources of contamination and to take corrective action.

…

## COST RECOVERY

37.     Section 125.3 of the Code states, in pertinent part, that the Board may request the administrative law judge to direct a licentiate found to have committed a violation or violations of the licensing act to pay a sum not to exceed the reasonable costs of the investigation and enforcement of the case.

## INTRODUCTION

38.     This case is about the compounding of prescription drugs, including those designated for sterile administration, in either a pharmacy or an outsourcing facility.  Compounding is a form of drug manufacturing subject to the drug manufacturing requirements of the Federal Food, Drug, and Cosmetic Act (FDCA) [21 U.S.C. § 301 et seq.].

39.     No drug may be manufactured and sold within the United States without going through the Food and Drug Administration (FDA) new drug approval process under Section 505 of the federal act (21 U.S.C. § 355).  California law has a similar new drug approval law which defers to the federal statute.  (Health and Safety Code § 111550.)  New Jersey law also has a similar new drug approval law which also defers to the federal statute.  (New Jersey Administrative Code, title 13, Law and Public Safety, Chapter 39, § 13:39-7.5.)

40.     There is an exception to the new drug approval process in federal law for sterile compounding pharmacies and outsourcing facilities, known as the 503A exception for sterile compounding pharmacies and the 503B exception for outsourcing facilities.  (21 U.S.C. §§ 353a,

11

353b.)  Under these exceptions, sterile compounding pharmacies and outsourcing facilities may perform sterile and nonsterile compounding of drugs that are not approved by the FDA, so long as they follow the restrictions and guidelines set forth in their respective exceptions.

41.  For outsourcing facilities, the facility must register as an outsourcing facility with the FDA and compound all drugs in accordance with current good manufacturing practices (CGMP), among other compounding-specific requirements.

42.  For sterile compounding pharmacies, the pharmacy must be licensed by the state in which they are physically located, as well as licensed by any other state as a nonresident pharmacy if the pharmacy intends to dispense, mail, ship, or otherwise deliver drugs into that state.  There are additional compounding specific requirements similar to the compounding requirements for outsourcing facilities with one major difference being that sterile compounding pharmacies are not required to follow CGMP.  Instead, sterile compounding pharmacies follow United States Pharmacopeia (USP) chapters which provide independent, peer-reviewed guidance for handling non-sterile compounding, sterile compounding, hazardous compounding, drug product testing, quality assurance, and much more.  USP chapters essentially set an industry standard in these matters.

43.  Compounds may be either "non-sterile" or "sterile," depending on the intended route of drug administration. Sterile drugs are those intended for parenteral administration (i.e., other than through the digestive system), including injectables and ophthalmic or inhalation drugs in aqueous format. It is important that these drugs be sterile and uncontaminated, because they bypass some of the body's natural defenses against pathogens and impurities.

44.  Both sterile compounding pharmacies and outsourcers are prohibited from compounding any drug that is essentially a copy of an already approved drug.  Thus, any drug already approved by the FDA shall not be compounded.[1]  Non-FDA-approved drugs pose a greater risk to patients than FDA-approved drugs.  These drugs have not undergone FDA review for safety, effectiveness, or quality, and have not been inspected for manufacturing quality, unlike

---

[1] There are limited exceptions, the most commonly used exception is if the drug being compounded is on the drug shortage list maintained online by the FDA at the time of compounding, distributing, and dispensing.

FDA-approved drugs.  Due to this greater risk, drugs should only be compounded to fulfill the needs of patients whose medical needs cannot be met by an FDA-approved drug.

45.     An outsourcing facility is also prohibited from wholesaling, so the facility may not compound any drug if the drug will be sold by any entity other than the outsourcing facility that compounded the drug.  In other words, the facility must sell, dispense, or otherwise deliver the drug directly to the end user, which may be the patient or may be to a prescriber or health clinic for administration in a clinic, hospital, or prescriber's office setting.

46.     Prior to January 1, 2022, outsourcing facilities registered in California were prohibited from acting as a pharmacy, specifically they could not sell drugs directly to an individual patient.  Outsourcing facilities could only sell their compounded drugs to a prescriber or other health care facility for administration to the patients of that prescriber or health care facility.  On January 1, 2022, the law changed, and now currently allows outsourcing facilities to also dispense drugs to a prescriber or to a patient pursuant to a patient-specific prescription written by a prescriber who is licensed in the State of California.

47.     Sterile compounding pharmacies, by contrast, are primarily pharmacies with an additional permit to perform sterile compounding.  Pharmacies, and by extension, sterile compounding pharmacies may only dispense drugs to patients pursuant to patient-specific prescriptions.

48.     Respondent Outsourcer and Respondent Pharmacy both have physical locations in the State of New Jersey.  Therefore, they both have nonresident licenses in the State of California.  Based on Code section 4303, subdivision (b), in order for discipline to be imposed by the California Board, any violation under California law that is a cause for discipline must also be a violation under New Jersey law.  In this case, the California laws, rules, and regulations cited all have parallel statutes or regulations in New Jersey law.

**FEBRUARY 7, 2024, INVESTIGATION REPORT**

49.     From July 2023 through the date of the Investigation Report, Respondent Outsourcer reported numerous complaints from their patients as to the products compounded by Respondent

///

Outsourcer and dispensed to these patients. An investigation ensued and Inspector P.P-S. was assigned to investigate.

50. Most of the drug products complained of were manufactured by Respondent Outsourcer and dispensed by Respondent Pharmacy.

51. Multiple patients complained that various batches and different types of eye drops caused pain in their eyes and had other side effects including burning, stinging, dry eyes, insomnia, headache, or a bad taste in the mouth. At least one patient had three different lots of Respondent Outsourcer's eye drops and only experienced these side effects with one of the three.

52. Respondent Outsourcer failed to investigate these patient complaints, informed the patients that these were known and expected side effects, and failed to test any retained product or have patients return the complained-about product for additional testing.

## FIRST CAUSE FOR DISCIPLINE

### (Failure to Investigate Complaints of Adverse Drug Reactions)

53. Respondent Outsourcer is subject to disciplinary action pursuant to Code sections 4301, subdivisions (j) and (o), and 4129.2, for violating laws regulating dangerous drugs and for failing to follow laws, rules, and regulations governing the practice of pharmacy, by failing to comply with CGMP when compounding, in conjunction with 21 C.F.R. section 211.22, subdivision (a), setting forth the responsibilities of the quality control unit. The circumstances are as set forth in paragraphs 49-52, above, and as follows:

54. Respondent Outsourcer did not fully investigate customer or patient complaints of experiencing adverse drug reactions. At minimum 12 complaints were not fully investigated, numbers 2023363, 2023439, 2023458, 2023520, 2023559, 2023573, ADE 23-011, ADE 23-019, ADE 23-025, ADE 23-032, ADE 23-057, and ADE 23-074. No retained samples were tested for any of the batches involved to ensure release specifications and investigations to ensure compliance to CGMP were not performed.

///

///

///

(HARROW HEALTH INC. DBA IMPRIMIS NJOF LLC; and IMPRIMISRX NJ LLC, JOHN PHILLIP SAHAREK, PRESIDENT;) ACCUSATION

## **SECOND CAUSE FOR DISCIPLINE**

### **(Failure to Review Production Records)**

55.     Respondent Outsourcer is subject to disciplinary action pursuant to Code sections 4301, subdivisions (j) and (o), and 4129.2, for violating laws regulating dangerous drugs and for failing to follow laws, rules, and regulations governing the practice of pharmacy, by failing to comply with CGMP when compounding, in conjunction with 21 C.F.R. section 211.192, production record review which required Respondent Outsourcer to have a quality control unit that reviewed and approved all drug product production and control records to determine compliance with all policies and procedures before a batch is released or distributed, and any failure of the drug product to meet specifications shall be thoroughly investigated.  The circumstances are as set forth in paragraphs 49-52, above, and as follows:

56.     Respondent Outsourcer did not fully investigate customer or patient complaints of experiencing adverse drug reactions.  At minimum 12 complaints were not fully investigated, numbers 2023363, 2023439, 2023458, 2023520, 2023559, 2023573, ADE 23-011, ADE 23-019, ADE 23-025, ADE 23-032, ADE 23-057, and ADE 23-074.  No retained samples were tested for any of the batches involved to ensure release specifications and investigations to ensure compliance to CGMP were not performed.

## **THIRD CAUSE FOR DISCIPLINE**

### **(Failure to Test Reserved or Retained Samples)**

57.     Respondent Outsourcer is subject to disciplinary action pursuant to Code sections 4301, subdivisions (j) and (o), and 4129.2, for violating laws regulating dangerous drugs and for failing to follow laws, rules, and regulations governing the practice of pharmacy, by failing to comply with CGMP when compounding, in conjunction with 21 C.F.R. section 211.170, subdivision (a), which states that an appropriately identified reserve sample that is representative of each lot in each shipment of each active ingredient shall be retained with at least twice the quantity necessary for all tests required to determine whether the active ingredient meets its established specifications, except for sterility and pyrogen testing.  The circumstances are as set forth in paragraphs 49-52, above, and as follows:

15

58. Respondent Outsourcer did not fully investigate customer or patient complaints of experiencing adverse drug reactions. At minimum 12 complaints were not fully investigated, numbers 2023363, 2023439, 2023458, 2023520, 2023559, 2023573, ADE 23-011, ADE 23-019, ADE 23-025, ADE 23-032, ADE 23-057, and ADE 23-074. No retained samples were tested for any of the batches involved to ensure release specifications and investigations to ensure compliance to CGMP were not performed.

## FOURTH CAUSE FOR DISCIPLINE

### (Responsibilities of Quality Control Unit)

59. Respondent Outsourcer is subject to disciplinary action pursuant to Code sections 4301, subdivisions (j) and (o), and 4129.2, for violating laws regulating dangerous drugs and for failing to follow laws, rules, and regulations governing the practice of pharmacy, by failing to comply with CGMP when compounding, in conjunction with 21 C.F.R. section 211.22, subdivision (a), which states that there shall be a quality control unit that shall have the responsibility and authority to approve or reject all components, drug product containers, closures, in-process materials, packaging material, labeling, and drug products, and the authority to review production records to ensure that no errors have occurred or that all errors are thoroughly investigated. The circumstances are as set forth in paragraphs 49-52, above, and as follows:

60. Respondent Outsourcer did not fully investigate customer or patient complaints of experiencing adverse drug reactions. At minimum 12 complaints were not fully investigated, numbers 2023363, 2023439, 2023458, 2023520, 2023559, 2023573, ADE 23-011, ADE 23-019, ADE 23-025, ADE 23-032, ADE 23-057, and ADE 23-074. No retained samples were tested for any of the batches involved to ensure release specifications and investigations to ensure compliance to CGMP were not performed. The quality control unit did not have control or authority over investigations of adverse drug reactions.

## NOVEMBER 30, 2022 INVESTIGATION REPORT

61. On or about December 22, 2021, A.H., a customer care representative, received a complaint from a patient about mold in the cap of her sterile compounded eye drops. A.H. is not

16

1  licensed as a pharmacist, was not supervised by a pharmacist, and was working in an unlicensed

2  call center located separately from Respondent Outsourcer and Respondent Pharmacy.

3      62.    On or about December 28, 2021, A.Z., a quality assurance specialist forwarded the

4  customer complaint to F.Z., a quality assurance post market surveillance specialist.  Neither A.Z.

5  nor F.Z. are licensed as a pharmacist, and were not supervised by a pharmacist, and were working

6  in an unlicensed call center located separately from Respondent Outsourcer and Respondent

7  Pharmacy.

8      63.    Despite all three of the individuals who had handled this patient's complaint not

9  being licensed as a pharmacist, one of them was apparently able to process a replacement order

10 and approve a shipment of this prescription medication to the patient without the involvement of

11 any licensed pharmacist.

12     64.    F.Z. determined, by reviewing the patient's complaint, without any input from a

13 pharmacist, that the mold under the cap was likely caused by the patient contaminating the

14 container.

15     65.    Between January 24, 2022 and February 3, 2022, K.F., a pharmacist employed by

16 Respondent Outsourcer became involved with this complaint and apparently reached out to the

17 patient, though no response by the patient was documented.  On February 3, 2022, K.F. and F.Z.

18 signed off on the patient complaint and considered the matter closed.  At no time was any staff

19 contacted who was employed by Respondent Pharmacy, who had dispensed the medication.

20     66.    During the Board's investigation, Inspector P.P-S. requested Respondent Outsourcer

21 to provide information about the relationship between Respondent Outsourcer and Respondent

22 Pharmacy, and information about the unlicensed call center, which Respondent Outsourcer refers

23 to as the "customer service department."

24     67.    Respondent Outsourcer explained that they do not sell directly to the patients.

25 Instead, they transfer all of their stock of compounded medications to Respondent Pharmacy for

26 dispensing.  However, Respondent Outsourcer frequently gets complaint calls because their

27 contact information is on the medication label as required by law.

28 ///

17

68. Respondent Outsourcer and Respondent Pharmacy essentially "share" the unlicensed call center personnel, with some being designated to one Respondent or the other, but the unlicensed call center is not located in a licensed location. Additionally, there were at least two unlicensed call center locations, designated as "north" and "south." Later, a corporate organization chart was provided which showed unlicensed call centers in Nashville, Tennessee and Tijuana, Mexico. The call center in Tijuana, Mexico, is noted to be an outsourced call center.

69. During the Board's investigation, Inspector P.P-S. also requested the policies and procedures for Respondent Outsourcer's unlicensed call center, and for the complaint intake and quality control units. Respondent Outsourcer responded that they had no policies or procedures for the unlicensed call center and they "worked off training documents." Respondent Outsourcer provided policies and procedures for their "product complaint handling" but the policies and procedures were on Respondent Pharmacy's letterhead and referenced Boards of Pharmacy. The policies and procedures provided no training for staff relating to CGMP or complaint handling, any staff or contractors were authorized to receive, review, and assess product complaints, and it is unclear if the individuals analyzing complaints work for Respondent Outsourcer, Respondent Pharmacy, the unlicensed call center, or any combination of the three.

70. During the Board's investigation, Inspector C.A. requested information from Respondent Pharmacy including policies and procedures. Respondent Pharmacy provided policies and procedures on complaint handling that allowed unlicensed individuals working in unlicensed spaces to receive and process prescriptions remotely, determine whether there was sufficient information to bill the prescription, make calls to clarify prescriptions, determine if a replacement drug product is needed, and contact the marketing department to cease marketing and sales within 24 hours.

71. Dispensing records from Respondent Pharmacy also showed it had dispensed 11 prescriptions to patients with invalid prescriptions in that the prescriber did not hold an active California license.

72. Inspector C.A. also reviewed compounding records from Respondent Pharmacy which showed that Respondent Pharmacy was engaged in sterile compounding with the following

18

substances: 1) Methylcobalamin, which is a dietary supplement and is not appropriate for sterile compounding; 2) Glutathione manufactured by Shandong J with no US grade of material (e.g. pharmaceutical, dietary) provided; and 3) DMPS Sodium (PF) Injection manufactured by Nanjing Pharmaceutical Chemical Co with no US grade of material provided.

<u>CAUSES FOR DISCIPLINE AS TO RESPONDENT OUTSOURCER</u>

**<u>FIFTH CAUSE FOR DISCIPLINE</u>**

**(Failure to Comply with CGMP: Lack of Complaint Procedures)**

73. Respondent Outsourcer is subject to disciplinary action pursuant to Code sections 4301, subdivisions (j) and (o), and 4129.2, for violating laws regulating dangerous drugs and for failing to follow laws, rules, and regulations governing the practice of pharmacy, by failing to comply with CGMP when compounding, in conjunction with 21 C.F.R. section 211.198, subdivisions (a) and (b). The circumstances are as set forth in paragraphs 61-69, above, and as follows:

74. Respondent's staff was not trained and was not supervised by a pharmacist when completing complaint forms and following up on complaints. There are no written procedures by Respondent that included provisions for review by the quality control unit, or for the quality control unit to make a determination as to the need for an investigation in accordance with 21 C.F.R. section 211.192. Finally, the procedures failed to include any review to determine whether the complaint represented a serious and unexpected adverse drug experience, which is required to be reported to the Food and Drug Administration.

**<u>SIXTH CAUSE FOR DISCIPLINE</u>**

**(Failure to Have Qualified Personnel)**

75. Respondent Outsourcer is subject to disciplinary action pursuant to Code sections 4301, subdivisions (j) and (o), and 4129.2, for violating laws regulating dangerous drugs and for failing to follow laws, rules, and regulations governing the practice of pharmacy, by failing to comply with CGMP when compounding, in conjunction with 21 C.F.R. section 211.25, subdivision (a), setting forth the qualifications necessary for compounding personnel. The circumstances are as set forth in paragraphs 61-69, above, and as follows:

19

76. Respondent Outsourcer had untrained, unlicensed, and unsupervised staff completing complaint forms and following up on complaints. The staff taking complaint calls had no CGMP training and were not located at Respondent Outsourcer's facility. Respondent Outsourcer's policies and procedures for complaint calls was generic across multiple entities with different, or no, licenses, and contained no mention of CGMP controls.

<u>**SEVENTH CAUSE FOR DISCIPLINE**</u>

**(Failure to Have Qualified Personnel)**

77. Respondent Outsourcer is subject to disciplinary action pursuant to Code sections 4301, subdivisions (j) and (o), and 4129.2, for violating laws regulating dangerous drugs and failing to follow laws, rules, and regulations governing the practice of pharmacy, by failing to comply with CGMP when compounding, in conjunction with 21 C.F.R. section 211.22, subdivision (a), setting forth the responsibilities of the quality control unit. The circumstances are as set forth in paragraphs 61-69, above, and as follows:

78. Respondent Outsourcer had untrained, unlicensed, and unsupervised staff completing complaint forms and following up on complaints. The staff taking complaint calls had no CGMP training and were not located at Respondent Outsourcer's facility. The quality control unit had no control over the untrained, unlicensed, and unsupervised staff that worked from remote locations outside of Respondent Outsourcer's facility.

<u>CAUSES FOR DISCIPLINE AS TO RESPONDENT PHARMACY</u>

<u>**EIGHTH CAUSE FOR DISCIPLINE**</u>

**(Failure to Maintain Quality of Compounded Sterile Preparations)**

79. Respondent Pharmacy is subject to disciplinary action pursuant to Code section 4301, subdivision (o), for failing to follow laws, rules, and regulations governing the practice of pharmacy, specifically Regulations section 1735.1(ae), and Health and Safety Code section 111255, maintaining the quality of compounded preparations, in that Respondent Pharmacy compounded non-sterile to sterile injectable drugs with an ungraded chemical, DMPS Sodium PF. This was true at least for lot number 021820022@2, which was dispensed into California between February 22, 2022 and November 1, 2022, pursuant to 58 prescription, for a total of 2,080ml, or

20

408 vials.  This is also likely to be true for an additional 280 prescriptions, 9,930ml, and 1,986 vials.  This caused the compounded drug product to be produced in a manner whereby it may have been contaminated or may have been rendered injurious to health.

**NINTH CAUSE FOR DISCIPLINE**

**(Offering for Sale an Adulterated Drug)**

80.     Respondent Pharmacy is subject to disciplinary action pursuant to Code section 4301, subdivision (o), for failing to follow laws, rules, and regulations governing the practice of pharmacy, specifically Code section 4169, subdivision (a)(2), and Health and Safety Code sections 111250, 111255, and 111295, by dispensing adulterated drugs, specifically DMPS Sodium PF, which was a non-sterile to sterile injection compounded with an ungraded chemical. This was true at least for lot number 021820022@2, which was dispensed into California between February 22, and November 1, 2022, pursuant to 58 prescription, for a total of 2,080ml, or 408 vials.  This is also likely to be true for an additional 280 prescriptions, 9,930ml, and 1,986 vials.

**TENTH CAUSE FOR DISCIPLINE**

**(Furnishing a Dangerous Drug Without a Prescription)**

81.     Respondent Pharmacy is subject to disciplinary action pursuant to Code section 4301, subdivision (o), for failing to follow laws, rules, and regulations governing the practice of pharmacy, specifically Code section 4059, subdivision (a), in that between September 28, 2021 and August 11, 2022, Respondent dispensed and furnished 11 prescriptions for dangerous drugs that were invalid in that the prescriber was not authorized to prescribe at the time due to her license being in inactive status.

**ELEVENTH CAUSE FOR DISCIPLINE**

**(Failing to Perform Compliant End Product Sterility)**

82.     Respondent Pharmacy is subject to disciplinary action pursuant to Code section 4301, subdivision (o), for failing to follow laws, rules, and regulations governing the practice of pharmacy, specifically Regulations section 1751.7, subdivision (e)(1), which requires that batch-produced sterile drug preparations shall be subject to USP chapter 71 compliant and pyrogens testing, and shall be quarantined until the testing confirms sterility.  Respondent Pharmacy failed

21

to use USP 71 compliant sterility testing, instead using "Scan RDI" a non-USP 71 compliant sterility test. Respondent Pharmacy dispensed at least 33,120ml, 1,104 vials, and 173 prescriptions of glutathione from lot 02082022@2 into California from approximately February 23, 2022, to March 3, 2022.

## TWELFTH CAUSE FOR DISCIPLINE

### (Failing to Supervise Non-Licensed Personnel)

83. Respondent Pharmacy is subject to disciplinary action pursuant to Code section 4301, subdivision (o), for failing to follow laws, rules, and regulations governing the practice of pharmacy, specifically Regulations section 1793.3, subdivisions (a) and (b), which states that non-licensed personnel may type prescription labels or otherwise enter prescription information into a computer record system but the responsibility for the non-licensed personnel's accuracy and the information entered by them lies with the registered pharmacist supervising such non-licensed personnel. Respondent Pharmacy had untrained and unlicensed staff performing duties in unlicensed locations, including a location outside of the United States. The unlicensed, unsupervised staff was responsible for order processing and review, billing, complaint handling, and adverse drug reaction reporting.

## THIRTEENTH CAUSE FOR DISCIPLINE

### (Failing to Have Compliant Quality Assurance Program)

84. Respondent Pharmacy is subject to disciplinary action pursuant to Code section 4301, subdivision (o), for failing to follow laws, rules, and regulations governing the practice of pharmacy, specifically Regulations section 1711, subdivision (e), which requires licensees to have a robust quality assurance program to advance error prevention, investigate errors, and assess the systems that led to the error so that the systems can be corrected. Respondent Pharmacy failed to do appropriate investigation or data collection, and analysis, failed to determine the cause of medication errors, and failed to attempt to ensure that errors did not recur.

///

///

///

## **FOURTEENTH CAUSE FOR DISCIPLINE**

### **(Unlicensed Personnel Acting as Pharmacist)**

85.     Respondent Pharmacy is subject to disciplinary action pursuant to Code section 4301, subdivision (o), for failing to follow laws, rules, and regulations governing the practice of pharmacy, specifically Regulations section 1793.1, which states that only a pharmacist or intern pharmacist being supervised by a pharmacist may receive new prescription drug orders orally, consult with the patient or patient's agent regarding a prescription or medical information contained in the patient's records, identify, evaluate, and interpret a prescription, interpret clinical data in the patient's medical records, consult with any prescriber, nurse, or other health care professional, supervise the packaging of drugs and check the packaging procedure and product, exercise professional judgment.  Respondent Pharmacy allowed unlicensed personnel to process prescription drug orders, review any holds on orders that could delay the processing of the prescription, update and change the patient's information regarding where the drug would be shipped, verify multiple orders by a patient and merge such orders together, open orders, verify HIPAA protocols, access all prescriptions on file, select the prescription to be refilled, and release the prescription to the pharmacy, open a new order on a patient's profile, access the patient's profile, the prescriber's office profile, send refill requests, process refill requests, investigate reasons for replacement prescriptions to be sent, consulting with the patient, pharmacist, and prescriber as needed, fills out complaint forms, create a new order, select the order for dispensing, and release the order to the pharmacy to fill the replacement.  This all requires professional judgment and the identification, evaluation, and interpretation of prescriptions.

### **DECEMBER 21, 2022 INVESTIGATION REPORT - Respondent Pharmacy Only**

86.     On or about November 10, 2022, the Board was notified of a recall initiated by Respondent Pharmacy for two lots of Timolol-Latanoprost (0.5/0.005)% P-F, an investigation by Board Inspector C.A. therefore ensued.

87.     Timolol-Latanoprost (0.5/0.005)% P-F is indicated for the treatment of glaucoma and ocular hypertension, and reduces intraocular pressure (fluid within the eye), it is a dangerous drug pursuant to Code section 4022, but it is not a controlled substance.

23

## FIFTEENTH CAUSE FOR DISCIPLINE

### (Failure to Support Beyond Use Date)

88.     Respondent Pharmacy is subject to disciplinary action pursuant to Code section 4301, subdivision (o), for violating laws, rules, and regulations governing the practice of pharmacy, specifically Regulations section 1735.2, subdivision (i), which states that every compounded drug preparation shall be given a beyond use date (BUD) after which the compounded drug should not be used, stored, transported, or delivered.  For sterile compounded drug preparations, extension of a beyond use date is only allowable when supported by a method suitability test, a container closure integrity test, and stability studies.  Respondent Pharmacy dispensed and delivered to patients sterile compounded Timolol-Latanoprost (0.5/0.005)% P-F with a BUD of 150 days without having a method suitability test, a container closure integrity test, or stability studies. This is true for at least two lots, with 71 prescriptions and 385 ml, but it is expected to also be true for 5 lots, 176 orders, and 975 ml.

## SIXTEENTH CAUSE FOR DISCIPLINE

### (Failing to Perform Compliant End Product Sterility)

89.     Respondent Pharmacy is subject to disciplinary action pursuant to Code section 4301, subdivision (o), for failing to follow laws, rules, and regulations governing the practice of pharmacy, specifically Regulations section 1751.7, subdivision (e)(1), which requires that batch-produced sterile drug preparations shall be subject to USP chapter 71 compliant and pyrogens testing, and shall be quarantined until the testing confirms sterility.  Between approximately January 1, 2022, and December 12, 2022, Respondent Pharmacy released batch-produced sterile drug preparations of Timolol-Latanoprost (0.5/0.005)% P-F without documented end product testing for sterility.  This is true for at least two lots, with 71 prescriptions and 385ml, but it is expected to also be true for 5 lots, 176 orders, and 975ml.

## DISCIPLINE CONSIDERATIONS

90.     To determine the degree of discipline, if any, to be imposed on Respondent Pharmacy, Complainant alleges that on or about October 15, 2021, in a prior action, the Board of Pharmacy issued Citation Number CI 2021 93270, and ordered Respondent to pay $750.00 due to

24

out of state disciplinary action. Specifically, on January 28, 2020, the Maine State Board of Pharmacy issued a reprimand, an order to cease and desist shipping pharmaceutical drugs into Maine until validly licensed, and a $10,750.00 fine due to the pharmacy's failure to notify the Maine Board of Pharmacy of a change of location, and making approximately 105 separate shipments of prescription drugs from its new, unlicensed location, between February 11, 2019, and April 29, 2019. That Citation is now final.

91. To determine the degree of discipline, if any, to be imposed on Respondent Pharmacy, Complainant alleges that on or about October 15, 2021, in a prior action, the Board of Pharmacy issued Citation Number CI 2021 93271, and ordered Respondent to pay $750.00 due to out of state disciplinary action. Specifically, on May 3, 2019, the New Jersey State Board of Pharmacy issued a $2,000.00 fine based on violations of New Jersey State Pharmacy Law observed during an inspection, including failure to conduct environmental testing and failure to maintain clean and orderly conditions in the sterile compounding cleanroom. That Citation is now final.

92. To determine the degree of discipline, if any, to be imposed on Respondent Pharmacy, Complainant alleges that on or about April 22, 2020, the Alabama State Board of Pharmacy issued a Statement of Charges and Notice of Hearing to Respondent Pharmacy based on findings resulting from an inspection on May 1, 2017, by the New Jersey State Board of Pharmacy, as well as the out of state discipline from the Maine State Board of Pharmacy set forth above in paragraph 90. On or about June 14, 2022, Respondent Pharmacy entered into a Consent Order with the Alabama State Board of Pharmacy whereby Respondent Pharmacy agreed to pay a $50,000.00 administrative fine, and be prohibited from dispensing to Alabama patients any drug product compounded by or received from any 503(b) outsourcing facilities.

## OTHER MATTERS

93. Pursuant to Code section 4307, if discipline is imposed against Nonresident Outsourcing Facility Permit number NSF 133, issued to Harrow Health Inc., DBA Imprimis NJOF LLC, John Phillip Saharek, President, Then Harrow Health Inc. and John Phillip Saharek shall be prohibited from serving as a manager, administrator, owner, member, officer, director,

25

associate, or partner of a licensee for five years if Nonresident Outsourcing Facility Permit number NSF 133 is placed on probation or until it is reinstated if it is revoked.

94. Pursuant to Code section 4307, if discipline is imposed against Nonresident Pharmacy Permit number NRP 2062 or Nonresident Sterile Compounding Pharmacy Permit number NSC 101151, issued to Harrow Health Inc., DBA Imprimis Rx, John Phillip Saharek, President, Then Harrow Health Inc. and John Phillip Saharek shall be prohibited from serving as a manager, administrator, owner, member, officer, director, associate, or partner of a licensee for five years if Nonresident Outsourcing Facility Permit number NSF 133 is placed on probation or until it is reinstated if it is revoked.

## **PRAYER**

WHEREFORE, Complainant requests that a hearing be held on the matters herein alleged, and that following the hearing, the Board of Pharmacy issue a decision:

1. Revoking or suspending Nonresident Outsourcing Facility Permit number NSF 133, issued to Harrow Health Inc. dba Imprimis NJOF LLC; John Phillip Saharek, President;

2. Revoking or suspending Nonresident Pharmacy Permit number NRP 2062, issued to Harrow Health Inc. dba ImprimisRx; John Phillip Saharek, President;

3. Revoking or suspending Nonresident Sterile Compounding Pharmacy Permit number NSC 101151, issued to Harrow Health Inc. dba ImprimisRx; John Phillip Saharek, President;

4. Prohibiting the owners and managers of Respondent Nonresident Outsourcing Facility Permit Number NSF 133, issued to Harrow Health Inc. dba Imprimis NJOF LLC; John Phillip Saharek, President, from serving as a manager, administrator, owner, member, officer, director, associate, or partner of a licensee for five years if Nonresident Outsourcing Facility Permit number NSF 133 is placed on probation or until it is reinstated if revoked;

5. Prohibiting the owners and managers of Respondent Nonresident Pharmacy Permit Number NRP 2062, issued to Harrow Health Inc. dba ImprimisRx; John Phillip Saharek, President, from serving as a manager, administrator, owner, member, officer, director, associate, or partner of a licensee for five years if Nonresident Pharmacy Permit number NRP 2062 is placed on probation or until it is reinstated if revoked;

26

1    6.    Prohibiting the owners and managers of Respondent Nonresident Sterile

2 Compounding Pharmacy Permit Number NSC 101151, issued to Harrow Health Inc. dba

3 ImprimisRx; John Phillip Saharek, President, from serving as a manager, administrator, owner,

4 member, officer, director, associate, or partner of a licensee for five years if Nonresident Sterile

5 Compounding Pharmacy Permit number NSC 101151 is placed on probation or until it is

6 reinstated if revoked;

7    7.    Ordering Harrow Health Inc. dba Imprimis NJOF LLC; John Phillip Saharek,

8 President, and Harrow Health Inc. dba ImprimisRx; John Phillip Saharek, President to pay the

9 Board of Pharmacy the reasonable costs of the investigation and enforcement of this case,

10 pursuant to Business and Professions Code section 125.3; and,

11    8.    Taking such other and further action as deemed necessary and proper.

12 DATED: 6/14/2024

Sodergren, Anne@DCA
Digitally signed by Sodergren, Anne@DCA
Date: 2024.06.14 11:48:55 -07'00'

13
ANNE SODERGREN
Executive Officer
14
Board of Pharmacy
Department of Consumer Affairs
15
State of California
*Complainant*
16

17

18 SA2023300701
38152692.docx

19

20

21

22

23

24

25

26

27

28