1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| IMPRIMISRX, LLC, | Case No. 21-cv-01305-BAS-DDL |
| Plaintiff, | **ORDER:** |
| v. | **(1) DENYING RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW;** |
| OSRX, INC.; OCULAR SCIENCE, INC., | |
| Defendants. | **(2) GRANTING REMITTITUR; AND** |
| | **(3) DENYING MOTION FOR NEW TRIAL CONDITIONED ON PLAINTIFF'S ACCEPTANCE OF THE REMITTITUR** |
| | **(ECF No. 359)** |

11
12
13
14
15
16
17
18
19
20
21
22
23

On November 20, 2024, a jury found in favor of Plaintiff ImprimisRx, LLC and against Defendants OSRX, Inc. and Ocular Science, Inc. on the claims of trademark infringement and California unfair competition. (Verdict, ECF No. 342.) The jury awarded $14.5 million in compensatory damages. (*Id.* at 4.) In addition, the jury found Defendants acted with malice, fraud, or oppression and awarded $20.4 million in punitive damages under state law, for a total of $34.9 million in damages. (*Id.*)

24
25
26
27
28

Defendants now bring a Renewed Motion for Judgment as a Matter of Law, which alternatively seeks a new trial or remittitur. (ECF No. 359.) Plaintiff responds (ECF No. 360), and Defendants reply (ECF No. 362).

After oral argument and for the reasons stated below, the Court **DENIES** the Motion for Judgment as a Matter of Law. The Court also **DENIES** the Motion for a New Trial, conditioned on Plaintiff's acceptance of the remittitur outlined below. Plaintiff must notify the Court by October 13, 2025, if it accepts the remittitur. If Plaintiff does not accept the remittitur, the case will proceed to a new trial.

## BACKGROUND

### I.     The Eyedrop Trademarks

Both Plaintiff and Defendants operate compounding pharmacies that focus on medications used in optometry and ophthalmology. (Joint Statement of Facts ¶¶ 1–8, ECF No. 233.) Compounding is the practice of combining, mixing, or altering ingredients of an existing drug to create a product tailored to the needs of a specific patient. (*See id.* ¶ 7.) *See also Nexus Pharms., Inc. v. Cent. Admixture Pharmacy Servs., Inc.*, 48 F.4th 1040, 1042–44 (9th Cir. 2022) (discussing the practice and regulation of compounding).

The parties have a history of litigation with each other. In 2016, Plaintiff sued Defendant Ocular Science over its use of a brand called Droplet, which Plaintiff claimed was similar to its brand named Dropless. (Trial Tr. 1-144:4–14.)[1] At that time, Ocular Science was also using two compounding formulas: Pred-Moxi and Dex-Moxi, which Plaintiff was attempting to patent. (*Id.* at 1-144:18–20, 1-147:12–21.)

Ultimately, the parties settled the dispute. (Trial Tr. 1-144:2–145:15; Def.'s Ex. 15.) They resolved that if Plaintiff was successful at patenting the formulations, Ocular Science

---

[1] The Trial Transcript is organized into six volumes, which the Court cites using the leading numeral in the pincite—e.g., 3-449:20 cites to Volume 3, Page 449, Line 20. The volumes' electronic case filing numbers are included below.

| Vol. 1 (ECF No. 334) | Vol. 2 (ECF No. 335) | Vol. 3 (ECF No. 336) | Vol. 4 (ECF No. 337) | Vol. 5 (ECF No. 340) | Vol. 6 (ECF No. 349) |
|---|---|---|---|---|---|

21cv1305

would stop manufacturing the formulas (and, thus, would not use the associated names, Pred-Moxi or Dex-Moxi) and would pay Plaintiff 20% of the revenue on sales of these products up until the time Ocular Science stopped using the two formulations.  (Trial Tr. 1-146:22–147:15; Def.'s Ex. 15.)

Unfortunately, the U.S. Patent and Trademark Office ("USPTO") did not issue the requested patents.  (Trial Tr. 1-147:22–23.)  Therefore, Ocular Science not only continued to use the formulations for its eyedrops and the associated names, but also added compounding formulas.  (*Id.* at 148:5–150:19.)  Plaintiff later filed this suit.

At trial, Plaintiff's trademark infringement and unfair competition claims focused on nine specific names for compounded eyedrops:

- • Pred-Moxi and Dex-Moxi, discussed above, which Plaintiff had started using in early 2015;

- • Pred-Gati-Brom, Tim-Brim-Dor-Lat, Pred-Brom, Tim-Brim-Dor, and Tim-Lat, which Plaintiff had started using in February 2017;

- • Moxi-Brom, which Plaintiff had started using in October 2019; and

- • Pred-Moxi-Brom, which Plaintiff had started using in August 2020.

(Trial Tr. 1-127:2–133:13, 1-134:18–22.)  The only allegations of infringement and unfair competition with respect to these compounding formulas considered by the jury pertained to the name of the product, not the actual combination of the ingredients.

The name of each compounding eyedrop uses a shorthand version of the chemical ingredients in the eyedrop.  (Trial Tr. 1-121:3–123:12.)  So, for example, the compounding drops sold by Plaintiff under the name Pred-Moxi contain the ingredients prednisolone and moxifloxacin.  Similarly, the drops named Dex-Moxi contain dexamethasone and moxifloxacin.  Plaintiff claimed Defendants sold compounding drops that violated Plaintiff's trademarks because Defendants used the exact same shorthand names in the same order to sell their own eyedrops.  (*E.g.*, *id.* at 2-239:8–16, 2-255:1.)

Defendants, on the other hand, argued that the names they used for their eyedrops were generic because the names simply referred to the ingredients in the drops.  (Trial Tr.

5-706:3–707:12.)  The jury disagreed, finding trademark infringement and state law unfair competition with respect to all nine of the eyedrop names.  (Verdict 2.)

## II.    Damages

In the damages section on the Verdict Form, the Court divided the contested trademarks into two groups:  those listed on the USPTO's Principal Register—Pred-Moxi and Dex-Moxi—and those listed on the Supplemental Register—Pred-Gati-Brom, Tim-Brim-Dor-Lat, Moxi-Brom, Pred-Brom, Pred-Moxi-Brom, Tim-Brim-Dor, and Tim-Lat. (Verdict 3–4.)

The evidence at trial regarding damages was limited.  To prove its actual damages, Plaintiff attempted to rely on evidence of Defendants' profits from infringing sales.  To show Defendants' profits, Plaintiff called expert witness Robert Wunderlich, who calculated OSRX's gross profits with respect to the infringing marks from August 2019 to November 2022.[2]  (Trial Tr. 2-433:9–433:25.)  Initially, Wunderlich found Defendants' sales revenue during that timeframe was $1.7 million for eyedrops bearing the marks on the Principal Register and $32.5 million for the eyedrops bearing the seven marks on the Supplemental Register.  (*Id.* at 2-430:10–22; Pl.'s Ex. 216 at 6; *see also* Trial Tr. 5-688:9–14.)[3]

Wunderlich acknowledged that those revenue figures did not deduct any costs from the production of the eyedrops, but he maintained that it was the responsibility of Defendants to produce evidence of their costs.  (Trial Tr. 2-432:4–18.)  Nonetheless, Wunderlich also provided an analysis where he deducted approximately $350,000 as the cost of goods sold from the $1.7 million in revenue for the marks on the Principal Register, for a gross profit of $1.4 million.  (*Id.* at 2-434:17–435:3; Pl.'s Ex. 216 at 6.)  Wunderlich

---

[2]  Two profit measures were used at trial.  First, there is "gross profit," which is "sales revenue less the cost of the goods sold," with "no adjustment being made for additional expenses[.]"  PROFIT, Black's Law Dictionary (12th ed. 2024).  Second, there is "net profit," which is "sales revenue less the cost of the goods sold and all additional expenses."  *Id.*

[3]  The figures referenced in Wunderlich's testimony can be found at pages 76–84 of Part 1 of Exhibit C to the Wesley Declaration, ECF No. 360-4.

also subtracted about $6.1 million as the cost of goods sold from the $32.5 million in revenue for the marks on the Supplemental Register, for a gross profit of $26.4 million. (Pl.'s Ex. 216 at 6.)

| Wunderlich's Calculation of Defendants' Gross Profits (2019–2022) | | |
|---|---|---|
| | Principal Marks Products | Supplemental Marks Products |
| Gross Revenue | $1.7 million | $32.5 million |
| Cost of Goods Sold | $0.35 million | $6.1 million |
| Gross Profit | $1.4 million | $26.4 million |

On cross-examination, Wunderlich admitted that: (1) he had assumed 100% of Defendants' eyedrop sales were due to infringement; (2) he did not consider when the marks had achieved secondary meaning; and (3) he did not consider Defendants' operating expenses beyond the cost of goods sold. (Trial Tr. 2-438:17–441:7, 2-442:3–18; 2-444:3–5.) Defendants' CEO testified that operating expenses as a percentage of revenue ranged from 71% in 2020 to 79% in 2022. (*See id.* at 3-566:11–18.)

The only testimony about Defendants' profits in 2023 and 2024 came from Defendants' CEO. He testified that the business's net profit in 2023 was approximately $1.7 million for all products sold, and that the business's profitability in 2024, although it had not yet been calculated, was probably worse than 2023. (Trial Tr. 3-575:9–22.)

During closing argument, even though there was no concrete testimony about how much Defendants had profited from the infringing marks in 2023 or 2024, Plaintiff's counsel asked the jury to extrapolate the revenue and then calculate a new net profit figure for 2019 through 2024. (*See* Trial Tr. 5-668:15–20.) To support this suggestion, counsel took the approximately $770,000 gross revenue amount given by Wunderlich for the marks on the Principal Register in 2022 and urged the jury to extrapolate $770,000 per year for 2023 and 2024. (*See id.* at 5-668:21–689:3; *see also* Pl.'s Ex. 216 at 6.) So, counsel assumed that Defendants' total revenue for these marks was about $3 million—$1.7 million

for 2019 to 2022 from Wunderlich's calculations, plus $1.4 million extrapolated for 2023 to 2024, then rounded down.

Then, Plaintiff's counsel appeared to take the total revenue from 2022 for the marks on the Supplemental Register—$13.8 million—then rounded down and asked the jury to extrapolate $13 million in additional revenue for 2023 and 2024, for an additional $26 million in revenue. (*See* Trial Tr. 5-688:22–689:5.) So, counsel assumed Defendants' total revenue for these marks was about $60 million—$32 million from Wunderlich's testimony, plus $26 million extrapolated for 2023 to 2024, then rounded up. (*See id.* at 5-689:4–7.)

Further, because these numbers corresponded with Defendants' theoretical revenue, as opposed to their profits, Plaintiff's counsel declared that about 30% was a reasonable profit margin. (Trial Tr. 5-689:8–14.) Finally, counsel applied this percentage to the revenue figures to reach a net profit of "about a million bucks" for the marks on the Principal Register and $18 million for the marks on the Supplemental Register. (*Id.* at 5-689:13–14.)

| Defendants' Net Profits Suggested in Closing Argument (2019–2024) | | |
|---|---|---|
| | Principal Marks Products | Supplemental Marks Products |
| Gross Revenue (2019–2022) | $1.7 million | $32 million |
| Extrapolated Gross Revenue (2023–2024) | $1.4 million | $26 million |
| ~ Total Gross Revenue (2019–2024) | $3.0 million | $60 million |
| Profit Margin | 30% | 30% |
| ~ Net Profit | $1.0 million | $18 million |

Ultimately, the jury awarded four times what Plaintiff's counsel requested for the marks on the Principal Register: $4 million. (Verdict 4.) The jury awarded slightly over

half of what counsel requested for the marks on the Supplemental Register: $10.5 million. (*Id.*)  Finally, the jury awarded $20.4 million in punitive damages, for a total of $34.9 million in damages.[4]  (*Id.* at 5.)

Defendants now move for judgment as a matter of law or a new trial under Rules 50 and 59.  (ECF No. 359.)  Alternatively, Defendants request a remittitur.  The Court heard oral argument and now addresses each request in turn.  (ECF No. 364.)

## JUDGMENT AS A MATTER OF LAW

### I.    Legal Standard

Under Rule 50, the Court may grant judgment as a matter of law if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a); *see also Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1093 (9th Cir. 2014) (providing the court must assess whether "the jury has reached a seriously erroneous result").  In a motion for judgment as a matter of law, the court "must view the evidence in the light most favorable to the nonmoving party—here, [Plaintiff]—and draw all reasonable inferences in that party's favor." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006).  "The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Id.*

### II.    Evidence of Trademark Infringement

Defendants argue: (1) the marks are generic and therefore there could be no trademark infringement; (2) alternatively, the marks were merely descriptive, and Plaintiff failed to prove they had any secondary meaning; and (3) no reasonable trier of fact could have found the marks were likely to cause confusion.  (Mot. 2:16–18:18.)

A generic term is the name of the product itself.  "It cannot become a trademark under any circumstances." *Filipino Yellow Pages, Inc. v. Asian Journal Publ'n, Inc.*, 198 F.3d 1143, 1147 (9th Cir. 1999) (quoting *Surgicenters of Am., Inc. v. Med. Dental*

---

[4]  The jury also found the infringement was willful for all nine marks and awarded a total of $400,000 in statutory damages.  (Verdict 5.)

*Surgeries, Co.*, 601 F.2d 1011, 1014 (9th Cir. 1979)). "In cases involving properly registered marks, a presumption of validity places the burden of proving genericness upon the defendant." *Id.* at 1146. "If a supposedly valid mark is not federally registered, however, the plaintiff has the burden of proving nongenericness once the defendant asserts genericness as a defense." *Id.*

A composite term made up of generic components is not automatically generic. *Filipino Yellow Pages*, 198 F.3d at 1148–49. "[W]ords which could not individually become a trademark may become one when taken together." *Id.* at 1148 (quoting *Surgicenters of Am.*, 601 F.2d at 1017). The court must view the trademark as a whole, not just break it down to its parts. *Id.* at 1150. What is key is how the term is understood by the consuming public. *Id.*

"A descriptive term, unlike a generic term, can be a subject for trademark protection under appropriate circumstances." *Filipino Yellow Pages*, 198 F.3d at 1147. "Although descriptive terms generally do not enjoy trademark protection, a descriptive term can be protected provided that it has acquired 'secondary meaning' in the minds of consumers, i.e., it has 'become distinctive of the [trademark] applicant's goods in commerce.'" *Id.* at 1146 (quoting *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10 (2d Cir. 1976)). "Secondary meaning can be established in many ways, including (but not limited to) direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant." *Id.* at 1151.

"Secondary meaning exists when 'in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself.'" *P and P Imports LLC v. Johnson Enters., LLC*, 46 F.4th 953, 960 (9th Cir. 2022) (quoting *Inwood Lab'ys v. Ives Lab'ys, Inc.*, 456 U.S. 844, 851 n.11 (1982)). This only requires a showing that the public associates the mark with a single source—even if the public is unsure who that source is. *Id.* at 960. The inquiry is intensely factual and is

generally best resolved by a jury. *See id.* at 961 (citing *Soc. Techs. LLC v. Apple Inc.*, 4 F.4th 811, 816 (9th Cir. 2021)). "'Secondary meaning can also be established by evidence of likelihood of confusion' because they are 'related determinations . . . rising from the same evidentiary findings.'" *Id.* at 962 (emphasis omitted) (quoting *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1015–16 (9th Cir. 1985)). But likelihood of confusion is a separate element for an infringement claim. *See id.*

When assessing the likelihood of confusion, the factfinder may consider the *Sleekcraft* factors; that is, the strength of the mark (there is less likelihood of confusion with a descriptive mark), similarity of the marks (which includes sight, sound, and meaning), evidence of actual confusion (although actual confusion is not dispositive), marketing channels used, type of goods, and the degree of care likely to be exercised by the purchaser, defendant's intent in selecting the mark, and the likelihood of expansion of product lines. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). "When the alleged infringer knowingly adopts a mark similar to another's, . . . courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Id.* at 354. "The likelihood of confusion analysis is [also] 'intensely factual [in] nature,' and thus is well-suited for resolution by a jury." *Neurovision Med. Prods., Inc. v. NuVasive, Inc.*, No. CV-09-6988 DSF (JEMx), 2014 WL 12544830, at *6 (C.D. Cal. Aug. 5, 2014) (quoting *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1031 (9th Cir. 2010)).

In this case, the names of the eyedrop compounds were not generic. Each name did not simply list the chemicals in the compounds. Rather, the mark took a shortened version of the name of each chemical and then combined them in a certain order. So, for example, if a compound consisting of prednisolone and moxifloxacin had been named prednisolone and moxifloxacin, it would be generic. Instead, however, the compound containing prednisolone and moxifloxacin was named Pred-Moxi. The name on the trademark was not the name of the product itself. It was a shortened version.

Citing McCarthy on Trademarks, Defendants argue that abbreviations of generic terms are generic. *See* 2 McCarthy on Trademarks and Unfair Competition § 12:37 (5th ed. 2025). However, Professor McCarthy goes on to say that "[t]he Trademark Board held that even if an abbreviation is derived from individual generic names of ingredients, that 'does not necessarily make the derived [abbreviation] term generic.'" *Id.* (alteration in original) (quoting *Baroness Small Estates, Inc. v. Am. Wine Trade, Inc.*, 104 U.S.P.Q. 1224, 1229, 2012 WL 476349 (T.T.A.B. 2012)). Thus, in *Baroness*, the Trademark Board held that "CMS" referring to Cabernet, Merlot, and Syrah varietals was not generic. *Id.* As Professor McCarthy points out, "[i]n some instances, an abbreviation or acronym of a generic name will be classified as descriptive, not generic." *Id.* (citing *In Re the Council on Certification of Nurse Anesthetists*, 85 U.S.P.Q.2d 1403 (T.T.A.B. 2007)). The names at issue in this case are such an abbreviation.

Furthermore, because each eyedrop is a compound consisting of several chemicals, each name uses the chemicals in a certain order. The name was not Moxi-Pred; it was Pred-Moxi. Plaintiff took several shortened names and combined them into a single name. This single name described the compound, but did not name it outright. As such, the jury correctly concluded that the names were descriptive.

There also is ample evidence from which the jury could have found the trademarked names had achieved secondary meaning. Plaintiff's witnesses testified that it had invested substantial time and money into marketing these names. (*E.g.*, Trial Tr. 2-267:7–12.) Survey evidence showed that one-third of respondents thought that two of the marks (Pred-Moxi-Brom and Pred-Gati-Brom) came from a single source. (*Id.* at 2-373:20–22.) Cindi White, VP of Marketing at Plaintiff, testified about numerous customer interactions where customers were confused about whether Plaintiff and Defendants were the same or affiliated companies. (*Id.* at 2-278:16–279:25.) And, finally, there was evidence Defendants knew that Plaintiff was using these names, that Plaintiff objected to Defendants' use of these names, and that there had been past disputes regarding Defendants' use of names similar to Plaintiff's products. This inquiry is an intensely

factual determination.  Plaintiff adduced sufficient evidence of secondary meaning, and the jury, after proper instruction, concluded Plaintiff had established this secondary meaning. Because evidence supported that conclusion, it would be inappropriate for the Court to disturb the jury's verdict.

Finally, there was evidence Defendants knowingly adopted names identical to Plaintiff's marks.  And White's testimony gave additional support to the jury's conclusion that use of the names created a likelihood of confusion.

Overall, Plaintiff produced sufficient evidence of trademark infringement, and the Court will not overturn the jury's verdict, which was based on facts in the record.  *See Oracle Corp.*, 765 F.3d at 1086 (providing relief under Rule 50 is appropriate only "if no reasonable juror could find in the non-moving party's favor").

## III. Damages

Defendants argue no reasonable trier of fact could have awarded damages in this case since there was no evidence of actual damages.  (Mot. 18:19–24:4.)  Specifically, Defendants object that Plaintiff's analysis assumed all of Defendants' sales were caused by the infringement; there was no evidence of diverted sales or lost customers; recovery of damages requires some evidence of actual confusion; and Defendants' profits do not necessarily measure Plaintiff's lost profits.  (*Id.*)

"Under the Lanham Act, the court, 'in its discretion,' may award '(1) defendant's profits,' [and] '(2) any damages sustained by the plaintiff.'"  *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1111 (9th Cir. 2012) (emphasis omitted) (quoting 15 U.S.C. § 1117(a)).  Trademark damages are assessed "in the same manner as tort damages: the reasonably foreseeable harms caused by the wrong."  *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1220 (9th Cir. 2023) (quoting *Skydive*, 673 F.3d at 1112).

To that end, proving actual damages in a trademark infringement case "is often difficult."  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993), *abrogated on other grounds by SunEarth Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th

21cv1305

Cir. 2016). "Damages are typically measured by any direct injury which a plaintiff can prove, as well as any lost profits which the plaintiff would have earned but for the infringement." *Id.*; *accord Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 620–21 (9th Cir. 1993). Even so, the purpose of the Lanham Act's remedies provision "is to 'take all the economic incentive out of trademark infringement.'" *Intel Corp.*, 6 F.3d at 621 (quoting *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir. 1986)); *cf. Jason Scott*, 68 F.4th at 1222 (noting a court may grant "a just monetary award" even where a plaintiff cannot prove actual damages, "so long as it constitutes compensation for the plaintiff's losses or the defendant's unjust enrichment and is not simply a penalty for the defendant's conduct").

Moreover, as Professor McCarthy notes: "In some cases of directly competitive parties, the profits made by defendant can be used as a rough estimate of plaintiff's lost sales." 4 McCarthy on Trademarks and Unfair Competition § 30:79 (5th ed. 2025). "The theory is that every sale made by the infringer was a sale that would have been made by plaintiff." *Id.* In other words, rather than the plaintiff trying to demonstrate that it lost profits, the plaintiff points to the defendant's profits from infringing sales and uses those profits as a proxy for the plaintiff's actual damages. *See id.*; *see also Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988 (9th Cir. 1995) (mentioning a plaintiff may "seek[] the defendant's profits as a measure of his own damage[s]"); *F21 OpCo, LLC v. Airwair Int'l Ltd.*, No. 2:22-cv-01684 SB-MAA, 2023 WL 2626368, at *2 (C.D. Cal. Feb. 17, 2023) ("[R]ecovery of a defendant's profits may also be a proxy for the plaintiff's actual damages."); *cf. Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 209 n.8 (9th Cir. 1989) (noting in a false advertising case that "surrogate measures of damages" are permitted in cases of "palming off" as "crude measures of damage to plaintiff's good will"); *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 149 (4th Cir. 1987) ("The defendants' profits, however, are a rough measure of the plaintiff's damages. Indeed, they are probably the best possible measure of damages available.").

The Court instructed the jury on this theory of actual damages. (Jury Instruction No. 22, ECF No. 344.) The Court told the jury that it could consider Defendants' profits as an "approximate measure of the sales Plaintiff would have made but for the actions of Defendants." (*Id.*) Further, if the jury chose to consider Defendants' profits to assess Plaintiff's damages, the Court instructed the jury to "determine how much of Defendants' net profits [it] believe[s] should be fairly allocated to Plaintiff as an approximation of Plaintiff's lost sales." (*Id.*)

Finally, it bears emphasizing that in a trademark case, "the nature of the proof required to support a jury award depends on the circumstances of the case and is 'subject to the principles of equity.'" *Skydive*, 673 F.3d at 1112 (quoting *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1223 (9th Cir. 2010)). "The trier of fact must distinguish between proof of the *fact* of damages and the *amount* of damages because a mark holder is held to a lower standard in proving the exact amount of actual damages." *Id.* (emphasis in original).

Against this backdrop, there was enough evidence for a reasonable jury to conclude Plaintiff suffered damages due to Defendants' trademark infringement. Plaintiff and Defendants are competitors in the compounded eyedrop industry. Defendants were selling eyedrops that not only competed with Plaintiff's products but also used the same names as Plaintiff's marks. Further, as discussed above, Plaintiff did establish some evidence of actual confusion, as well as that Plaintiff had invested substantial time and money into marketing the eyedrop names. The jury also found Defendants willfully infringed on all nine trademarks.

Although the evidence concerning the amount of damages was limited, there was enough proof to survive a Rule 50 challenge. Plaintiff used evidence of Defendants' profits to approximate Plaintiff's lost sales. Wunderlich testified as to the gross revenue, cost of goods sold, and profits Defendants received from the sale of the nine products using Plaintiff's trademarked names from 2019 to 2022. Defendants' CEO also testified that operating expenses as a percentage of revenue ranged from 71% in 2020 to 79% in 2022.

21cv1305

Because the evidence showed that the parties' products competed, as well as figures for Defendants' revenue, costs, and profits, there was enough proof to find damages, considering this case's circumstances. Stated differently, "the jury had sufficient tools for estimating [Plaintiff's] actual damages." *See DSPT Int'l*, 624 F.3d at 1223; *see also Intel*, 6 F.3d at 621 (affirming use of a "crude" measure of damages in a Lanham Act case). Moreover, even though some of the damages calculations could have benefited from a little more precision, "[d]amages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate." *Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927); *see also Lindy Pen*, 982 F.2d at 1408 (citing *Eastman Kodak*).

In short, because the Court must construe the evidence in the light most favorable to Plaintiff under Rule 50, the Court finds Plaintiff produced sufficient evidence for a jury to award damages.

## IV.    Willfulness

Defendants argue the evidence was insufficient to support a finding of willfulness. (Mot. 24:5–14.) The jury was asked to expressly determine willfulness because Plaintiff sought statutory damages. (Jury Instruction No. 23; *see also* Verdict 4.)

The Lanham Act allows a plaintiff to "eschew actual damages under § 1117(a) and elect to seek statutory damages under § 1117(c)." *K & N Eng'g, Inc. v. Bulat*, 510 F.3d 1079, 1082 (9th Cir. 2007). An award of statutory damages should be no less than $1,000 and no more than $200,000 "per type of goods or services sold, offered for sale, or distributed." 15 U.S.C. § 1117(c)(1). Willful infringement increases the ceiling on statutory damages to $2,000,000. *Id.* § 1117(c)(2).

"Willful infringement carries a connotation of deliberate intent to deceive. Courts generally apply forceful labels such as 'deliberate,' 'false,' 'misleading,' or 'fraudulent' to conduct that meets this standard." *Lindy Pen*, 982 F.2d at 1406. "Willfulness . . . 'require[s] a connection between a defendant's awareness of its competitors and its

- 14 -

actions at those competitors' expense.'" *Id.* (quoting *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 966 (D.C. Cir. 1990)). "[K]nowing use in the belief that there is no confusion is not bad faith." *Id.* at 1406 (citing *Nalpac, Ltd. v. Corning Glass Works*, 784 F.2d 752, 755 (6th Cir. 1986)). Willfulness "is a question of fact that turns on the defendant's state of mind, and 'is often accompanied by questions of intent, belief, and credibility.'" *Adidas-Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1046 (D. Or. 2008) (quoting *SRI Int'l, Inc. v. Advanced Tech. Lab'ys, Inc.*, 127 F.3d 1462, 1465 (Fed. Cir. 1997)).[5]

The jury considered the credibility of Defendants' witnesses and concluded Defendants were willful in copying Plaintiff's marks. The jury could have taken into consideration the evidence that Defendants' cofounder had been a paid consultant for Plaintiff who left in June 2015 to start a competing business. Plaintiff objected to Defendants' entry into the compounding eye formula business as a competitor from the outset. Plaintiff also struggled to keep Defendants from copying its products, eventually suing Ocular Science in 2016 for copying eye formulas for which Plaintiff was attempting to patent.

Although the Court may not have concluded similarly, it is loath to second-guess the intensely factual determination of willfulness. The jury was properly instructed on the standard for willfulness and, in a special verdict, found Defendants were willful with respect to the copying of each mark. Sufficient evidence supported this finding. Hence, the Court rejects Defendants' request for judgment as a matter of law on this issue.

---

[5] Willfulness also informs whether it is appropriate for the court to award the defendant's profits under 15 U.S.C. § 1117(a). Previously, to recover a defendant's profits as an equitable remedy, a plaintiff had to show that the defendant "acted willfully." *Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, 28 F.4th 35, 38 (9th Cir. 2022). However, in *Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 219 (2020), the Supreme Court held that willfulness is not an "inflexible precondition to recovery" of a defendant's profits under the Lanham Act. Instead, a "defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate." *Id.*; *accord Harbor Breeze Corp.*, 28 F.4th at 38.

In short, Defendants fail to demonstrate the jury lacked a legally sufficient evidentiary basis to find for Plaintiff on the issues of trademark infringement, damages, and willfulness. *See* Fed. R. Civ. P. 50(a). Thus, the Court denies their Motion for Judgment as a Matter of Law.

## NEW TRIAL OR REMITTITUR

### I. Legal Standard

Rule 59 allows a court to grant a new trial. Fed. R. Civ. P. 59(a). Rule 59 does not enumerate specific grounds for a new trial, but the court is bound to grant a new trial for "grounds that have been historically recognized." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003)). Historically, those grounds include "claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Id.* at 729 (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).

In considering a Rule 59 motion, the court "is not required to view the trial evidence in the light most favorable to the verdict. Instead, the district court can weigh the evidence and assess the credibility of the witnesses." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014). However, a court should not grant a new trial unless it is "left with the definite and firm conviction that a mistake has been committed." *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1372 (9th Cir. 1987).

### II. Excessive Damages

#### A. Compensatory Damages

Defendants move for a new trial and a remittitur, arguing that both the compensatory and the punitive damages awarded were excessive. (Mot. 1:4–7; 25 n.19.) "Due Process 'prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor.'" *S. Union Co. v. Irvin*, 563 F.3d 788, 791 (9th Cir. 2009) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003)). Where an award of damages is 'grossly

21cv1305

excessive or monstrous, clearly not supported by the evidence, or only based on speculation or guesswork,' . . . and gives rise to an inference that 'passion and prejudice tainted the jury's finding of liability, a new trial may be in order." *Snyder v. Freight, Const., General Drivers, Warehousemen & Helpers, Local 287*, 175 F.3d 680, 689 (9th Cir. 1999) (quoting *L.A. Memorial Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986)).

"No 'simple mathematical formula' exists in this area." *S. Union Co.*, 563 F.3d at 791. And the court should give substantial deference to a jury's finding of the appropriate amount of damages. *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996). However, "if the district court finds the amount of the award based on profits to be too high, it may 'in its discretion' enter judgment for a lower sum." *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1012 (9th Cir. 1994) (citing 15 U.S.C. § 1117(a)).

Thus, when a court "determines that the damages award is excessive, it has two alternatives. It may grant defendant's motion for a new trial or deny the motion conditional upon the prevailing party accepting a remittitur. The prevailing party is given the option of either submitting to a new trial or of accepting a reduced amount of damage[s] which the court considers justified." *Fenner v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir. 1983); *see also Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1094 (9th Cir. 2014) ("A remittitur must reflect 'the maximum amount sustainable by the proof.'" (quoting *D & S Redi-Mix v. Sierra Redi-Mix and Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982)). "If the prevailing party does not consent to the reduced amount, a new trial must be granted." *Fenner*, 716 F.2d at 603. "If the prevailing party accepts the remittitur, judgment must be entered in the lesser amount." *Id.*

Although Plaintiff introduced sufficient evidence of damages to avoid judgment as a matter of law, the evidence addressing the amount of damages at trial was very limited. As summarized above, Plaintiff introduced evidence of Defendants' profits from 2019 to 2022 as a surrogate measure to approximate its own actual damages. Plaintiff relied on an

expert witness, Wunderlich, who calculated OSRX's gross profits with respect to the infringing marks from August 2019 to November 2022. He found the gross revenue for the two marks on the Principal Register to be $1.7 million and for the seven marks on the Supplemental Register to be $32.5 million. Wunderlich then deducted about $350,000 from the $1.7 million and $6.1 million from the $32.5 million for the cost of goods sold. Yet, on cross-examination, Wunderlich admitted that: (1) he had assumed 100% of Defendants' sales were due to infringement; (2) he did not consider when the marks had achieved secondary meaning, and (3) he did not consider Defendants' operating expenses beyond the cost of goods sold. Defendants' CEO then testified that operating expenses as a percentage of revenue ranged from 71% in 2020 to 79% in 2022. Defendants, however, did not introduce any evidence addressing how these operating expenses were allocated to the sales of the infringing products.

Overall, considering the limited evidence, the Court finds the jury's $14.5 million compensatory damages award is excessive. To start, the $4 million award for the marks on the Principal Register clearly exceeds the maximum amount sustainable by the proof. Wunderlich opined that Defendants' gross revenue for these marks from 2019 to 2022 was $1.7 million. Plaintiff's counsel later asked the jury to assume the total revenue for these marks from 2019 to 2024 was $3 million and asked for a $1 million award. The jury awarded four times what counsel requested: $4 million. Even if 100% of Defendants' sales were due to infringement, this award far exceeds Defendants' revenue for these marks, let alone their profits. On this basis alone, a remittitur is appropriate.

Second, although Plaintiff claimed it suffered $8 million in actual damages in 2023 and 2024 in its closing argument, there was insufficient evidence to support this demand. Rather, Wunderlich's assessment of Defendants' profits stopped at 2022. There was no comparable testimony, modeling, or supporting documentation that established Defendants' profits for 2023 or 2024 (let alone that 100% of these profits were due to Defendants' infringement). Instead, Defendants' CEO testified that the profits in 2023 were approximately $1.7 million for all products sold and likely lower in 2024. (Trial Tr.

3-575:9–22.)  The CEO did not break down this total profit into profit from the marks raised in this trial and other products.  It was Plaintiff's burden to introduce Defendants' profits to support its actual damages claim, and it failed to do so for 2023 and 2024.  This lack of evidence also justifies a remittitur.

In calculating an appropriate remittitur, the Court mirrors the approach used by Plaintiff in closing argument.  There, as mentioned above, Plaintiff used a 30% profit margin to account for Defendants' costs.  (Trial Tr. 5-689:8–13.)  Indeed, Defendants' CEO testified that the business had significant operating expenses as a percentage of revenue, and this testimony was not controverted.  Therefore, if the Court applies that same margin to the sales figures substantiated in Wunderlich's testimony for 2019 to 2022, then the maximum profits are $507,050 ($1,690,168 multiplied by 30%) for the marks on the Principal Register and $9,742,488 ($32,474,960 multiplied by 30%) for the marks on the Supplemental Register.  With Plaintiff's concession that Defendants had at least some deductible expenses, the Court finds these amounts are the maximum sustainable by the proof at trial.

Hence, a remittitur is appropriate, and the Court reduces the total compensatory damages from $14,500,000 to $10,249,538.

## B.    Punitive Damages

The court may assess whether a punitive damages award exceeds the amount necessary to accomplish the goals of punishment and deterrence in deciding whether the award is grossly excessive. *Morgan v. Woessner*, 997 F.2d 1244, 1258 (9th Cir. 1993).  The Supreme Court "has pointed to three guideposts: '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.'" *S. Union Co.*, 563 F.3d at 791 (quoting *State Farm*, 538 U.S. at 418).  Degree of reprehensibility is the most important of these guideposts.  *Id.*  In addition, "[c]ourts take account of a defendant's wealth when 'an amount sufficient to punish or to deter one

individual may be trivial to another.'" *Zazu Designs v. L'Oreal*, 979 F.2d 499, 508 (7th Cir. 1992) (Easterbrook, J.) (quoting *Black v. Iovino*, 219 Ill. App. 3d 378, 394 (1st Dist. 1991)).

In *Southern Union Co. v. Irvin*, the Ninth Circuit analyzed these factors, ultimately finding that the punitive damages were excessive. 563 F.3d at 791–93. "As we see it, most of the indicia of reprehensibility do not appear here." *Id.* The Ninth Circuit pointed out that the harm was not caused "to some poor struggling person," but was inflicted upon a large company. *Id.* at 791. The harm was not physical. *Id.* Reckless disregard for the safety of others was not involved. *Id.* at 792–93. The plaintiff was not financially vulnerable, and the harm did not inflict egregious physical or economic harm on the weak. *Id.* In addition, the court noted that the award of compensatory damages was substantial. *Id.* at 792.

Similarly, this case involves two successful competing compounding pharmacies, both jockeying for dominance in what is clearly a very lucrative market and attempting to squeeze the other out of the marketplace. Because Plaintiff has already stripped Defendants of all the net profits they made on the marks without considering whether and how much use of the names benefited Defendants, all the profit incentive has been removed. Even with the remittitur, Plaintiff received a substantial award of compensatory damages.

Additionally, the degree of reprehensibility normally seen in cases with punitive damages awards is lacking. The harm inflicted was not inflicted on some poor struggling person. There was no physical harm or reckless disregard for the safety of others. Plaintiff was not financially vulnerable, and the harm did not inflict egregious physical or economic harm on the weak. There was no evidence of concealment. And the parties litigated similar issues in the past resulting in a settlement—Defendants could have realistically assumed that when Plaintiff failed to get the patent registrations it was seeking, Defendants were free to continue to manufacture the formulas and use the names that referred to these formulations.

Finally, there was very little evidence adduced about the overall financial position of Defendants, and the evidence that was provided reflected Defendants' inability to pay the high amount awarded by the jury. Defendants' CEO testified Defendants operated at a loss for the years prior to 2020. In 2020, net income was $100,000; in 2021, it was $309,000; and in 2022, it was $769,000. (Trial Tr. 3-566:19–567:6.) Plaintiff did not demonstrate otherwise.

For all of these reasons, the Court finds that any more than $1,000,000 in punitive damages would be grossly excessive under the circumstances of this case. Thus, the Court grants remittitur and reduces the punitive damages amount to $1,000,000.

## STAY

At the conclusion of oral argument for these motions, Defendants requested a stay of enforcement of the monetary judgment pending appeal. In deciding whether to grant such a stay, the Court must consider: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Golden Gate Restaurant Ass'n v. City and County of San Francisco*, 512 F.3d 1112, 1115 (9th Cir. 2008) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). In the forty-five pages Defendants devote to requesting a new trial, judgment as a matter of law, and a remittitur (ECF Nos. 359, 363), they make no effort to address any of these factors except the first. In fact, the request for a stay appeared to be an afterthought at the close of oral argument.

This case has been pending since 2021. Plaintiff has been trying to stop Defendants from using these marks since even before 2021. At this point, the need for finality and the protection of the public from continued confusion militates against a stay. Thus, the Court denies the request to stay the judgment pending appeal.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Renewed Motion for Judgment as a Matter of Law (ECF No. 359).  In addition, the Court **DENIES** the Motion for New Trial (ECF No. 359).  However, the Court makes this denial conditional on Plaintiff accepting a remittitur in the amount of $11,249,538: $507,050 for the marks on the Principal Register; $9,742,488 for the marks on the Supplemental Register; and $1,000,000 in punitive damages.  Plaintiff is ordered to file a notice on the docket stating whether it accepts the remittitur or elects to proceed with a new trial no later than **October 13, 2025**. If Plaintiff accepts the remittitur, Defendants' request to stay enforcement of the judgment pending appeal is **DENIED.**

**IT IS SO ORDERED.**

**DATED: September 26, 2025**

**Hon. Cynthia Bashant, Chief Judge**
**United States District Court**

21cv1305